## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **TOGETHER EMPLOYEES, by** | ) | |
| **Individual Representatives,** | ) | |
| **ROBERTA LANCIONE** | ) | |
| **JOYCE MILLER, MARIA DIFRONZO,** | ) | |
| **MICHAEL SACCOCCIO,** | ) | |
| **ELIZABETH BIGGER,** | ) | |
| **NATASHA DICICCO,** | ) | |
| **NICHOLAS ARNO and** | ) | **CIVIL ACTION NO.** |
| **RUBEN ALMEIDA,** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MASS GENERAL BRIGHAM** | ) | |
| **INCORPORATED** | ) | |
| **Defendant** | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Attorneys for the Plaintiffs,

Ryan P. McLane, Esq. (BBO: 697464)
Lauren Bradford, Esq. (BBO: 700084)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
ryan@mclanelaw.com
lauren@mclanelaw.com

## ORAL ARGUMENT REQUESTED

## I.    INTRODUCTION

<u>First, what this case is not</u>: this case is ***not*** a challenge to the defendant's vaccination policy. Every single plaintiff stands ready, willing, and able to take safety precautions in the workplace to prevent the spread of COVID-19 and protect those that they work with and serve. (Compl., ECF 1, ¶ 60 and ¶ 71, pp. 13, 15). Not only are they willing, but plaintiffs also have and do take safety precautions to prevent the spread of the disease. The vast majority of these plaintiffs heroically fought on the front lines of the pandemic last year, working long hours under extremely stressful conditions to save lives and ensure that people received quality medical care. Their sincerity and commitment to battling COVID-19 should be without question. Each plaintiff has either a religious belief or a disability (a few have both) that conflicts with one safety policy: vaccination. These conflicts are protected under federal law. Thus, this case is not a challenge to the lawfulness of the policy imposed by the defendant, but rather an attempt to prevent discrimination and retaliation based on religion and disability.

<u>What this case is</u>*:* This case *is* about the defendant's decision to ignore federal law and instead apply their own set of rules when it comes to religious and disability accommodations, developing their own system-wide "position" around granting these accommodations instead of following Title VII and the Americans with Disabilities Act ("ADA"). (Compl., ECF 1, ¶ 27, p. 6). Defendant wrongfully denied all of the plaintiffs' accommodation requests by creating a system that

hindered its employees' ability to communicate their beliefs and disabilities, restricted their access to those reviewing requests for accommodations and by total failure to engage in an interactive process[1]. *Id.* Over two hundred plaintiffs form the unincorporated association "Employees Together," although far more are likely affected by the defendant's system of discrimination and retaliation, as over 5,000 employees and "persons of interest" remain noncompliant with defendant's vaccination policy:

**From:** MGB Manager Update <mgbmanagerupdate@PARTNERS.ORG>
**Sent:** Wednesday, October 13, 2021 6:36 PM
**To:** MGB Manager Update <mgbmanagerupdate@PARTNERS.ORG>
**Subject:** Today's Focus: Final push for COVID-19 Vaccine Policy compliance; Timeline for those who remain non-compliant



## Mass General Brigham

## Focus
Information and insights for managers

Thank you to everyone who has been working so hard to help us reach 100% compliance with the COVID-19 Vaccination Policy. As you know, this Friday is the compliance deadline. Staff who remain non-compliant will be placed on unpaid administrative leave and face the loss of network access, followed by termination. As of today, October 13, there are 2,576 employees and 3,034 persons of interest (POIs) who remain non-compliant.

Plaintiffs brought claims against the defendant for disability discrimination under the ADA, religious discrimination under Title VII and retaliation as to both, due to the defendant's clear bad faith discrimination which includes but is not limited to: sending emails to supervisors to attempt to convince employees whose

---

[1] Defendant is likely to couch its "exemption" process as an interactive process, but it was nothing of the sort. The interactive process necessarily includes two-way communication, which in substance there was not. Employees simply filled out an online form designed to prevent them from providing sufficient information and an anonymous individual would email them stating that their "exemption" was either accepted or denied, encouraging them to get vaccinated. Occasionally, requests for more information were emailed, with no guarantee of review. No meaningful conversation occurred between defendant's committee and the plaintiffs.

religious exemptions were denied to take a vaccine (after these same employees just asserted their religious opposition to doing so), discouraging doctors to provide support for employees' medical exemptions, denying accommodations based on lack of information while at the same time preventing employees from providing supporting documents to their accommodation requests, failing to engage in any interactive process and by failing to disclose who was on the "exemption committee" (or what qualifications, if any, these individuals had to determine the sincerity of someone's religious beliefs or disabilities).

## II.    FACTS

On June 24, 2021, defendant announced that all employees would be required to be vaccinated against COVID-19. (Comp., ECF 1, Ex. A). The announcement provided that medical and religious "exemptions" would be available, along with an exemption for those who are or intend to become pregnant. (Comp., ECF 1, ¶ 20, p. 4). Employees seeking "exemption" had to fill out one of two forms: a medical request form, which was a word document (Comp., ECF 1, Ex. B), or a religious exemption form, which was an online form (Comp., ECF 1, Ex. C). An email address was provided at the bottom of the medical form, but no email address was provided on the religious form. The medical form was to be completed by a physician. The religious exemption form contained a small text box that employees were supposed to utilize to communicate their sincerely held religious beliefs. Although there was no specified character limit, approximately eight words are visible within the text box. There was no option, on either form, for employees to provide any supporting

documentation providing the basis for and evidence in support of their need for accommodation[2]. With respect to medical exemptions, defendant instructed its network providers not to draft letters in support of employees' medical accommodations.

After preventing its employees from effectively communicating their needs for accommodation, defendant then, via their anonymous "MGB Vaccination Committee," denied plaintiffs their accommodations. Additionally, they would not communicate with plaintiffs nor discuss their decisions, the criteria for which were never disclosed[3] (plaintiff DiCicco received an email stating "[w]e will not be providing additional information related to denials or approvals, other than the request was reviewed and it was either approved or denied"). (Comp., ECF 1, Ex. H). Instead of interacting with plaintiffs, defendant sent an email to its supervisors providing talking points that these supervisors should use with employees who had their exemptions denied. (Comp., ECF 1, Ex. G). Thus, instead of engaging with and advocating for their subordinate employees, supervisors were to push a narrative on them. This included encouraging them to get vaccinated, despite having already asserted that it would violate their religious conscience or cause them physical harm. Additionally, supervisors were encouraged to push the narrative that a

---

[2] This option was provided for some employees *after* they were already denied accommodation (with no guarantee of review). This goal is obvious, as defendant provided a link to vaccination sites in its denial email, an effort that likely resulted in many individuals forsaking their religious beliefs after being denied.

[3] Initial denial emails stated boilerplate language that an individual failed to state a religious belief or misconstrued employees' beliefs regarding the role of aborted fetal tissue in the production, manufacturing and testing of the vaccines. However, there was no legitimate discussion on the matter.

thorough review took place, when in fact the review was not thorough. More telling, supervisors were to promote the narrative that the committee reviewed the requests, not in conformity with the law, but based upon defendant's "position around granting exceptions." *Id.*

No accommodations were provided to plaintiffs, nor was there any meaningful form of an interactive process. Defendant then informed plaintiffs that they would be placed on unpaid leave on October 15, 2021, if they did not forsake their religious beliefs and put their health at risk by taking a COVID-19 vaccine. After unpaid leave, the point of which was to allow plaintiffs to get vaccinated, they would be terminated on November 5, 2021.

## III.   LEGAL STANDARD

### A. Preliminary Injunctive Relief

The First Circuit utilizes a four-part framework to determine whether to grant preliminary injunctive relief: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc.* v. *Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996).

### B. Exhaustion of Administrative Remedies

Traditionally, those with discrimination complaints under 42 U.S.C. 2000e-5 must exhaust their administrative remedies with the EEOC[4]. The First Circuit, in *Bailey* v. *Delta Airlines, Inc.*, 722 F.2d 942 (1983) has held that there is exception for those seeking preliminary injunctive relief, and that plaintiffs who have not exhausted remedies may seek recourse in the Federal District Courts, stating "[w]e is not prepared to adopt a rule categorically barring all suits for preliminary relief pending administrative disposition. In our view, there is considerable force to the argument that the statute does not require so much." See also *Less vs. Berkshire Hous. Ser.,* D. Mass., No. 00-30033-MAP (Sept. 8, 2000), ("[T]rial courts should maintain their "customary equitable authority to grant preliminary relief in appropriate cases," even though that power arises outside the statutory scheme.").

Other district and circuit courts agree, most recently in the District Court for the Northern District of Texas, *Sambrano et al.,* v. *United Airlines, Inc.*, N.D. Tex, 4:21-cv-1074 (2021), a case very similar to the one before us. The Court in *Sambrano* has issued a Temporary Restraining Order, enjoining United Airlines from placing its employees on unpaid leave after denying their requests for religious and disability accommodation. Plaintiffs in this matter are awaiting their Notices of Right to Sue from the EEOC, however due to the volume, obvious backlog at the EEOC and the fact that many plaintiffs are already receiving right to sue letters, this action is appropriately brought in this Court.

---

[4] Currently, the EEOC has already issued right to sue letters for many plaintiffs, stating that it is unlikely that the agency can complete the administrative processing within 180 days.

IV.    **ARGUMENT**

    A.  **Plaintiffs are Likely to Succeed on Their Religious Discrimination Claims**

In order to establish a prima facie case of religious discrimination based on a failure to accommodate, the plaintiff must show that "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C.* v. *Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 55 (1st Cir. 2002). A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religions includes "all aspects of religious observance and practice, as well as belief." *Id*, citing 42 U.S.C. § 2000e(j).  Further, 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." § 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences…" And this may be (plaintiffs were never informed of the reason) one possible explanation for defendant's denial of plaintiffs' religious accommodation requests: as New York Governor Kathy Hochul now famously said, "[t]here's not a legitimate reason for religious

exemptions because the leaders of all the organized religions have said there's no legitimate reason[5]." Two weeks later, this legal position was defeated. *Dr. A* v. *Kathy Hochul*, N.D. NY., No. 1009 (October 12, 2021). There is simply no way attribute the beliefs and statements of "leaders of all the organized religions," or even some of them, to an individual's sincerely held and personal religious beliefs.

The religious discrimination plaintiffs each asserted a bona fide religious belief or practice, notified the defendant, and have since faced adverse action as a result of their inability to forsake their religious conscience by adhering to defendant's policy, including being notified or placed on unpaid leave[6] and are subject to termination on November 5, 2021. None of the religious exemption plaintiffs were informed as to why their accommodations were denied, nor was there any meaningful interactive process. "Bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986)

1. **Defendant Failed to Accommodate Plaintiffs and Instead took Adverse Action Against Plaintiffs Without Even Engaging in the Interactive Process**

Plaintiffs seeking religious accommodation sent their requests via an online form, containing a small text box that employees were supposed to utilize to

---

[5] https://www.nny360.com/news/publicservicenews/hochul-vaccine-mandate-for-health-staff-self-defense/article_235db479-aeb3-58c4-917c-fdfab1a24a75.html?fbclid=IwAR1GKWzX4IfW3NP2JFDnd5pcJxIG1upVrDcKwB8IirKmBJI1lPpdti8OEA4

[6] The date in which employees were to be placed on unpaid leave changed from October 15, 2021 to October 20, 2021, although some employees were taken off schedule, etc.

communicate their sincerely held religious beliefs. This did not provide a character or word limit, and approximately eight words are visible within the text box. There was no availability for employees to provide any supporting documentation such as clergy letters or personal statements. Plaintiffs were denied via email, which provided a link to find out where they could get vaccinated. Some plaintiffs were told that they could provide further information (Comp., ECF 1, Exhibit P) and many either had their stated beliefs mischaracterized (Exhibit A) or were granted an accommodation only to have it taken away (Exhibit B). Plaintiff Almeida had been granted a religious accommodation for the flu vaccine for a number of years, only to be denied a religious exemption for the COVID-19 vaccine (Comp., ECF 1, Exhibit R). He was told this accommodation determination was based on a "new process." There was no meaningful dialogue between any agents of the defendant and any of the plaintiffs, particularly those seeking religious accommodation. "Bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986). Defendant did not offer any reasonable accommodations, nor did they undergo any "bilateral cooperation" or seek to find any reasonable accommodations, for those plaintiffs seeking religious accommodations.

### 2. Defendant Did Not Assert, Nor Would it Face, Undue Hardship.

"Once an employee has made out a *prima facie* case of discrimination, the employer must show that it offered a reasonable accommodation *or* that a

reasonable accommodation would be an undue burden." *Sanchez-Rodriguez* v. *AT & T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8 (1st Cir. 2012). Defendant never made a showing, nor will it be able to show, that it would face undue hardship by accommodating plaintiffs' religious beliefs. First, defendant never offered an accommodation to plaintiffs. Second, 42 U.S.C. § 2000e-2(a)(1) states that it is unlawful for an employer to, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." § 2000e(j) provides the provision "… unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

"[T]he search for a reasonable accommodation goes both ways." *Cloutier* v. *Costco Wholesale Corp.*, 390 F.3d 126, 131 (1st Cir. 2004). Every plaintiff, since submitting their accommodation request, has been willing to abide by any reasonable accommodation that would have little impact on defendant's business operations and that would ensure the safety of others. Further, in *Cloutier*, the Court found that Costco had offered a reasonable accommodation, and that it was the plaintiffs' requested accommodation (which was no accommodation at all, but instead a complete violation of the policy) that caused the breakdown. Costco's offering of a religious accommodation satisfied their duty, and thus, plaintiff's

refusal of Costco's offered accommodation would therefore cause a hardship on Costco.

Here, defendant did not offer any accommodations and never demonstrated hardship, or any other reason for denial of the plaintiffs' religious accommodation requests. In fact, defendant did accommodate employees, demonstrating the lack of hardship it would face in accommodating plaintiffs. Plaintiffs are therefore likely to prevail in their meeting all of the elements of their religious discrimination claims.

### a. Defendant Would not be Financially Burdened (and Would Likely Benefit Financially) by Accommodating Plaintiffs.

Defendant would not face a financial hardship of more than a "de minimis" cost in accommodating plaintiffs' religious beliefs. Any number of accommodations can be made to prevent the spread of COVID-19, including testing, mask wearing, hand washing, screening, face shields, and distancing, to name just a few.

Defendant is also "swimming in money" (Comp., ECF 1, Exhibit P), just brought in $4.1 billion in revenues last quarter alone and already performs testing at its facilities. Further, defendant has no policy in place stating that it will not accept patients who are unvaccinated. Instead, defendant implements safety policies that include a "Safe Care Commitment[7]" as well as patient and visitor policies[8] to help prevent the spread of COVID-19, to include testing patients who are admitted to the hospitals, screening employees daily, ensuring that everyone, including employees, wears a mask, washes their hands frequently, and stays home

---

[7] https://www.massgeneralbrigham.org/covid19/safe-care-commitment
[8] https://www.massgeneralbrigham.org/patient-information/preparing-office-visit

if they display "any symptoms of a possible respiratory illness" until they are better.

Additionally, none of the plaintiffs currently has COVID-19, nor have they violated

the Safe Care Commitment policies and put themselves and others at risk in the

past, nor do they plan to in the future. Rather, they are willing to abide by any

reasonable accommodations, including the aforementioned.

Additionally, defendant would likely benefit financially from these

accommodations, as they are already facing staffing crises at their facilities. Many

of the plaintiffs are still receiving emails requesting that employees work overtime

shifts at "crisis rates" being paid significant bonuses:



13

Ridding themselves of over two hundred employees[9] and having to pay crisis rates and overtime to the employees that have remained would likely cause closures of certain units and loss of funds, along with a necessity to pay the current employees more for overtime and crisis pay.

### 3. Defendant Did Not Assert, Nor Would Accommodating Plaintiffs Cause, an Issue to Safety.

Courts are "somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice." *Cloutier,* citing *Draper v. U.S. Pipe & Foundry Co.,* 527 F.2d 515, 520 (6th Cir.1975). "The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted." *Toledo* v. *Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989). Defendant cannot point to any hardships, because it never attempted any methods of accommodation with the plaintiffs.

Further, any hypothetical risk that plaintiffs pose, which is currently none, as none of them are COVID positive and entering defendants' places of work, is outweighed by the risk to defendant's patients if defendant is forced to lose significant numbers of its staff. Massachusetts hospitals are no stranger to patient care issues resulting from staffing shortages[10]. This problem is not limited to Massachusetts and is causing many hospitals to face significant crises[11]. It should

---

[9] https://www.bostonglobe.com/2021/10/06/metro/mass-hospitals-prepare-fire-hundreds-employees-who-refuse-covid-vaccine/

[10] https://www.nbcboston.com/news/local/st-vincent-nurses-continue-to-demand-safe-staffing-levels-as-strike-enters-day-202/2501138/

[11] https://bangordailynews.com/2021/10/12/news/gop-wants-to-ease-janet-mills-vaccine-mandate-after-hospital-reduces-admissions-more/

also be noted that defendant allows unvaccinated visitors into its hospitals. With

Mass General Hospital alone seeing 50,000 patients per year[12], allowing an

accommodation for 229 employees across the Commonwealth of Massachusetts

would not be unreasonable.

### B. Plaintiffs are Likely to Succeed on Their Disability Discrimination Claims.

Discrimination against a qualified individual includes but is not limited to

"not making reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability who is an applicant

or employee, unless such covered entity can demonstrate that the accommodation

would impose an undue hardship on the operation of the business of such covered

entity. 42 U.S.C. § 12112(b)(5)(A). To prevail on a disability discrimination claim, a

plaintiff must show by a preponderance of the evidence that he (1) has a disability

within the meaning of the ADA; (2) is qualified to perform the essential functions of

the job, with or without reasonable accommodations; and (3) was subject to an

adverse employment action based in whole or part on his disability. *Ramos-

Echevarria* v. *Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011). Each disability plaintiff

has shown that they have a disability that impairs a major life function, at the very

least, working. Additionally, they are all currently employed and remain qualified

to perform the essential functions of their jobs. Lastly, they have all been alerted

---

[12] https://www.massgeneral.org/news/press-release/Massachusetts-general-hospital-marks-200-years-of-patient-care

that they are or will be placed on unpaid leave until they get vaccinated, followed by termination on November 5, 2021.

A disability discrimination case can be proven via direct evidence or via the "McDonnell Douglas" burden shifting method, offering evidence sufficient to establish that a plaintiff "(i) has a disability within the meaning of the [ADA]; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the [ADA]; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result." *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973). A "disability" under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). Determining whether an impairment substantially limits one or more major life activities involves a three-step analysis: (1) determine whether the alleged disability is a physical or mental impairment, (2) identify the life activities upon which plaintiff relies, and (3) determine whether the impairment substantially limited one or more of the activities found to amount to major life activities. *Santiago Clemente* v. *Executive Airlines, Inc.*, 213 F.3d 25, 30 (1st Cir. 2000).

Plaintiffs seeking disability accommodations have all provided documentation supporting their need for an accommodation, including doctor letters

evidencing that the taking of vaccines would significantly limit their major life activities.

### 1. Defendant Did Not and Cannot Show Undue Hardship or That Plaintiffs Pose a Direct Threat.

"At its core, Title I of the ADA is about protecting the disabled from discriminatory employment action based on stereotypes and fear." *E.E.O.C.* v. *Amego, Inc.*, 110 F.3d 135, 142 (1st Cir. 1997). Defendant has not made any showing of undue hardship or direct threat in its failure to provide reasonable accommodations, nor has it made any good faith efforts to accommodate the plaintiffs. *Brown v. F.L. Roberts & Co.,* 419 F.Supp.2d 7, 17 (D.Mass.2006), requiring proof of undue hardship after plaintiff establishes a *prima facie* case.

Undue Hardship is defined "an action requiring significant difficulty or expense, when considered in light" of several factors, namely: (i) the nature and cost of the accommodation needed under this chapter; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness,

administrative, or fiscal relationship of the facility or facilities in question to the covered entity. 42 U.S.C. § 12111(10). The First Circuit, in *Amego,* supra, cited the Seventh Circuit's opinion in *Vande Zande* v. *Wisconsin Dep't of Admin*, 44 F.3d 538, (7th Cir. 1995), stating that an employer may prove undue hardship by establishing that the costs of the proposed accommodation are excessive in relation either to its benefits or to the employer's financial health or survival. *Id.*

First, and most importantly, defendant has provided accommodations to certain employees. While this does not provide any validity to defendant's evaluation process (certain plaintiffs were denied accommodations when their requests were nearly identical to others who were provided with accommodations), it does underscore that 1) it is not an undue hardship for defendant to provide disability accommodations, and 2) defendant does not consider unvaccinated employees to be a direct threat.

Factually, it would be false for defendant to claim that it would be an undue hardship to accommodate plaintiffs, or that they are a direct threat, for many of the reasons outlined in the hardship analysis of the religious discrimination plaintiffs. In a nutshell: there is already a testing system in place (and it would not pose an undue hardship to test employees periodically), defendant's resources show that any new accommodations would be de minimis, and that the plaintiffs already abide by safety measures that prevent the spread of COVID-19.

The First Circuit, in *Amego*, analyzed the "direct threat" analysis with respect to the transmission of diseases, holding that, in Title I ADA cases where a direct threat defense under 42 U.S.C. § 12113(b) is implicated, the plaintiff must demonstrate that he or she can perform the essential functions of the job. *Id.* Further, where essential job functions implicate the safety of others, plaintiff must demonstrate that "she can perform those functions in a way that does not endanger others." Again, defendant failed to state its reasons for denying reasonable disability accommodations, thus the only two defenses that it has are undue hardship and direct threat. *Amego's* direct threat analysis draws from a Supreme Court Case, *School Bd. Of Nassau County, Fla.* v. *Arline*, 480 U.S. 273 (1987). In *Arline*, the Justice Brennan stated:

> *The fact that* some *persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act all persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather, they would be vulnerable to discrimination on the basis of mythology—precisely the type of injury Congress sought to prevent. We conclude that the fact that a person with a record of a physical impairment is also contagious does not suffice to remove that person from coverage under § 504. Id.*

Thus, defendant is not entitled to refuse reasonable accommodations to the plaintiffs for the several reasons. First, plaintiffs do not have an infectious disease. Any fear of direct threat would be that plaintiffs *could* catch the disease and spread it to others. Second, plaintiffs cannot be perceived to have the disease due only to their vaccination status, especially because they are screened daily. Third, each plaintiff already adheres to

several safety precautions and is willing to abide by any other reasonable accommodations, such as periodic testing, further screening, etc. Therefore, defendant cannot show undue hardship or a direct threat if it were to provide reasonable accommodations to the plaintiffs.

Lastly, defendant failed to participate in any interactive process. There was no meaningful communication with disability discrimination plaintiffs at all. "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation ... through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002), citing 29 C.F.R. § 1630. "It is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Taylor* v. *Principal Fin. Group, Inc.* 93 F.3d 155 (5th Cir. 1996). This simply did not occur between defendant and disability discrimination plaintiffs.

### C. Plaintiffs are Likely to Succeed on their Retaliation Claims

To establish a *prima facie* case of retaliation, an employee must show that: "(1) he engaged in protected conduct under Title VII; (2) he experienced an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action." *Sanchez-Rodriguez* v. *AT & T*

*Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8 (1st Cir. 2012). Once a *prima facie* case of retaliation is established, the defendant bears the burden of demonstrating that there was a non-discriminatory reason for the adverse employment action.

Here, plaintiffs engaged in the protected activity of requesting religious and disability accommodations and their failure to abide by perceived EEOC violations. Defendant's denial of their accommodations, without any form of explanation, refusal to offer accommodations, non-disclosure of the committee members, instructions to physicians not to provide documentation for disability accommodation requests, provision of narrative talking points to supervisors and prevention of religious accommodation requests with any substantive documentation, all within the immediate timeframe of submission of accommodation requests and denial are all adverse employment actions. Plaintiffs submission of these accommodation requests were met with a process designed to prevent them from receiving accommodations, and not to grant the accommodations.

### D. Plaintiffs Will Suffer Irreparable Harm

The imminent and irreparable harm that plaintiffs will suffer as a result of the adverse action being taken against them is more than simply financial. Plaintiffs are forced with the "impossible choice" to forsake their religious convictions, or, in the case of the disability discrimination plaintiffs, potentially put themselves in danger of physical harm or adhere to defendant's policy. See *On Fire*

21

*Christian Center, Inc.* v. *Fischer*, 453 F.Supp.3d. 901, 914 (W.D. KY, 2020), referring to one's choice of having to violate their religious beliefs or face enforcement action as one that is impossible to make. It isn't much of a choice, and it should not be taken lightly. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S.Ct. 63 (2020). While *Roman Catholic Diocese* involved state action restricting worship, the underlying principle that this country values the ability to practice one's religion is a principle that is still applicable here. Plaintiffs being forced to choose whether they want to abide by their sincere religious beliefs, especially after being wrongfully denied an accommodation, or losing their employment, including health insurance and, in the case of some plaintiffs, the sole means of providing for themselves and their families, showing that more than simply money damages are at stake in this matter. There are several recent cases, similar to the one at hand, where courts have granted preliminary injunctive relief, finding irreparable harm in the face of an identical decision: See *Sambrano* and *Dr. A*, supra, along with *Dr. A's* related case, *Does 1-6* v. *Hochul*, 2021 WL 4172915 (E.D. NY. September 14, 2021), *Magliulo v. Edward Via College of Osteopathic Medicine*, No. 3:21-CV-2304, 2021 WL 36799227 (W.D. La. Aug. 17, 2021), granting TRO, for failure to provide religious exemptions and that "threat to religious freedom was imminent," and *Dahl v. Bd. of Trustees of W. Mich. Univ., No.* 1:21-cv-757, 2021 WL 3891620, (W.D. Mich. Aug. 31, 2021),

granted TRO enjoining school from preventing plaintiffs from engaging in sports after having been denied religious exemption due to claimed hardship.

"If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc.*, supra. Additionally, this would not likely be a short-term loss of income. Most Massachusetts Hospitals have policies in place similar to that of the defendant[13]. Attempting to find an accommodation as a new applicant will undoubtedly prove difficult after having been terminated for failure to comply with defendant's policy. "Many reasonable employees would find a month without a paycheck to be a serious hardship," and a "reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former." *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 72–73, (2006).

*Burlington* also described the harms of emotional distress on those in these situations. At least two of the plaintiffs are currently treating for behavioral therapy and on leave, not because defendant put them on leave, but because of the emotional toll that this impossible decision has taken on them. (Comp., ECF 1, Exhibits M, N)

---

[13] https://www.bostonglobe.com/2021/07/29/business/most-massachusetts-hospitals-will-mandate-covid-vaccination-their-workers/

Therefore, the irreparable harm that the plaintiffs are facing is far more than just an issue of backpay and are very real and very imminent. Granting preliminary injunctive relief would ensure that the plaintiffs do not face the aforementioned imminent harms.

### E. The Balance of Harms Clearly Favors the Plaintiffs, as Defendants Will Suffer Absolutely No Harm and Would Likely Benefit.

The balance of harms favors the plaintiffs. Defendant will suffer no harm and would benefit from the continued employment of dedicated and skilled employees, avoiding further staffing crises, avoiding patient care crises and likely avoiding the financial costs of having to pay significant bonuses and overtime to the few staff that it would have left after terminating plaintiffs.

Any perceived harm does not currently exist, even with respect to COVID-19. Undoubtedly, the vaccination policy is in place to curb the spread of the virus. There has been no indication that plaintiffs are spreading the virus, nor any assertion, in general, that the hospital staff as a whole have been doing so. Defendant necessarily treats unvaccinated patients and takes numerous safety precautions to protect both employees and patients alike, from getting the virus. Here, plaintiffs are suggesting that they be able to take additional precautions (save only vaccination) and there is no evidence to suggest that, if the injunction were allowed, that the plaintiffs, who make up less than 1% of defendant's employees, would

cause any harm, financially, operationally, or to the safety of others[14]. There exists no harm now and there is no evidence that harm will come if preliminary injunctive relief is granted.

### 1. Defendant Will *Benefit* from Retaining Skilled and Dedicated Employees.

Unless defendant is denying accommodations and effectuating termination of these employees because it is looking to reduce its workforce (which would further evidence discrimination and retaliation), it will be losing over two hundred skilled, trained, and dedicated employees. That in and of itself if is a harm, not to the plaintiffs, but to the defendant. Defendant will have to hire new employees to fill the void left by the plaintiffs or continue shelling out large bonuses for other employees to cover the work that plaintiffs were doing.

Defendant will therefore benefit from having the plaintiffs continue their dedicated work for Mass General Brigham. Unless the real motive was to terminate workers in an effort to save money or use the religious and disability accommodation denials as a pretext for a different reason to effectuate termination, both of which would be unlawful, it should be assumed that defendant would otherwise *want* to retain the plaintiffs as employees, and would benefit from keeping them employed, furthering defendant's mission.

### F. Public Policy Favors the Plaintiffs.

---

[14] An additional safety net is that 93% of defendant's employees are already vaccinated, lessening any perceived future risk that plaintiffs could pose. https://www.bizjournals.com/boston/news/2021/09/30/as-vaccination-deadlines-loom-mass-hospitals-bra.html

The public has an incredibly strong interest in protecting the ability to freely practice one's religion, "even in a pandemic." *Roman Catholic Diocese*. See also, *Sambrano*, *Dr. A* and *Harvest Rock Church* v. *Newsom*, 141 S.Ct. 889 (2020). Further, the public has an interest in receiving medical care. The incredibly strong interest in battling COVID-19 (which is not in dispute) will be made more difficult to the public if hospitals and medical facilities reduce their staff, which will happen here. With already critical staffing levels, patient care, even despite COVID-19, patient care will take a significant downturn with less healthcare workers. And, for the reasons listed above, failing to grant this preliminary injunction will not prevent the public mission of battling COVID-19. By keeping more frontline workers in the fight, the public's interest will be furthered, not hindered. Thus, granting this preliminary injunction will favor the public.

## V.    CONCLUSION

Plaintiffs are seeking injunctive relief enjoining the defendant from taking adverse action against them and enjoining the defendant from enforcement of the vaccination policy against the plaintiffs until either they receive their accommodations, the EEOC takes up and completes an investigation, or a decision on the merits is reached. The plaintiffs have demonstrated a strong likelihood of success on the merits and significant, imminent and irreparable harm, compared to the benefit that defendant and the public would receive from the issuance of a preliminary injunction.

Plaintiffs, by their attorneys,

 /s/ Ryan P. McLane
Ryan P. McLane, Esq. (BBO: 697464)
Lauren Bradford, Esq. (BBO: 700084)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
ryan@mclanelaw.com
lauren@mclanelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2021, I caused the foregoing to be

electronically filed through the Court's ECF system. I further certify that I will

cause a true and correct copy of the foregoing, along with the Summons and Verified

Complaint (ECF 1), to be served by process server on the defendant.

/s/ Ryan P. McLane
Attorney for Plaintiffs

# EXHIBIT A

11:36

🔒 outlook.office.com

Fri 8/20/2021 10:10 AM

Good morning Janiye,

As of right now, no you do not need to complete the form again since you have already done so.

Best,
Willa

**Wilhelgyne Rose** |She/Her(s)
Human Resources Specialist | Patient Care Services
Massachusetts General Hospital | 55 Fruit St. Boston, MA 02114
www.massgeneral.org/careers

**Answers to many Human Resources and Benefits questions can be found at www.AskMyHRportal.com or you can call 1-833-Ask-MyHR (275-6947)**

*The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please contact the sender and delete the material from any electronic devices.

…

**Baird, Janiye G.,R.N.**                                    Fri 8/20/2021 10:01 AM
Hi sad to hear this was prematurely sent out, do i need to fill out the form again?

**Rose, Wilhelgyne**                                                ⋯
To: Baird, Janiye G.,R.N.
Fri 8/20/2021 9:49 AM

Dear Janiye,

I am writing to let you know that I prematurely provided an approval to your religious exemption request. I sincerely apologize for any confusion or inconvenience this oversight may cause. Religious exemption requests, including the one you submitted, will be processed by Human Resources beginning the week after the September 3rd deadline and employees will be notified regarding the status of their request shortly thereafter.

Thank you in advance for your understanding and patience as we continue to work through this process.

Best,
Willa

**Wilhelgyne Rose** |She/Her(s)
Human Resources Specialist | Patient Care Services
Massachusetts General Hospital | 55 Fruit St. Boston, MA 02114
www.massgeneral.org/careers

**Answers to many Human Resources and Benefits questions can be found at www.AskMyHRportal.com or you can call 1-833-Ask-MyHR (275-6947)**

*The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please contact the sender and delete the material from any electronic devices.

…

**Rose, Wilhelgyne**                                                ⋯
To: Baird, Janiye G.,R.N.; Gaughen, Alisa
Wed 8/18/2021 3:14 PM

Good afternoon,

Your COVID19 Religious Exemption for the current COVID19 season has been received and approved.
Your Flu Religious Exemption for the 2021/2022 Flu Season has been received and approved.

Please allow 24-48hrs to see these approvals through your PeopleSoft Account. You can view this by going to the myDetails tab and under the Vaccination Section.

Thank you.

5:00

outlook.office.com

**MGH Religious Exemption**

**BG**  Baird, Janiye G.,R.N.                                      Tue 9/14/2021 4:58 PM
(No message text)

**BG**  Baird, Janiye G.,R.N.                                      Tue 9/14/2021 12:18 PM
Good Afternoon, i'm wondering what your decision was based on considering other people I know were approved a...

**MC**  MGB Religious Exemptions Committee
To: Baird, Janiye G.,R.N.
Tue 9/14/2021 12:07 PM

Good afternoon,

Your request for a religious exemption from COVID-19 and/or flu vaccination has been reviewed and is denied.  We want to remind you of important upcoming deadlines. Please make sure that you:

- Receive a complete series of a COVID-19 vaccine or approved exemption (both doses of Pfizer or Moderna or single dose of Johnson & Johnson). To meet the fully vaccinated deadline of **October 15**, the deadline to receive the:
  - *first dose of the Moderna vaccine is September 16*.
  - *first dose of the Pfizer vaccine is September 23*.
- Document vaccination status by visiting vaccinecheck.massgeneralbrigham.org.

Information about ongoing vaccine clinics can be found here.
COVID-19 vaccines are safe and effective at preventing serious illness and death from COVID-19. Please review the following guidance to help answer questions.

Best,
The MGB Vaccination Committee
. . .

**BG**  Baird, Janiye G.,R.N.
To: MGB Religious Exemptions Committee
Sun 9/5/2021 12:08 PM

Good Evening,

To start this response from your committee is incorrect. I did not state that I oppose abortion, that is everyone's personal  right. My personal religious beliefs involve not using fetal lie cells or fetal calls in any sense in making , producing , testing etc vaccines or in any sense . Also , I was originally approved for this year and then a week later was told never mind that was sent prematurely. Furthermore , I have been approved for religious exemptions multiple times from MGH , since the time MGH mandated the flu vaccine, so why now am I being sent a canned response that others are also being sent when before I was approved with no problems .? The last two I missed the deadlines due to changing job position and not getting my request submitted when I thought it got sent , and from guilt I spent much time repenting and praying for forgiveness. Prior to that I was not as religious as I am now. Though the other two vaccines did not use fetal lie cells they are still contaminants that my deeply held religious beliefs don't agree with injecting into my body. I refuse all other vaccines , for example Tdap when offered during all my pregnancy's , and any other vaccines since becoming faithful . I eat all GMO free organic products, free of chemicals , phthalates , etc. In the prior years where my religious exemption was approved for the flu vaccine ,  I wrote very similar letters and was again approved without request for additional information. I feel I have provided adequate reasoning for my beliefs and find it odd that I was  approved this year and the had that taken back. I provided many excepts from the bible that I follow and believe in strongly in my original exemption letter that support my reasoning for not wanting to put contaminants like the covid 19'or flu vaccine in my body. I feel I have this sufficiently explained my strong relations belief and ask for your consideration to my faith in regards to this, the flu and any other booster shots that are mandated .

kindly
Janiye Baird
. . .

**BG**  [Draft]

# EXHIBIT B



Begin forwarded message:

**From:** Heather Sullivan <hmas0531@gmail.com>
**Date:** September 15, 2021 at 11:44:46 AM EDT
**To:** MGB Religious Exemptions Committee <MGBReligiousExemptions@partners.org>
**Subject: Re: NWH Request for Religious Exemption**

Dear MGB Religious Exemption Committee,

Could you please provide me an explanation as to why my request was denied? I spent five hours carefully documenting my religious exemption appeal and I'm requesting further information as to why it was rejected  Thank you

Heather Sullivan

On Sep 14, 2021, at 8:53 AM, MGB Religious Exemptions Committee <MGBReligiousExemptions@partners.org> wrote:

Heather,

Your request for a religious exemption from COVID-19  vaccination has been reviewed and is denied   Information about ongoing vaccine clinics can be found here

Regards,

MGB Religious Exemption Committee

**From:** Heather Sullivan <hmas0531@gmail.com>
**Sent:** Thursday, September 2, 2021 10:59 AM
**To:** MGB Religious Exemptions Committee <MGBReligiousExemptions@PARTNERS ORG>

**Subject:** Re: Fw: Action Required - NWH Request for Religious Exemption: additional information required

**External Email - Use Caution**

Dear MGB Religious Exemption Committee,

I hope this email finds you well, and that you have had a relaxing summer  My name is Heather Sullivan and I have worked as a Registered Nurse on the inpatient pediatrics unit at Newton-Wellesley Hospital for the past two years  I am writing to you in response to a religious exemption denial that I recently received  I do have a great deal of respect for the entire Mass General Brigham organization's staff, and the results of every single person's phenomenal effort throughout the COVID-19 pandemic can speak for itself  Regarding the rejection of my religious waiver from the vaccination, I must appeal as I feel it deserves a second look with more information regarding my faith

I was raised my entire life in the Catholic church, but recently became more devout in my faith this past year after joining a young adult Cathilic prayer group at my parish, St  Mary's of the Assumption in Dedham, MA  Father Dominic of this church can attest to my spiritual formation throughout my participation with this group, and I have included his contact information below  Furthermore, my religious convictions regarding abortion and the use of foetal cell lines became stronger this past summer through my experiences working as the Nurse Manager of Attleboro Women's Health Center (AWHC), a pregnancy resource center that assists women in crisis pregnancies, many of whom are contemplating abortion  Kathy Hill, an AWHC volunteer, as well as Darlene Howard, the Director of AWHC can both attest to my spiritual growth throughout my time working at this organization, and I have included both of their contact information below

My experiences with St  Mary of the Assumption's young adult prayer group as well as with Attleboro Women's Health Center opened up my eyes to the Catholic moral objection to vaccines using aborted foetal cells in stem cell research, testing, development, and otherwise  Before this past year, my family and I did not understand that many modern vaccines are manufactured involving the use of foetal cell lines  Consequently, I had received all of my childhood immunizations and annual flu shots  However, had I known the vaccines which used cells derived from aborted babies at any point in its research to production, myself and my family would have declined them  Even though many vaccines do not contain foetal cells themselves, there exists a close cooperation between the harvester and the abortionist for living samples to be extracted  As a Catholic, I believe that every human being is created by God in His image at conception, and therefore has intrinsic value  Thus, according to my beliefs, it would be sinful to accept any vaccine that is connected to the use of foetal cells, even if that connection is far removed from the original foetus

While Johnson & Johnson's COVID-19 vaccine used foetal cell lines in its development, design, production, and subsequent testing, the Pfizer and Moderna vaccines used foetal cell lines in their design and development, as well as in their subsequent batch testing, but not for the cellular production of the vaccine  Although Pfizer and Moderna's vaccines for COVID-19 are not the direct by-products of foetal cells, their production including the spike protein's redesign, subsequent recoding of mRNA fragments, as well as the expression of pseudoviruses and neutralization used aborted foetal cells  Therefore, these vaccines rely heavily on foetal cell lines, and my religious objection is to any use of the bodies and tissue of aborted foetuses regardless of whether a vaccine contains physical by-products of foetal cells

I referenced the Charlotte Loizer Institute's table on COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines in my research on this matter  Please reference this table (found at https://s27589 pcdn co/wp-content/uploads/2020/12/COVID-19-Vaccine-Candidates-and-Abortion-Derived-Cell-Lines pdf), which includes hyperlinks to scientific journals which provide information on each vaccine's use of specific foetal cells in design and development  These studies reveal that some of Moderna and Pfizer's confirmatory lab tests for the COVID-19 vaccine used abortion-derived cells  Specifically, their protein test and pseudovirus used HEK-293 cells  Human Embryonic Kidney cells, attempt 293 (HEK-293) were developed from the kidney cells of a likely aborted Dutch female in 1972  Please see the discussion on the bioethics of HEK-293 use found at https://www.pdcnet org/C1257D43006C9AB1/file/5265B61D5497F5258S257D94004802BB/$FILE/ncbq_2006_0006_0003_0077_0099 pdf Information on Moderna's use of HEK-293 cells can be found at https://www.nature com/articles/s41586-020-2622-0 pdf, while information on Pfizer's use of HEK-293 cells can be found at https://www biorxiv org/content/10 1101/2020 09 08 280818v1 full pdf

Foetal cell lines, whatever the genetic modification or passage of time, are still objectively cells from a foetus, and often from a specific tissue or organ  Thus, the Pfizer, Moderna, and J&J vaccines all violate my religious beliefs regarding the sanctity of life to some degree  My stance is supported by various passages from the Holy Bible, such as "Before I formed you in the womb I knew you, and before you were born, I consecrated you" (Jeremiah 1:5), and "As you do not know the way the spirit comes to the bones in the womb of a woman with child, so you do not know the work of God who makes everything" (Ecclesiastes 11:5)

As you mentioned, numerous faith organizations that oppose abortion have publicly supported COVID-19 vaccination, including the Vatican  Their support for vaccination is based on the argument that the evil of abortion was committed for the good of others through stem-cell research  However, the Holy Bible refutes this in Romans 3:8, which states: "And why not do evil that good may come, as some people slanderously charge us with saying  Their condemnation is just " Furthermore, in his *Address to a Meeting of the Pontifical Academy of Sciences, 23 October 1982: AAS 75 (1983) 37*, Saint John Paul II stated "I condemn, in the most explicit and formal way, experimental manipulations of the human embryo, since the human being, from conception to death, cannot be exploited for any purpose, whatsoever "

The Vatican's remarks on vaccination are not defined as Catholic church teaching or doctrine  In a statement letter made by the Vatican regarding COVID-19 vaccinations, it objectively states that vaccinations are not a moral obligation and must be voluntary  According to *Rome, from the Offices of the Congregation for the Doctrine of the Faith, on 21 December 2020, Liturgical Memorial of Saint Peter Canisius,* "Practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary" (*Section 5*)  "Pharmaceutical companies and governmental health agencies are therefore encouraged to produce, approve, distribute and offer ethically acceptable vaccines that do not create problems of conscience for either health care providers or the people to be vaccinated" (*From the same document, Section 4*)  "Those who, however, for reasons of conscience, refuse vaccines produced with cell lines from aborted fetuses, must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent" (*From the same document, Section 5*)  As the Catholic church teaches that God gives us the Holy Spirit to guide us in determining right from wrong, which lives within our conscience, we are encouraged to listen to our conscience when making all decisions  The Vatican's statement verifies that we should not compromise our consciences, but instead do what we can within what we believe is morally permissible to ensure the safety and wellbeing of others  This is something I have done and continue to do  Consequently, my Catholic beliefs do not permit me to knowingly and willingly receive a vaccine that was developed through stem-cell research from aborted foetuses


I sincerely appreciate the MGB Religious Exemption Committee's careful review of my case in consideration of my religious beliefs as well as the internal conflict I have been going through  I hope my explanation of these beliefs with references adequately explains my stance on the COVID-19 vaccine, but I would be happy to provide you with more information or additional explanation should you require it  At Newton-Wellesley Hospital, our mission is to treat and care for all of our patients as well as their families as we would a beloved family member  As a nurse, I have made it my duty to respect and value each individual patient and coworker's religious beliefs without judgement  I have experienced a level of distress over this situation and decision, and it has not been easy to stand up for my faith  I respectfully request for the MGB Religious Exemption Committee to respect my religious beliefs regarding morally-tainted vaccines and to re-examine my case if possible


Thank you very much for considering this appeal


Respectfully,


Heather Sullivan, RN



Father Dominic (617) 459-7687
Kathy Hill (508) 397-7280
Darlene Howard (774) 284-0589



On Wed, Sep 1, 2021 at 5:09 PM Sullivan, Heather Marie <HMSULLIVAN@partners.org> wrote:


**From:** MGB Religious Exemptions Committee <MGBReligiousExemptions@PARTNERS ORG>
**Sent:** Tuesday, August 31, 2021 8:57 PM
**To:** Sullivan, Heather Marie <HMSULLIVAN@PARTNERS ORG>
**Subject:** Action Required - NWH Request for Religious Exemption: additional information required


Heather,

Your request for a religious exemption from COVID-19 and/or flu vaccination has been received, but relies on inaccurate information  You explained that your religious objection to the vaccine was due to your opposition to abortion; however, none of the COVID-19 vaccines contain cells from an aborted fetus  While the J&J vaccine used a fetal cell line that was developed in the 1970s and 1980s to produce and manufacture the vaccine, the vaccine itself does not contain fetal cells  Moreover, Pfizer and Moderna's mRNA vaccines did not use a fetal cell line to produce and manufacture the vaccine  Numerous faith organizations who oppose abortion have publicly supported COVID-19 vaccination

Please provide an additional explanation so that we may further consider your request  In particular, if your religion publicly supports vaccination, please explain how your faith prevents you from receiving a vaccine  Please also provide any supporting documentation that you believe will be relevant to further consideration of your request, including evidence that you have a history of religious exemption to vaccines  If you have received vaccines in the past, please explain why your religion did not prevent you from receiving vaccines in the past and now will not allow for COVID-19 and/or flu vaccination  If your response is not received by September 6th,  your request for an exemption will be denied  Information about ongoing

vaccine clinics can be found here  Information about ongoing vaccine clinics can be found here

Regards,

MGB Religious  Exemptions Committee

The information in this e-mail is intended only for the person to whom it is addressed  If you believe this e-mail was sent to you in error and the e-mail contains patient information, please contact the Mass General Brigham Compliance HelpLine at http://www.massgeneralbrigham org/complianceline  If the e-mail was sent to you in error but does not contain patient information, please contact the sender and properly dispose of the e-mail

Please note that this e-mail is not secure (encrypted)  If you do not wish to continue communication over unencrypted e-mail, please notify the sender of this message immediately  Continuing to send or respond to e-mail after receiving this message means you understand and accept this risk and wish to continue to communicate over unencrypted e-mail

--

Heather Sullivan RN, BSN, MBA

hmas0531@gmail com

(781) 414-2091

The information in this e-mail is intended only for the person to whom it is addressed  If you believe this e-mail was sent to you in error and the e-mail contains patient information, please contact the Mass General Brigham Compliance HelpLine at http://www.massgeneralbrigham org/complianceline   If the e-mail was sent to you in error but does not contain patient information, please contact the sender and properly dispose of the e-mail

Please note that this e-mail is not secure (encrypted)   If you do not wish to continue communication over unencrypted e-mail, please notify the sender of this message immediately   Continuing to send or respond to e-mail after receiving this message means you understand and accept this risk and wish to continue to communicate over unencrypted e-mail