UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TOGETHER EMPLOYEES, by Individual Representatives, ROBERTA LANCIONE, JOYCE MILLER, MARIA DIFRONZO, MICHAEL SACCOCCIO, ELIZABETH BIGGER, NATASHA DICICCO, NICHOLAS ARNO and RUBEN ALMEIDA,<br>Plaintiffs,<br>v.<br><br>MASS GENERAL BRIGHAM, INCORPORATED.<br>Defendant. | Civil Action No. 1:21-cv-11686<br><br>**LEAVE TO FILE GRANTED ON NOVEMBER 1, 2021 ECF DOC. 24** |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Mass General Brigham, Incorporated ("MGB"), one of the world's premier health care systems, is a leader in combating the COVID-19 pandemic.  MGB has cared for thousands of COVID-19 patients, and provides state-of-the art medical care for 1.5 million patients a year.

In June 2021, MGB informed its employees that it would soon be implementing a COVID-19 Vaccination Policy (the "Vaccination Policy") that would require all employees to be vaccinated against COVID-19 as a condition of employment.  MGB did so after considerable deliberation among its senior leadership, including world renowned experts in infectious disease and infection control.  As the Delta variant raged, MGB determined that the Vaccination Policy was critical to keeping safe its medically vulnerable patient population, staff and visitors, and that existing protocols were not an adequate substitute.  The Vaccination Policy was necessary to minimize staff absences to ensure an available workforce to continue to combat the ongoing public

health crisis.  The Vaccination Policy was essential to maintaining patient and public trust, including so that people would timely access health care at MGB.

In August 2021, MGB rolled out the Vaccination Policy, requiring that all employees receive a COVID-19 vaccination by October 15, 2021, unless approved for a religious or medical exemption.  MGB's announcement explained clearly to employees that if they were out of compliance, they would be placed on unpaid leave and ultimately face termination.

MGB thoughtfully designed separate processes for employees' requests for medical or religious exemptions.  A Religious Exemption Review Committee—led by a senior attorney in MGB's Office of the General Counsel and comprised of trained Human Resources professionals—developed and implemented MGB's interactive process for determining whether or not to grant each religious exemption request.  Under the leadership of MGB's Chief Medical Officer, Workplace Health and Wellness, MGB set up two clinical panels of medical experts to assess requests under the very specific guidance of the Centers for Disease Control as to what narrow set of conditions were contraindications for COVID-19 vaccination.

Those reviewing exemption requests were advised at the outset of MGB's urgent health and safety priorities that would guide the review process:  to protect patients, staff, visitors, and the public trust, the process had to be prompt, and to be as rigorous as possible consistent with the law, to minimize the number of unvaccinated staff given the rapid spread of the Delta variant. Understanding those urgent health and safety priorities, the Religious Exemption  Review Committee and—in parallel—the two clinical panels, conducted careful, prompt and thorough interactive processes to review employees' request forms, to ask for more information where warranted, to consider the employees' responses, and to make nuanced decisions as to which employees would be allowed an exemption, and which denied.

Plaintiffs' requests were denied, because after careful review, they did not meet MGB's criteria for exemption.  They refused to comply with the Policy, and thus are on unpaid leave.  If they remain out of compliance, MGB will terminate their employment.  If they get vaccinated, they can return to work, and MGB very much hopes that they will.

Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction.  They cannot show a substantial likelihood of success on their claims for failure to accommodate a disability or sincere religious belief, or for retaliation.  They cannot show irreparable harm, as it is well established that plaintiffs in employment cases can be readily compensated for any losses of wages or emotional distress by money damages.  The balance of hardships, and the public interest, strongly favor MGB as it strives to continue to provide a safe environment for vulnerable patients and the public that relies on the health care system amidst an ongoing pandemic that has killed almost five million people worldwide—and counting.

## SUMMARY OF THE EVIDENCE

MGB is comprised of 16 entities across the health care continuum with 6,500 physicians, 9,100 nurses, and another 78,000 individuals who collectively provide safe, quality care in hospitals, labs, physicians' offices, outpatient centers, rehab facilities, urgent care clinics, and in patients' homes.  *See* Declaration of Dr. Michael Klompas ("Klompas Dec.") ¶5.  MGB's workforce cares for 1.5 million patients a year, including some of the most medically complicated and vulnerable patients in the world.  Klompas Dec. ¶6. MGB is also the largest academic health system and private employer in Massachusetts.  MGB highly values that it is, and is known as, among the safest places for acutely ill patients in the state.  Klompas Dec. ¶7.  MGB has cared for many thousands of COVID-19 patients. Klompas Dec. ¶ 8.

**MGB's Announcement of a COVID-19 Vaccination Policy**

On June 24, 2021, MGB's CEO announced to all staff that it would soon be requiring

staff to receive the COVID-19 Vaccination as a condition of employment, absent an approved medical or religious exemption.  Klompas Dec. ¶9.  On August 10, 2021, MGB's CEO sent a notice to staff members explaining its Vaccination Policy.  Klompas Dec. ¶10.  The August 10, 2021 announcement included links to forms that employees could use to request a disability or religious exemption from the Vaccination Policy.  Klompas Dec. ¶12.

The Policy initially indicated that employees should be fully vaccinated by October 15, 2021,[1] unless granted a religious or medical exemption.  Klompas Dec. ¶13.  The deadline to request an exemption was September 3, 2021.[2]  Klompas Dec. ¶14.  The Vaccination Policy stated: "The COVID-19 vaccines are safe and effective and recommended for all of the healthcare workforce. Requiring vaccination as a condition of employment has been demonstrated to be necessary to achieve the highest levels of workforce vaccination and increase safety for all employees, patients and visitors to the health care settings. All [MGB] workforce are required to receive vaccination for COVID-19 unless exempted by this policy, in order to achieve a fully vaccinated workforce."  Klompas Dec. ¶15.  There were frequent notices to staff about pending deadlines to submit requests and to receive a first vaccine dose, and about the consequences of non- compliance with the Vaccination Policy.  Klompas Dec. ¶16.

**The Decision to Implement the Vaccination Policy**

Prior to issuing the Vaccination Policy, MGB's leaders recognized the immense burden that COVID-19 had placed on MGB, its patients and employees.  Because of patients' uniquely vulnerable status, COVID-19 is particularly deadly.  Even with all of the careful controls, there

---

[1] Later MGB revised the Vaccination Policy to require a first dose of a two-dose series by October 15, 2021 (followed by a later second dose).  Klompas Dec. ¶13.
[2] Those processing requests endeavored to review and process requests received after the deadline. Hashimoto Dec. ¶33; Nichols Dec. ¶32.

was still spread in hospitals, and more measures were needed to protect patients and staff, including a staff vaccination requirement.  Klompas Dec. ¶17.

MGB did not take the decision to enact the Vaccination Policy lightly.  Some of the most senior leaders at MGB, including world renowned experts in infectious disease and infection control, were involved in making this important decision, as were MGB leaders in Human Resources, Occupational Health, Operations, Legal, and Diversity, Equity and Inclusion. Klompas Dec. ¶18.

MGB determined that the COVID-19 Vaccination Policy was necessary given the unique emergency created by the COVID-19 pandemic; the unique threat of severe illness and death associated with COVID-19 especially in hospitalized patients; the additional stresses on its already overburdened system created by the highly contagious Delta variant; its responsibility to maintain the highest possible level of quality patient care; its need to protect patients, staff and visitors; its need to keep staffing levels adequate to provide patient care; its need as a major health care system to inspire trust with the public so that the public would feel safe accessing medical care; and its concern that the fall of 2021 and winter of 2022 would see another rise in COVID-19 cases. Klompas Dec. ¶19.

In the global COVID-19 pandemic, MGB recognized that it had a heightened responsibility (1) for the health and safety of its health care staff and patients; (ii) to continue to provide essential services to patients; and (iii) as a role model to other healthcare organizations throughout the country.  Klompas Dec. ¶20.  There is an extra onus on health care workers to protect themselves from COVID-19 in order to protect patients.  MGB treats medically vulnerable people at higher risk for serious disease and death from COVID-19 than the general public, including—to name just a few examples—elderly patients; cancer patients and others with weakened immune systems;

patients with severe heart and lung disease; infants in the neonatal intensive care unit; pregnant patients; and pediatric patients who are not yet eligible to be vaccinated.  Klompas Dec. ¶21.[3]

Clinical data and trends clearly demonstrate that: (i) COVID-19 vaccines have high efficacy to prevent symptomatic COVID-19 and even higher efficacy to prevent hospitalizations and deaths; (ii) COVID vaccines have similar or better safety profiles than other vaccines currently fully FDA approved; (iii) full vaccination offers advantages regarding patient and healthcare personnel safety; (iv) morbidity and mortality of COVID-19 far exceeds that of influenza; (v) COVID-19 has been uniquely disruptive to hospital operations and workforce continuity, far more so than influenza; (vi) health care workers and other essential workers have higher rates of infection than people in other fields; (vii) masking diminishes risk of nosocomial (in-hospital) transmission but it is not perfect; vaccines provide additional and constant protection without requiring reminders, persuasion, mask-fitting aids, or other behavioral changes.  Klompas Dec. ¶23.  MGB's Dr. Michael Klompas, who helped make the decision to adopt the Vaccination Policy, published an article for the *Annals of Internal Medicine* entitled "The Case for Mandating the COVID-19 Vaccine for Health Care Workers," July 13, 2021.  Klompas Dec. ¶24.

When MGB made the decision to implement the Vaccination Policy for its entire workforce, it found additional support in the prioritization set by the federal and state government that included all hospital workers in the first wave of vaccinations in Dec. 2020-March 2021, regardless of whether they were front-line workers.  This prioritization recognized the need to preserve the integrity of the healthcare workforce during the pandemic.  Klompas Dec. ¶25.

---

[3] The decision to mandate a vaccine for health and safety reasons is not new to MGB.  Prior to the COVID-19 Vaccination Policy, MGB had already been requiring flu vaccination annually (since 2018) and MMR (measles, mumps, and rubella) vaccination.  Klompas Dec. ¶22.

Another important consideration in MGB's decision to implement the COVID-19 Vaccination Policy is public and patient trust in its safety.  A major stressor on the Massachusetts health system then and now, is the extremely high census (number of patients) and acuity (severity of health issues) in hospitals, attributable in part to deferral of care during the pandemic.  Many patients or members of the public were afraid to access care because they feared contracting COVID-19, causing them to be sicker and need more acute care later.  Klompas Dec. ¶26.

The Vaccination Policy also helps MGB to ensure that it is a safe place for visitors when they come to the hospital in support of patients.  Many medically vulnerable people visit MGB offices every day to provide support to hospitalized family members: a patient may need a ride home after receiving anesthesia; pediatric patients require an adult parent or guardian to accompany them to appointments; elderly or disabled patients may require a companion to access health care; many patients need emotional support from a family member or friend during their time at MGB.  Klompas Dec. ¶27.

**MGB Included Remote Workers in its Vaccination Policy**

MGB decided to include remote employees in the COVID-19 Vaccination Policy for reasons including that: (i) all MGB employees are expected to be deployable to the hospital as needed; (ii) remote employees may need to interface with personnel on the front lines in patient-facing positions; (iii) all remote employees are providing critical support to the health care community during this pandemic and thus their absence due to illness can impact critical operations; and (iv) unvaccinated remote employees are more vulnerable to COVID-19 infection, which can result in gaps in essential staffing.  Klompas Dec. ¶28.

**MGB Determined Other Controls Were Not an Adequate Substitute for Vaccination**

MGB leadership determined that the COVID-19 Vaccination Policy was critical to its health and safety priorities.  Substitutes such as allowing an employee to decide instead to mask,

engage in periodic testing, and socially distance were not adequate to meet MGB's urgent health and safety priorities and protect its vulnerable patient population.  This is for many reasons including that:  (i) in many MGB positions it is not practical to adequately socially distance from other staff, patients and visitors; (ii) testing by itself is not adequate to identify when an employee is infected and contagious because employees are at constant risk of infection; testing once per week will miss infections that might arise the other 6 days of the week; testing daily is unduly onerous on the system and impractical; testing can convey to healthcare workers a false sense of safety that may lead to lapses in other safety measures; (iii) if an employee does test positive they may have already been contagious for two or more days; and (iv) it is now well established that even if a vaccinated individual gets infected they are at least 50% less likely to transmit infection compared to unvaccinated people.  Klompas Dec. ¶29.

**Many Other Leading Health Care Systems Also Required COVID-19 Vaccines**

MGB joins many other leading U.S. health care systems in requiring COVID-19 vaccination for employees, ensuring that patients are being cared for in the safest clinical environment possible.  Klompas Dec. ¶30.  Similarly, a range of healthcare entities issued a consensus statement recommending that the COVID-19 vaccination should be a condition of employment for all healthcare personnel in facilities in the U.S. Klompas Dec. ¶31.  Also in July 2021, 58 signatories in the health care field, including the American Academy of Nursing and the American College of Physicians, signed on to a "Joint Statement in Support of COVID Vaccine Mandates for all workers in Health and Long Term Care."  Klompas Dec. ¶32.

**Urgent Health and Safety Concerns Guided MGB's Exemption Processes**

MGB implemented parallel but distinct processes for reviewing medical exemption and religious exemption requests, each with different teams.  Klompas Dec. ¶33.  Those processing

religious or medical exemption requests were advised of MGB's urgent health and safety priorities, and the need to develop a rigorous, rapid, and efficient review process. Senior leadership and health experts at MGB set these priorities.  Klompas Dec. ¶ 34; Declaration of Dr. Dean Hashimoto ("Hashimoto Dec.") ¶17; Declaration of Ramona Nichols ("Nichols Dec.") ¶13.

First, the review process needed to be prompt, given the ongoing and rapid spread of the Delta variant, the constant threat of nosocomial transmission of COVID-19, and the need to have employees vaccinated by the schedule set out in MGB's Vaccination Policy.  Second, the review process was to be as rigorous as possible in accordance with the law, given the risks that unvaccinated staff presented to patients, employees, and visitors and to ensure MGB staff remain available to respond to the ongoing public health crisis.  Third, it would be an undue hardship for MGB to allow large numbers of employees to remain unvaccinated and thus a constant source of potential threat to MGB's medically vulnerable patient population, other employees and visitors. Klompas Dec. ¶35; Hashimoto Dec. ¶18; Nichols Dec. ¶13.

Those processing medical and religious exemption requests were advised that the pandemic, and the rapid spread of the Delta variant, was a public health emergency, and that MGB had an urgent responsibility to continue serving its large and complex patient population, as well as to protect its staff, medically vulnerable population and visitors from infection.  They were also aware that as a major hospital, the perception of safety was critical for patients, visitors and the public.  Klompas Dec. ¶ 36; Hashimoto Dec. ¶19; Nichols Dec. ¶15.  They were advised that that the coming fall and winter seasons were concerning for new waves of infection especially given the Delta variant.  Klompas Dec. ¶37;   Hashimoto Dec. ¶20; Nichols ¶16.

Those processing requests were also advised that exemption requests were to be reviewed and processed as soon as possible, to ensure that any employee whose exemption was denied would

have time to consider vaccination, and if they decided to vaccinate, to do so consistent with the schedule laid out in the Vaccination Policy.  Hashimoto Dec. ¶34; Nichols Dec. ¶17.  Those processing requests factored into their decision-making MGB's workforce and public health considerations with allowing a large number of exemptions, because to do so would impose an undue hardship given the risks that unvaccinated staff pose to MGB's medically vulnerable patient population, employees and visitors.  Hashimoto Dec. ¶37; Nichols Dec. ¶35.

Due to MGB's urgent health and safety priorities, MGB determined that they could not provide an appeal process for every employee whose requests were denied.  Because the surge in cases from the Delta variant in the summer and fall of 2021 was (and is) stressing the health care system and this was an emergency, MGB's capacity to engage in an interactive process on these issues was not limitless.  Hashimoto Dec. ¶42; Nichols Dec. ¶42.

**The Medical Exemption Review Process**

MGB's Chief Medical Officer, Workplace Health and Wellness, developed and led MGB's interactive process for determining whether or not to grant medical exemptions from the vaccine requirement established by MGB's COVID-19 Vaccination Policy.   Declaration of Dr. Dean Hashimoto (Hashimoto Dec. ¶¶1, 3).

To request a medical exemption, an employee would have their health care provider (HCP) complete the MGB form.  Hashimoto Dec. ¶6.  The HCP could check various boxes to indicate certain conditions indicated by the Centers for Disease Control (CDC) as potential contraindications for the COVID-19 vaccine, including "history of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID-19 vaccine," "temporary exemption due to administration of COVID-19 monoclonal antibodies," and "temporary exemption due to a history of multisystem inflammatory syndrome." Hashimoto Dec. ¶¶8-11.  The

form allowed the HCP to identify and describe "Other medical reasons."  The form indicated "Requests will be reviewed on a case-by-case basis.  Clarification from the requesting employee and/or their physician may be requested in writing or by phone."  Hashimoto Dec. ¶¶11.

**The Two Clinical Panels Examining Requests for Medical Exemptions**

MGB assembled two clinical panels to review requests for medical exemptions:  an Occupational Health Clinical Panel, comprised of three occupational health clinical directors who are nurse practitioners and registered nurses by training; and an Infection Control Panel, comprised of five physicians who are experts in infection control and disease.  Hashimoto Dec. ¶¶13-15.  These two panels worked in sync in examining and making consistent and thoughtful decisions about employees' medical exemption requests.  Hashimoto Dec. ¶16.

**MGB's Interactive Process with Respect to Medical Exemption Requests**

The two medical panels developed an interactive process with respect to medical exemption requests.  Hashimoto Dec. ¶24.  Each medical exemption request received an individualized, thoughtful, case-by-case review.  Hashimoto Dec. ¶25.  The two panels used a layered, nuanced approach to reviewing the requests, meeting as often as needed to discuss and process the requests.  Hashimoto Dec. ¶¶26-27.  They consulted as needed with various world-renowned specialists at MGB, including specialists in Obstetrics, Allergy, and Neurology.  Hashimoto Dec. ¶28.  The panels followed the CDC guidance regarding medical contraindications to vaccination, which evolved over time as new data and studies emerged.  The medical contraindications to the vaccine are few and well-defined by the CDC guidance.[4]  *See* Hashimoto Dec. ¶¶7 (Ex. 8), 29.  As a result, its panel could generally make decisions based upon the original

---

[4] When CDC guidance changed urgently to encourage pregnant people to be vaccinated, MGB in turn updated its process regarding pregnancy.  Hashimoto Dec. ¶¶34-35.

submission by HCPs.  Hashimoto Dec. ¶29.  Where the panels had questions for the employee or his or her HCP, such as when the information provided was too vague, or the nature or severity of the condition was unclear, they would reach out to the employee or the HCP for more information. Hashimoto Dec. ¶30.   The employee or HCP could provide more information at a dedicated e-mail mailbox.  Hashimoto Dec. ¶32.

Ultimately, one or both panels made thoughtful, considered decisions on each request. Hashimoto Dec. ¶36.

**Communication of the Decisions on Medical Exemption Requests**

As decisions were made, each employee received by e-mail a written decision either approving or denying the request.  Hashimoto Dec. ¶38.  Decisions were made on a rolling basis to allow denied applicants as much time as possible to be vaccinated prior to the October 15 deadline.  Allowances were made to ensure sufficient time including giving temporary exemptions for those consulting their doctors for more information.  Hashimoto Dec. ¶39.

**Some Employees Reached Out to the Committee About Denial of Their Requests**

Some employees displeased with the denial of their requests wrote to the Occupational Health mailbox to express disappointment or seek to provide additional information.   The panels reviewed those additional communications to determine if they contained any new medical information sufficient to support the exemption.  Hashimoto Dec. ¶41.

**The Religious Exemption Review Process**

In order to request a religious exemption, an employee simply had to enter information into an online form.  Nichols Dec. ¶7.  The form asked the employee to "(1) identify your sincerely held religious belief, practice or observance and (2) explain why it prevents you from receiving a COVID-19 vaccine."  The form advised each employee, "Please note that you may be required to

provide additional information or supporting documentation to support your request for an exemption." Nichols Dec. ¶8.  Employees could choose how long an explanation to write; it said right on the form that the text box would expand as needed.  Nichols Dec. ¶9.

**The Religious Exemption Review Committee**

MGB assembled the Religious Exemption Review Committee to review the religious exemption requests, led by a senior in-house attorney in MGB's Office of the General Counsel, and comprised of Human Resources professionals who were trained in the applicable standards governing religious exemptions, including what constitutes an undue hardship.  Nichols Dec. ¶¶10-11.  Certain other employees with particularly relevant expertise served as advisors to the Committee.  Nichols Dec. ¶12.  The Religious Exemption Review Committee met frequently to develop a reasonably consistent approach to religious exemption requests, and worked tirelessly to review and process each request.  Nichols Dec. ¶¶20-22.

The Religious Exemption Review Committee designed an interactive process for evaluating the religious exemption requests.  Each request received careful, individualized attention from at least one reviewer from the Religious Exemption Review Committee, and often from more member(s) of that Committee if not the full Committee.  Nichols Dec. ¶¶ 23-25.

In that interactive process, employees who raised any substantive religious objection to the vaccine would by contacted by email for more information.  Follow-up questions were asked to assess the employee's religious belief, adherence to that belief, and how the belief prevented them from receiving the COVID-19 vaccine.  The Committee followed an approach aimed to achieve reasonable consistency between follow-up questions but also to provide each reviewer flexibility to customize the questions that were appropriate to that particular request.  The reviewer exercised his or her best judgment in choosing the follow-up questions most fitting for each individual

request.  Nichols Dec. ¶¶26-28.  Employees were instructed to send responses to the follow-up questions to a dedicated e-mail box at MGB.  Employees were free to submit whatever information or supporting documentation they wanted to that e-mail box along with their responses to the follow-up questions.  Many chose to send documents or attachments.  Many were downloaded or cut and pasted from the internet.  The Committee became well-acquainted with the many forms available online, as members saw the same internet forms submitted by multiple employees.  Nichols Dec. ¶¶29-32.

Each employee's response was then reviewed by the same Committee member who had been assigned to that request.  The Committee members carefully reviewed any follow-up responses submitted by the employees to which they had been assigned.  Nichols Dec. ¶30.  In some cases, where a Committee member determined that more information was needed, that member would send additional follow-up questions to the employee, and carefully review any additional information submitted by the employee in response.  Nichols Dec. ¶31.

The Committee's process involved having the requisite interaction with each employee to get an understanding of the nature of the sincere religious belief, the person's adherence to the religious belief, and how that person's religious belief prevented them from receiving the COVID vaccine.  Nichols Dec. ¶33.  The Committee met frequently to ensure a consistent approach to making decisions on requests that was consistent with MGB's urgent health and safety priorities.  The Committee strove for a consistent and thoughtful approach to what would be considered a sincere request; a religious request; and a conflict with the Vaccination Policy.  Nichols Dec. ¶34.  At least one Committee member made the decision as to each request.  In more detailed cases, a subset of the Committee or the whole Committee also participated in the decision.  Nichols Dec. ¶36.

**Communication of Decision on Religious Exemption Requests**

After decisions were made, each employee who had requested an exemption received by e-mail a written decision either approving or denying the request.  Nichols Dec. ¶37.  Most approvals were emailed to employees on or after September 6, 2021.  Denials were emailed as the decisions were made.  The Committee endeavored to ensure that all decisions for requests received before the September 3, 2021 deadline were emailed at least three weeks before the October 15 deadline for employee vaccination. Nichols Dec. ¶38.

**Some Employees Reached Out to the Committee About Denial of Their Requests**

Some employees who were displeased with the denial of their requests wrote to the Committee to express their disappointment with the decision or seeking to provide additional information.   Some of these interactions were very tense, and the Committee felt that it was important to continue to use the dedicated email address for these sensitive and deeply personal communications.  Nichols Dec. ¶40.  The Committee reviewed those additional communications to the extent feasible.  In particular, the Committee strove to ensure that each employee had the opportunity to provide the necessary information to consider their request.  Nichols Dec. ¶41.

**Decisions on Individual Plaintiffs' Requests for Exemptions**

After careful review as described above, Plaintiffs' requests for religious or medical exemptions were denied.  Hashimoto Dec. ¶¶43-54; Nichols Dec. ¶¶43-74.

**Any of the Named Plaintiffs Can Come Back to Work at MGB Upon Vaccination**

Any of the named Plaintiffs—or any MGB employee currently on unpaid leave due to non-compliance with the MGB Vaccination Policy—is eligible to return to work as soon as he or she is compliant with the Vaccination Policy.  Hashimoto Dec. ¶55; Nichols Dec. ¶75.

## ARGUMENT

## I.    A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY REMEDY

"A preliminary injunction is an 'extraordinary and drastic remedy,' that 'is never awarded as of right.'" *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)).  To secure a preliminary injunction, a plaintiff must show: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020).  "The plaintiff bears the burden of proof for each of the factors."  *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

Many courts, including the First Circuit, faced with nearly identical challenges to COVID-19 vaccine mandates, have held that the plaintiffs had failed to demonstrate a substantial likelihood of success on the merits or irreparable harm.  *See, e.g., Does 1-6 v. Mills*, No. 21-1826, 2021 WL 4860328 (1st Cir. Oct. 19, 2021) (affirming denial of preliminary injunction challenging Maine's vaccine mandate for healthcare workers)[5]; *Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021) (denying motion for preliminary injunction brought by healthcare workers alleging violations of Title VII, ADA, and constitutional rights); *Johnson v. Brown*, 2021 WL 4846060 (D. Or. Oct. 18, 2021) (denying motion for temporary restraining order brought by healthcare workers challenging Oregon's state-ordered vaccine mandate).  Plaintiffs offer no compelling reasons why their claims should be treated any differently.

---

[5] On October 29, 2021, the U.S. Supreme Court denied the plaintiffs' application for injunctive relief. *Does 1-3 et al. v. Mills*, 595 U. S. __ (2021).

## II.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON ANY OF THEIR CLAIMS

The moving party's likelihood of success on the merits is the "touchstone" of the preliminary injunction inquiry. *Bray v. Worcester Polytechnic Inst.*, 2021 WL 1989993, at *4 (D. Mass. May 18, 2021). "If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail.'" *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (citing *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)). The Court has directed[6] that the preliminary injunction proceedings will focus only on the named Plaintiffs' claims —not those of what Plaintiff claims are over 200 unnamed members of the unincorporated association, Together Employees.[7]  The named Plaintiffs cannot show any likelihood of success on their claims, let alone a substantial likelihood.

---

[6] During the status conference on October 25, 2021, the Court directed that "at least in the short term, it's the named plaintiffs that I think ought to be the object of our focus" and not "this question of the unincorporated association." (Oct. 25, 2021 Tr. at 15:11-13). MGB therefore understands that the Court will only consider the named plaintiffs' allegations at the preliminary injunction stage. Despite the Court's instruction, Plaintiffs improperly filed exhibits relating to people who are not named Plaintiffs. *See* ECF Doc. 1 (Plaintiffs' Exhibits 4, 5, 12 - 19). To the extent that Plaintiffs are seeking class relief, MGB plans to move to strike those claims.

[7] While the Court was clear that Together Employees' claims are not part of  these preliminary injunction proceedings, the alleged association also lacks standing to pursue such relief  An association only has standing to sue on behalf of its members when three requisites are met: "(1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *U.S. v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992). Even assuming, *arguendo*, that Together Employees could fulfill the first two requisites, it plainly cannot fulfill the third. Claims asserted by unnamed plaintiffs would require personal participation by, and unique evidence from, each plaintiff because each has a unique alleged religious belief or disability and each employee's interactive process with MGB was unique. The nature of such claims renders them impossible to be resolved on an association-wide (or class-wide) basis. Accordingly, even

A.      **Plaintiffs Are Not Likely to Succeed on The Religious Accommodation Claims**

To establish a prima facie case of failure to accommodate their religious beliefs, Plaintiffs must show that (1) a sincerely held religious practice conflicts with an employment requirement, (2) they brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment decision.  *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 55 (1st Cir. 2002); *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 131 (1st Cir. 2004).  If an employee makes out a prima facie case, "the employer must show that it offered a reasonable accommodation or that a reasonable accommodation would be an undue burden."  *Sanchez-Rodriguez v. AT & T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8 (1st Cir. 2012).[8]  Plaintiffs have no likelihood of success on the merits.

---

if the Court were entertaining its claims at the preliminary injunction stage, which it is not, the association could not demonstrate a likelihood of success on any claims because it lacks standing.

[8] Plaintiffs have not shown that they exhausted administrative remedies. They note in a footnote that right to sue letters have been issued for unspecified "plaintiffs," and question whether the EEOC can complete administrative processing within 180 days, without citation to any authority. ECF No. 3 p. 7 n.4.  Plaintiffs cite *Bailey v. Delta Airlines, Inc.*, 722 F.2d 942 (1st Cir. 1983) in support of pursuing recourse in federal court without exhausting remedies.  But in *Bailey*, the Court merely recognized that "the procedural requirements of Title VII should be considered in the equitable balancing process which would attend any grant of injunction relief," including "[a]t a minimum, [that] an aggrieved person seeking preliminary relief outside the statutory scheme for alleged Title VII violations would have to make a strong showing of irreparable injury sufficient in kind to justify the disruption of the prescribed administrative process and overcome reluctance to enforce personal service contracts in equity."  *Id.* at 944.  The court did "not reach the question of what circumstances would justify a district court in granting preliminary relief in other cases" because, like Plaintiffs here, the *Bailey* plaintiffs "made no showing of anything approaching the irreparable injury required to obtain preliminary relief." Id. at 944-945.  *See also Mills*, 2021 WL 4860328, at *10 (citing *Bailey*, 722 F.2d at 944) (affirming district court's holding that unvaccinated healthcare workers had failed to show that their employment and economic injuries amounted to irreparable harm, particularly where they had not exhausted their administrative remedies).

**1.      Plaintiffs Cannot Show A Substantial Likelihood of
Success in Proving Sincerely Held, Religious Beliefs
That Conflict with The Vaccination Policy**

MGB's Religious Exemptions Review Committee carefully considered every employee's

exemption request—including those of the Plaintiffs—and after its rigorous review process, denied

requests that did not show:  (i) a sincerely held belief; (ii) that was religious in nature; and (iii) that

conflicted with the Vaccination Policy.  Nichols Dec. ¶¶33-34.  MGB completed a careful and

thorough review of each request.  Nichols Dec. ¶¶30-31.  Plaintiffs have pointed to no evidence to

suggest that they are likely to succeed in persuading this Court or a jury to second-guess MGB's

judgments in this regard.  Thus, Plaintiffs have not shown a substantial likelihood of success in

proving they had a sincerely held, religious belief that precluded vaccination.  *See Union

Independiente,* 279 F.3d at 56; *Robinson v. Children's Hosp. Bos.*, No. CV 14-10263-DJC, 2016

WL 1337255, at *6 (D. Mass. Apr. 5, 2016).

**2.      MGB Has Demonstrated That Permitting Further
Exemptions from the Vaccination Policy—Including
Plaintiffs' Requests—Would Cause Undue Hardship**

Even if the named Plaintiffs could meet their burden to show that they had a sincere

religious belief that conflicted with the Vaccine policy, MGB has demonstrated that permitting

further exemptions from the Vaccination Policy—including Plaintiffs' requests—would be an

undue hardship.  The standard for determining whether a religious exemption would impose an

undue hardship on an employer is whether the employer would suffer more than a "de minimis"

hardship.  *See Cloutier*, 390 F.3d at 134.

**a.      EEOC Guidance Supports That MGB Would Face an Undue
Hardship**

Just days ago, the EEOC published guidance reiterating the undue hardship standard in

the context of the COVID-19 pandemic:

The Supreme Court has held that requiring an employer to bear more than a "de minimis," or a minimal, cost to accommodate an employee's religious belief is an undue hardship.  **Costs to be considered include not only direct monetary costs[9] but also the burden on the conduct of the employer's business – including, in this instance, the risk of the spread of COVID-19 to other employees or to the public**.[10]

MGB's experts made an extremely time-sensitive assessment that allowing large numbers of employees to remain unvaccinated would impose an undue hardship because of "the risk of spread of COVID-19 to other employees [and] to the public."  *Id.*  Further, in that same guidance, the EEOC stated that in the undue hardship analysis:

> Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public **(especially medically vulnerable individuals)**."

*Id.* (emphasis added).  In its declarations submitted herewith, MGB has shown that allowing further exemptions from its Vaccination Policy would constitute an undue hardship given that its patient population *by definition* consists of "medically vulnerable individuals."  Indeed, *all* MGB employees, regardless of role, must be deployable to the hospital as needed (an indoor, group setting), and *all* are supporting in some way MGB's critical operations that delivers state-of-the-art care to over a million patients every year.  Klompas Dec. ¶¶6, 28.  MGB determined that allowing additional unvaccinated employees to test and mask was an undue hardship because they are much less effective infection control measures than vaccination.   Klompas Dec. ¶29.

---

[9] While Plaintiffs are cavalier about the costs of testing, the logistical and cost burden of testing large numbers of unvaccinated employees are far more than de minimis.

[10] *See* EEOC Guidelines, § L: "Vaccinations–Title VII and Religious Objections to COVID-19 Vaccine Mandates":   https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=#L (last accessed October 29, 2021).

Plaintiffs' assertion that MGB developed its "own system-wide 'position' around [exemptions] instead of following Title VII and the [ADA]" is wrong.  Doc. 3 p. 2.  Instead, MGB has presented evidence that it developed a rigorous process *consistent* with the law, including but not limited to weighing that permitting additional exemptions would cause an undue hardship.   Nichols Dec. ¶14.

> **b.    Case Law Supports that MGB Would Face an Undue Hardship**

On October 19, 2021, the First Circuit held that unvaccinated health care workers denied exemptions had no likelihood of success on the merits of their Title VII claims against their hospital and health facility employers:   "The hospitals need not provide the exemption the [unvaccinated employees' request] because doing so would cause them an undue hardship."  *See Mills*, 2021 WL 4860328, at *10.  The Court weighed facts including that: unvaccinated workers pose risks to vulnerable patients; vaccines are far superior to testing and masking to prevent infection; the Delta variant poses new dangers; and healthcare workers perform a critical role in public health.  *Id.* at *7-8.  MGB has shown that these very same factors would make allowing further exemptions to its Vaccination Policy an undue hardship.  Klompas Dec. ¶¶23, 35.

On October 14, 2021, the District of Colorado held that a private employer had no obligation to allow an unvaccinated airport employee to continue working—even though the employee had been granted a religious exemption from the employer's COVID-19 vaccination requirement.   *Barrington v. United Airlines, Inc.*, No. 21-CV-2602-RMR-STV, 2021 WL 4840855, at *3 (D. Colo. Oct. 14, 2021).  In reaching this determination, the Court held that, even with other COVID-19 mitigation measures (like masking) in place, the risk that the unvaccinated employee posed to others constituted an undue burden on her employer.  *Id.* at *4.

Long before COVID, this Court recognized that unvaccinated employees pose an undue hardship to health care employers treating medically vulnerable patients.  In 2015, this Court (Casper, J.) granted summary judgment to a hospital employer who denied a religious exemption to an employee from a required flu vaccination, on the grounds that to do so "would have increased the risk of transmitting influenza to its already vulnerable patient population."  *Robinson*, 2016 WL 1337255 at *9.  The Court held:

> Health care employees are at high risk for influenza exposure and can be a source of the fatal disease because of their job. Numerous medical organizations support mandatory influenza vaccination for health care workers. The medical evidence in this record demonstrates that the single most effective way to prevent the transmission of influenza is vaccination.

*Id.*  MGB has provided overwhelming evidence that allowing further exemptions outside its rigorous process would cause undue hardship, including the "risk of transmitting [COVID-19] to its already vulnerable patient population."  *Id.*  Hashimoto Dec. ¶37; Klompas Dec. ¶35; Nichols Dec. ¶35.  And as in *Robison,* MGB has provided strong evidence that vaccination remains "the single most effective way to prevent [] transmission."  *Id.*; Klompas Dec. ¶23.[11]

To force MGB to allow further exemptions that did not meet its criteria—including those of Plaintiffs—would also cause MGB an undue hardship by compromising public trust in its health care system.  The First Circuit has held that an exemption that damages the employer's public image constitutes an undue hardship, in a case with far lower stakes than the public's trust in a

---

[11] The fact that MGB asked its managers, in speaking with employees who were non-compliant with its policy, to encourage them to get vaccinated just reinforces that MGB had determined that getting patients vaccinated was a health and safety imperative.  *See* ECF Doc. 1 at 36 (Complaint, Ex. G).  CDC guidance directs employers to encourage vaccination.  *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/essentialworker/workplace-vaccination-program.html (last accessed Oct. 31, 2021).

renowned health care system.  *See Cloutier*, 390 F.3d at 134, 136 (allowing employee to wear eyebrow ring, contrary to retailer's uniform, would impose more than de minimis undue burden on employer because it would adversely affect the employer's public image).  MGB has established that public trust was of urgent concern including so that people would access medical care. Plaintiffs have not shown substantial likelihood of success on the religious claims.

### B.      Plaintiffs Are Not Likely to Succeed on Their Disability Claims

"To establish a claim for failure to accommodate, [Plaintiffs] must produce sufficient evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA, (2) he was a qualified individual, and (3) the [employer], despite knowing of the plaintiff's disability, did not reasonably accommodate it."  *Flaherty v. Entergy Nuclear Ops., Inc.*, 946 F.3d 41, 55 (1st Cir. 2019).  The "reasonableness" of an accommodation is determined on a case-by-case basis. *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647 (1st Cir. 2000).  Plaintiffs bear the burden to show the requested accommodation is "reasonable on its face."  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).  Employers are never required to provide accommodations that "would impose an undue hardship on the operation of the business."  *Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 32 (1st Cir. 2011) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Plaintiffs have no likelihood of success on the disability claims.

### 1.      Plaintiffs Have Not Shown They Are Disabled Within the Meaning of the ADA

The fact that an individual is living with a medical condition does not automatically render that person disabled under the law.  *See Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011) (employee with epilepsy was not disabled under the ADA; "[e]vidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability").  Plaintiffs have not shown they have disabilities as defined by the ADA.  MGB notes that the *very narrow* set of

medical conditions that are contraindications to the COVID-19 vaccine per CDC guidance (Hashimoto Decl. ¶29) are distinct from what is an ADA "disability." *See* 42 U.S.C.A. § 12102 (under ADA, "disability" requires "a physical or mental impairment that substantially limits one or more major life activities," or a record of or being regarded as having a qualifying impairment).

### 2.   Plaintiffs Have Not Shown They Are Qualified Individuals Because They Pose a Direct Threat

An employer's obligations under the ADA are not unbounded.  Legislatures and courts have long recognized that when an employee poses a direct threat to others in the workplace—and where no accommodation would eliminate that threat—the employer does not violate the ADA when it refuses to continue to employ that person.  *See Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) ("A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk.").

It is Plaintiffs' burden to show that they could perform the essential functions of their jobs without endangering others.  *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).  As unvaccinated people who work for a *healthcare system* amidst a global pandemic, they cannot make such a showing.:

> [W]here the employee is responsible for ensuring the safety of others entrusted to his or her care, other courts… have simply considered the risk question to be part of the "qualified" analysis. [] We hold that, in a Title I ADA case, it is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore "qualified."  **Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others**.

*Amego*, 110 F.3d at 144 (emphasis added).  This Plaintiffs cannot do.

MGB has submitted overwhelming evidence that unvaccinated employees *do endanger* vulnerable patients, staff, visitors and the public.  A vaccinated individual who gets infected is at

least 50% less likely to transmit infection compared to unvaccinated people.  Klompas Dec. ¶29.
Other protocols are not adequate substitutes to vaccines for infection control. [12]  Klompas Dec.
¶29.  The CDC reports 741,566 people in the U.S. have died of COVID-in the pandemic.[13]  MGB
determined that for urgent health and safety reasons, it could not permit further exemptions.  So
long as they remain unvaccinated, Plaintiffs cannot show that they are qualified individuals under
the ADA because they pose a direct threat.

### 3.    MGB Would Suffer an Undue Hardship if Forced to Provide Further Medical Exemptions, Including to Plaintiffs

Even if Plaintiffs could establish that they are qualified disabled individuals under the ADA
—which they cannot—their disability discrimination claim still fails because MGB can show that
permitting further exemptions from its Vaccination Policy—including for Plaintiffs—would
impose an undue hardship on its operations in multiple respects.  MGB has demonstrated that its
urgent health and safety priorities required a rigorous process for exemption requests.  Hashimoto
Dec. ¶¶20-21.  It has showed that two clinical panels of medical experts, advised by still more
experts in various medical specialties, reviewed each request for medical exemption, using the
CDC's detailed medical guidance as to the narrow set of health conditions that are
contraindications for the COVID-19 vaccine.   Hashimoto Dec. ¶¶26-29.  Exemption requests—
including Plaintiffs'—that did not meet CDC guidance, as applied by the experts on MGB's
clinical panels, were  denied.

---

[12] MGB intends to move to strike Plaintiffs' designation of Dr. David Diggs as their proposed
expert witness on grounds including that he does not have the experience or specialized training
rendering him to qualified to testify as an expert on the many subjects in their expert disclosure,
and his testimony is not based on reliable data, tested or generally accepted in the scientific
community.  Fed. R. Evid. 702; *Milward v. Rust-Oleum Corp*., 820 F. 3d 469, 1st Cir.; 2016
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

[13] CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases.

MGB has shown that granting further exemptions—including Plaintiffs' requests—would be an undue hardship.  An employer is not required to make accommodation even for an otherwise qualified individual with a disability if **"the accommodation would impose an undue hardship on the operation of the business**."  *Colon-Fontanez*, 660 F.3d at 32 (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added).  MGB's "business" is delivering state-of-the-art care to medically vulnerable people all day every day.

There is no universal test for undue hardship in the ADA context—the analysis is case-specific but guided by the statute and applicable case law.  *Barnett*, 535 U.S. at 402.  The "undue hardship inquiry focuses on the hardships imposed ... **in the context of the particular [employer's] operations**."  *Barnett*, 535 U.S. at 402 (emphasis added).  As demonstrated above, *see* Section I(A)(2), MGB has provided strong evidence that in the context of its health care systems' operations, allowing further exemptions outside the parameters of the CDC guidance and MGB's rigorous process, is an undue hardship.  The EEOC's guidelines reinforce that: "Undue hardship refers not only to financial difficulty, but to reasonable **accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business**."[14]  MGB has shown that permitting exemptions for those its expert clinical panels found not to merit them under the CDC guidance, is "unduly extensive, substantial, [and] disruptive," and that accepting the greater risk of infection would "fundamentally alter the nature [and] operation of" its systems.  The EEOC also specifies that "An employer may consider whether current circumstances create 'significant difficulty' in acquiring or providing

---

[14] Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA, https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada  (last accessed October 29, 2021) (emphasis added).

certain accommodations, considering the facts of the particular job and workplace."[15] The facts of MGB's workplace demonstrate that permitting additional exemptions would cause an undue hardship, particularly where MGB experts determined they were not contraindicated for the COVID-19 vaccine—would undermine public and patient trust in MGB, and prevent patients from accessing care. This is yet more evidence that allowing additional exemptions from the Vaccination Policy is an undue burden. Hashimoto Dec. ¶37.

On September 30, 2021, the Eastern District of Kentucky held that current and former employees of St. Elizabeth Medical Center and Summit Medical Group ("St. Elizabeth"), were unlikely to succeed on their claim that St. Elizabeth's process for seeking medical exemptions from its COVID-19 vaccination requirement did not comply with the ADA. *Beckerich*, 2021 WL 4398027, at *4. In so deciding, the Court cited the fact that St. Elizabeth granted other requests for medical exemptions and stated that, "Plaintiffs simply have not shown that Defendants have not complied with the ADA in providing *necessary* medical accommodations to the vaccination requirement." Id. at *4 (emphasis added).[16] Plaintiffs have not shown substantial likelihood of success on their disability claims.

---

[15] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last accessed November 1, 2021).

[16] Plaintiffs' allegation that MGB "instructed its [] physicians not to draft letters" in support of medical exemptions [ECF Doc. 1 ¶27(a)] is false and not supported by any evidence. MGB followed CDC guidance which provided a very narrow list of contraindications for the COVID-19 vaccine and Board of Registration of Medicine guidance that warned that a physician who "grants an exemption outside the acceptable standard of care may be subject to discipline." https://www.mass.gov/news/the-massachusetts-board-of-registration-in-medicine-guidance-on-covid-exemptions (last accessed Oct. 31, 2021).

**C.** **Plaintiffs Are Not Likely to Succeed on Their Retaliation Claims**

To set forth a prima facie case of retaliation under the ADA or Title VII, Plaintiffs must show that they engaged in a protected activity and were subjected to a materially adverse employment action because of that activity. *Colon-Fontanez*, 660 F.3d at 36. If Plaintiffs could make such a showing, the burden would shift to MGB to articulate a legitimate non-retaliatory reason for the challenged employment actions. *Jones v. Walgreen Co.*, 679 F.3d 9, 20 (1st Cir. 2012). Then Plaintiffs would "bear[] the ultimate burden of showing that [MGB's] explanation was, in fact, pretextual. To do so [they] must raise a genuine issue of fact as to whether retaliation motivated the adverse employment action." *Jones*, 679 F.3d at 21. Plaintiffs must show that their impending terminations are "the result of the defendant's retaliatory animus." *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46.

**1.** **Plaintiffs Cannot Show Any Adverse Action *Because Of* Submitting Exemption Requests**

Plaintiffs' retaliation claims fail because they cannot show any adverse action was taken *because* they made exemption requests. To the contrary, employees who submitted requests, including Plaintiffs, received an interactive process and considered decision. Plaintiffs are subject to unpaid leave and potential termination not because they requested exemption, but because they were not approved and remain non-compliant with the Vaccination Policy. MGB would welcome Plaintiffs back to work if they came into compliance with the Vaccination Policy. Hashimoto Dec. ¶55.

**2.** **Plaintiffs Cannot Show Pretext**

Plaintiffs' claims also fail because they cannot show that MGB's reasons for the Vaccination Policy, including the consequences of non-compliance, are pretextual. *Jones*, 679 F.3d at 21 (To establish pretext, Plaintiffs must "raise a genuine issue of fact as to whether

retaliation motivated the adverse employment action.").  The Vaccination Policy is a neutral policy of general applicability; consequences for non-compliance are based on the employees' vaccination status, not whether or not they applied for an exemption (and not their religion or disability).  *Harris v. Univ. of Massachusetts, Lowell*, No. 21-CV-11244-DJC, 2021 WL 3848012, at *7 (D. Mass. Aug. 27, 2021); *Klaassen v. Trustees of Indiana Univ.*, No. 1:21-CV-238 DRL, 2021 WL 3073926, at *38 (N.D. Ind. July 18, 2021).  Plaintiffs have not shown a substantial likelihood of prevailing on their retaliation claims.

## III.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiffs cannot demonstrate a likelihood of irreparable harm if their motion is not granted. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (irreparable harm is as "an essential prerequisite" for receiving such redress).

Courts measure irreparable harm on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009), such that "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Mass. Coal. of Citizens with Disabilities v. Civ. Defense Agency & Office*, 649 F.2d 71, 75 (1st Cir. 1981).  Given their failure to demonstrate a substantial likelihood of success on the merits, Plaintiffs must therefore make a particularly strong showing of irreparable harm, which they cannot do.  The First Circuit recently held under similar circumstances that plaintiffs challenging COVID-19 mandates could not show irreparable harm.  *See Mills*, 2021 WL 4860328, at *10.

An asserted injury is "irreparable" only where remedies available at the conclusion of a trial on the merits are insufficient to make a prevailing party whole.  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("Irreparable harm most often exists where a party has no adequate remedy at law.").  A party seeking a preliminary injunction must therefore

substantiate its claim of irreparable harm with a particularized showing of the injury that will ensue absent the relief sought. *See Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6-7 (1st Cir. 1991) ("irreparable harm is not assumed; it must be demonstrated, and a speculative injury is insufficient to show irreparable harm").

## A.       The Loss of Employment is Not Irreparable Harm

It is well-established that losses arising out of a discharge from employment do not constitute irreparable injury justifying preliminary injunctive relief absent a showing of special circumstances, because any lost wages and benefits, which can be calculated to an exact amount, can be awarded as money damages. *See Mills*, 2021 WL 4860328, at *10 (citing *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) ("When litigants seek to enjoin termination of employment, money damages ordinarily provide an appropriate remedy.  To obtain an injunction, therefore, the [employees] must show a 'genuinely extraordinary situation.'"); *Mass. Correction Officers Federated Union v. Baker*, 2021 WL 4822154, at *7 (D. Mass. Oct. 15, 2021) ("While Plaintiffs' members may suffer the harm of losing employment, it is well settled that the loss of employment is not considered irreparable for the purposes of an injunction."); *DeNovellis v. Shalala*, 135 F.3d 58, 63 (1st Cir. 1998) (salary loss, emotional distress, and loss of prestige "[n]either in sum nor in individual parts . . . amount to irreparable injury . . . .").

In *Sampson*, the Supreme Court articulated the high bar for finding an "extraordinary situation" where loss of employment amounts to irreparable harm:

> We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual.

*Sampson*, 415 U.S. at 92 n.68.  As such, courts have routinely held that employees facing the loss of employment due to their refusal to comply with their employers' COVID-19 vaccine requirements have failed to demonstrate irreparable harm.  *See Mills*, 2021 WL 4860328, at *10; *Massachusetts Correction Officers*, 2021 WL 4822154, at *7.[17]

Plaintiffs ignore this dispositive issue, and argue that their loss of employment would "not likely be a short term loss of income" because "[m]ost Massachusetts Hospitals [*sic*] have policies in place similar to that of the defendant."  (ECF No. 3 at 23).  This amounts to an admission that MGB's Vaccination Policy and exemptions process is a best practice for health care systems in a pandemic, as MGB's evidence shows.  Klompas Dec. ¶¶30-32.  Their claim also ignores that the U.S. is in the midst of a labor shortage,[18] and Plaintiffs are unable to muster any legal support to show that even a long-term loss of income would meet the threshold to show irreparable harm.[19]

---

[17] *See also Beckerich*, 2021 WL 4398027, at *6  (loss of employment due to failure to take COVID-19 vaccine "is not considered an irreparable injury" because wrongful termination claims exist for the very reason to recover "monetary damages to compensate their loss of employment"); *Bauer v. Summey*, 2021 WL 4900922, at *18 (D.S.C. Oct. 21, 2021) ("plaintiffs fail to make a clear showing of irreparable harm based on their loss of employment under" COVID-19 vaccine policy); *Valdez v. Grisham*, 2021 WL 4145746, at *12 (D.N.M. Sept. 13, 2021) ("any harm to [employee] caused by her potential termination and/or inability to continue to work as a nurse is a function . . . of her employer's own vaccine mandate. And . . . being so terminated/prevented from working as a nurse does not equate to irreparable harm."); *Norris v. Stanley*, 2021 WL 3891615, at *3 (W.D. Mich. Aug. 31, 2021) ("Plaintiff has failed to show that she faces an irreparable injury in the event that MSU terminates Plaintiff's employment" based on employee's refusal to receive COVID-19 vaccine); *Johnson*, 2021 WL 4846060, at *25 (claims brought by healthcare workers challenging Oregon's COVID-19 mandate that they faced loss of jobs, income, and benefits "are the types of concerns the Supreme Court states are 'routine,'" and are "compensable by money damages.").

[18] *See e.g.,* "4.3 Million Workers Are Missing. Where Did They Go?," THE WALL STREET JOURNAL, October 14, 2021, https://www.wsj.com/articles/labor-shortage-missing-workers-jobs-pay-raises-economy-11634224519

[19] *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72-73 (2006), cited by Plaintiffs, certainly does not support that proposition.   *Burlington* did not involve a preliminary injunction, nor does the Court's holding have anything to do with whether the employees in that case (or any other) could demonstrate irreparable harm under similar circumstances.

At least two of the Plaintiffs also claim that their harm is irreparable on the grounds that they are seeking treatment alleged emotional distress. (ECF No. 3 at 23). But even if they could prove emotional distress caused by MGB, the First Circuit has held that emotional distress damages resulting from the loss of employment *do not* amount to irreparable harm. *See Shalala*, 135 F.3d at 64 ("while [the employee] may recover compensation for her emotional distress claim if she prevails on the merits, the fact that an employee may be psychologically troubled by an adverse job action does not usually constitute irreparable injury warranting injunctive relief."); *Soldevila v. Secretary of Agriculture of U.S.*, 512 F.2d 427, 430 (1st Cir. 1975) (reversing district court's holding that plaintiff suffered irreparable harm where "he and his family . . . were psychologically troubled by the potential discharge").[20]

In short, Plaintiffs cannot show any irreparable harm. Alternatively, they could obtain a COVID-19 vaccination, resume their employment with MGB, and avoid any harm altogether.

### B.      MGB is a Private Employer; Plaintiffs' Constitutional Claims Fail

Plaintiffs next instead argue that their harm is irreparable because they are being "forced" to choose between forsaking their alleged religious beliefs and medical conditions, and keeping their job. (ECF No. 3 at 21). Plaintiffs rely almost exclusively on cases involving constitutional claims brought against state actors in other jurisdictions, which offer little guidance to the instant case in which MGB is a private employer. *Id.* at 21-22.

But it is well-settled that private employers like MGB are *not* state actors and therefore cannot be liable for violations of employees' constitutional rights. *See Jordan v. Verizon New England, Inc.*, 180 F. App'x 183, 184 (1st Cir. 2006) ("the alleged constitutional violations are, to

---

[20] *See also Beckerich*, 2021 WL 4398027, at *6 ("emotional injuries stemming from wrongful termination claims are routinely compensated by monetary damages in this Court and in courts across the country.").

quote the district court, 'curious claims, given the fact that his former employer is a private, rather than governmental, entity.'"); *Dyer v. E. Coast Diners, LLC*, 33 F. Supp. 3d 82, 91 (D. Mass. 2014) ("The defendant is a private employer, and not a[n] agent of the state, therefore there is no cause of action under the . . . Constitution.").  As such, courts have held that employees refusing to receive the COVID-19 vaccine fail to show irreparable harm by alleging constitutional violations. *See, e.g., Beckerich*, 2021 WL 4398027, at *6 ("constitutional rights are not at question here, as Defendants are not state actors" and so  "Plaintiffs' 'constitutional right to privacy' falls short of establishing   irreparable   harm."); *Norris*, 2021  WL 3891615, at *2 (rejecting argument that plaintiff's "constitutional rights will be infringed upon, causing her irreparable harm" because she "can be properly compensated by monetary damages").

## IV.   THE BALANCE OF HARDSHIPS STRONGLY FAVORS MGB

### A.   MGB Has a Strong Interest in Providing the Safest Possible Environment for its Patients, Staff, Visitors and the Public

The balance of the hardships weighs strongly in favor of MGB.  As other judges in this district have determined, "[e]ven considering the economic impact on the Plaintiffs if they choose not to be vaccinated, when balancing that harm against the legitimate and critical public interest in preventing the spread of COVID-19 by increasing the vaccination rate . . ., the Court finds the balance weighs in favor of the broader public interests."  *Massachusetts Correction Officers*, 2021 WL 4822154, at *8.  These principles are even more heightened in this case, where MGB, the largest healthcare system in the state has a particularly strong interest in ensuring the safest possible environment, by requiring vaccination, which provides the most protection against the transmission of COVID-19.  Klompas Dec. ¶23.  This Court properly recognized this strong public interest during an earlier hearing, stating that MGB "is a major healthcare provider in a major metropolitan area with a very strong interest . . . in providing the safest possible facility as well as

creating a public perception of safety . . so that people feel confident to use their facilities." (Oct. 20, 2021 Tr. at 73:6-11).

By contrast, Plaintiffs risk only choosing to depart from their jobs, which could be addressed with monetary damages if they prevailed. Another court that recently grappled with weighing similar harms in a case brought by employees refusing COVID-19, aptly explained:

> In these cases "easier" than *Jacobson*, which deal with private, non-state actors, courts have rationalized that each of us trade off our individual liberties every day in exchange for employment. Alongside Judge Easterbrook in the Seventh Circuit, "[w]e assume with plaintiffs that they have a right in bodily integrity. They also have a right to hold property." *Klaassen*, 7 F.4th at 593. Yet, to work at St. Elizabeth, Plaintiffs agree to wear a certain uniform, to arrive at work at a certain time, to leave work at a certain time, to park their vehicle in a certain spot, to sit at a certain desk and to work on certain tasks. They also agree to receive an influenza vaccine, which Defendants have required of their employees for the past five years. These are all conditions of employment, and "every employment includes limits on the worker's behavior in exchange for his remuneration." *Bridges v. Houston Methodist Hosp.*, No. H-21-1774, —— F.Supp.3d ——, ——, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021). **If an employee believes his or her individual liberties are more important than legally permissible conditions on his or her employment, that employee can and should choose to exercise another individual liberty, no less significant – the right to seek other employment**.

*Beckerich*, 2021 WL 4398027, at *9 (emphasis added). The Plaintiffs here too have options: they can choose to comply with the Vaccination Policy and come back to work at MGB, or find new work in a setting that will allow them to remain unvaccinated. As this Court acknowledged at an earlier hearing, of the Plaintiffs' unpaid leave or potential termination, "some of that inevitably falls under the heading of living the consequences of one's own choices." Tr. 10/20/21 at 71:24-25.

### B.      MGB is in the Best Position to Determine Safety Policies for Staff

Plaintiffs make a last gasp attempt to justify an injunction with the frivolous argument that forcing MGB to provide exemptions for employees who refuse vaccination will benefit MGB

because it will retain over two hundred skilled employees whose employment will otherwise be terminated without the injunction.  (ECF No. 3 at 25).  MGB made a deliberate judgment otherwise, for safety and operational reasons.  *See, e.g.* Klompas Dec. ¶35.  As this Court recognized:  "It may be, that as plaintiffs argue, that this decision could do more harm to healthcare if those these employees, but that's a judgment for them to make, not for me, unless they have violated the applicable law."  (Oct. 20, 2021 Tr. at 73:12-16).

## V.     THE PUBLIC HAS A STRONG INTEREST IN HEALTH AND SAFETY

The public interest in limiting COVID-19 transmission was a chief driver of MGB's Vaccination Policy.  Klompas Dec. ¶19.  The First Circuit recently recognized Maine's interest in safeguarding its residents against COVID-19 as "paramount."  *Mills*, 2021 WL 4860328, at *11. The First Circuit found no error "in the district court's conclusion that [Maine's COVID-19 vaccine requirement] promotes strong public interests and that an injunction would not serve the public interest."  *Id.*  This Court echoed that sentiment at an earlier hearing, when it stated "the public needs to have confidence that the place is safe and that the hospital is doing what it can to manage infectious disease."  (Oct. 20, 2021 Tr. at 23:1-3).  *See also Harris*, 2021 WL 3848012, at *8 (Casper, J.) (recognizing the "strong public interest" in "preventing further spread of COVID-19 . . . a virus which has infected and taken the lives of thousands of Massachusetts residents" and holding that plaintiffs' requested relief would weaken efforts to prevent further spread of the virus). By contrast, the public has no interest in overriding MGB's Vaccination Policy and exemptions process that is protecting the lives of MGB's patients, co-workers, and visitors, and making it safe for the public to access potentially life-saving prevention and treatment.

## CONCLUSION

For all of these reasons, MGB respectfully requests that this Court DENY Plaintiffs' Motion for Preliminary Injunction.

MASS GENERAL BRIGHAM INCORPORATED

By Its Attorneys,

Respectfully submitted,

*/s/ Katherine E. Perrelli*
Katherine E. Perrelli (BBO# 549820)
Lynn A. Kappelman (BBO# 642017)
Kristin McGurn (BBO# 559687)
Dawn Reddy Solowey (BBO#567757)
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
**Dated:**  November 1, 2021        Boston, MA 02210-2028
kperrelli@seyfarth.com
lkappelman@seyfarth.com
kmcgurn@seyfarth.com
dsolowey@seyfarth.com
TEL: (617) 946-4800
FAX: (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2021, a copy of the foregoing document was filed electronically through the Court's electronic filing system ("ECF system") and that counsel for Plaintiffs is a registered user of the ECF system.  Notice of this filing will be sent by operation of the Court's ECF system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's ECF system.

*/s/ Katherine A. Perrelli*
Katherine A. Perrelli