UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOGETHER EMPLOYEES, by individual representatives, ROBERTA LANCIONE JOYCE MILLER, MARIA DIFRONZO, MICHAEL SACCOCCIO, ELIZABETH BIGGER, NATASHA DICICCO, NICHOLAS ARNO and RUBEN ALMEIDA, Plaintiffs<br><br>v.<br><br>MASS GENERAL BRIGHAM INCORPORATED Defendant | CIVIL ACTION NO. 1:21-cv-11686-FDS |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUBMISSION OF SUPPLEMENTAL AUTHORITY**

Plaintiffs, who have heroically served the public for nearly two years through this pandemic, should apparently be comforted knowing that this punishment could all be over for them if they simply forsake their religious beliefs or put themselves at risk physically and mentally. No less than five times was some version of "plaintiffs are welcome back if they just get vaccinated" reiterated throughout defendant's opposition and accompanying declarations. This Hobson's choice helps underscore the tone-deaf approach that the defendant has taken with the plaintiffs throughout this entire "process," as the whole reason plaintiffs are not receiving the vaccine is that their religious beliefs and/or disabilities, protected under federal law, preclude them from doing so.

1

## I.   DEFENDANT'S EVASIVE "POSITION" AND ITS MYSTERIOUS "QUOTA."

Defendant is apparently aggrieved over plaintiff's assertion that it developed a system-wide "position" as to the granting of exemptions. However, those are not plaintiffs' words, they are the defendants. (Compl., ECF 1, Ex. G). This was underscored with bizarre and non-committal language by both Dr. Hashimoto and Ramona Nichols, incorporated into defendant's opposition. Phrases like "***further exemptions,***" "allowing ***additional unvaccinated*** employees," the need to "***minimize the number of unvaccinated staff***," and that it would be an undue hardship for the defendant "to allow ***large numbers*** of employees to remain unvaccinated," are scattered throughout the defendant's papers. (See Nichols Dec. ¶ 14, Hashimoto Dec. ¶ 18, Def. Opp., ECF 27, pp. 19-20).

During the October 25, 2021 status hearing,[1] plaintiffs argued for the ability to conduct just a single expedited deposition of someone with personal knowledge as to the defendant's religious exemption process (Tr. 10/20/21 at 14:19-25 and 15:1-2). Plaintiffs' request was denied and, unsurprisingly, defendant failed to disclose the very facts pertinent to these issues, such as who was in charge, names of individuals who were on the committee, what their qualifications were, and most

---

[1] The status hearing had three issues to deal with: scheduling, expedited discovery and whether or not to conduct an evidentiary hearing. Out of the blue, however, defendant "wanted to note for the record" its objections as to whether an unincorporated association has standing to move for injunctive relief. Thus, the Court's statements as to refraining from focusing "immediately on this question of the unincorporated association" dealt with the immediate issue raised in the middle of a status conference and without notice. It had nothing to do with denying plaintiffs the ability to submit evidence demonstrating the sham process employed by defendant to wrongfully deny their religious and disability accommodations, nor was it an acceptance of a convenient way to "box out" the members of the association, all of whom have been disclosed to the defendant and all of whom were denied through defendant's sham exemption processes. (Compl., ECF 1, ¶6, p. 2).

importantly, any specific criteria as to acceptance and/or denial of the accommodations. And defendant certainly has good reason for these facts to avoid evidentiary sunlight.

First, through the evasive language outlined above, and by deliberately **not** saying that defendant denied all accommodation requests it received, defendant is admitting what has already been asserted by plaintiffs: that defendant is currently accommodating people with religious exemptions and disabilities. Thus, defendant's assertion through Dr. Klompas that "allowing any employee to decide instead to just mask, engage in periodic testing, and socially distance was not adequate to meet MGB's urgent health and safety priorities and protect its vulnerable patient population (Klompas Dec. ¶ 29)," is completely contradicted by the fact that the defendant is currently doing and allowing exactly that.

Second, defendant's opposition papers have revealed that there was, in fact, a "quota" of accommodations that was not to be exceeded: the statements made in Dr. Hashimoto's and Nichols' declarations, incorporated into defendant's opposition, specifically state their belief of the hardship defendant would face with "large numbers" of accommodated employees and allowing "further" accommodations. (Nichols Dec. ¶ 14, Hashimoto Dec. ¶ 18, Def. Opp., ECF 27, pp. 19-20). Whether defendant established a specific number of accommodations that it would accept, we do not know at this time, but defendant certainly discouraged its committee members from accommodating plaintiffs and other employees. (See Nichols Dec. ¶ 14 , *supra*: "the review process was to be ***as stringent as possible***, consistent with

the law, ***so as to minimize the number of unvaccinated staff at MGB...***" and that ""it would be an undue hardship for MGB to allow ***large numbers of employees*** to remain unvaccinated…" simply saying "consistent with the law," does make it so nor change the fact that the goal was to *limit* the number of accommodations allowed). Defendant's employees, therefore, were unknowingly competing for accommodations. More importantly for the preliminary injunction stage: defendant, having conceded that it is doing the very thing that it claims would be an undue hardship, has ***not*** shown just how many "further" and "additional" accommodations would cause further hardship if injunctive relief were to be granted. As is clear, "once an employee has made out a *prima facie* case of discrimination, the ***employer must show that it offered a reasonable accommodation or that a reasonable accommodation would be an undue burden.***" *Sanchez-Rodriguez* v. *AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8 (1st Cir. 2012).

## II. DEFENDANT'S OPPOSITION PAPERS SHOW THAT ITS PROCESSES WERE DISCRIMINATORY.

This Court made its preliminary decision[2] based on assurances that defendant's "process for evaluating reasonable accommodation requests was thorough, thoughtful, and robust." Tr. 10/20/21 at 49:23-25. Defendant had an

---

[2] At the October 20, 2021 hearing, Judge Saylor stated: "Under the circumstances, I'm going to assume that there was a sincerely-held religious belief, but I'm also gong to assume that the hospital gave the plaintiffs an opportunity to make their case and evaluate it," and that "[t]here are issues, as I said, about exactly how that process worked, but it appears to me at least on this record that it is unclear that there is a substantial likelihood of success on the merits of those claims given ***the structure*** provided by the hospital and the nature of the case law." Tr. 10/20/21 at 69:1-5 and 71:10-15.

opportunity to provide a record demonstrating as much, but instead has provided nothing but evasive language and hollow words, clearly showing that their processes for evaluation of accommodation requests were discriminatory.

First, defendant failed to establish what the religious exemption process constituted at all. Sure, we received elegant verbiage: but what does it show? For instance, "[t]hese Human Resources professionals were trained in responding to accommodation requests and given additional training in responding to religious exemption requests as part of this process." Nichols Dec. ¶ 10. While this sounds very professional and "robust," it actually lacks any meaning. What does the training consist of? What is "this process," and what *new* training was required that wasn't provided before? The rest of the Declaration is less helpful:

1. Defendant "arranged for certain employees with particularly relevant expertise to serve as advisors to the Committee." Nichols Dec. ¶ 12. There was no mention as to who these advisors were, what their "particularly relevant expertise" was, nor how many advisors played this role.

2. The defendant's committee was "tasked with designing a process that would be consistent with those urgent health and safety priorities." Nichols Dec. ¶ 16. There is no mention as to what this process consisted of.

3. One of the most telling was ¶ 17 of Nichols' Declaration, where she essentially stated that the committee needed to hurry the process to allow employees to get vaccinated. In other words, she reinforces plaintiffs'

position: that this process was intended to *exclude* accommodation requests, not accept them.

Space does not allow for a complete, line-by-line analysis of Ms. Nichols' Declaration and its complete lack of evidentiary value. However, there is simply no support for her statement that the committee "carefully reviewed" follow-up responses (¶30), or what constituted the "thoughtful approach, for example what would be considered a sincere request; a religious request; and a conflict with the Vaccination Policy." (¶34). Simply look at the Defendants' Exhibits 29-32, dealing with Dr. Biggers' religious accommodation request:

1. Exhibit 29: Dr. Biggers clearly and sincerely states that she has refused any vaccines with a connection to aborted fetal tissue, provided a Scriptural basis for her belief and clearly identified, using scientific sources, the role that aborted fetal tissue plays in the current vaccines (never stating that the vaccines *contained* aborted fetal tissue) and her religious opposition to taking them.

2. Exhibit 30: an anonymous individual from the vaccination committee misconstrues Dr. Biggers' accommodation request, stating that Dr. Biggers claimed that the vaccines contained aborted fetal tissue.

3. Exhibit 31: Dr. Biggers stated that she was disappointed that her request was denied and corrected the reviewer as to what she actually stated in the request, providing further information as to aborted fetal tissue's role in the production, manufacture and testing of the vaccines.

4. Exhibit 32: the anonymous reviewer responds to Dr. Biggers, simply stating that her request has been denied and that she should get vaccinated.

This is defendant's evidence of the committee working "tirelessly" (Nichols Dec. ¶22) and providing the "careful, individualized attention" (¶24) and having the "requisite interaction" with the employee so that the reviewer could "get an understanding of the nature of the sincere religious belief, the person's adherence to the religious belief, and how that person's religious belief prevented them from receiving the COVID vaccine," (¶33). The defendant is not even trying to hide, at this point, its intent to prevent as many as possible from receiving accommodations. This is not the type of "bilateral cooperation" outlined in plaintiff's Memorandum, citing *Ansonia Bd. Of Educ.* v. *Philbrook*, 479 U.S. 60, 69 (1986).

With respect to disability accommodations, the same undefined "hardship" is asserted, while at the same time great pains were taken to say, but also not say, that other accommodations were granted. This process was far simpler. The defendant simply took a list from the CDC of contraindications for the vaccine and denied anything that was not on the list. (See Hashimoto Dec. ¶29 and also Compl., ECF 1, Ex. D). While this is one set of reasons for accommodation, it does not fit the full definition of disability under 42 U.S.C. § 12102(1)(A)-(C). All of the disability discrimination plaintiffs meet the definition under the ADA and were denied.

### III. DEFENDANT'S STILL HAVE NOT DEMONSTRATED UNDUE HARDSHIP

Dr. Michael Klompas, who authored a Declaration submitted with defendant's opposition papers, co-authored a report on a study entitled "COVID-19

7

infections among HCWs exposed to a patient with a delayed diagnosis of COVID-19.[3]" Within this report, Dr. Klompas and others found that less than 5% of healthcare workers who were exposed to a COVID-19 positive patient, *without proper PPE*, ended up being infected. "Despite spending a median 45 minutes with an exposed patient without a mask, most healthcare workers did not develop infection, *despite not wearing the PPE recommended by the CDC.*" *Id.* Roughly three months later, he co-authored another report, this time entitled "Low Risk of Coronavirus Disease 2019 (COVID-19) Among Patients Exposed to Infected Healthcare Workers.[4]" After this study, where 253 patients were exposed to infected healthcare workers, only a single clear case of transmission from provider to patient was evident. It goes on to state that "[t]his assessment **provides reassuring data to patients and their providers, documenting that the risk to patients of acquiring COVID-19 from an infected healthcare worker is very low**." *Id.*

Dr. Hashimoto was quoted in a ScienceDaily article of Mass General Brigham's universal mask mandate, which showed that COVID-19 rates dropped after masking was implemented. "This is the most direct COVID-19 research data to this point that is based on testing of health care workers pre- and post-implementation of universal masking policies," said Dean Hashimoto, MD, the chief medical officer for Occupational Health Services at Mass General Brigham. "When our Infection Control leaders announced a universal masking policy early in the

---

[3] https://www.cambridge.org/core/journals/infection-control-and-hospital-epidemiology/article/covid19-infections-among-hcws-exposed-to-a-patient-with-a-delayed-diagnosis-of-covid19/0E33EC04F36251CDE10F0856777B6F3C
[4] https://academic.oup.com/cid/article/73/7/e1878/5898497

pandemic it was a bold move, especially at a time when, like all health systems, we were facing PPE shortages. But the results of this study demonstrate that requiring masks for all hospital staff regardless of role in the organization was critical to protecting our employees.[5]"

These statements, by defendant's experts, were not contained within the text of their Declarations. And why would they be? They don't support the defendant's discriminatory policies. Included as Exhibit 5 was Dr. Klompas' "*Annals of Internal Medicine*" op-ed, entitled "The Case for Mandating the Covid-19 Vaccine for Health Care Workers," published July 13, 2021. (Klompas Dec. ¶ 24). This article was written *after* defendant made plans to implement the vaccine policy. (¶ 9). In fact, less than three weeks after, and less than a month before the policy actually took effect, rendering it completely self-serving and unhelpful to the Court. (¶ 10).

The defendant has still failed to meet its burden of proving undue hardship. Its opposition takes an interesting approach, by failing to state that any of plaintiffs' denials were based on grounds that their beliefs and disabilities were insincere. However, they don't concede sincerity, either. Rather, they simply submitted the documents, followed by a twofold defense of "undue hardship." Defendant takes great pains to use artful words like "additional" and "further", positing both the idea that accommodations in and of themselves cause undue hardship while at the same time also asserting that any *more* accommodations would be the hardship. Defendant is currently accommodating employees, which is

---

[5] https://www.sciencedaily.com/releases/2020/07/200715111449.htm

not in dispute. Thus, their assertion that masking, screening and testing are inadequate or would be an undue hardship are false. They are currently doing the very thing they assert is an undue hardship. Next, their implication that "large numbers" or "further" or "additional" accommodations would be a hardship are not supported by facts or evidence but are just conclusory statements that they have now contradicted. It is ***defendant*** who bears the burden of showing undue hardship, which it has not done. *Sanchez-Rodriguez,* Supra.

### IV.   SUPPLEMENTAL AUTHORITY

There are recent cases that do apply here and are helpful to this Court:

*Sambrano et al., v. United Airlines, Inc.*, N.D. Tex, 4:21-cv-1074 (2021), the Court has extended the TRO in this matter, enjoining United Airlines from placing employees on unpaid leave after claim of "undue hardship."

*Jane Does 1-14* v. *Northshore Univ. Health. Syst.,* N.D. Il. 1:21-cv-05683 (2021), nearly identical to this matter, Court granted initial TRO preventing hospital from terminating employees based on "undue hardship" claim.

*We The Patriots USA, Inc. v. v. Hochul*, No. 21-2179, dkt. 65 (2d Cir. Sept. 30, 2021), issuing an injunction pending appeal against enforcement of New York's COVID-19 Vaccine Mandate for its failure to allow for religious accommodations.

  /s/ Ryan P. McLane
Ryan P. McLane, Esq. (BBO: 697464)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
ryan@mclanelaw.com