# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TOGETHER EMPLOYEES, by individual representatives, ROBERTA LANCIONE, JOYCE MILLER, MARIA DIFRONZO, MICHAEL SACCOCCIO, ELIZABETH BIGGER, NATASHA DICICCO, NICHOLAS ARNO, and RUBEN ALMEIDA,** ) | |
| ) | |
| **Plaintiffs,** ) | **Civil Action No. 21-11686-FDS** |
| ) | |
| **v.** ) | |
| ) | |
| **MASS GENERAL BRIGHAM INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

SAYLOR, C.J.

This is a case challenging a mandatory COVID-19 vaccination policy. Defendant Mass General Brigham, Inc. ("MGB") is a Massachusetts corporation and major hospital and healthcare network that operates, among other facilities, Massachusetts General Hospital and Brigham and Women's Hospital in Boston. Plaintiff Together Employees is an unincorporated association of 229 employees of MGB who were denied a religious or medical exemption from a COVID-19 vaccination policy. The remaining plaintiffs are eight individual employees whose exemption requests were denied.

On June 24, 2021, MGB announced a mandatory COVID-19 vaccination policy for all its employees. It later set a deadline for that policy, providing that non-complying employees

would be placed on unpaid leave on October 20, 2021, and thereafter terminated on November 5, 2021.

On October 17, 2021, plaintiffs brought this lawsuit, alleging claims of discrimination and retaliation under Title VII and the ADA and seeking to enjoin MGB from enforcing its vaccination policy.  The Court held hearings on plaintiffs' motion for preliminary injunction on October 20 and November 4, 2021, and orally denied the motion from the bench.  The following memorandum sets forth the reasoning of the Court in greater detail.

## I.   __Background__

Except where noted, the Court relies on the parties' briefs, affidavits, documentary evidence, and oral argument to decide the present motion.

### A.   __Factual Background__

Plaintiff Together Employees is an unincorporated association of 229 employees who were denied a religious or medical exemption from the MGB COVID-19 vaccination policy. The remaining plaintiffs are individual employees of MGB who were denied religious or medical accommodations.  (Pl. Exs. J-M; O-R).[1]

Defendant Mass General Brigham, Inc. is a Massachusetts corporation with a principal place of business in Massachusetts.  MGB owns and operates hospitals and other facilities throughout the Commonwealth of Massachusetts.  (Klompas Dec. ¶¶ 5-7).  Among other things, it owns and operates Massachusetts General Hospital; Brigham and Women's Hospital; Faulkner Hospital; McLean Hospital; Massachusetts Eye and Ear Hospital; Newton-Wellesley Hospital; Cooley Dickinson Hospital; and Spaulding Rehabilitation Hospital.  Each year, MGB provides

---

[1] Plaintiffs' exhibits are designated as Exhibits A-S with the complaint; Exhibits A-B with the motion for preliminary injunction; and Exhibits 1-19 filed separately.  Because the two exhibits attached to the motion for preliminary injunction are not referenced in this opinion, the Court will refer to plaintiffs' Exhibits A-S and 1-19 where relevant.

medical care for 1.5 million patients.  (*Id.* ¶ 6).

### 1.     COVID-19 Pandemic

COVID-19 is a contagious viral disease that can cause serious illness and death.  (*Id.* ¶ 19).  As of this writing, approximately 750,000 Americans have died from the disease.  CTR. FOR DISEASE CONTROL & PREVENTION, COVID-19 MORTALITY OVERVIEW: PROVISIONAL DEATH COUNTS FOR CORONAVIRUS DISEASE 2019 (2021) (last updated Nov. 3, 2021).  In the summer of 2021, after several months of declining infection rate, the highly contagious Delta variant of the virus caused a significant further outbreak.

In 2020 and early 2021, three COVID-19 vaccines were approved by the Food and Drug Administration as safe and effective.  The three vaccines were developed and produced by Pfizer, Moderna, and Johnson & Johnson.  U.S. FOOD & DRUG ADMIN., COVID-19 VACCINES (2021) (last updated Oct. 29, 2021).  The Pfizer and Moderna vaccines employ messenger RNA (mRNA) technology; the Johnson & Johnson does not.  (*See id.*).  Both the federal and Massachusetts state governments prioritized the early vaccination of all hospital workers, recognizing the importance of protecting the healthcare workforce during the pandemic. (Klompas Dec. ¶ 25).

### 2.     MGB's COVID-19 Vaccination Policy

In June 2021, MGB announced it would require its employees to obtain a COVID-19 vaccination.  (Pl. Ex. A).  In light of the outbreak of COVID-19 caused by the Delta variant, MGB determined that such a vaccination policy was critical to keeping safe its medically vulnerable patient population, employees, and visitors.  (Klompas Dec. ¶¶ 20-21, 27).  MGB required that employees receive the COVID-19 vaccine by October 15, 2021.  (*Id.* ¶ 13). Employees were told that noncompliance with the policy would result in unpaid leave, and ultimately, termination.  The announcement also explained that certain exemptions would be

available for medical or religious reasons.  (*Id.*).

Employees seeking a religious exemption were required to fill out an online form.  (*Id.*).
The form asked several questions and contained a text box stating:

> In the space provided, please (1) identify your sincerely held religious belief,
> practice or observance and (2) explain why it prevents you from receiving a
> COVID-19 vaccine.  Please note that you may be required to provide additional
> information or supporting documentation to support your request for an
> exemption.

(Pl. Ex. C).  The online form did not provide an option to attach supporting documentation.

However, the text box response field did not have a character limit, and the instructions noted

that "the text box would expand as needed."  (Nichols Dec. ¶ 9).  The online form advised

employees that they "may be required to provide additional information or supporting

documentation to support [their] request for an exemption."  (*Id.* ¶ 8).

Employees seeking a medical exemption were provided a form to be completed by a

physician.  (Hashimoto Dec. ¶ 6).  The exemption form contained several check boxes to be

filled by the employee's physician to indicate whether the employee had one of several

conditions indicated by the Centers for Disease Control (CDC) that might merit a deferral of

vaccination.  (*Id.* ¶ 7).  One of the check boxes asked the physician to identify "other medical

reasons," and instructed the physician to explain his or her reasoning elsewhere on the form.  (*Id.*

¶ 11).

MGB created two separate committees to review requests for exemption.  The first

committee, the Religious Exemption Review Committee, was "led by a senior attorney in

MGB's Office of the General Counsel and comprised of trained Human Resources

professionals."  (Nichols Dep. ¶¶ 11, 19).  The members of the committee were "trained in

responding to accommodation requests and given additional training in responding to religious

exemption requests." (*Id.* ¶¶ 10, 19).  Employees who raised "substantive religious objection[s]" to the vaccination policy received follow-up questions from the committee, often individualized to the particular objection of the employee.  (*Id.* ¶¶ 25-28).  Employees who received follow-up questions were directed to send their responses to a dedicated MGB e-mail box and were free to submit whatever supporting documentation they wanted.  (*Id*. ¶ 29).  In some cases, the committee sent additional follow-up questions to employees after determining more information was needed.  (*Id.* ¶ 31).

The second committee, the Medical Exemption Review Committee, was directed by Dr. Dean Hashimoto, the Chief Medical Officer for Workplace Health and Wellness.  (Hashimoto Dec. ¶ 3).  MGB assembled two panels to review these requests:  one focused on occupational health, and the other focused on infection control.  (*Id.* ¶¶ 13-15).  The Occupational Health Clinical Panel was comprised of three nurse practitioners serving as occupational health clinical directors.  (*Id.* ¶ 14).  The Infection Control Panel was comprised of five physicians with expertise in infection control and disease.  (*Id.* ¶ 15).  The two panels worked together with Dr. Hashimoto to develop an interactive process.  (*Id.* ¶¶ 24-26).  The Occupational Health Clinical Panel would review exemption requests with Human Resources when accommodation issues arose, and would consult as needed with medical experts at MGB.  (*Id.* ¶¶ 25, 28).  When the panels had additional questions for employees or their physicians, they would solicit additional information by e-mail.  (*Id.* ¶¶ 30-31).

### 3.    <u>Plaintiffs' Requested Accommodations</u>

The eight named individual plaintiffs requested exemptions and accommodations from MGB's COVID-19 vaccination policy.  Either the Religious Exemption Review Committee, the Medical Exemption Review Committee, or both denied all plaintiffs' requests.  (Pl. Exs. O-R). Summarized below are each plaintiff's objections to the COVID-19 vaccine and the committees'

relevant responses.[2]

Elizabeth Bigger is a physician specializing in oncology.  She requested a religious exemption, contending that she is a Christian who opposes abortion and that she objects to the use of fetal cell lines in the development of the vaccines.  (Def. Ex. 29).  The Religious Exemption Review Committee denied her request.  It stated, among other things, that (1) the Pfizer and Moderna vaccines "did not use a fetal cell line to produce and manufacture the vaccine"; (2) numerous religious organizations publicly support COVID-19 vaccination; and (3) she had a history of receiving other vaccines in the past without objection.  (Def. Exs. 30-32).

Natasha DiCicco is a technical supervisor in radiology.  She requested a religious exemption, contending that according to her religious beliefs she should "treat [her] body as a temple and refrain from putting anything into [her] body that [she has] moral objections or health concerns with."  (Def. Ex. 33).  The committee denied her request, noting that she did not request an exemption from taking the influenza vaccine.  (Def. Exs. 34-36).

Nicholas Arno is an electrician.  He requested a religious exemption on the basis of his Christian religious belief that he should not use vaccines that "interfere with our bodies [sic] own immune systems that God created."  (Def. Ex. 25).  The committee requested additional information, noting that (1) his religion "has publicly supported vaccination"; (2) he had received other vaccinations without objection in the past; and (3) he failed to explain how his religious beliefs prevented him from getting vaccinated.  (Def. Ex. 26).  The committee denied his request after reviewing additional information.  (Pl. Ex. 3).

---

[2] The Court briefly notes a few inconsistencies in the record.  According to defendant's exhibits, plaintiffs Saccoccio and DiFronzo requested religious accommodations and were denied.  (Def. Exs. 37-40, 49-52).  However, the complaint does not allege religious discrimination on the basis of those denials.  In addition, although the complaint alleges disability discrimination against plaintiff Saccoccio, his affidavit does not assert that he sought a medical exemption.  (Pl. Ex. L).

Ruben Almeida is a technologist in radiology.  He requested a religious exemption on the basis of his Christian religious belief that he must keep his "body as pure of any foreign substances as humanly possible."  (Def. Ex. 21).  The committee denied his request after raising concerns that he did not avoid the use of "over the counter or prescription man-made medications or other products."  (Def. Exs. 22-24).

Roberta Lancione is a registered nurse.  She requested a religious exemption on the basis of (1) her religious objection to use of aborted fetal cell lines in the development of the Johnson & Johnson vaccine and (2) the fact that the function of the Pfizer and Moderna vaccines was adverse to her religious belief that "God's creation . . . was made complete."  (Def. Ex. 41).  The Religious Exemption Review Committee denied her religious exemption after noting that (1) the Pfizer and Moderna vaccines did not use a fetal cell line to produce and manufacture the vaccine and (2) she had in the past submitted to vaccine requirements without objection on the basis of religion.  (Def. Exs. 42-44).[3]  She also requested a medical accommodation on the basis of a history of chronic lymphocytic leukemia and angio-edema in response to other vaccines.  (Def. Ex. 11).  In denying her medical exemption, the Occupational Health Clinical Panel recommended that she consult an allergist to evaluate whether she should consider using a non-mRNA vaccine.  (Def. Ex. 12)

Joyce Miller is a manager of information desks.  She requested a religious exemption on the basis of her belief that "all products offered to [her] by [her] employer or workplace be . . . entirely . . . removable from [her] body."  (Def. Ex. 45).  After expressing concerns regarding her prior vaccinations against influenza, the Religious Exemption Review Committee denied her

---

[3] Lancione's response to MGB's request for more information explained that she had not requested religious exemptions to other vaccines because she had consistently been granted a medical exemption in the past. (Def. Ex. 43).

exemption request.  (Def. Exs. 46-48).  Her requested medical exemption for "severe mental anguish/anxiety" was denied by the Occupational Health Clinical Panel because she did not "demonstrate a sufficient medical reason or contraindication to support an exemption."  (Def. Exs. 13-14).

Maria DiFronzo is a medical imaging clinical instructor and radiologic technologist.  She requested a medical exemption on the basis of her pregnancy.  (Def. Ex. 9).  The Occupational Health Clinical Panel denied her request on the basis of updated guidance from the CDC recommending that pregnant individuals obtain a COVID-19 vaccination.  (Def. Ex. 10).

Michael Saccoccio is a registered nurse.  He requested a medical exemption on the basis of his anxiety and post-traumatic stress disorder.  (Def. Ex. 15).  After a preliminary denial and request from the Occupational Health Clinical Panel for more specific information, his physician informed the panel that his PTSD was due to severe childhood trauma.  (Def. Exs. 16-18).  The panel then upheld its earlier denial on the ground that Saccoccio had not demonstrated "a sufficient medical reason or contraindication to support an exemption."  (Def. Exs. 16, 19).

### B.    Procedural Background

On October 17, 2021, plaintiffs brought this lawsuit against MGB.  The complaint asserts three claims:  (1) failure to make reasonable accommodations in violation of the Americans with Disabilities Act; (2) religious discrimination in violation of Title VII; and (3) retaliation.  Also on October 17, 2021, plaintiffs moved for preliminary injunction to enjoin MGB from enforcing the COVID-19 vaccination policy.  The motion alleged that plaintiffs face imminent adverse action by being placed on unpaid leave on October 20, 2021, and subsequently terminated on November 5, 2021.  The Court held an initial hearing on October 20, 2021, and orally denied the motion for the reasons stated on the record.  The parties were directed to submit additional memoranda and affidavits.  The Court then held a second hearing on the motion on November 4,

2021, which it again denied from the bench.

## II.   **Legal Standard**

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A plaintiff's likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (citing *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).  "[A]n inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Id.*

## III.   **Analysis**

### A.   **Standing of Plaintiff Together Employees**

Standing to sue is a threshold issue in every federal case.  "If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992).  Plaintiffs have the burden of "adducing facts necessary to support standing." *Id.* at 114.

An unincorporated association has standing to sue on behalf of its members if three requirements are met:  "(1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded

necessitates the personal participation of affected individuals." *Id.* at 115.

Here, the complaint alleges that Together Employees is an unincorporated association of 229 unvaccinated MGB employees.  It is highly doubtful that Together Employees has standing to sue on behalf of its members, because the claims asserted and relief demanded clearly require the personal participation of each affected employee.  At a minimum, each member will have his or her own unique medical or religious issues, which almost certainly will implicate highly personal matters (that, in turn, may raise substantial privacy concerns).  It is unclear how Together Employees can properly represent their interests under the circumstances. Furthermore, the use of an unincorporated association as a plaintiff in this context would effectively operate as an end-run around the strict requirements of Fed. R. Civ. P. 23.  The Court therefore concludes that Together Employees is not likely to succeed on the merits of its claims.

## B.  Likelihood of Success on the Merits

### 1.  Claims of Disability Discrimination under the ADA

The Americans with Disability Act prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A).

To establish a claim for failure to reasonably accommodate, "a plaintiff must produce sufficient evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA, (2) he was a qualified individual, and (3) the [employer], despite knowing of the

plaintiff's disability, did not reasonably accommodate it." *Flaherty v. Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 55 (1st Cir. 2019).[4]

### a.   Disability

A disability is a physical or mental impairment that substantially limits one or more of an individual's major life activities.  42 U.S.C. § 12102(1).  Courts apply a three-prong test to determine disability, considering (1) whether plaintiff has a physical or mental impairment; (2) whether the life activities plaintiff relies upon are "major" or "of central importance to daily life"; and (3) whether the impairment substantially limits plaintiff's major life activities.  *Carroll v. Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002) (internal citations omitted).

An impairment that is sporadic or in remission can qualify as a disability "if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).  However, "[e]vidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability."  *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011).  There must also be evidence that the impairment substantially limits one or more of an individual's major life activities.

Major life activities include basic tasks such as working, seeing, hearing, speaking, and breathing.  42 U.S.C. § 12102(2)(A).  They also include "the operation of a major bodily function," including immune system functions, digestion, and normal cell growth.  42 U.S.C. § 12102(2)(B).

---

[4] Plaintiffs cite the *McDonnell Douglas* burden-shifting framework, which is used in cases that lack direct evidence of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  However, the First Circuit has found that the "*McDonnell Douglas* model does not apply to ADA discrimination claims based on failure to reasonably accommodate."  *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 n.3 (1st Cir. 2001) (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999)).  Instead, "whether a requested accommodation is reasonable or whether it imposes an undue hardship are questions typically proved through direct, objective evidence."  *Id.*

Here, four named plaintiffs allege disabilities that preclude them from receiving the COVID-19 vaccine.  The alleged physical or mental impairments are PTSD (Saccoccio), pregnancy (DiFronzo), angio-edema/leukemia (Lancione), and severe mental anguish (Miller). Without much elaboration, plaintiffs contend that the major life activity affected is "working" and that "the taking of vaccines would significantly limit their major life activities."  (Plaintiffs' Mem. at 15-17).

There is considerable doubt as to whether any of the named plaintiffs have a "disability" that substantially limits them from "working."  Plaintiffs have only offered conclusory statements that their conditions substantially impair their ability to work.  *See Lebron-Torres v. Whitehall Lab'ys*, 251 F.3d 236, 241 (1st Cir. 2001) (concluding that "failure to proffer any evidence specifying the kinds of jobs that [plaintiff's] . . . condition prevented her from performing dooms her ADA claim"); *Carroll*, 294 F.3d at 239 (finding insufficient evidence of disability where plaintiff did not "show that he or she is significantly restricted in his or her ability to perform a class of jobs or a broad range of jobs in various classes") (internal quotation marks omitted).

Furthermore, and in any event, all four plaintiffs are, and have been, working for MGB, notwithstanding their various medical conditions.[5]  None of them are medically precluded from taking the vaccine; none have a condition for which the vaccine is contraindicated.  And in the case of plaintiff DiFronzo, pregnancy alone is not a "disability" within the meaning of the ADA (although complications resulting from pregnancy may be).  *See Navarro v. Pfizer Corp.*, 261 F.3d 90, 97 (1st Cir. 2001); U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-CVG-2015-1,

---

[5] It appears that plaintiff Miller was granted leave under the Family and Medical Leave Act beginning on October 15, 2021.  (Pl. Ex. M).

ENF'T GUIDANCE ON PREGNANCY DISCRIMINATION & RELATED ISSUES (2015) (stating that "[a]lthough pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA").

In *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 411 (8th Cir. 2018), the Eighth Circuit considered whether the plaintiff who requested exemption from the measles, mumps, and rubella vaccine had a disability within the meaning of the ADA.  One of the claimed impairments was an "immune system disability" stemming from chemical sensitives and allergies.  *Id.*  The court noted that there was insufficient evidence in the record to conclude that the plaintiff's allergies substantially impaired her ability to perform major life activities—she never sought any medical attention when she experienced a chemical sensitivity, she had never been hospitalized due to an allergic reaction, and she never "had to leave work early because of a reaction."  *Id.*  Those facts were "not enough for a reasonable fact-finder to conclude she is disabled."  *Id.*; *see Eubanks v. Mercy Med. Ctr., Inc.*, 2015 WL 9255326, at *6 (D. Md. Dec. 17, 2015) (dismissing ADA claim because plaintiff seeking flu shot exemption did not supply facts showing that her allergies substantially limited major life activity).[6]

In short, plaintiffs have not demonstrated a likelihood of success on their claims that they are "disabled" within the meaning of the ADA.

---

[6] The Southern District of New York also recently applied the ADA's definition of "disability" in a case where plaintiff sought an influenza vaccination exemption from her employer.  *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 158 (S.D.N.Y. 2020).  The plaintiff asserted that her allergy to the flu vaccine was a disability.  *Id.* at 163.  She claimed that she had two prior adverse reactions to the influenza vaccine that caused anxiety, difficulty breathing, and stress.  *Id.*  Although the court assumed that the plaintiff's allergy could qualify as an impairment that limited the major life activity of breathing, it concluded that she "nevertheless failed to show that this impairment substantially limited her breathing at the time she sought an accommodation" many years later.  *Id.* at 163-64.  The court left open the possibility that "some reactions to vaccines can be severe enough in intensity, duration, frequency, or after-effects to rise to the level of a disability under the ADA."  *Id.* at 165.

### b.     Qualified Individual

To succeed on a claim under the ADA, plaintiffs must further prove that they are "qualified" individuals.  A qualified individual is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  To be a qualified individual, an employee must show "(1) 'that she possesses the requisite skill, experience, education and other job-related requirements for the position'; and (2) 'that she is able to perform the essential functions of the position with or without reasonable accommodation.'"  *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017) (quoting *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006)).  Plaintiffs bear the burden of showing that they are "qualified."  *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).  A "significant degree of deference" is given to an employer's own business judgment about the necessities of the job.  *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012).

Plaintiffs are not, however, qualified individuals if they pose a "direct threat" to the health or safety of other individuals in the workplace.  42 U.S.C. § 12113(b).  "Where [plaintiff's] essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others."  *Amego*, 110 F.3d at 144; *see also Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 n.16 (1987) (stating, in case concerning Rehabilitation Act, that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk").[7]

---

[7] The statute, 42 U.S.C. § 12113(b), states that "the term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."  "Direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  § 12111(3).  The language concerning "qualification standards" is in a

The EEOC's recent guidance on COVID-19 vaccination mandates for employers is instructive:

> To determine if an employee who is not vaccinated due to a disability poses a "direct threat" in the workplace, an employer first must make an individualized assessment of the employee's present ability to safely perform the essential functions of the job . . . .  The determination that a particular employee poses a direct threat should be based on a reasonable medical judgment that relies on the most current medical knowledge about COVID-19.  Such medical knowledge may include, for example, the level of community spread at the time of the assessment.  *Statements from the CDC provide an important source of current medical knowledge about COVID-19*, and the employee's health care provider, with the employee's consent, also may provide useful information about the employee.  Additionally, the assessment of direct threat should take account of the type of work environment, such as:  whether the employee works alone or with others or works inside or outside; the available ventilation; the frequency and duration of direct interaction the employee typically will have with other employees and/or non-employees; the number of partially or fully vaccinated individuals already in the workplace; whether other employees are wearing masks or undergoing routine screening testing; and the space available for social distancing.

> If the assessment demonstrates that an employee with a disability who is not vaccinated would pose a direct threat to self or others, the employer must consider whether providing a reasonable accommodation, *absent undue hardship*, would reduce or eliminate that threat.  Potential reasonable accommodations could include requiring the employee to wear a mask, work a staggered shift, making changes in the work environment (such as improving ventilation systems or limiting contact with other employees and non-employees), permitting telework if feasible, or reassigning the employee to a vacant position in a different workspace.

*See* U.S. Equal Emp. Opportunity Comm'n, What You Should Know About COVID-19

and the ADA, the Rehabilitation Act, and Other EEO Laws: § K (2021) (emphasis added).

---

section of Title I called "defenses," which suggests that the defendant, not the plaintiffs, bears the burden of proof as to that issue.  The First Circuit has concluded, however, that plaintiffs bear the burden of demonstrating that they are not a direct threat in cases where their "essential job functions necessarily implicate the safety of others."  *Amego*, 110 F.3d at 144.  The plaintiff in *Amego* cared for disabled patients in a residential program, and one of her essential functions was administering medications to patients, which implicated the safety of others.  *Id.* at 137.  However, the *Amego* court cautioned that "[t]here may be other cases under Title I where the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense, on which the defendant would bear the burden."  *Id.* at 144.  Here, although the record is not clear on each of the named plaintiffs' job responsibilities, it appears that their job functions at MGB implicate the safety of others.

Here, plaintiffs are employees of a major hospital and healthcare network.  On this record, it appears very likely that their "essential job functions necessarily implicate the safety of others." *Amego*, 110 F.3d at 144.  Among the four plaintiffs requesting medical accommodations, two are registered nurses, one serves as a manager of information desks, and the remaining is a medical imaging clinical instructor and radiologic technologist.  The registered nurses almost certainly interact with patients as part of their job functions.  It is unclear from the record how much the instructor/technologist and manager interface with patients, visitors, and staff, but it appears unlikely that they hold back-office positions requiring no physical presence at any hospital.  Furthermore, and in any event, defendant notes that "all MGB employees are expected to be deployable to the hospital[s] as needed."  (Klompas Dec. ¶ 28).

Plaintiffs nevertheless contend that they would pose no direct threat in the workplace.  They cite to a portion of *Arline* stating that "[t]he fact that some persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the [ADA] all persons with actual or perceived contagious diseases."  480 U.S. at 285 (emphasis omitted).  However, in determining whether an individual with a contagious disease is otherwise qualified, the *Arline* court endorsed use of the following factors:

> [Findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Id.* at 288.  The court also advised that "courts normally should defer to the reasonable medical judgments of public health officials."  *Id.*

Although plaintiffs brush aside the direct-threat analysis by arguing that plaintiffs do not

currently have a contagious disease, that is surely not the end of the inquiry.  How COVID-19 is

transmitted, how long infected persons are contagious, and the potential risks to other employees,

visitors, and staff, are all relevant factors.  It is undisputed that COVID-19, and particularly the

Delta variant, is a highly contagious disease, transmitted in large part through proximity to

infected people.  Nor is it disputed that COVID-19 is often serious and sometimes fatal, or that

the disease can be transmitted by infected persons who are entirely asymptomatic.

Under the circumstances, it was reasonable for MGB to conclude that unvaccinated

employees—who are more likely to become infected—pose a direct threat to patients and others.

"[T]his court should not second-guess the hospital's judgment in matters of patient safety."

*Griel v. Franklin Med. Cen.*, 71 F. Supp. 2d 1, 9 (D. Mass. 1999), *aff'd sub nom., Griel v.

Franklin Med. Ctr.,* 234 F.3d 731 (1st Cir. 2000); *cf. Giles v. Sprouts Farmers Mkt., Inc.*, 2021

WL 2072379, at *6 (S.D. Cal. May 24, 2021) (holding that defendant's masking policy did not

amount to discrimination under Title III of ADA because defendant considered "direct threat

posed by Plaintiff by her unwillingness to wear a face mask or face shield"); *Hernandez v. W.

Texas Treasures Est. Sales, LLC*, 2021 WL 4097148, at *5 (W.D. Tex. Aug. 19, 2021) (same).

In summary, the Court finds that plaintiffs have not shown a likelihood of success on

their claims that they are "qualified" individuals within the meaning of the ADA.

### c.   <u>Reasonable Accommodation</u>

Even assuming plaintiffs could prove they are qualified individuals, they must further

show that the employer was aware of their disabilities and did not reasonably accommodate

them.  *Flaherty*, 946 F.3d at 55.[8]  Plaintiffs must "demonstrate in the first instance what specific

---

[8] The statute provides as follows:

The term "reasonable accommodation" may include--

(A)   making existing facilities used by employees readily accessible to and usable by individuals

accommodations [they] needed and how those accommodations were connected to [their] ability to work." *Ortiz-Martínez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017) (citing *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012)).  That is, plaintiffs must "provide sufficient information to put the employer on notice of the need for accommodation" and "explain how the accommodation is linked to plaintiff's disability."  *Jones*, 696 F.3d at 89.  The requested accommodation must be "reasonable on its face."  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002); *see Reed*, 244 F.3d at 259.

Another "element in the reasonableness equation is the likelihood of success."  *Evans v. Fed. Express Corp.*, 133 F.3d 137, 140 (1st Cir. 1998).  Plaintiffs must demonstrate that the proposed accommodations "would enable [them] to the perform the essential functions of [their] job[s]" and would be "feasible for the employer under the circumstances."  *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 136 (1st Cir. 2009) (quoting *Reed*, 244 F.3d at 259).[9]

Here, the accommodation requested by all four named plaintiffs is simply that they not

___

with disabilities; and

(B)   job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(a).

[9] Much confusion has resulted from two conceptually similar ideas:  (1) plaintiff's burden to prove a reasonable accommodation that "is feasible for the employer" and (2) defendant's burden to prove undue hardship. The First Circuit has attempted to reconcile that tension as follows:

[W]e believe the best way to distinguish between the two burdens is to follow in essence the lead of our sister circuits:  In order to prove "reasonable accommodation," a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.  If plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details.

*Reed*, 244 F.3d at 259.

receive the vaccine.  Defendant's Medical Exemption Review Committee deployed two panels to review plaintiffs' purported disabilities, consulted with "various world-renowned specialists at MGB, including in Obstetrics, Allergy, and Neurology," and adhered to the CDC's guidance regarding the very few recognized medical contraindications to COVID-19 vaccination. (Hashimoto Dec. ¶¶ 28-29).  Contraindications to the COVID-19 vaccine include a history of severe allergic reaction to vaccines or certain vaccine ingredients like polyethylene glycol.  (Def. Ex. 8).  Other considerations include "myocarditis or pericarditis, autoimmune diseases, Guillain-Barré Syndrome, and Bell's palsy."  (*Id.*).  Given those guidelines, defendant concluded that the four named plaintiffs' purported disabilities were not contraindications to vaccination. And where the claimed disability is not a contraindication for the vaccine, the requested accommodation does not sufficiently relate to the claimed disability.  *Hustvet,* 910 F.3d at 411.

According to the present record, the four named plaintiffs did not request any other specific workplace accommodation, such as remote work, masking, social distancing, screening, and testing.  Some plaintiffs did not mention such accommodations at all in their affidavits; others made only general allegations concerning religion, such as, "I was more than willing to discuss what accommodation would allow me to practice my religion while at the same time ensure the safety of myself and others while at work."  (Pl. Exs. 1-3).[10]  It is plaintiffs' burden to demonstrate what specific accommodations they needed and how those accommodations were connected to their ability to work.  *See Ortiz-Martínez,* 853 F.3d at 605.

---

[10] In their memorandum, counsel for plaintiffs contend that "they are willing to abide by any reasonable accommodations," including staying at home if they have an illness, wearing a mask, washing their hands frequently, and screening for COVID-19 daily.  (Plaintiffs' Mem. at 12-13).  However, statements by counsel are not part of the evidentiary record.

In any event, to the extent plaintiffs are requesting masking, socially distancing, or periodic testing as reasonable accommodations, MGB is justified in concluding that doing so would present an undue hardship.  After consulting with experts, MGB determined that "allowing any employee to decide instead just to mask, engage in periodic testing, and socially distance was not adequate to meet [its] urgent health and safety priorities and protect its vulnerable patient population."  (Klompas Dec. ¶ 29).  To the extent plaintiffs are requesting remote work as reasonable accommodations, they have not provided evidence that their positions could be performed remotely, or that such accommodations would be reasonable under the circumstances.  *See Reed*, 244 F.3d at 259.

In summary, because there is an insufficient nexus between the accommodation requests and plaintiffs' purported disabilities, it is unlikely that plaintiffs can prove that the requested accommodations were reasonable at this stage.

### d.   Undue Hardship

If plaintiffs have made the necessary showing that they are disabled, that they are qualified individuals, and that the employer failed to accommodate their disabilities, defendant has the burden of demonstrating an undue hardship on the operation of its business.  *Reed*, 244 F.3d at 258-60.  The undue hardship inquiry must take into account the context of the particular employer's business and the nature of operations.  *See Barnett*, 535 U.S. at 402.[11]

Considerations include not only direct economic costs, but indirect ones related to health and safety.  *See* U.S. EQUAL EMP. OPPORTUNITY COMM'N, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS: § L (2021)

---

[11] The EEOC's guidelines note that undue hardship is not just "financial difficulty, but . . . reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business."  U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-CVG-2003-1, ENF'T GUIDANCE ON REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE ADA (2002).

(stating that costs include "the burden on the conduct of the employer's business – including, in this instance, the risk of the spread of COVID-19 to other employees or to the public").

The First Circuit recently confronted the issue of undue hardship in *Does 1-6 v. Mills*, 2021 WL 4860328, at *10 (1st Cir. Oct. 19, 2021).  In *Mills*, unvaccinated healthcare workers sought a preliminary injunction based on, among other things, a Title VII claim against their hospital employers.  *Id.*  Evaluating the likelihood of success on the merits, the First Circuit concluded that "hospitals need not provide [a COVID-19 vaccination] exemption . . . because doing so would cause them to suffer undue hardship."  *Id.*; *see also Robinson,* 2016 WL 1337255, at *10 (finding that, in Title VII case, "accommodating [plaintiff's] desire to be vaccine-free in her role [as intake employee at Boston Children's Hospital emergency department] would have been an undue hardship because it would have imposed more than a *de minimis* cost").  Reputational effects on an employer can also impose an undue hardship.  *See Cloutier,* 390 F.3d at 136 (finding undue hardship in Title VII case where accommodation would "adversely affect the employer's public image").

On the record before the Court, it appears that MGB has established a reasonable likelihood of success on its contention that providing plaintiffs an exemption from the vaccination policy would impose an undue hardship.  MGB is essentially in the business of providing medical care to patients, many of whom are medically vulnerable to COVID-19 infection.  It contends that permitting the requested accommodations would create a greater risk of COVID-19 infection in its facilities.  (Klompas Dec. ¶ 29).  That heightened risk, in turn, would undermine its "responsibility to maintain the highest level of patient care" and "protect patients, staff and visitors."  (Klompas Dec. ¶ 19).  It would also place "additional stresses on [defendant's] already overburdened system created by the highly contagious Delta variant."

(*Id.*).

After consulting with experts, MGB determined that the alternatives to vaccines, such as masking, periodic testing, and social distancing, would impose an undue hardship.  Specifically, it concluded that (1) social distancing from other staff, patients, and visitors is not always practicable; (2) testing is inadequate because, among other reasons, it misses infections on days not tested and conveys a false sense of security to healthcare workers; and (3) vaccinated individuals who become infected with COVID-19 are "at least 50% less likely to transmit infection compared to unvaccinated people." (Klompas Dec. ¶ 29). [12]  The policy also was designed to minimize staff absences, so that defendant's workforce could continue to combat the COVID-19 pandemic.  (Klompas Dec. ¶ 35).[13]  And MGB has a strong interest in maintaining public trust and confidence in its ability to provide a reasonably safe environment for its patients, and to assure the public that they may seek health care in its facilities without an unnecessary risk of infection.

In response, plaintiffs first contend that any undue hardship is hypothetical because defendant never actually contemplated or attempted an accommodation.  While it is true that courts are "somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that has never been put into practice," defendant's undue hardship

---

[12] In an attempt to rebut the claim of undue hardship, plaintiffs cite to several articles authored by Dr. Michael Klompas, a Hospital Epidemiologist at Brigham and Women's Hospital, and Dr. Dean Hashimoto, Chief Medical Officer of Workplace Health and Wellness at Mass General Brigham.  According to plaintiffs, those articles suggest a low probability of COVID-19 transmission from healthcare workers and emphasize the benefits of masking.  (Plaintiffs' Reply at 8-9).  It is notable that the three reports were published in 2020, prior to the emergence of the Delta variant.  Those early reports also do not preclude updated findings by defendant and its experts that COVID-19 vaccinations are now necessary to protect patients and staff.  (Klompas Dec. ¶ 17-29).

[13] Although the record does not reflect the actual cost of COVID-19 testing for MGB, it appears likely that the cost of administering tests to hundreds of employees on a routine basis, including the hours spent reviewing and transmitting results, is not substantial.

here is far from hypothetical. *Cloutier*, 390 F.3d at 135 (quoting *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975)). Indeed, the First Circuit has noted that it "is possible for an employer to prove undue hardship without actually having undertaken any of the possible accommodations." *Id.* (quoting *Draper*, 527 F.2d at 520). That is particularly true here, where MGB owns and operates a hospital network, and is surely capable of balancing the risks of different strategies to combat the spread of disease. Certainly, it is not required to attempt any actions that it has concluded may materially compromise patient safety.

Plaintiffs further contend that defendant would not be unduly burdened because it allows unvaccinated patients into its hospitals, and the addition of a few unvaccinated employees would not materially alter the overall risk. However, unvaccinated patients implicate substantially different concerns than unvaccinated employees. MGB physicians have an ethical duty to treat all patients requiring medical care, including the unvaccinated. *See* AMA, Code of Medical Ethics Op. 1.1.2 (stating that physicians "have an ethical obligation to provide care in cases of medical emergency" and may not decline patients solely based on "infectious disease status"). MGB cannot simply turn away unvaccinated patients. But even if it must accept those patients, it is entitled to manage the risk of infectious disease as best it can. And, in any event, the issue is whether granting *employees* an accommodation from the COVID-19 vaccine would impose an undue hardship; the vaccination status of defendant's patients or visitors is not material.

Plaintiffs also point to MGB's alleged profits during the COVID-19 pandemic, arguing that it could not be financially burdened because MGB is "swimming in money" and "brought in $4.1 billion in revenues last quarter." (Plaintiffs' Mem. at 12). For present purposes, and without further comment, it is enough to note that issue of undue hardship cannot be resolved simply by reference to an employer's financial capabilities.

23

Plaintiffs next argue that a reasonable accommodation would not unduly burden MGB because it is facing staffing shortages that would only be exacerbated by "[r]idding [itself] of over two hundred employees and having to pay crisis rates and overtime to the employees that have remained." (Plaintiffs' Mem. at 13-14).  It is for MGB to decide how to operate its business, balance competing interests, and respond to staffing issues; again, the immediate question is simply whether any undue hardship would be imposed by granting the requested accommodation.

Plaintiffs further argue that there is no undue hardship because defendant accommodated the requests of other employees for religious or medical exemptions from the COVID-19 vaccine.  The record contains very little information about the basis for accommodations that were granted by defendant.  MGB counsel stated during oral argument that it received 2,402 requests for accommodation, including 1,976 religious exemption requests and 426 medical exemption requests (with some overlap).  Of those requests for accommodation, MGB apparently granted 234 total.  It is unclear on this record why those requests were granted, and what accommodations were provided.  At a minimum, the position of the employee is surely relevant; it is likely that an employee working (for example) in billing or accounting is better able to work remotely than a physician treating cancer patients, or a registered nurse administering medications to patients.  Regardless, defendant does not have to show that it eliminated all risk from all possible sources of COVID-19 infection.  That is simply not possible, given the realities of operating a major hospital organization during a worldwide pandemic.

Finally, plaintiffs argue that they are not currently spreading COVID-19.  But it cannot be true, as plaintiffs contend, that MGB faces no undue hardship simply because "none of [plaintiffs] are COVID positive" at this precise moment.  (Plaintiffs' Mem. at 14).  The First

Circuit in *Mills* certainly did not conclude as such, nor have other courts confronted with COVID-19 vaccination questions. *Does 1-6*, 2021 WL 4860328, at *10; *Barrington*, 2021 WL 4840855, at *4 (discussing "greater *risk* of contracting COVID-19 if [other employees of United Airlines] are required to come in contact with unvaccinated coworkers") (emphasis added). Moreover, in determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 n.15 (1977); U.S. EQUAL EMP. OPPORTUNITY COMM'N, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS: § L (2021) (stating that "[a] relevant consideration is the number of employees who are seeking a similar accommodation . . . [that is,] the cumulative cost or burden on the employer"). Therefore, defendant's undue hardship is not just accommodating one unvaccinated employee with a higher risk of spreading COVID-19, but potentially hundreds.

In summary, defendant has established a likelihood of success on its contention that granting the requested accommodations would cause an undue hardship.

### e.      **Interactive Process**

Finally, an employee's request for accommodation *may* create a duty on the part of the employer to engage in an interactive process, requiring "bilateral cooperation and communication." *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014).[14]  Both the employee and employer must act in good faith, but "empty gestures on the part of the employer will not satisfy the good faith standard." *Id.*  A refusal to give a requested

---

[14] Courts do not reach the issue of failure to engage in an interactive process when plaintiff cannot demonstrate that the requested accommodation was reasonable under the circumstances.  *See Jones*, 696 F.3d at 91 (rejecting claim of failure to engage in interactive process because "[a]n employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [his] job with an accommodation") (quoting *Walgreen Co.*, 679 F.3d at 19).

accommodation does not by itself amount to bad faith, "so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations." *Id.* at 133.  Importantly, "liability for failure to engage in an interactive process depends on a finding that the parties could have discovered and implemented a reasonable accommodation through good faith efforts." *Trahan v. Wayfair Me., LLC*, 957 F.3d 54, 67 (1st Cir. 2020)

Here, defendant contends that it engaged in an interactive process.  Dr. Dean Hashimoto, MGB's Chief Medical Officer of Workplace Health and Wellness, was tasked with developing and leading MGB's process for considering medical exemptions from the COVID-19 vaccine. (Hashimoto Dec. ¶ 3).  Two clinical panels were assembled to review these requests.  (*Id.* ¶ 13). The Occupational Health Clinical Panel included the expertise of occupational health clinical directors with substantial experience in disability evaluation and management.  (*Id.* ¶ 14).  The Infection Control Panel was comprised of five physicians with specialized expertise in infection control and disease.  (*Id.* ¶ 15).

Dr. Hashimoto contends that "[e]ach medical exemption request was given an individualized, thoughtful, case-by-case review."  (*Id.* ¶ 25).  As necessary, the panels would consult with specialists at MGB in fields such as Obstetrics, Allergy, and Neurology.  (*Id.* ¶ 28). Dr. Hashimoto alleges that the CDC's published guidance concerning medical contraindications to the vaccine was a pivotal standard that the panels used to assess the medical exemption requests.  (*Id.* ¶ 29).  The panels solicited and provided further individualized information as needed using follow-up e-mails to employees.  (*Id.* ¶ 30).  For example, upon denying plaintiff Lancione a medical exemption for her angio-edema, the panel recommended she consult an allergist for her concerns.  (Def. Ex. 12).  When denying medical exemptions to employees, the panels allowed the employees to submit additional information for consideration at an

Occupational Health and Safety e-mail address.  (Def. Exs. 10, 12, 14, 16).  Plaintiff Saccoccio, after being denied in the first instance, submitted additional materials to the reviewing panel, and the panel considered those materials before affirming its denial.  (Def. Exs. 17-19).

Given those assertions, the present record does not support a finding of bad faith on the part of MGB in considering plaintiffs' accommodation requests.[15]  The evidence to date indicates that defendant communicated with plaintiffs, followed up for additional information as needed, and rendered individualized decisions on accommodations in accordance with CDC guidelines.  Plaintiffs are therefore unlikely to succeed on their claims that defendant failed to engage in an interactive process.

In summary, and for all of the foregoing reasons, plaintiffs have not demonstrated a likelihood of success on the merits on their claims for disability discrimination in violation of the ADA.

### 2.  Claims of Religious Discrimination under Title VII

Plaintiffs further assert that MGB violated Title VII of the Civil Rights Act of 1964 by refusing to grant them religious accommodations under COVID-19 vaccination policy.

Title VII prohibits employers from discriminating against employees on the basis of religion, among other things.  42 U.S.C. § 2000e-2(a).  Claims of religious discrimination under Title VII are analyzed under a two-part framework.  *Cloutier v. Costco Wholesale Corp.*, 390

---

[15] Plaintiffs contend that defendant's process was not interactive because it rubber-stamped the CDC's guidance and discouraged network physicians from writing medical exemption requests.  However, plaintiffs do not point to any law that would prohibit employers from considering medical guidance during an interactive process.  Indeed, the EEOC's guidelines advise that employers may rely on CDC recommendations.  *See* U.S. EQUAL EMP. OPPORTUNITY COMM'N, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS: § K (2021).  Furthermore, defendant's e-mails to network physicians were apparently based on guidance from the Massachusetts Board of Registration of Medicine, which "warned that a physician who grants an exemption outside the acceptable standard of care may be subject to discipline."  Mass. Bd. of Registration in Med. Guidance on COVID Exemptions (Sept. 20, 2021), https://www.mass.gov/news/the-massachusetts-board-of-registration-in-medicine-guidance-on-covid-exemptions.

F.3d 126, 133 (1st Cir. 2004).  First, a plaintiff must make a *prima facie* case "that a *bona fide* religious practice conflicts with an employment requirement and was the reason for the adverse employment action."  *Id.*  Second, if the plaintiff establishes a *prima facie* case, "the burden then shifts to the employer to show that it offered a reasonable accommodation," or if it did not, "that doing so would have resulted in undue hardship."  *Id.*

### a.    *Prima Facie* Case

To establish a *prima facie* case of religious discrimination based on failure to accommodate, a plaintiff must assert "that a *bona fide* religious practice conflicts with an employment requirement and was the reason for the adverse employment action."  *Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012) (quoting *Cloutier*, 390 F.3d at 133).  To qualify as a *bona fide* religious practice, plaintiff must show "both that the belief or practice is religious and that it is sincerely held."  *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R.*, 279 F.3d 49, 56 (1st Cir. 2002).

Title VII defines "religion" as including "all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j).  Beliefs need not be "acceptable, logical, consistent, or comprehensible to others" to qualify as religious.  *Union Independiente*, 279 F.3d at 56 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)).

Determining whether a belief is sincerely held is a fact-intensive inquiry, turning on the "factfinder's assessment of the employee's credibility."  *Id.*  Evidence that an employee acted inconsistently with his or her professed belief is relevant in assessing whether a belief is sincerely held.  *Id.* at 57.  The factfinder can also consider whether the alleged conflict between an employment requirement and religious belief is a "moving target," although "such evidence might simply reflect an evolution in [plaintiff's] religious views."  *Id.* at 57 & n.8.

Here, the Court is presented with a series of affidavits, each alleging that the employee

holds a sincere religious belief that precludes COVID-19 vaccination.  Attempting to determine

whether plaintiffs have established a *prima facie* case is far from an easy task.

First, there is the question of whether plaintiffs' assertions constitute *religious* beliefs—as

opposed to philosophical, medical, or scientific beliefs, or personal fears or anxieties—that

conflict with the vaccination policy.  In a somewhat analogous case, the Third Circuit considered

whether a hospital employee's opposition to influenza vaccination constituted a religious belief.

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.,* 877 F.3d 487, 488 (3d Cir. 2017).  The court

ultimately determined that plaintiff did not establish a *prima facie* case that his objection to

vaccination was a religious belief, reasoning as follows:

> It does not appear that [plaintiff's] beliefs address fundamental and ultimate
> questions having to do with deep and imponderable matters, nor are they
> comprehensive in nature.  Generally, [plaintiff] simply worries about the health
> effects of the flu vaccine, disbelieves the scientifically accepted view that it is
> harmless to most people, and wishes to avoid this vaccine.  In particular, the basis
> of his refusal of the flu vaccine—his concern that the flu vaccine may do more
> harm than good—is a medical belief, not a religious one.  He then applies one
> general moral commandment (which might be paraphrased as, "Do not harm your
> own body") to come to the conclusion that the flu vaccine is morally wrong.  This
> one moral commandment is an "isolated moral teaching"; by itself, it is not a
> comprehensive system of beliefs about fundamental or ultimate matters.

*Id.* at 492.  While that analysis appears to be entirely correct, the principle articulated is difficult

to apply in practice.  Few beliefs are entirely isolated from a belief system, and in any event there

are not always bright lines that would readily permit beliefs to be sorted into the categories of

"religious" and "non-religious."

An additional complication arises from the fact that the professed religious beliefs here

do not appear to comport entirely with the doctrine of any organized religion.  It appears that

most, if not all, organized religions of any size in the United States do not oppose COVID-19

vaccination.  That does not end the inquiry, but surely bears on it to some degree.  *See* U.S.

29

EQUAL EMP. OPPORTUNITY COMM'N, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE
ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS: § L (2021) (noting that "[a]n employer
should not assume that an employee is insincere simply because some of the employee's
practices deviate from the commonly followed tenets of the employee's religion, or because the
employee adheres to some common practices but not others."); *Vinning-El v. Evans*, 657 F.3d
591, 594 (7th Cir. 2011) (stating, in First Amendment context, that "although sincerity rather
than orthodoxy is the touchstone, a prison still is entitled to give *some* consideration to an
organization's tenets.  For the more a given person's professed beliefs differ from the orthodox
beliefs of his faith, the less likely they are to be sincerely held"); *Caviezel v. Great Neck Pub.
Schs.*, 701 F. Supp. 2d 414, 429 (E.D.N.Y. 2010), *aff'd*, 500 F. App'x 16 (2d Cir. 2012)
(concluding, in case about New York vaccination requirements for school children, that
plaintiff's objection to vaccine was not sincerely held religious belief, in part because church to
which plaintiff belonged did not oppose vaccination).  But courts should also be wary of the real
danger, in evaluating both the nature of a belief and its sincerity, that they may tend to favor
well-established or widely practiced religions and the expense of new or disfavored ones.

In any event, the basic inquiry is whether the belief at issue is religious, and whether it is
sincerely held.  The record includes multiple affidavits that allege sincerely held religious beliefs
that would preclude the particular employee from receiving the vaccine.  It appears that MGB
accepted some professions of religious sincerity, but not all, and did not accept those from the
named plaintiffs.  It is difficult on this record, and at this preliminary stage, for this Court to
make any kind of deeper inquiry.  The Court is mindful that Title VII's "capacious definition" of
religion "leaves little room for a party to challenge the religious nature of an employee's
professed beliefs," and that sincerity depends on a fact-intensive assessment of credibility.

*Union Independiente*, 279 F.3d at 56.  Indeed, courts confronted with Title VII religious discrimination issues often assume that plaintiffs have established a *prima facie* case and resolve matters on other grounds.  *See, e.g.*, *Robinson v. Children's Hosp. Bos.*, 2016 WL 1337255, at *6 (D. Mass. Apr. 5, 2016) (assuming at summary judgment stage, "that [plaintiff] can establish a *prima facie* case that her refusal to take the influenza vaccination is based on a sincerely held, bona fide religious belief"); *Barrington v. United Airlines, Inc.*, 2021 WL 4840855, at *2 (D. Colo. Oct. 14, 2021) (stating that "the Court will presume that this [*prima facie*] requirement has been met" to examine COVID-19 vaccination policy at TRO stage).

With some misgivings, this Court will do the same here.  It will assume, for the sake of argument, that plaintiffs can establish a *prima facie* case that a *bona fide* religious belief prevents them from taking the COVID-19 vaccine.

### b.   Reasonable Accommodation

Once plaintiffs establish a *prima facie* case, the burden shifts to defendant to show that it offered a reasonable accommodation, or if not, that doing so would have resulted in undue hardship.  *Cloutier*, 390 F.3d at 133.  "Cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior."  *Sanchez-Rodriguez*, 673 F.3d at 12 (quoting *Rocafort v. IBM Corp.*, 334 F.3d 115, 120 (1st Cir. 2003)).  Here, as noted, the only specific request made by plaintiffs for an accommodation is that they not receive the vaccine.  And it is undisputed that defendant did not offer any accommodation to plaintiffs, such as increased COVID-19 testing or masking.

### c.   Undue Hardship

Because defendant did not offer a reasonable accommodation, it must prove that doing so would have resulted in undue hardship.  Under Title VII, an accommodation is an undue hardship "if it would impose more than a *de minimis* cost on the employer."  *Cloutier*, 390 F.3d

31

at 134.  For the reasons set forth above, defendant has shown a likelihood of success on the merits of that contention—that is, permitting the named plaintiffs to continue to work at MGB without being vaccinated would materially increase the risk of spreading the disease and undermine public trust and confidence in the safety of its facilities.  Those likely harms to MGB—while perhaps difficult to measure in terms of dollar amounts—are certainly not *de minimis*.[16]

### d.    Interactive Process

Finally, plaintiffs argue that defendant failed to engage in a meaningful interactive process.  The Supreme Court has noted that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business."  *Ansonia Bd. of Educ. v. Philbook*, 479 U.S. 60, 69 (1986) (internal citation omitted).  However, "liability for failure to engage in an interactive process depends on a finding that the parties could have discovered and implemented a reasonable accommodation through good faith efforts."  *Mills*, 2021 WL 4860328, at *10 (quoting *Trahan*, 957 F.3d at 67).

Here, defendant formed a Religious Exemption Review Committee to evaluate requests for religious exemptions.  After initial consideration of accommodation requests, the committee often sent employees follow-up questions that were tailored to the particular religious objections of each employee.  (Nichols Dep. ¶¶ 25-28).  Employees who received follow-up questions were directed to send their responses to a dedicated MGB e-mail box and were free to submit whatever supporting documentation they wanted.  (*Id*. ¶ 29).  In some cases, the committee sent additional follow-up questions to employees after determining more information was needed.

---

[16] To the extent that plaintiffs seek to impose additional financial costs, such as screening and testing of hundreds of employees multiple times per week, the record does not reflect the exact size or nature of the burden. As noted, however, plaintiffs have not specifically requested such an accommodation.

(*Id.* ¶ 31).  Given the record at this stage, it seems likely that defendant engaged in an interactive process.

As the First Circuit concluded in *Mills* on similar facts, the evidence suggests that MGB engaged in an interactive process in good faith.  2021 WL 4860328, at *10; *see also Barrington*, 2021 WL 4840855, at *5 (holding that plaintiff was unlikely to succeed in establishing violation of Title VII for failure to engage in interactive process where defendant represented "that employees who had requested accommodation were notified via email of the proposed accommodation and given five days to respond").

### e.      Exhaustion of Administrative Remedies

A further potential issue remains.  To bring an action for employment discrimination under Title VII, an employee must first file a charge with either (1) the Equal Employment Opportunity Commission (within 180 days of the alleged unlawful employment practice) or (2) a parallel state agency—here, the Massachusetts Commission Against Discrimination (within 300 days of that practice).  42 U.S.C. § 2000e-5(e)(1); *Aly v. Mohegan Council, Boy Scouts of America*, 711 F.3d 34, 41 (1st Cir. 2013).[17]  Plaintiffs may seek relief in federal court only if "the EEOC dismisses the administrative charge, does not bring civil suit, or does not enter into a conciliation agreement within 180 days of the filing of the administrative charge."  *Aly*, 711 F.3d at 41.  In other words, plaintiffs who have failed to exhaust their administrative remedies are not

---

[17] Although the parties discuss exhaustion of administrative remedies with respect to Title VII, the same requirements are also present for plaintiffs' ADA claims.  Title I of the ADA incorporates the powers, remedies, and procedures set forth in Title VII of the Civil Rights Act by reference.  42 U.S.C. § 12117(a).  Therefore, a plaintiff seeking to bring charges of employment discrimination under the ADA must exhaust administrative remedies under the same standard articulated for Title VII.  *See Farris v. Shinseki*, 660 F.3d 557, 562 (1st Cir. 2011) ("Claims of employment discrimination arising under the ADA are subject to the same remedies and procedures as those under Title VII of the Civil Rights Act of 1964.  Under Title VII, a[n] . . . employee must exhaust her administrative remedies before initiating a complaint of discrimination in federal court.  The same is true for claims under the ADA.") (internal citations omitted); *Bonilla v. Muebles J. J. Alvarez, Inc.*, 194 F.3d 275, 277-78 (1st Cir. 1999) (applying 42 U.S.C. § 2000e-5(e) exhaustion requirements in Title I ADA employment discrimination case).

entitled to judicial relief under Title VII.  *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005).

When the EEOC takes any of the listed actions, the agency issues a right-to-sue notice, notifying

the charging party of his right to bring suit within 90 days.  29 C.F.R. § 1601.28 (2020).

There are thus two basic components to administrative exhaustion under Title VII:  (1)

timely filing a charge with the EEOC (the "timeliness requirement"); and (2) receipt of a right to

sue letter from the EEOC (the "verification requirement").  *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 798 (1973); *Vazquez-Rivera v. Figueroa*, 759 F.3d 44, 48 (1st Cir. 2014).  In

*Edelman v. Lynchburg Coll.*, 535 U.S. 106, 112-13 (2002), the Supreme Court clarified that the

purpose of the time limitation on the charging party is to "encourage . . . raise[ing] a

discrimination claim before it gets stale" while the purpose of requiring EEOC verification is "to

protect[] employers from the disruption and expense of responding to a claim unless a

complainant is serious."

Title VII provides a private right of action only after the verification requirement has

been satisfied.  42 U.S.C. § 2000e-5(f)(1).  The statute authorizes federal district courts to grant

preliminary relief if requested by the EEOC after the filing of the charge.  *Id.* § 2000e-5(f)(2)

("Whenever a charge is filed with the Commission and the Commission concludes . . . that

prompt judicial action is necessary . . . the Commission . . . may bring an action for appropriate

temporary or preliminary relief").

That framework is somewhat at odds with the ability of a Title VII plaintiff to obtain

preliminary injunctive relief.  In *Bailey v. Delta Air Lines, Inc.*, the First Circuit in *dicta* implied

that a showing of irreparable harm may justify the granting of a preliminary injunction in a Title

VII case even where plaintiffs did not obtain a right-to-sue letter.  722 F.2d 942, 944-45 (1st Cir.

1983) ("We need not decide the jurisdictional issue here, for the plaintiffs in the present case

have made no showing of anything even approaching the irreparable injury required to obtain preliminary relief. . . .  [W]e do not reach the question of what circumstances would justify a district court in granting preliminary relief in other cases.").  The court concluded that "the procedural requirements of Title VII should be considered in the equitable balancing process which would attend any grant of injunctive relief" and that to obtain such relief, a claimant would have to, at a minimum, make a showing of "irreparable injury sufficient in kind and degree to justify the disruption of the prescribed administrative process."  *Id.*[18]

Here, it is unclear whether plaintiffs have exhausted their administrative remedies.  The only information plaintiffs have supplied on this topic is that "the EEOC has already issued right to sue letters for many plaintiffs, stating that it is unlikely that the agency can complete the administrative processing within 180 days."  (Plaintiffs' Mem. at 18, n. 8).  There is insufficient evidence in the record to determine whether each named plaintiff has met the timeliness and verification requirements under Title VII.  In any event, plaintiffs have not made "a showing of irreparable injury sufficient in kind and degree to justify the disruption of the prescribed administrative process."  *Bailey*, 722 F.2d at 944.[19]

In summary, and for the foregoing reasons, plaintiffs have not shown a likelihood of success on their claims for religious discrimination in violation of Title VII.

### 3.   **Retaliation**

To establish a *prima facie* case of retaliation under Title VII or the ADA, plaintiffs must

---

[18] The First Circuit has elaborated that the required showing of "genuinely extraordinary" irreparable harm is "subject to a sliding scale analysis, such that the showing of irreparable harm required of a plaintiff increases in the presence of factors, including the failure to exhaust administrative remedies, which cut against a court's traditional authority to issue equitable relief."  *Gately v. Com. of Mass.*, 2 F.3d 1221, 1232 (1st Cir. 1993); *see DeNovellis v. Shalala*, 135 F.3d 58, 62 (1st Cir. 1998).

[19] On somewhat similar facts, the First Circuit in *Mills* recently affirmed the district court's conclusion that unvaccinated healthcare workers "had not exhausted their administrative remedies."  2021 WL 4860328, at *10.

establish (1) that they engaged in protected conduct; (2) that they suffered an adverse employment action; and (3) that there was a causal connection between the protected conduct and adverse action.  *Colón-Fontánez v. Mun. of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011).[20]  If plaintiffs make such a showing, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action.  *Walgreen Co.*, 679 F.3d at 20.  Then, plaintiffs bear "the ultimate burden of showing that [defendant's] explanation was, in fact, pretextual" and that the challenged employment action was the result of "defendant's retaliatory animus."  *Id.* at 21 (quoting *Callazo v. Bristol-Myers Squibb Mfg. Inc.*, 617 F.3d 39, 46 (1st Cir. 2010)).

Here, plaintiffs likely can only meet the first two elements of their *prima facie* case. Requesting a reasonable accommodation is a protected activity.  *Colón-Fontánez*, 660 F.3d at 36. And they have suffered adverse employment actions by being placed on unpaid leave and subsequently terminated.  Third, however, they likely cannot show a causal connection between the protected activity and adverse employment action.  To establish a causal connection at the preliminary injunction stage, "[m]ere conjecture and unsupported allegations will not suffice. Rather, [plaintiffs] must demonstrate the existence of specific facts that would enable a finding that explanatory reasons offered . . . were mere pretext for [a] true motive of retaliation." *Shalala*, 135 F.3d at 65 (affirming no likelihood of success on merits of ADEA retaliation claim).  Defendant contends that "plaintiffs are subject to unpaid leave and potential termination not because they requested exemption, but because they were not approved and remain non-complaint with the Vaccination Policy."  (Defendant's Opp. at 28).  Defendant further avers that

---

[20] A retaliation claim does not depend on the success of plaintiffs' disability claims.  *See Colon-Fontanez*, 660 F.3d at 36.

it would "welcome Plaintiffs back to work" if they received the COVID-19 vaccine.  (*Id.*).
Critically, plaintiffs have not put forth specific facts that demonstrate a true motive of retaliation.

Even if plaintiffs could make a *prima facie* case, defendant has articulated a legitimate,
non-retaliatory reason for the challenged employment action.  According to defendant, its policy
is a neutral one of general applicability, and "consequences for non-compliance are based on the
employees' vaccination status, not whether or not they applied for an exemption (and not on their
religion or disability)."  (Defendant's Opp. at 28-29).  At this stage, it seems unlikely that
plaintiffs will be successful on the merits of their retaliation claim.  *See Barrington*, 2021 WL
4840855, at *6-7 (finding, at TRO stage, that Title VII retaliation claim related to COVID-19
vaccine policy would likely fail).

### C.      Potential for Irreparable Harm

When a plaintiff fails to meet his burden to show a likelihood of success on the merits,
"failure to do so is itself preclusive of the requested relief."  *Bayley's Campground, Inc. v. Mills*,
985 F.3d 153, 158 (1st Cir. 2021).  However, for completeness, the Court will consider the
remaining factors, which also counsel against injunctive relief.

Irreparable harm is measured "on a sliding scale, working in conjunction with a moving
party's likelihood of success on the merits, such that the strength of the showing necessary on
irreparable harm depends in part on the degree of likelihood of success shown."  *Braintree Labs.,
Inc. v. Citigroup Glob. Mkts., Inc*., 622 F.3d 36, 42-43 (1st Cir. 2010).  "Irreparable harm most
often exists where a party has no adequate remedy at law."  *Charlesbank Equity Fund II v.
Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

In *Mills,* the First Circuit held that plaintiffs moving to enjoin a COVID-19 vaccine
policy could not show irreparable harm in the form of loss of employment.  2021 WL 4860328,

at *10.[21]  The court noted that money damages are generally an appropriate remedy, and that appellants had failed to show a "genuinely extraordinary situation" as set forth in *Sampson v. Murray.  Id.*; *see also Shalala*, 135 F.3d at 63 (salary loss, emotional distress, and loss of prestige "[n]either in sum nor in individual parts . . . amount to irreparable injury . . . .").

Another judge in this district recently denied a motion for preliminary injunction by the Massachusetts Correction Officers Federated Union to prevent enforcement of a COVID-19 vaccine requirement.  *Mass. Corr. Officers Federated Union v. Baker*, 2021 WL 4822154, at *1 (D. Mass. Oct. 15, 2021).  There, the court found that irreparable harm was lacking because "it is well settled that the loss of employment is not considered irreparable for the purposes of an injunction."  *Id.* at *7; *see also Beckerich*, 2021 WL 4398027, at *6 (stating that loss of employment due to failure to comply with COVID-19 vaccine policy was "not considered an irreparable injury" because wrongful termination claims exist for the very reason to recover "monetary damages to compensate their loss of employment"); *Bauer v. Summey*, 2021 WL 4900922, at *18 (D.S.C. Oct. 21, 2021) (finding that economic harm from loss of employment due to COVID-19 vaccination mandate was not irreparable); *Valdez v. Grisham*, 2021 WL 4145746, at *12 (D.N.M. Sept. 13, 2021) (holding that being terminated or prevented from working as nurse based on COVID-19 vaccination mandate does not constitute irreparable harm); *Norris v. Stanley*, 2021 WL 3891615, at *3 (W.D. Mich. Aug. 31, 2021) (finding that plaintiff-employee failed to show irreparable injury would result if defendant-employer terminated her employment for failure to comply with COVID-19 vaccination mandate);

---

[21] During oral argument, plaintiffs attempted to distinguish the lack of irreparable harm in *Mills* by arguing that here, plaintiffs made a greater showing in the form of mental anguish, loss of income, and impending homelessness.  Even assuming the existence of those harms, they all stem from loss of employment and emotional distress, which do not qualify as irreparable harm under First Circuit precedent.

*Johnson v. Brown*, 2021 U.S. Dist. LEXIS 200159, at \*72 (D. Or. Oct. 18, 2021) (finding no irreparable harm where plaintiffs faced temporary harm to jobs and benefits relating to Oregon executive order requiring healthcare and educational workers to be vaccinated against COVID-19).

Plaintiffs also claim irreparable harm on the ground that two employees are pursuing treatment for emotional distress.  However, while an employee "may recover compensation for her emotional distress claim if she prevails on the merits, the fact that an employee may be psychologically troubled by an adverse job action does not usually constitute irreparable injury warranting injunctive relief."  *Shalala*, 135 F.3d at 64.

Finally, plaintiffs contend that they are faced with an "impossible choice" to "forsake their religious convictions, or, in the case of the disability discrimination plaintiffs, potentially put themselves in danger of physical harm."  (Plaintiffs' Mem. at 21-22).  They cite to a variety of state action cases, arguing that irreparable harm results from a "loss of First Amendment freedoms."  (*Id.*).  However, MGB is a private employer, not a state actor.  There are no First Amendment claims at issue.  *See Beckerich*, 2021 WL 4398027, at \*6.

Therefore, for the reasons stated, plaintiffs will not suffer irreparable harm in the absence of injunctive relief.

### D.   <u>Balance of Equities</u>

The Court must next consider the balance of equities.  Plaintiffs will certainly experience economic hardship if they lose their jobs (although, again, that injury can be addressed with monetary damages if they prevail).  MGB has a strong interest in protecting its patients, visitors, and staff from exposure to COVID-19.  As the court noted in *Baker*, "[e]ven considering the economic impact on the Plaintiffs if they choose not to be vaccinated, when balancing that harm against the legitimate and critical public interest in preventing the spread of COVID-19 by

increasing the vaccination rate . . . the Court finds the balance weighs in favor of the broader

public interests."  2021 WL 4822154, at *8.  The Court here similarly concludes that the balance

of equities weighs in defendant's favor.

  **E.**  <u>**The Public Interest**</u>

  Finally, the Court must consider whether granting a preliminary injunction would serve

the public interest.  Other courts confronted with similar requests have generally considered the

public interest in curbing the spread of the COVID-19 pandemic.  *See, e.g.*, *Does 1-6 v. Mills*,

2021 WL 4783626, at *17 (D. Me. Oct. 13, 2021), *aff'd*, 2021 WL 4860328 (1st Cir. Oct. 19,

2021) (finding that vaccine mandate promotes public interest); *Bimber's Delwood, Inc. v. James*,

496 F. Supp. 3d 760, 789 (W.D.N.Y. 2020) (holding that injunction against "enforcing measures

employed specifically to stop the spread of COVID-19 is not in the public interest"); *Harris v.*

*Univ. of Mass.*, 2021 WL 3848012, at *8 (D. Mass. Aug. 27, 2021) (concluding that enjoining

vaccine mandate at University of Massachusetts is not in public interest); *Beckerich*, 2021 WL

4398027, at *7 (reasoning that "ending the COVID-19 pandemic" is in public's best interest).

  Here, enjoining defendant from enforcing a vaccination mandate intended to curb the

spread of COVID-19 is not in the public interest.  This virus "has infected and taken the lives of

thousands of Massachusetts residents," and dismantling this vaccination policy would undermine

defendant's efforts to combat the pandemic.  *Harris*, 2021 WL 3848012, at *8.  That factor

similarly weighs against the issuance of a preliminary injunction.

**IV.**  <u>**Conclusion**</u>

  For the foregoing reasons, and the reasons set forth on the record during the hearings on

October 20 and November 4, 2021, plaintiffs have not shown a likelihood of success on the

merits of their claims, that they will suffer immediate irreparable harm if the injunction does not

issue, that the balance of equities favors issuance of the injunction, or that an injunction would be

in the public interest.  Accordingly, plaintiffs' motion for a preliminary injunction is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: November 10, 2021                    Chief Judge, United States District Court