**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

TYLER ADAMS, et al.,
                    Plaintiffs,
        v.
MASS GENERAL BRIGHAM
INCORPORATED,
                    Defendant.

Civil Action No. 1:21-cv-11686-FDS

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................... 1

Summary of Argument ....................................................................................................... 3

Argument ............................................................................................................................ 5

    I.       Exempting Plaintiffs From the Vaccination Policy Was an Undue Hardship. ........... 5

        A.   Undue Hardship Standards Under Title VII and the ADA. ........................................ 8

        B.   The Undisputed Record Shows That MGB's Decision to Implement the Vaccination Policy Was the Product of MGB's Expert Medical Judgment, Real-World Clinical Experience, and Medical Evidence. ............................................................................... 9

            1. The Policy Was the Product of the Collective Judgment of MGB's Leadership and Renowned Medical Experts. .................................................................................... 9

            2. Clinical Experience During the COVID Pandemic Showed That Existing Infection Control Policies Were Insufficient. ......................................................................... 10

            3. Strong Evidence Showed the Vaccines Were Highly Effective. .......................... 12

            4. There Were No Workable, Safe Alternatives to Vaccination. .............................. 13

            5. MGB's Critical Objectives Required That All of its Employees Be Subject to the Vaccination Policy. .............................................................................................. 14

        C.   MGB Determined That Its Health and Safety Priorities Required Implementing Legally Compliant But Rigorous Exemption Processes. ........................................... 17

        D.   Granting Plaintiffs' Exemptions Would Have Increased the Risk of COVID Infection Across MGB and Negatively Impacted Patient Care. .............................. 18

            1. Neither Title VII Nor the ADA Required MGB To Take an All or Nothing Approach to Religious and Medical Exemptions. ................................................ 19

            2. The Aggregate Effects of Numerous Exemption Requests are Relevant to the Undue Hardship Analysis. .................................................................................... 21

        E.   A More Permissive Policy Further Risked Undermining the Public's Confidence in the Safety of MGB Facilities. ...................................................................................... 21

        F.   Alternative Infection Control Measures Would Have Imposed Substantial Safety Risks and Financial and Administrative Burdens. .................................................... 24

            1. Alternative Measures Were Not Safe. ................................................................. 24

            2. Alternative Measures Would Have Imposed Substantial Financial and Administrative Burdens on MGB. ....................................................................... 25

        G.   Because the Facts Supporting MGB's Undue Hardship Defense are Undisputed, MGB is Entitled to Summary Judgment. ................................................................ 27

    II.     Plaintiffs Cannot Establish a Prima Facie Case Under the ADA as a Matter of Law. ........ 28

A.   Nine Plaintiffs Cannot Show They Are Disabled as a Matter of Law. ..................... 28

    1.   Four Plaintiffs Did Not Request a Medical Exemption, and Thus There is no Evidence They Are Disabled or Requested Accommodation for a Disability. .... 29

    2.   Five Plaintiffs Concede Their Reported Condition(s) Did Not Substantially Limit Any Major Life Activity. ............................................................................... 30

    3.   Two Plaintiffs Reported Pregnancy—Which is Not a Disability—As Their Only Medical Condition. ................................................................................ 30

B.   Plaintiffs Cannot Establish That They Are "Qualified Individuals" Because They Posed a Direct Threat to Others as a Matter of Law. ................................................. 31

    1.   This Court Properly Held that MGB Was Likely to Succeed on the ADA Claims Because Plaintiffs Posed a Direct Threat. ............................................ 31

    2.   The Undisputed Record Shows Plaintiffs Posed a Direct Threat. ........................ 32

    3.   First Circuit Precedent Supports a Conclusion That Plaintiffs Posed a Direct Threat. ....................................................................................................... 34

    4.   Numerous Courts Have Held That the Risk of COVID Transmission Is a Direct Threat Under the ADA. .................................................................... 34

    5.   Circuit Courts Routinely Affirm Summary Judgment Where Employees Cannot Show They Could Perform Essential Job Functions Without Endangering Others. ....................................................................................................... 35

    6.   No Reasonable Accommodation Would Eliminate the Threat. ........................... 36

C.   Plaintiffs Cannot Show That Exemption From the Vaccination Policy Was A Reasonable Accommodation Because They Cannot Show That Avoiding Vaccination Was Necessary for Their Alleged Conditions. ..................................... 36

    1.   Seven Plaintiffs Conceded Their Conditions Are Not Contraindications. ........... 39

    2.   MGB's Expert Panels Determined the Remaining 14 Plaintiffs Did Not Have a CDC Contraindication. ....................................................................... 39

Conclusion ............................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ansonia Bd. of Educ. V. Philbrook*,
　479 U.S. 60 (1986)..................................................................................................24, 26

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*,
　No. CV 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022)..........................................20, 27

*Bekker v. Humana Health Plan, Inc.*,
　229 F.3d 662 (7th Cir. 2000) .......................................................................................35

*Biden v. Missouri*,
　142 S. Ct. 647 (2022)..............................................................................................7, 19

*Brox v. Hole*,
　590 F. Supp. 3d 359 (D. Mass. 2022) ....................................................................8, 9, 10, 22

*Cloutier v. Costco Wholesale Corp.*,
　390 F.3d 126 (1st Cir. 2004) ................................................................................. *passim*

*Does 1-2 v. Hochul*,
　No. 21CV5067AMDTAM, 2022 WL 4637843 (E.D.N.Y. Sept. 30, 2022)....................19, 27

*Does 1-6 v. Mills*,
　16 F.4th 20 (1st Cir. 2021).........................................................................................27

*E.E.O.C. v. Amego, Inc.*,
　110 F.3d 135 (1st Cir. 1997) ................................................................................. *passim*

*Flaherty v. Entergy Nuclear Ops., Inc.*,
　946 F.3d 41 (1st Cir. 2019).....................................................................................28, 29

*Freadman v. Metro. Prop. & Cas. Ins. Co.*,
　484 F.3d 91 (1st Cir. 2007).........................................................................................30

*Fults v. Nissan N. Am. Inc.*,
　4:18-CV-73-TAV-CHS, 2020 WL 12862964 (E.D. Tenn. Sept. 16, 2020) ...........................39

*Garcia-Ayala v. Lederle Parenterals, Inc.*,
　212 F.3d 638 (1st Cir. 2000)...............................................................................8, 25, 26, 28

*Gent v. CUNA Mut. Ins. Soc'y*,
　611 F.3d 79 (1st Cir. 2010) ........................................................................................12

*Giles v. Sprouts Farmers Mkt, Inc.*,
  2021 WL 2072379 (S.D. Cal., May 24, 2021) .......................................................35

*Griel v. Franklin Med. Cen.*,
  71 F. Supp. 2d 1 (D. Mass. 1999) ........................................................................6

*Groff v. DeJoy*,
  35 F.4th 162 (3d Cir. 2022) .................................................................................8

*Hernandez v. Costco Wholesale Corp.*,
  No. CV-21-00357-PHX-DLR, 2022 WL 17537981 (D. Ariz. Dec. 8, 2022) ........35

*Hernandez v. West Texas Treasures Estate Sales, LLC*,
  2021 WL 4097148 (W.D. Tex. Aug. 19, 2021) .....................................................35

*Hustvet v. Allina Health Sys.*,
  910 F.3d 399 (8th Cir. 2018) ...............................................................................38

*Jarvis v. Potter*,
  500 F.3d 1113 (10th Cir. 2007) ............................................................................35

*Jones v. Nationwide Life Ins. Co.*,
  696 F.3d 78 (1st Cir. 2012) .........................................................................6, 37, 38

*Lundstrom v. Contra Costa Health Servs.*,
  No. 22-CV-06227-CRB, 2022 WL 17330842 (N.D. Cal. Nov. 29, 2022) ......29, 34

*Madison v. Cruz*,
  393 F. Supp. 3d 135 (D. Mass. 2019) ..................................................................12

*Mann v. Frank*,
  795 F. Supp. 1438 (W.D. Mo. 1992) ....................................................................21

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*,
  896 F.2d 5 (1st Cir. 1990) ....................................................................................5

*Moses v. Am. Nonwovens, Inc.*,
  97 F.3d 446 (11th Cir. 1996) ...............................................................................36

*Mulloy v. Acushnet Co.*,
  460 F.3d 141 (1st Cir. 2006) (ADA) ....................................................................5

*O'Hailpin v. Hawaiian Airlines, Inc.*,
  583 F. Supp. 3d 1294 (D. Haw. 2022) .................................................................21

*Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*,
  853 F.3d 599 (1st Cir. 2017) ..........................................................................37, 39

*Ramos-Echevarria v. Pichis, Inc.*,
659 F.3d 182 (1st Cir. 2011) ..................................................................29

*Reed v. LePage Bakeries, Inc.*,
244 F.3d 254 (1st Cir. 2001) ..................................................................22

*Robinson v. Children's Hosp. Bos.*,
No. CV 14-10263-DJC, 2016 WL 1337255 (D. Mass. Apr. 5, 2016) ....................8, 20, 21, 27

*Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*,
181 F.3d 15 (1st Cir. 1999) ....................................................................6

*Sch. Bd. of Nassau Cnty., Fla. v. Arline*,
480 U.S. 273 (1987) ..........................................................................31, 32

*Soto-Ocasio v. Fed. Exp. Corp.*,
150 F.3d 14 (1st Cir. 1998) ..................................................................24, 26

*Tchankpa v. Ascena Retail Grp., Inc.*,
951 F.3d 805 (6th Cir. 2020) ................................................................37, 38

*Together Employees v. Mass General Brigham Incorporated*,
573 F. Supp. 3d 412 (D. Mass. 2021) ............................................................ *passim*

*Trans World Airlines, Inc. v. Hardison*,
432 U.S. 63 (1977) ............................................................................8, 21

*US Airways, Inc. v. Barnett*,
535 U.S. 391 (2002) ..............................................................................37

*Ward v. Mass. Health Rsch. Inst., Inc.*,
209 F.3d 29 (1st Cir. 2000) ....................................................................8

*Witt v. Bristol Farms*,
2021 WL 5203297 (S.D. Cal. Nov. 9, 2021) ......................................................35

*Wurzel v. Whirlpool Corp.*,
482 F. App'x 1 (6th Cir. 2012) ................................................................35

**Statutes**

42 U.S.C. § 12102(1)(A) ..........................................................................28

42 U.S.C. § 12111 ................................................................................31

42 U.S.C. § 12113(b) ..............................................................................31

Americans with Disabilities Act ................................................................ *passim*

Rehabilitation Act of 1973 § 504 ................................................................................32

**Rules and Regulations**

Fed. R. Evid. 1006 .......................................................................................................13

*See* Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff
Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021) ...........................................17, 18

**Other Authorities**

*Potential Rapid Increase of Omicron Variant Infections in the United States*, Dec.
20, 2021 ....................................................................................................................12

# INTRODUCTION

Mass General Brigham Incorporated ("MGB") is one of the world's premier health care systems and a leader in combating the COVID global pandemic.  MGB serves 1.5 million patients a year including those with some of the most medically complicated conditions in the world.  MGB is the largest employer in the Commonwealth, with over 80,000 personnel.

To protect its vulnerable patient population, and its staff, visitors, and the public from COVID infection, MGB relied on current scientific data and world-renowned experts to implement a Vaccination Policy in 2021, requiring all staff to be vaccinated absent an approved medical or religious exemption (the "Vaccination Policy").  MGB's expert leaders did so for compelling reasons including that: despite its extensive precautions, there were clusters of in-hospital transmission between patients and staff; even acutely ill patients were deferring care for fear of contracting COVID at the hospital; fearful patients sought assurance that their providers were vaccinated; and data showed that the COVID vaccine was safe and effective, providing unparalleled protection against both contracting and transmitting COVID.

Every MGB workforce member was subject to the Policy, because every MGB workforce member supported patient care.  Failing to protect those employees from illness, even if they lacked a regular on-site presence, would adversely impact MGB's workforce and hurt patient care. Every MGB employee was subject to being called in to the hospital or other clinical sites at any time, including being redeployed to a patient-facing role in the pandemic emergency; indeed, the record shows that many employees *were*, in fact, redeployed to patient-facing roles.  MGB employees had a badge allowing them to go to the hospital at any time in the event of emergency, as MGB employees did during the COVID crisis, the Boston Marathon bombing, and 9/11.

Each request by an employee for a religious or medical exemption from the Vaccination Policy was individually reviewed by well-trained reviewers who conducted an interactive process

with each employee.  Those employees who were not approved, and who refused vaccination by the deadline, were placed on unpaid leave.  After that cooling off period—in which employees were encouraged to reconsider becoming vaccinated and to stay working at MGB—MGB terminated those employees who remained out of compliance with the Vaccination Policy.

This case arises out of MGB's enforcement of its Vaccination Policy with respect to Plaintiffs, who applied for religious or medical exemptions to the policy—or both—but, after a careful review process, were not approved because they did not meet MGB's legally compliant criteria for exemption.

Plaintiffs argue that they should have been allowed to work unvaccinated in a health care system that serves the most vulnerable patients, during a deadly pandemic, amid the lethal Delta and Omicron surges.  They claim this despite that Plaintiffs included *inter alia* a neonatal intensive care doctor who resuscitated premature infants; a radiologic technologist who was inches from scores of vulnerable patients all day every day; a home health nurse who entered the homes of sick patients and their families daily; and numerous nurses who set IVs, took vital signs, and treated patients who were elderly, immunocompromised, or otherwise especially at risk for severe illness and death from COVID.  Plaintiffs also include other staff who worked closely with patients, the public, and fellow employees: for example, those bringing iPads to patient rooms during lockdown; staffing the information desk and interacting constantly with patients and visitors; serving as a security guard at a hospital entrance; or manning the gym where healthcare workers exercised.  Plaintiffs also include those with mission-critical roles supporting patient care from behind the scenes by, for example, keeping the "Patient Gateway" portal running to enable uninterrupted patient-clinician communications, performing patient intake, registering patients, and scheduling critical care.  Plaintiffs' circumstances vividly illustrate the reasons underlying

MGB's determination that a policy permitting widespread exemptions from COVID vaccination would impose an undue hardship on its operations by compromising patient care and the health and safety of its patients, staff, and visitors.

In October of 2021, this Court denied Plaintiffs' Motion for Preliminary Injunction—in which Plaintiffs tried in vain to forestall their terminations—and held that Plaintiffs were not likely to succeed on the merits of their claims under Title VII or the ADA.[1]  The parties then conducted Phase I discovery, exchanging tens of thousands of pages of documents and written discovery and taking representative depositions of 31 plaintiffs and nine witnesses for MGB.  On the undisputed record evidence established during discovery, Plaintiffs' claims fail as a matter of law.

MGB used its best medical and scientific judgment in implementing the Vaccination Policy, with its steadfast commitment to patient care always as its focus.  In the midst of the COVID crisis, with a Delta variant surging, MGB constructed a fair, legally compliant process for reviewing exemption requests and worked around the clock to review individually thousands of requests.  MGB terminated those employees whose requests did not meet MGB's criteria and who refused vaccination.  It did so to protect human lives and ensure continued delivery of state-of-the-art care to its patients.  MGB is entitled to judgment as a matter of law.

## SUMMARY OF ARGUMENT

In Section I below, MGB shows that all of Plaintiffs' claims under both the ADA and Title VII fail because to allow them to work unvaccinated would have imposed an undue hardship on MGB, as a matter of law.  That is, even if any Plaintiff could meet their burden of establishing the

---

[1] *Together Employees v. Mass General Brigham Incorporated*, 573 F. Supp. 3d 412 (D. Mass. 2021).  The First Circuit affirmed that ruling on an emergency basis, holding that Plaintiffs could not show irreparable harm. 19 F.4th 1 (1st Cir. 2021).  The Supreme Court denied Plaintiffs' application for writ of injunction pending appeal. No. 21A175 (U.S. Nov. 29, 2021) (Breyer, J., in chambers).  The First Circuit affirmed this Court's ruling on the merits, holding that Plaintiffs could not show irreparable harm.  32 F.4th 82 (1st Cir. 2022).

elements of a prima facie case, their claims would fail as a matter of law. That is so because, under Title VII and the ADA, employers are not required to extend accommodations where it would place an undue hardship on the operation of their business. The Vaccination Policy was the product of the collective judgment of MGB's senior leadership, including world-renowned experts in infectious disease. It was supported by MGB's clinical experience and abundant scientific evidence showing the safety and efficacy of the newly available COVID vaccines. MGB determined that its health and safety priorities required legally compliant but rigorous exemption processes, and that a more permissive policy would have unacceptably increased the risk of COVID infection, negatively impacted patient care, and undermined the public's confidence in the safety of MGB facilities. Alternative infection control measures would have imposed substantial safety risks, and financial and administrative burdens. In short, the consequence of allowing Plaintiffs to remain working unvaccinated at MGB was literally life or death. The unvaccinated Plaintiffs posed a potentially deadly danger to vulnerable patients, patients' families, visitors, the public, and to other MGB staff, and threatened MGB's operations. Because allowing them to work at MGB unvaccinated was an undue hardship, all of Plaintiffs' claims fail as a matter of law.

In Section II, MGB demonstrates why the claims of the 22 Plaintiffs who sought medical exemptions fail for the additional, independent reason that they cannot establish a prima facie case as a matter of law. At least nine cannot show that they were "disabled." None can show that they were "qualified" disabled persons, because they posed a direct threat to others under the ADA as a matter of law. None can show that exempting them from the Vaccination Policy was a reasonable accommodation as a matter of law.

MGB does not address in this brief—at this Phase I stage—the reasons why the Plaintiffs who sought religious exemptions cannot establish a prima facie case under Title VII. First, the

court need not reach the issue, since MGB has shown that exempting Plaintiffs from the Vaccination Policy was an undue hardship as a matter of law. *See, e.g., Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990) ("Yet, assuming for the sake of argument that … [the plaintiff] made out his prima facie case, the bottom line would be unaffected."). Second, the reasons why each of the 156 Plaintiffs who sought religious exemptions cannot establish a sincere religious conflict with the vaccine are individualized and have not been fully explored in the limited Phase I discovery. If any of the Plaintiffs' claims were to survive this Phase I summary judgment—which they should not, because they fail on undue hardship—MGB intends to seek summary judgment in Phase II on grounds including that they cannot establish a (i) sincere, (ii) religious (iii) conflict with the Vaccination Policy.

## ARGUMENT

### I.    Exempting Plaintiffs From the Vaccination Policy Was an Undue Hardship.

Under Title VII and the ADA, employers are not required to extend accommodations where doing so would place an undue hardship on the operation of their business. *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 134 (1st Cir. 2004) (Title VII) *cert. denied,* U.S. 1131 (2005); *Mulloy v. Acushnet Co.*, 460 F.3d 141, 148 (1st Cir. 2006) (ADA). The summary judgment record establishes, through robust and undisputed evidence, that granting Plaintiffs' requested exemptions from MGB's Vaccination Policy would have imposed an undue hardship.

Indeed, even at the preliminary injunction stage, this Court found MGB had shown a likelihood of success on its undue hardship defenses. *Together Employees I*, 573 F. Supp. 3d at 435 ("MGB has established a reasonable likelihood of success on its contention that providing plaintiffs an exemption from the vaccination policy would impose an undue hardship [under the ADA]."); *id.* at 441 (holding that MGB had shown a likelihood of success on Title VII undue hardship defense). Now, with Phase I of fact discovery concluded, the uncontroverted evidence

leaves no room for a reasonable trier of fact to find otherwise.  *See Cloutier*, 390 F.3d 126 (affirming summary judgment for employer on undue hardship in Title VII accommodation case); *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 148-49 (1st Cir. 1997) (in ADA case, affirming summary judgment for employer on undue hardship).

The undue hardship inquiry does not allow employees to substitute their judgment for that of their employer.  Title VII and the ADA do not afford Plaintiffs a jury trial simply because they disagree with MGB's decision to enact the Vaccination Policy, or do not like the outcomes of their own exemption requests.  *See Cloutier*, 390 F.3d at 136 (employer's determination that employee's proffered accommodation would adversely impact its public reputation was entitled to deference in analyzing undue hardship defense; "[s]uch a business determination is within [the employer's] discretion"); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012) (in ADA accommodation cases, "[t]he court gives a 'significant degree' of deference to an employer's business judgment about the necessities of a job") (quotation and citation omitted); *Griel v. Franklin Med. Cen.*, 71 F. Supp. 2d 1, 9 (D. Mass. 1999), *aff'd sub nom. Griel v. Franklin Med. Ctr.*, 234 F.3d 731 (1st Cir. 2000) (courts "should not second-guess the hospital's judgment in matters of patient safety").  *See also Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999) ("courts may not sit as super personnel departments") (internal quotation marks, alteration, and citation omitted); Tr. of Hearing on Pls.' Mot. for Prelim. Inj. (Nov. 4, 2021) (Saylor, C.J.), 17:13-18 ("Even assuming reasonable people can disagree, why doesn't the hospital get to say we're a hospital, we have decided to follow some medical practices and promote a reasonably safe environment? Why doesn't the hospital get to make that call?").

These principles are especially important in the healthcare context.  MGB entities include some of the most renowned healthcare providers in the world: Massachusetts General Hospital

("MGH"); Brigham and Women's Hospital ("The Brigham"); McLean Hospital; Massachusetts Eye and Ear Hospital; Newton-Wellesley Hospital; and others. *Together Emps.*, 573 F. Supp. 3d at 424; SOUF ¶1.  These household names provide sophisticated medical care for over a million complex and critically ill patients every year and tend to the exceptionally sick and vulnerable. *Together Emps.*, 573 F. Supp. 3d at 424; SOUF ¶¶2, 3.  In so doing, they owe their highest commitment to "the fundamental principle of the medical profession: first, do no harm." *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022).  For that very reason, "[v]accination requirements are a common feature of the provision of healthcare in America" and "[h]ealthcare workers … are ordinarily required to be vaccinated for" communicable diseases. *Biden*, 142 S. Ct. at 653.

In the face of an unprecedented and rapidly-changing global pandemic—and the emergence of a new, highly contagious Delta variant—MGB determined in the summer of 2021 that achieving near-universal vaccination of its workforce against COVID (with the sole exception of those granted lawful exemptions) was necessary to ensure the safety of patients, employees, contractors, visitors, and public health.  SOUF ¶¶51, 121-130.  There is no evidence in the record to controvert the soundness of that determination—and overwhelming evidence to support it.

Accordingly, Plaintiffs' requested accommodation—exemption from MGB's Vaccination Policy—would have imposed an undue hardship.  Granting additional exemptions would have unacceptably increased the risk of COVID infection across MGB's system, compromising the safety of patients, staff, and visitors and adversely impacting patient care.  A more permissive exemptions process further risked undermining public confidence in the safety of MGB facilities. Plaintiffs' proposed alternative (masking and testing) would have imposed untenable safety risks, as well as financial and administrative burdens, on MGB.  Any one of these harms would be an undue hardship.  All of them together make the undue hardship crystal clear as a matter of law.

A.      **Undue Hardship Standards Under Title VII and the ADA.**

Under Title VII, "[a]n accommodation constitutes an 'undue hardship' if it would impose more than a *de minimis* cost on the employer." *Cloutier*, 390 F.3d at 134 (*citing Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). "This calculus applies both to economic costs … and to non-economic costs … ." *Id.* "In conducting an undue hardship inquiry, the court must consider 'not only [] direct economic costs, but indirect ones related to health and safety.'" *Brox v. Hole*, 590 F. Supp. 3d 359, 367 (D. Mass. 2022) (*appeal filed*, Apr. 14, 2022) (*quoting Together Employees*, 573 F. Supp. 3d at 435); *see also Robinson v. Children's Hosp. Bos.*, No. CV 14-10263-DJC, 2016 WL 1337255, at *8 (D. Mass. Apr. 5, 2016) (under Title VII, "undue hardship can also exist if the proposed accommodation would either cause or increase safety risks") (internal quotations and citation omitted). *Hardison* teaches that the undue hardship test under Title VII "is not a difficult threshold to pass." *Groff v. DeJoy*, 35 F.4th 162, 174 (3d Cir. 2022), *cert. granted Groff v. DeJoy*, No. 22-174, 2023 WL 178403 (U.S. Jan. 13, 2023) (internal quotation marks and citations omitted).

The ADA frames the inquiry somewhat differently. Under the ADA, an employer establishes undue hardship by showing that the accommodation sought "would present 'significant difficulty or expense[.]'" *Ward v. Mass. Health Rsch. Inst., Inc.*, 209 F.3d 29, 36 (1st Cir. 2000) (*quoting* 29 C.F.R. § 1630.2(p)(1)). "[F]actors to be considered as to undue hardship include the cost of the accommodation, the effect on expenses and resources, the impact of the accommodation on the operation of the facility (including on other employees' ability to do their jobs) and the impact on the facility's ability to conduct business." *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 649 (1st Cir. 2000) (*citing* 29 C.F.R. § 1630.2(p)). As this Court observed, "Considerations include not only direct economic costs, but indirect ones related to health and safety." *Together Emps.*, 573 F. Supp. 3d at 435 (*citing* U.S. Equal Emp. Opportunity Comm'n,

WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § L (2021)); *Brox*, 590 F. Supp. 3d at 367 (*quoting Together Emps.* At 435).

Whether viewed through the lens of Title VII's "more than a *de minimis* cost" standard or the ADA's "significant difficulty or expense" inquiry, the result is the same: granting Plaintiffs' requested exemptions would have resulted in undue hardship to MGB as a matter of law.

**B.    The Undisputed Record Shows That MGB's Decision to Implement the Vaccination Policy Was the Product of MGB's Expert Medical Judgment, Real-World Clinical Experience, and Medical Evidence.**

**1.    The Policy Was the Product of the Collective Judgment of MGB's Leadership and Renowned Medical Experts.**

The decision to implement MGB's Vaccination Policy was made by MGB's senior leadership, among whom are world-renowned experts in infectious disease and infection control: Dr. Michael Klompas, Hospital Epidemiologist at The Brigham; Dr. Erica Shenoy, Associate Chief of Infection Control at MGH; Dr. Tom Sequist, MGB's Chief Medical Officer; Dr. Paul Biddinger, the Endowed Chair in Emergency Preparedness and Director of the Center for Disaster Medicine at MGH; Dr. Dean Hashimoto, MGB's Chief Medical Officer for Workplace Health and Wellness; and, Dr. Ronald Walls, MGB's Chief Operating Officer.  SOUF ¶¶45-50.  Dr. Klompas has published widely on surveillance, diagnosis, prevention, and treatment of infections in hospital settings, including COVID, in peer-reviewed journals such as ANNALS OF INTERNAL MEDICINE and CLINICAL INFECTIOUS DISEASES.  SOUF ¶115.  MGB leaders in Human Resources, Occupational Health, Operations, Disaster Planning, Legal, Diversity, Equity and Inclusion, and Finance were also involved in the decision.  SOUF ¶49.

The Senior Management Committee ("SMC") unanimously advised that MGB adopt the Vaccination Policy.  SOUF ¶50.  MGB's President and CEO, Dr. Anne Klibanski, chaired the SMC, which included Chief Human Resources Officer Rosemary Sheehan, Dr. Walls, and MGB's

Chief Financial Officer Niyum Gandhi.  *Id.*  The SMC also included physician representatives from MGB's stakeholder institutions.  *Id.*

In sum, the critical determination at the heart of MGB's Vaccination Policy—that requiring COVID vaccination for MGB's workforce was necessary to ensure the safety of patients, staff, and visitors—was the product of leadership's collective medical judgment, expertise, and experience.  And those are second to none.  *Together Emps.*, 573 F. Supp. 3d at 436  (recognizing that, as a top-ranked healthcare system worldwide, MGB "is surely capable of balancing the risks of different strategies to combat the spread of disease").  In implementing the Vaccination Policy, MGB was "very lucky, very fortunate … to literally have international experts, the leading experts, not just in the country, but in the world in terms of vaccine side effects, in terms of the effectiveness of the vaccine."  SOUF ¶60.

### 2.     Clinical Experience During the COVID Pandemic Showed That Existing Infection Control Policies Were Insufficient.

MGB's Vaccination Policy was also borne of experience.  Prior to the advent of COVID vaccines, MGB had put in place an "infection control structure" that included masking, testing, directives not to come into work with symptoms, and restrictions on visitors to MGB facilities. SOUF ¶¶20-21.  Despite those measures, Dr. Klompas explained (and as he reported in a February 2021 article published in CLINICAL INFECTIOUS DISEASES), The Brigham saw a "large COVID cluster" in the fall of 2020.  SOUF ¶¶22-23.  In that cluster, analyzed by genome sequencing in partnership with the state Department of Public Health, there were <u>38</u> staff infections and <u>14</u> patient infections.  *Id.*  Such a cluster developed despite a rigorous infection control infrastructure, including a universal mask requirement for employees and patients, and testing of all patients on admission (and if they developed symptoms post-admission).  SOUF ¶¶19-21, 23.  In November of 2021, Dr. Klompas co-authored an article in CLINICAL INFECTIOUS DISEASES describing multiple

observed instances of COVID transmission from asymptomatic and pre-symptomatic individuals at The Brigham despite use of masks and eye protection.  SOUF ¶115(c).  The article concludes by finding, *inter alia*, that COVID transmission may sometimes occur even where both parties to an interaction are masked.[2] SOUF ¶115(c).  Plaintiffs admitted that they were personally aware of in-hospital transmission within MGB.  SOUF ¶58.

Moreover, in the pre-vaccine period, patients—many of them in need of critical care—stayed away from MGB facilities, frightened of contracting COVID.  SOUF ¶¶83-87.  This deferred care led to increased patient census and acuity of medical conditions in patients who eventually presented at MGB facilities, belatedly and with more complex conditions than if they had timely sought care.  SOUF ¶¶72-82.  Dr. Klompas testified that even patients with serious conditions such as heart attacks and strokes, and those requiring cancer surgery, "were simply afraid to come to the hospital" and "therefore, did not."  SOUF ¶¶76, 85.  Health systems worldwide, including MGB, saw "a startling drop off in people seeking care for what are really life-threatening conditions."  SOUF ¶74.  This pattern occurred "in every one of [MGB's] entities." *Id.*  MGB's internal data, quantitative and qualitative, showed "widespread evidence … that patients were staying away in droves."  SOUF ¶75.  MGB found it essential for patients and the public health "to make the hospital a safe place to people to come back to."  SOUF ¶80.  Plaintiffs themselves admitted under oath that patients deferred care due to fear of contracting COVID at the hospital, to the detriment of the patients' health.  SOUF ¶¶79, 82.  The need to minimize infection was especially urgent because in the summer of 2021, experts anticipated a fall and winter surge

---

[2] Plaintiffs concede that alternatives to vaccination are not panaceas.  Nearly all admitted that masking does not prevent transmission of COVID 100% of the time.  SOUF ¶¶293-296.

of the highly contagious new Delta variant.  SOUF ¶¶119-120.[3]  Indeed, not only were those fears well-founded, but another contagious variant, Omicron, followed soon thereafter, causing yet another surge in infections.[4]

### 3.    Strong Evidence Showed the Vaccines Were Highly Effective.

At the time MGB decided to implement the Vaccination Policy, overwhelming real-world medical evidence demonstrated the effectiveness of the COVID vaccines at reducing the spread of infection, viral shedding, and the length and severity of illness.  Dr. Klompas testified: "And then in parallel, we see the emerging data on vaccines showing …[v]accines … are powerfully effective in decreasing infections."  SOUF ¶63.  MGB's experts "could see that vaccination was so effective at decreasing transmission," made individuals "less likely to be infected," caused the infected to "shed[] virus for shorter periods of time," and led to " lower rates of transmission" of COVID. SOUF ¶64.  Thus, as Dr. Klompas testified, "it was apparent to us that if this is a safe intervention, we should be doing this in order to try to further diminish the chances of additional hospital viral infections…"  SOUF ¶¶42-44, 65.  Dr. Walls, MGB's Chief Operating Officer and a physician with over 35 years of emergency medicine experience, testified that peer-reviewed medical literature at the time of the policy's formulation was clear: "The overwhelming data, at the time, was that the vaccination conferred an[] extremely high level of protection from getting infected

---

[3] This Court may take judicial notice of the information from the CDC's website concerning the Delta variant, and of published news reports. *See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of disease information on CDC's website); *Madison v. Cruz*, 393 F. Supp. 3d 135, 137 n.2 (D. Mass. 2019) (courts may take judicial notice of newspaper articles and press releases "when their conten[t]s cannot be reasonably questioned").

[4] *Potential Rapid Increase of Omicron Variant Infections in the United States*, Dec. 20, 2021, https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/mathematical-modeling-outbreak.html (last visited Feb. 2, 2023).  Although the time period relevant to this case is the time in which MGB made its decisions regarding Plaintiffs' exemption requests prior to their terminations (August – November 2021), the inevitable implication of Plaintiffs' argument is that they ought to have been permitted to work unvaccinated through subsequent COVID surges.

with the virus." SOUF ¶¶33, 67-69. Those data were borne out by real world experience. Since MGB has implemented the Vaccination Policy, MGB entities "have not had a cluster anything like what we had back in fall 2020 before vaccines." SOUF ¶¶313-14.

In reaching the decision to implement the Vaccination Policy, MGB joined many other leading U.S. health care systems. SOUF ¶94. The decision was also in accord with the unanimous recommendation of the Massachusetts Health & Hospital Association ("MHA"). SOUF ¶95. The MHA explained that it "reviewed the scientific and public health literature and [] concluded that mandatory vaccination of healthcare workers is in the best interest of the public health and safety of patients and healthcare workers." *Id.*

### 4. There Were No Workable, Safe Alternatives to Vaccination.

While Plaintiffs' Complaint vaguely alludes to their willingness to abide by MGB's other infection control protocols in lieu of vaccination (presumably, *e.g.*, testing, wearing masks, and social distancing), *see* Compl. (ECF No. 61), ¶¶268, 280, MGB's scientists determined those would be inadequate for health and safety reasons. SOUF ¶97. Nearly 8 out of 10 (127) Plaintiffs admitted that it was not possible for them to socially distance from all colleagues, patients, visitors, or members of the public when they worked on-site at an MGB entity. SOUF ¶98.[5] Nearly *85%* of Plaintiffs admitted that they had removed their masks indoors to eat or drink during the workday. SOUF ¶295. And more than five dozen Plaintiffs (64) are personally aware of one or more instances of transmission of COVID (either staff to staff or staff to patient) within an MGB entity during their employment. SOUF ¶58. Those admissions highlight what MGB knew, as discussed

---

[5] The charts summarizing Plaintiffs' written discovery responses, included as Record Appendix exhibits, are admissible under Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings[.]").

*supra*, through hard experience—existing infection control measures, though important, were insufficient and paled in comparison to the power of vaccines.  SOUF ¶¶66, 97.

**5.     MGB's Critical Objectives Required That All of its Employees Be Subject to the Vaccination Policy.**

MGB's expert leaders made a deliberate decision that the Vaccination Policy would apply to all employees, not only those with a regular on-site presence.  The record shows there were four key reasons why.

*First*, every single MGB employee is subject to redeployment, including to on-site roles. SOUF ¶¶8-12, 38-41, 108-110.[6]  MGB needed a consistent policy for all employees so that it could pull anyone in that it needed to, without constraints as to which employees it could pull in, or delays in trying to figure out who was vaccinated or unvaccinated.   SOUF ¶108.   The uncontradicted evidence shows that this possibility of redeployment was not theoretical—it was mission-critical.  SOUF ¶¶108-110.  During the pandemic, employees were redeployed to direct patients and the public to designated entrances; to screen everyone entering the hospital for symptoms; to ask about COVID exposure and ensure patients cleaned their hands; to give them a mask; and to give patients color-coded stickers to indicate they were properly screened.  SOUF ¶¶35-36.   Plaintiff Frenchwood, for example, an Assistant Billing Manager at MGH, was redeployed two days per week in April and May of 2020 when she handed out masks and checked people in at the entrance of The Brigham.  SOUF ¶287.  Plaintiff Erickson, a Senior Clinical Business Analyst who previously worked on site only one day per week, was redeployed from March to August of 2020 to bring iPads to COVID floors at The Brigham.  SOUF ¶277.  Hundreds of employees were required to manage such tasks, which required them to be in very close

---

[6] Most Plaintiffs (119) also *admitted* this is the case, including *forty* Plaintiffs who admitted they *actually were* redeployed to new positions at least once during the pandemic.  SOUF ¶¶32, 39.

14

proximity to members of the public and patients.  SOUF ¶36.  MGB also redeployed hundreds of people to help run testing and vaccination clinics.  SOUF ¶38.  Plaintiff Erickson, for example, was redeployed from December 17, 2020 to January of 2021 to work 17 shifts in an MGB vaccination clinic.  SOUF ¶277.  Early in the pandemic, MGB mobilized and redeployed its employees, including those who typically were patient-facing, but also those from Administration and HR, at the request of the Commonwealth of Massachusetts and the City of Boston, to run Boston Hope—a brand new field hospital to treat lower-acuity COVID patients to ease the burden on the region's hospital system.  SOUF ¶¶35-37.

*Second*, "every one of [MGB's] employees has a critical job" and all support patient care, as multiple witnesses testified.  SOUF ¶112.  Dr. Hashimoto testified: "[E]ven if you're working remotely for MGB, your focus and your purpose, based upon the MGB mission, is patient care. So even if you're doing computer work or doing something which is not patient-facing, ultimately, what you're doing … is supporting an organization that must provide excellent and safe patient care."  SOUF ¶113.  In other words, at MGB *all* employees are essential, and their absence affects MGB's ability to provide safe, high-quality patient care.  SOUF ¶¶99-113.  For example, as CHRO Rose Sheehan testified, the person who answers the phone to confirm appointments might typically perform work remotely, but is critical to patient care.  SOUF ¶112.  Plaintiffs' own job functions illustrate this point.  Plaintiff Adams, for instance, performed work remotely as a New Patient Intake Clinical Navigator.  SOUF ¶290.  Among her duties was to call new patients as part of the intake process, going over their past medical history, current medications, allergies, surgical history, family history, and any other concerns.  *Id.*  Plaintiff Alexandrova worked remotely as a Software Engineer.  SOUF ¶291.  She was a member of an analytical team that solved maintenance issues with Patient Gateway, the online portal on which MGB's patients *inter alia* view test results,

communicate with providers, schedule appointments, participate in research, and access their medical bills. *Id.* As discussed *supra* in Section I(B)(3), vaccinated people were less likely to become infected with COVID, and even vaccinated people who became infected enjoyed robust protection from severe infection, shed virus for shorter periods of time compared with unvaccinated people, were less likely to transmit the virus, experienced high viral loads for shorter periods of time, and were less likely than unvaccinated people to exhibit symptomatic illness. SOUF ¶66. In view of this medical evidence, MGB determined that the Vaccination Policy was necessary to minimize workforce disruptions: even if an employee lacked a regular on-site presence, her absence due to illness would hurt patient care. SOUF ¶¶99-113.

*Third*, the requirements of many positions within MGB were dynamic and fluid—especially in the midst of a global pandemic. Employees who performed work remotely would nonetheless come to campus for any number of reasons and be in proximity to co-workers or patients. SOUF ¶¶101-102. For example, Plaintiff Frenchwood—apart from her on-site redeployments—went on campus multiple times during the pandemic to retrieve and drop off items such as her ID badge and equipment. SOUF ¶287. Plaintiff Driscoll worked remotely, but came on campus to conduct trainings for three days in December of 2020 and five days in June of 2021. SOUF ¶286. Whether any given position was patient-facing in nature was fluid in practice, too: for example, an HVAC mechanic became patient-facing as soon as a patient room required HVAC repair. SOUF ¶101. Like many employers, MGB was in the process of transitioning more employees to on-campus roles. For example, at the time of her termination, Plaintiff Frenchwood's role was coded "hybrid," meaning she would be assigned a date to begin going into the office one or more days per week. SOUF ¶287.

*Fourth*, for equity reasons, MGB treated all employees the same with regard to vaccination, including when it initially offered vaccinations to staff in early 2021. SOUF ¶114.

Additionally, some of MGB's workers were independently required to become vaccinated against COVID under directives from the Massachusetts Department of Public Health ("DPH"). For example, DPH regulations that went into effect shortly after MGB's Vaccination Policy required in-home health care workers—such as Plaintiff Attarian, *see* SOUF ¶¶25, 262—to become vaccinated against COVID by October 31, 2021. 105 C.M.R. § 159.000 *et seq.* The U.S. government, too, required all eligible staff working at health care facilities that participate in the Medicare and Medicaid programs to obtain a COVID-19 vaccine by January 4, 2022. *See* Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021) (emergency regulations).

### C.     MGB Determined That Its Health and Safety Priorities Required Implementing Legally Compliant But Rigorous Exemption Processes.

In view of the urgent need to vaccinate its workforce, MGB developed religious and medical exemption processes that were intended to be (a) legally compliant and (b) rigorous, so as to minimize the number of unvaccinated staff at MGB given the risks unvaccinated staff posed to MGB's patient population, employees, visitors, and public health. SOUF ¶131-158. The need for rigor was essential because every unvaccinated employee, let alone a broad swath of unvaccinated employees, elevated the risk of disease transmission and threatened the integrity of MGB's operations. SOUF ¶134-142. Achieving as close to universal vaccination as possible was "the only way [MGB] could really protect our patients and our workforce" because "the virus was ubiquitous in the community" and, thus, the objective was to create "a chain of protection" from vaccination among MGB's employees. SOUF ¶141. Every unvaccinated person who became infected could expose multiple people, creating an "exponential" risk of disease spread. *Id.* Dr.

Walls analogized the problem to traffic safety.  SOUF ¶142.  Although even one drunk driver on the road creates risk, 100 drunk drivers creates exponentially more risk; in the same way, each additional unvaccinated person created "unnecessary risk" at MGB, resulting in undue hardship. *Id.*

The evidence amassed in discovery regarding Plaintiffs' circumstances only underscores the reality of those risks.  Of the 160 Plaintiffs who remain parties to this litigation,[7] more than two-thirds (109) regularly worked on site at an MGB entity.  SOUF ¶258.  Many of these Plaintiffs served in roles directly rendering medical care or assistance to patients, including as physicians, nurses, medical assistants, technologists, physician assistants, nurse practitioners, surgical technicians, and mental health counselors.  SOUF ¶259.  An additional 26 Plaintiffs worked a hybrid schedule, with regular on-site presence.  SOUF ¶260.  It is undisputed that these Plaintiffs routinely interacted directly with patients, co-workers, and members of the public.  SOUF ¶¶262-292.

### D. Granting Plaintiffs' Exemptions Would Have Increased the Risk of COVID Infection Across MGB and Negatively Impacted Patient Care.

Plaintiffs do not, because they cannot, seriously dispute the considerations that gave rise to MGB's Vaccination Policy.  They have produced no evidence to challenge MGB's determination that a prompt and rigorous process was required in the midst of an unprecedented worldwide public health crisis.  *See* SOUF ¶¶52-98.  Nor can they dispute the soundness of MGB's expert medical judgment that near-universal employee vaccination would provide indispensable protection

---

[7] There were originally 267 putative Plaintiffs in this action.  *See* Tr. of Hearing on Pls.' Mot. for Prelim. Inj. (Nov. 4, 2021), 21:23-25; 35:25-36:1.  As of the filing of Plaintiffs' Corrected Amended Complaint, there were 223.  *See* ECF No. 61.  As of this filing, 47 more have voluntarily dismissed their claims, the claims of 15 others have been dismissed for failure to prosecute, and the claims of one additional Plaintiff, Dr. James Wines, were dismissed as a discovery sanction. All dismissals were with prejudice.

against the spread of COVID in its facilities where the most medically complex procedures are performed for the most vulnerable of patients. *Biden*, 142 S. Ct. at 653 (observing that "healthcare workers and public-health organizations overwhelmingly support" vaccine requirements for healthcare workers); *Does 1-2*, 2022 WL 4637843, at *2 ("It is the consensus of reliable public health authorities that the COVID-19 vaccine prevents the spread of the virus[.]").

### 1. Neither Title VII Nor the ADA Required MGB To Take an All or Nothing Approach to Religious and Medical Exemptions.

Unable to point to any record evidence giving rise to a material factual dispute on undue hardship, MGB anticipates Plaintiffs will instead argue:  because MGB granted 234 medical and religious exemptions from its Vaccination Policy, it was somehow required to allow *all* such exemptions, and doing so could not have been an undue hardship. *See, e.g.*, SOUF ¶252; Pls.' Mot. For Preliminary Injunction (ECF No. 3), at 18; Pls.' Reply (ECF No. 34), at 3, 9-10.

The argument trips over the falsity of its own premise, and misunderstands the nature of the undue hardship inquiry.  In MGB's judgment, *any* unwarranted exemptions posed an unacceptable additional risk of disease spread in its facilities.  SOUF ¶¶139-142.  Consequently, MGB constructed parallel but distinct religious and medical exemption processes designed to be rigorous, compliant, and efficient.  SOUF ¶¶131-182, 199-222, 226-238, 246-247, 250-257.

The religious exemption process was designed and spearheaded by Vanessa Gilbreth, Senior Legal Counsel in MGB's Office of the General Counsel.  SOUF ¶¶199-200.  Attorney Gilbreth, a seasoned labor and employment lawyer, was directed to ensure that the religious exemption process was consistent, fair, interactive, and legally compliant.  SOUF ¶¶199-200.  She provided extensive training to the members of the Religious Exemption Review Committee ("RERC") regarding the legal standards for evaluation of requests for religious accommodation, and ongoing support and advice throughout the review process.  SOUF ¶¶203-214.  After

holistically reviewing each request, members of the RERC engaged in interactive processes to understand of the nature of employees' religious beliefs and adherence.  SOUF ¶¶215-238  For medical exemptions, MGB assembled two panels comprised of MGB's internationally renowned medical experts, guided by CDC criteria, to individually review each request.  SOUF ¶¶163-166, 170-177.  Medical panelists engaged in interactive dialogue with employees as necessary to gain an understanding of the nature of each employee's asserted condition.  SOUF ¶¶167-169.  Through these parallel processes, MGB made the medical and business judgment that 234 of the requested exemptions satisfied its lawful criteria and were therefore approved.  SOUF ¶¶250-253.  The rest (including Plaintiffs'), MGB determined, did not.  SOUF ¶251.

Accordingly, the fact that the exempted unvaccinated employees already introduced *some* increased risk of infection among the employee population does not mean MGB was required to accept an *even greater* risk from accommodating Plaintiffs.  If anything, common sense suggests just the opposite, as Courts, including this Court in this very case, have recognized.  *Together Emps.*, 573 F. Supp. 3d at 437 ("[MGB] does not have to show that it eliminated all risk from all possible sources of COVID-19 infection" to establish undue hardship); *Aukamp-Corcoran*, 2022 WL 507479, at *7 ("Granting Plaintiff's religious exemption request, therefore, even though 24 such requests had already been granted, 'could have put the health of vulnerable patients at risk,' with the potential for increased hospitalization and death as result.") (quotations and citation omitted); *Robinson*, 2016 WL 1337255, at *10 (undue hardship met where "the Hospital decided to achieve the *safest possible* environment for its patients" by seeking "as close to total compliance as possible" with vaccination requirement absent an approved exemption) (emphasis added).  The law does not force MGB to choose only from two extremes: grant all exemption requests, or none.

### 2. The Aggregate Effects of Numerous Exemption Requests are Relevant to the Undue Hardship Analysis.

More broadly, Plaintiffs' unstated premise—that undue hardship may only be assessed at the margin, and does not account for the cumulative impact of granting Plaintiffs' requested exemptions—is wrong. The Supreme Court, this Court, and others have made clear that the aggregate effects matter. *See Hardison*, 432 U.S. at 84 n.15 (the fact that a company "may have many employees whose religious observances, like [plaintiff's], prohibit them from working on Saturdays or Sundays" can constitute an "undue burden"); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309 (D. Haw. 2022) ("Employers 'may take into account the cumulative cost or burden of granting accommodations to other employees.'"); *Together Emps.*, 573 F. Supp. 3d at 437 ("in determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation"); *Robinson*, 2016 WL 1337255, at *6 (noting EEOC guidance that employers can consider "potentially the number of employees who actually request accommodation"); *Mann v. Frank*, 795 F. Supp. 1438, 1452 (W.D. Mo. 1992) *aff'd Mann v. Frank*, 7 F.3d 1365 (8th Cir. 1993) ("th[e] proposed accommodation, if employed throughout the entire [workforce], would result in a substantial burden"). *See also Amego,* 110 F.3d at 148 (undue hardship considers "the type of operations of the covered entity including the *composition, structure, and functions of the workforce* of such entity") (emphasis added).

The undisputed record shows that those effects would be an "exponential" increase in risk to MGB's patients, workforce, and visitors. SOUF ¶¶105, 141. By any measure, such hardship is undue.

### E. A More Permissive Policy Further Risked Undermining the Public's Confidence in the Safety of MGB Facilities.

The First Circuit has held that undue hardship may result if a requested accommodation would adversely affect the employer's public reputation or image. *See Cloutier*, 390 F.3d at 136

(undue hardship where, in employer's judgment, requested accommodation would "adversely affect the employer's public image"). *See also Brox*, 590 F. Supp. 3d at 367 (recognizing adverse impacts on employer's "reputation as a steward of the public welfare" as undue hardship). The inquiry takes into account "the context of the particular [employer's] operations[.]" *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258 (1st Cir. 2001).

Here, that public reputation had life or death consequences. Keeping its patients safe and healthy is core to MGB's mission. SOUF ¶¶4-7. In order for MGB to do so, patients must feel comfortable to seek care in the first place—and, prior to the Vaccination Policy, many patients were staying away, afraid of infection. SOUF ¶¶70-87. This deferral of care, as discussed *supra*, caused alarming rises in patient census in the hospitals and the acuity of their medical conditions. SOUF ¶72. Dr. Walls testified that these concerns of "public trust" were among the motivations that drove MGB's decision to implement the Vaccination Policy: "Establishing clearly for the public that our entire population of providers and employees and everyone [the public] might encounter was vaccinated was a really important part of that." SOUF ¶70. Dr. Klompas echoed this, testifying that requiring "as many people on campus [to be] vaccinated as possible" was "critical in order to provide [] catch-up care" for those who had deferred services, since "the public, by and large, accepts the fact that vaccines are helpful." SOUF ¶77.

At the time MGB decided to put its Vaccination Policy into effect, both medical literature and practical experience showed that patients were taking their providers' vaccination status into account in deciding whether or not to seek care. MGB leaders were aware of a number of papers published across the medical world showing that people with acute conditions were less likely to receive care during COVID than not. SOUF ¶73. The literature showed a startling drop off in patients seeking care for life-threatening conditions, including heart attacks, strokes, asthma

22

exacerbations and cancer.  SOUF ¶¶74-76.  Dr. Walls testified that this phenomenon was observed throughout the MGB system.  SOUF ¶75.  As COO, Dr. Walls was aware of both the large-scale trend and individual cases—physicians apprised him that patients had inquired if all MGB staff or all of the providers involved in performing a procedure would be vaccinated, or had expressed concerns about contracting COVID at the hospital.  SOUF ¶¶83-87.  In one case, a gynecologic oncologist at MGH informed Dr. Walls about a cancer patient reluctant to see an oncologist out of concern that she would be exposed to COVID if she were to go to the hospital.  SOUF ¶84.  Forty-two Plaintiffs conceded that patients asked *them* if they were vaccinated.  SOUF ¶¶24-31.  One Plaintiff conceded at deposition that patients were "looking for reassurance" that their providers were vaccinated.  SOUF ¶28.  Dr. Walls testified that MGB knew that patients were "staying away in droves" and that the Vaccination policy was "the single most important thing [it] could do" to ensure patients' return to care.  SOUF ¶87.

The record shows that the Vaccination Policy was foundational to the public's trust in accessing  care.  SOUF ¶¶70-82.  MGB determined that a more permissive policy would have undermined that objective by allowing widespread non-vaccination.  SOUF ¶¶150-151.  MGB knew this from experience; under a prior more permissive approach to the flu vaccine, MGB was unable to obtain even 90% compliance prior to mandating the vaccine—which, in the context of COVID, would pose a substantial risk to patients, visitors, and public health.  SOUF ¶152.

The resulting injuries to MGB's reputation as providing the safest of places to obtain care, and resulting impacts on the care and safety of its patients, constitute undue hardship as a matter of law under Title VII and the ADA.  *Cloutier*, 390 F.3d at 135; *Amego, Inc.*, 110 F.3d at 148 n.14 (under ADA, undue hardship takes into account, *inter alia*, "the nature … of the accommodation" requested and the "impact [] of such accommodation upon the operation of the facility").

**F.      Alternative Infection Control Measures Would Have Imposed Substantial Safety Risks and Financial and Administrative Burdens.**

**1.      Alternative Measures Were Not Safe.**

The hardship that would result from certain Plaintiffs' proposed alternative to vaccination—masking, social distancing and a new regime of surveillance testing of employees— is also relevant to the undue hardship inquiry.  *See Ansonia Bd. of Educ. V. Philbrook*, 479 U.S. 60, 69 (1986) (under Title VII, undue hardship "is at issue only where the employer claims that it is unable to offer *any* reasonable accommodation without such hardship") (emphasis added); *cf. Soto-Ocasio v. Fed. Exp. Corp.*, 150 F.3d 14, 19 (1st Cir. 1998) (employer not liable under ADA for failing to engage in interactive process where no reasonable accommodation possible).  The unrefuted evidence is that MGB's leadership and medical experts found these protocols to be inadequate to achieve its health and safety priorities, for many reasons.  SOUF ¶¶97, 297-311.

As Dr. Klompas explained, in most MGB roles it is not practical to adequately socially distance from other staff, patients, and visitors.  SOUF ¶97.  The vast majority of Plaintiffs admit this.  SOUF ¶98.  Furthermore, masks, though effective, cannot prevent all disease transmission. SOUF ¶61, 115(c).  Most Plaintiffs admit this, too.  SOUF ¶¶293-296.  Even with a policy requiring universal masking of staff, there were documented clusters of patient and staff infections. SOUF ¶¶22-23.  Plaintiffs admitted under oath that they were aware of this in-hospital transmission.  SOUF ¶58.  Testing suffered from multiple significant shortcomings as an alternative infection control policy: (1) employees are at a constant risk of infection, and therefore testing alone is inadequate to identify when an individual is infected and contagious; (2) testing on Day X inevitably misses infections that develop subsequently; (3) an employee may carry contagious disease for two or more days before testing positive; and (4) testing can cause a false sense of safety that may lead to lapses in other safety measures.  SOUF ¶¶97, 299.  On top of all

of this, a vaccinated person is significantly less likely to transmit infection compared to unvaccinated persons.  SOUF ¶66.

### 2. Alternative Measures Would Have Imposed Substantial Financial and Administrative Burdens on MGB.

The record shows that the economic and operational consequences of these Plaintiffs' proposed alternatives, too, would have been enormous.  *See*, *e.g.*, *Garcia-Ayala*, 212 F.3d at 649 (undue hardship under the ADA considers, *inter alia*, "the cost of the accommodation, the effect on expenses and resources, the impact of the accommodation on the operation of the facility … and the impact on the facility's ability to conduct business"); *Cloutier*, 390 F.3d at 134 (undue hardship under Title VII considers extent of cost to employer).

On this score, the uncontroverted evidence shows that implementing a new surveillance testing program for unvaccinated employees—even if such a program had been safe, which it was not—would be operationally impossible, would negatively impact patient care, and would have drained massive funds and resources from MGB's already overburdened system.  No funding was available from any source to defray the huge cost of such a program.  SOUF ¶311.  The program would encompass facilities occupying a staggering 25 million square feet, including approximately 400 buildings across numerous campuses across Massachusetts.  SOUF ¶300.  MGH alone has dozens of entrances where testing would have to take place.  *Id.*

To staff such a program system-wide, *three shifts* of testing would have been required, or the equivalent of 5.5 Full Time Equivalent positions for just one role, because many facilities are open 24/7.  SOUF ¶302.  In the middle of a staffing shortage, personnel would have to be diverted from other operational areas—such as patient care.  SOUF ¶¶304-308.  Or MGB would have to hire more costly contract workers.  SOUF ¶305.

In addition, testing takes up space and disrupts operational flow.  SOUF ¶303.  Specifically, space around entrance testing sites would have been required so that tested individuals could wait for their PCR results.[8]  *Id.*  For MGB's entities, though, existing space is already scarce, and critical for operational workflow dedicated to the patient-care mission.  *Id.*

Processing test results would require use of labs – either labs on site at MGB facilities, or (for those facilities without labs) off-site lab services (which would have entailed a significant expense).  SOUF ¶307.  To prioritize testing for unvaccinated employees would risk delaying test results for MGB's patients, negatively impacting patient care.  *Id.*

Finally, a system-wide surveillance testing program for unvaccinated employees would have presented a host of additional burdens, including: the cost of new technology and staffing solutions to report results; instituting new reporting structures for staff; costs of supplies; operational logistics of locating testing sites for hundreds of different buildings across all MGB campuses; labor cost concerns with testing time; testing capacity issues; and, concerns about operationalizing and ensuring the prompt turnaround of PCR test results.  SOUF ¶¶301-309.  In sum, MGB's CHRO testified: "[O]perationally, [a surveillance testing program] didn't make any sense."  SOUF ¶310.  Any such program would have imposed substantial cost and disruption to MGB's existing operations during critical pandemic response and, thus, an undue hardship.  *Garcia-Ayala*, 212 F.3d at 649; *Cloutier*, 390 F.3d at 134.

In short, the record shows that certain Plaintiffs' proposal—exemption from the Vaccination Policy under a regime of masking and testing—is actually no viable proposal at all.  Accordingly, MGB had no duty to grant Plaintiffs' requested exemptions under Title VII or the ADA.  *See Ansonia Bd. of Educ.*, 479 U.S. at 69; *Soto-Ocasio*, 150 F.3d at 19.

---

[8] Rapid antigen tests were not readily available until late 2021 or 2022.  SOUF ¶301.

G.      **Because the Facts Supporting MGB's Undue Hardship Defense are Undisputed, MGB is Entitled to Summary Judgment.**

The undisputed facts set forth in Sections I(B)-(F), *supra*, establish MGB's undue hardship defense as a matter of law.  *See Does 1-6 v. Mills*, 16 F.4th 20, 36 (1st Cir. 2021), *cert. denied sub nom. Does 1-3 v. Mills*, 142 S. Ct. 1112 (2022) (affirming denial of preliminary injunction; finding that "[t]he hospitals need not provide the exemption the appellants request because doing so would cause them to suffer undue hardship"); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. CV 19-5734, 2022 WL 507479, at *7 (E.D. Pa. Feb. 18, 2022) (summary judgment for employer with mandatory vaccine policy on undue hardship defense under Title VII); *Robinson*, 2016 WL 1337255, at *10 (summary judgment for employer on  failure to accommodate claims based on denial of religious exemption to vaccine requirement, on undue hardship grounds); *Does 1-2 v. Hochul*, No. 21CV5067AMDTAM, 2022 WL 4637843, at *16 (E.D.N.Y. Sept. 30, 2022) (*appeal filed*, Nov. 1, 2022) (granting motion to dismiss Title VII claim based on denial of COVID vaccine exemption, in part, on the basis of undue hardship; concluding that "exempting the plaintiffs from the  vaccine requirement would expose vulnerable patients … as well as other healthcare workers, to the COVID-19 virus, which is obviously a significant hardship").

MGB is therefore entitled to summary judgment as to <u>all Plaintiffs</u> on both the Title VII and ADA claims.[9]  The Court could end its analysis there.  Plaintiffs' ADA claims, though, fail as a matter of law for multiple further, independent reasons discussed below.  *See* Section II, *infra*.

---

[9] Even if the Court were to conclude that a material dispute of fact exists concerning whether it was an undue hardship to accommodate employees who performed all of their work remotely (though there is no such dispute), in any case MGB would be entitled to judgment as a matter of law with respect to all Plaintiffs who interacted to any extent with patients, visitors, co-workers, or the public.

## II.     Plaintiffs Cannot Establish a Prima Facie Case Under the ADA as a Matter of Law.

"To establish a claim for failure to accommodate, [Plaintiffs] must produce sufficient evidence for a reasonable jury to find that (1) [they were] disabled within the meaning of the ADA, (2) [they were] qualified individual[s], and (3) the [employer], despite knowing of the [] disability, did not reasonably accommodate it."  *Flaherty v. Entergy Nuclear Ops., Inc.*, 946 F.3d 41, 55 (1st Cir. 2019).  The "reasonableness" of an accommodation is determined on a case-by-case basis. *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647 (1st Cir. 2000).

The 22 Plaintiffs who claimed in the Amended Complaint to have sought medical exemptions[10] from MGB's COVID Vaccination Policy cannot establish a prima facie case under the ADA.  First, nine Plaintiffs cannot show they were "disabled" as a matter of law.  Second, none of the Plaintiffs can establish that they are "qualified," because they cannot show they could remain unvaccinated and perform the essential functions of their jobs without posing a direct threat to others.  Third, none have established that exemption from vaccination would have been a reasonable accommodation in light of the facts that their conditions were not contraindicated under CDC guidance, and they were employees working for a major healthcare system during a deadly global pandemic.[11]  The ADA claims should be dismissed for these additional reasons as well.

### A.     Nine Plaintiffs Cannot Show They Are Disabled as a Matter of Law.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A).  Plaintiffs bear the burden of proving that they

---

[10] Eighteen of the 22 submitted requests for both religious *and* medical exemption.  SOUF ¶¶184-185.

[11] All 22 have received other vaccinations as adults, SOUF ¶187; none have established why or how vaccination against COVID is any different in light of their purported medical conditions. Sixteen of the 22 never previously sought medical accommodation from any employer.  SOUF ¶188.

are disabled under the law.  *Flaherty*, 946 F.3d 41, 53 (1st Cir. 2019).  The fact that a person has

a medical condition does not automatically render that person disabled.  *See Ramos-Echevarria v.*

*Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011) ("[e]vidence of a medical diagnosis of impairment,

standing alone, is insufficient to prove a disability").  "[A] record that an employee has a condition

that is not a disability does not satisfy the ADA."  *Lundstrom v. Contra Costa Health Servs.*, No.

22-CV-06227-CRB, 2022 WL 17330842, at *5 (N.D. Cal. Nov. 29, 2022) (*appeal filed*, Dec. 19,

2022).  Nine Plaintiffs fail to establish that they are disabled under the ADA.

> **1.   Four Plaintiffs Did Not Request a Medical Exemption,
> and Thus There is no Evidence They Are Disabled or
> Requested Accommodation for a Disability.**

Four Plaintiffs cannot show they were disabled as a matter of law because they did not

even submit a medical exemption request to MGB.  To request a medical exemption from MGB's

Vaccination Policy, an employee was required to submit an exemption request form completed

and signed by a health care provider.  SOUF ¶161.  Four Plaintiffs did not.

- In her sworn questionnaire responses, Plaintiff Driscoll identified herself as only
having submitted a religious exemption request.  She produced no evidence in
discovery that she sought a medical request, and MGB has no record of her submitting
a medical request.  SOUF ¶190.

- Plaintiffs Hooper, Pinnetti, and Vicente concede that their own health care providers
refused to complete a medical exemption request form for them.  SOUF ¶191.  A
provider-completed form with provider signature was required.  SOUF ¶161.[12]

Given their failures to establish that they ever requested a medical exemption from the

Vaccination Policy, or to provide any other evidence of a disability, Plaintiffs Jill Driscoll, Scott

---

[12] MGB has no record of Plaintiffs Hooper or Pinnetti otherwise corresponding with Occupational
Health to request a medical exemption.  In correspondence to others at MGB, Plaintiff Pinnetti
admitted her reported medical condition "does not qualify [her] for an exemption."  SOUF ¶192.
Plaintiff Vicente completed and submitted a medical exemption form without a provider signature;
despite the lack of medical documentation, a clinical panel reviewed the request and denied it after
determining that Plaintiff Vicente's reported condition was not a contraindication.  SOUF ¶196.

Hooper, Melissa Pinnetti, and Frivian Vicente cannot show a disability as a matter of law.[13]  Their ADA claims must be dismissed.

### 2.   Five Plaintiffs Concede Their Reported Condition(s) Did Not Substantially Limit Any Major Life Activity.

Five of the Plaintiffs concede that they are not disabled under the law because, by their own sworn admissions, their reported medical conditions do not substantially limit any of their major life activities.  SOUF ¶193.  Given these admissions, the ADA claims of Plaintiffs Lora Blank, Jill Driscoll,[14] Lori Fleury, Susan Marconi, and Corinne Valstyn fail as a matter of law.

### 3.   Two Plaintiffs Reported Pregnancy—Which is Not a Disability—As Their Only Medical Condition.

Two Plaintiffs, Lora Blank[15] and Kerry Haines, sought medical exemption from the Vaccination Policy solely on the basis that they were pregnant.  It is well-established that "pregnancy alone is not a 'disability' within the meaning of the ADA." *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d at 430 (citation omitted); U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-CVG-2015-1, ENF'T GUIDANCE ON PREGNANCY DISCRIMINATION & RELATED ISSUES (2015)).  Without evidence of specific pregnancy complications that "substantially limit" a "major life activity," Plaintiffs' claims fail.  Plaintiff Blank concedes that her pregnancy did not substantially limit any major life activity; Plaintiff

---

[13] In addition, they cannot make the required showing that they ever requested an accommodation, and their claims fail for that additional reason.  *See Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007) ("Ordinarily, the employer's duty to accommodate is triggered by a request from the employee.") (citation omitted).

[14] Plaintiff Driscoll concedes that she did not submit a medical exemption request and that any medical condition she may have does not substantially limit any of her major life activities, so her claim must fail for the each of the reasons articulated in both subsections (1) and (2) but is counted only once for purposes of determining how many Plaintiffs are not disabled as a matter of law.

[15] Plaintiff Blank both identifies pregnancy as her only condition and concedes that pregnancy does not limit any major life activity, so she is referenced in both subsections (2) and (3) but only counted once for purposes of determining how many Plaintiffs are not disabled as a matter of law.

Haines adduced no evidence of pregnancy-related complications that rendered her disabled under the ADA.  SOUF ¶¶194-195.  Their claims fail to establish a disability and thus fail as a matter of law.

### B.    Plaintiffs Cannot Establish That They Are "Qualified Individuals" Because They Posed a Direct Threat to Others as a Matter of Law.

None of the medical Plaintiffs can establish that they are qualified individuals—and so cannot establish their *prima facie* case—because they posed a direct threat to the health and safety of others in the workplace.  42 U.S.C. § 12113(b).  "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111.  "A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk."  *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 288 (1987).  "[I]n a[n] ADA case, it is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore 'qualified.' **Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others.**"  *Amego, Inc.*, 110 F.3d at 144 (holding that plaintiffs bear the burden of establishing that they are "qualified" and can perform the essential functions of their jobs without posing a direct threat to others, and that defendants only bear the burden of establishing "direct threat" when it is "purely a matter of defense" and "is not tied to the issue of essential job functions.") (emphasis added).  Plaintiffs cannot meet this burden.

### 1.    This Court Properly Held that MGB Was Likely to Succeed on the ADA Claims Because Plaintiffs Posed a Direct Threat.

At the preliminary injunction stage, this Court properly held that "plaintiffs are employees of a major hospital and healthcare network. On this record, it appears very likely that their 'essential job functions necessarily implicate the safety of others.'"  *Together Emps.*, 573 F. Supp.

3d at 432 (quoting *Amego, Inc.*, 110 F.3d at 144).  Following Phase I Discovery, the uncontroverted record evidence amply supports this conclusion as a matter of law.

In *Arline*, the Supreme Court adopted four factors to determine whether a disabled employee at risk of spreading an infectious disease exposes others to such significant health and safety risks that they are not "qualified" under the law:[16]  "(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." *Arline,* 480 U.S. at 287.  This Court properly followed the *Arline* factors at the preliminary injunction stage.  *Together Emps.*, 573 F. Supp. 3d at 432-33.  Noting that it "should not second-guess the hospital's judgment in matters of patient safety," this Court held that "[u]nder the circumstances, it was reasonable for MGB to conclude that unvaccinated employees—who are more likely to become infected—pose a direct threat to patients and others." *Id.* (internal quotation omitted) ("[i]t is undisputed that COVID-19, and particularly the Delta variant, is a highly contagious disease, transmitted in large part through proximity to infected people. Nor is it disputed that COVID-19 is often serious and sometimes fatal, or that the disease can be transmitted by infected persons who are entirely asymptomatic.").

### 2.    The Undisputed Record Shows Plaintiffs Posed a Direct Threat.

The undisputed record evidence demonstrates that Plaintiffs posed a direct threat as a matter of law.  Most of the Plaintiffs who submitted medical requests worked on site all of the time, and all of the Plaintiffs acknowledged reporting to campus for at least one work shift in the period immediately prior to the pandemic or during the pandemic.  SOUF ¶186.  Many of the Plaintiffs conceded at deposition that the patients they treated—including the elderly, the

---

[16] In *Arline*, the Court evaluated claims under Section 504 of the Rehabilitation Act of 1973; courts interpreting ADA claims are guided by case law under that Act.  *Amego, Inc.*, 110 F.3d at 143.

immunocompromised and the very young—were at particularly high risk for COVID.  SOUF ¶¶18, 258-275.  It is also undisputed that MGB treats medically vulnerable people at higher risk for serious disease and death from COVID than the general public, including—to name just a few examples—elderly patients; cancer patients and others with weakened immune systems; patients with severe heart and lung disease; infants in the neonatal intensive care unit; pregnant patients; and pediatric patients not yet eligible to be vaccinated.  SOUF ¶17.

The undisputed record also shows that unvaccinated people posed a greater risk to others than vaccinated people.  In summer 2021, MGB leaders determined based on scientific data that: (i) people who were vaccinated were less likely to get infected with COVID; (ii) when a person who is vaccinated gets infected with COVID, they shed the virus for a shorter period of time compared with an unvaccinated person; (iii) the virus they do shed is less likely to be replication competent, to be able to actually reproduce itself and infect a cell, compared with an unvaccinated person; (iv) from transmission studies, a vaccinated person was about half as likely to transmit compared with an unvaccinated infected person; (v) vaccinated people are less likely to have symptoms than unvaccinated people, and symptoms (coughing, sneezing, etc.) are a predictor of the amount of transmission; and (vi) vaccinated people have a high viral load for a shorter time, making them less likely to transmit.  SOUF ¶66.  These are undisputed scientific facts.  In addition, as discussed in Section I, *supra*, MGB had previously experienced significant in-hospital transmission, including a documented, studied major cluster at The Brigham, *see* Section I(B)(2).  As Dr. Walls testified, every unvaccinated person who became infected created an "exponential" risk of disease spread.  SOUF ¶¶105, 141.  These undisputed facts led MGB to the conclusion that unvaccinated staff posed a significant, intolerable health and safety risk.

### 3.    First Circuit Precedent Supports a Conclusion That Plaintiffs Posed a Direct Threat.

The First Circuit's *Amego* decision supports the conclusion that Plaintiffs posed a direct threat as a matter of law.  In *Amego*, the Court held that the plaintiff, who administered medications to disabled people in a residential program, could not establish that she could perform the essential functions of her job without posing a direct threat to her patients, and it was "eminently reasonable" for her employer to find that the risk the plaintiff posed to her patients was "too great to run." *Amego, Inc.*, 110 F.3d at 145.  The plaintiff in *Amego* had depression and had twice attempted suicide (once using medication she had access to at work), and her coworkers were concerned that she had trouble focusing and posed a risk to patients.  *Id.*  The Court noted that "the nature of the risk was such that it was extremely difficult to guard against" and cited the vulnerability of Amego's clients.  *Id.*  Similarly, the nature of the risk the unvaccinated Plaintiffs posed to vulnerable patients–as well as families, visitors, staff, and the public–was "extremely difficult to guard against," and "too great to run."  It was a direct threat as a matter of law.

### 4.    Numerous Courts Have Held That the Risk of COVID Transmission Is a Direct Threat Under the ADA.

Numerous courts have held that an individual presents a direct threat when they pose a heightened risk of transmitting COVID to others.  In *Lundstrom*, although the Northern District of California dismissed an unvaccinated healthcare worker's claim under the ADA because the plaintiff failed to establish that she was disabled, it noted that the argument that an unvaccinated healthcare worker poses a direct threat to coworkers, patients, and clients "appears to have merit." *Lundstrom,* 2022 WL 17330842, at *5 (citing *Together Emps.*, 573 F. Supp. 3d at 431-33).

In the context of Title III of the ADA, many courts have held that a business's decision to deny in-person services to a patron who refused to comply with a health and safety policy "does not amount to discrimination under the ADA" where the business "conducted an individualized

assessment of the direct threat posed by [the patron's] unwillingness" to comply. *Hernandez v. Costco Wholesale Corp.*, No. CV-21-00357-PHX-DLR, 2022 WL 17537981, at *2 (D. Ariz. Dec. 8, 2022) ("entity does not commit discrimination under the ADA when it denies services to an 'individual [who] poses a direct threat to the health or safety of others'.") (quoting 42 U.S.C. § 12182(b)(3)); *see also Hernandez v. West Texas Treasures Estate Sales, LLC*, 2021 WL 4097148, at *5 (W.D. Tex. Aug. 19, 2021) (*appeal filed*, Jan. 25, 2022) ("given the indisputable risk to others, failure to wear a mask in a place of public accommodation during the COVID-19 pandemic is a direct threat as a matter of law"); *Giles v. Sprouts Farmers Mkt, Inc.*, 2021 WL 2072379, at *5 (S.D. Cal., May 24, 2021) (dismissing ADA claim based on direct threat where plaintiff refused to comply with store's COVID policy); *Witt v. Bristol Farms*, 2021 WL 5203297, at *6 (S.D. Cal. Nov. 9, 2021), appeal dismissed, 2022 WL 726961 (9th Cir. Jan. 14, 2022) (same).

It is undisputed that MGB's expert medical judgment was that the unvaccinated Plaintiffs were more likely to transmit COVID; that heightened risk is a direct threat as a matter of law.

### 5. Circuit Courts Routinely Affirm Summary Judgment Where Employees Cannot Show They Could Perform Essential Job Functions Without Endangering Others.

Circuit courts routinely affirm summary judgment in cases where employees cannot show that they could safely perform the essential functions of their jobs without endangering others. *See, e.g.*, *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 15 (6th Cir. 2012) *cert. denied Wurzel v. Whirlpool Corp.*, 568 U.S. 887 (2012) (summary judgment for employer where employee with Prinzmetal angina, which causes coronary artery spasms, worked at heights and with machinery and posed ADA direct threat); *Jarvis v. Potter*, 500 F.3d 1113, 1124 (10th Cir. 2007) (summary judgment for employer; employee with PTSD who had a history of striking and kicking coworkers posed ADA direct threat); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000) (summary judgment for employer; alcoholic physician posed a ADA direct threat to patients);

*Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) *cert. denied Moses v. Am. Nonwovens, Inc.*, 519 U.S. 1118 (1997) (summary judgment for employer; employee with epilepsy who worked with fast-moving, high-temperature machinery "failed to produce probative evidence that he was not a direct threat"). Similarly, for the reasons discussed *supra*, Plaintiffs cannot establish that they could perform their essential functions without endangering MGB's vulnerable patient population, workforce, and visitors.

### 6. No Reasonable Accommodation Would Eliminate the Threat.

MGB determined the Vaccination Policy was uniquely effective and other controls were not an adequate substitute: in other words, no other protocol would eliminate the direct threat that unvaccinated personnel posed to others. The "the overwhelming scientific evidence" available to MGB established that "vaccination was the single most effective step in preventing infection and contagion." SOUF ¶68. MGB determined that substitutes such as masking, testing, and social distancing were not adequate to meet MGB's urgent health and safety priorities. SOUF ¶97; *see* Section I(B)(4), *supra*. MGB determined that Plaintiffs posed an unmitigable, intolerable direct threat, and consequently all of their ADA claims fail as a matter of law.

### C. Plaintiffs Cannot Show That Exemption From the Vaccination Policy Was A Reasonable Accommodation Because They Cannot Show That Avoiding Vaccination Was Necessary for Their Alleged Conditions.

The claims of all of the Plaintiffs who sought medical exemptions further fail because they cannot show, as a matter of law, that their requested accommodation—exemption from the Vaccination Policy—was a reasonable accommodation under the circumstances, a required showing for Plaintiffs' prima facie case under the ADA.

"Under the ADA an employer is required to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would

impose an undue hardship on [its] operation of the business'." *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 604 (1st Cir. 2017) (quoting 42 U.S.C. § 12112(b)(5)(A)). Plaintiffs bear the burden to show that a requested accommodation is "reasonable on its face." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). They cannot do so on this record.

The accommodation Plaintiffs sought was a medical exemption from the Vaccination Policy. "[T]o show that a proposed accommodation is reasonable, a plaintiff must demonstrate that it 'would enable [him] to perform the essential functions of [his] job' and would be 'feasible for the employer under the circumstances'." *Jones*, 696 F.3d at 90 (quote omitted). *Accord Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020) (ADA "[a]ccommodations must be *necessary considering the employee's physical limitations*") (emphasis added) (internal quotations and citation omitted). It is Plaintiffs' burden to proffer accommodations that are reasonable under the circumstances. *Jones*, 696 F.3d at 90.

Exemption from the Vaccination Policy was not a reasonable accommodation because it was not medically necessary for any of the 22 medical Plaintiffs. Where Plaintiffs' medical conditions were not a contraindication for the vaccine, exemption from the Vaccination Policy was not a reasonable accommodation. *Tchankpa*, 951 F.3d at 813.

The panels generally followed the CDC guidance regarding medical contraindications to vaccination, which evolved over time as new data emerged. SOUF ¶¶170-171. MGB's experts' consensus was that exemptions should be driven by the CDC guidance, like the rest of MGB's COVID policies. SOUF ¶172.[17] This provided consistency in following the science and public

---

[17] MGB's expert medical panelists conducted a holistic review, and thus there were instances in which MGB approved exemptions that were not based on a CDC contraindication—including a couple of neurological cases in which, after consultation with an MGB neurology or immune-neurology specialist, the panelists determined exemption was warranted because there was close proximity between neurological changes and the vaccine. SOUF ¶176.

health recommendations, and allowed decisions to be based on the aggregate data and findings of the very large community of public health experts that result in CDC guidance. *Id.* The medical contraindications to the vaccine are few and well-defined by CDC guidance. SOUF ¶170. Outside those narrow contraindications, the CDC recommends the rest of the public be vaccinated. *Id.* Most people with underlying medical conditions are especially in need of vaccination because they are higher risk for severe disease and death from COVID. SOUF ¶171. Every Plaintiff who sought a medical exemption was determined by MGB experts *not* to have a CDC contraindication to COVID vaccination or otherwise present a medical reason to avoid vaccination. SOUF ¶¶197, 250-251.

As this Court explained at the preliminary injunction stage, "where the claimed disability is not a contraindication for the vaccine, the requested accommodation does not sufficiently relate to the claimed disability." *Together Emps*, 573 F. Supp. 3d at 434 (citing *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 410 (8th Cir. 2018)). In *Hustvet*, the court held that the plaintiff's request for accommodation—to forgo rubella immunization—was not "sufficiently relate[d] to her purported disability" of a seizure disorder. *Hustvet*, 910 F.3d at 411 (affirming summary judgment for employer on failure to accommodate claim). *Hustvet* noted that "the CDC does not consider past seizures to be a contraindication or even a precaution for the vaccine." *Id.* As this Court correctly observed, the same analysis shows that exemption from the Vaccination Policy is not reasonable where the Plaintiffs did not have a CDC contraindication to the vaccine.

It is Plaintiffs' burden to "explain how the accommodation is linked" to their reported conditions—to produce evidence of a "causal connection between the major life activity that is limited and the accommodation sought." *Jones*, 696 F.3d at 89 (internal quotation omitted). Plaintiffs have the "burden to explain how [their] specific accommodation requests were related

to [their] disability and duties at work." *Ortiz-Martinez*, 853 F.3d at 606.  Put another way, "a proposed accommodation cannot be said to be 'reasonable' if it is not also 'necessary.'" *Fults v. Nissan N. Am. Inc.*, 4:18-CV-73-TAV-CHS, 2020 WL 12862964, at *3 (E.D. Tenn. Sept. 16, 2020) (*citing Tchankpa* at 812).  Plaintiffs cannot meet this burden as a matter of law.

### 1.    Seven Plaintiffs Conceded Their Conditions Are Not Contraindications.

Seven Plaintiffs conceded under oath that their medical conditions are *not* contraindications to the COVID vaccine, so their claims should be dismissed because the request is not sufficiently related to the purported disability as a matter of law.  SOUF ¶198.  Since Plaintiffs conceded their conditions are not CDC contraindications, they cannot show, as a matter of law, that exemption from the COVID vaccine was necessary or reasonable.  MGB's expert clinical panels agreed.  SOUF ¶¶197.  Given this undisputed evidence, the ADA claims of the Plaintiffs who admitted they did not have a CDC contraindication – Lora Blank, Jill Driscoll, Maryna Garbitt, Joyce Miller, Melissa Pinnetti, Michael Saccoccio, and Marissa Williams – fail as a matter of law.

### 2.    MGB's Expert Panels Determined the Remaining 14 Plaintiffs Did Not Have a CDC Contraindication.

For the remaining 14 Plaintiffs,[18] it is undisputed that MGB's expert clinical panels reviewed the medical documentation those Plaintiffs provided and determined that their conditions were not CDC contraindications to the vaccine and did not demonstrate a sufficient medical reason to support an exemption.  SOUF ¶197.  Plaintiffs offer nothing to dispute those findings other than their self-serving, unsupported, lay allegations.  Some of Plaintiffs' alleged conditions include prior COVID-19 infection, pregnancy,[19] and mental health conditions.  SOUF ¶¶193-194, 198

---

[18] Plaintiff Hooper claims his condition is contraindicated, but he never even submitted a medical exemption request to MGB, so MGB does not include him in this section.  *See* Section II(A)(1).

[19] During the roll-out of the Vaccination Policy, the CDC updated its guidance to recommend that pregnant women *should* be vaccinated against COVID.  SOUF ¶173.  Consequently, MGB updated

Given that MGB's expert clinical panels reviewed the materials submitted by Plaintiffs and their medical providers, and determined that their conditions were not CDC contraindications (or otherwise a medical reason to avoid vaccination), Plaintiffs cannot show the required relationship between the accommodation request and the claimed disability as a matter of law.

## **CONCLUSION**

The undisputed record shows that in the middle of a global public health emergency, MGB—the Commonwealth's largest healthcare provider and employer—established a COVID vaccination requirement for its workers to protect the health and safety of its patients, visitors, employees, and the public at large.   Plaintiffs do not challenge the lawfulness of MGB's Vaccination Policy, nor do they proffer any basis to undermine the expert medical judgment and consensus that gave rise to it.   Instead, they claim they were entitled to remain in their roles as unvaccinated workers at a healthcare system serving medically complex patients despite that MGB determined, after careful review, that they did not qualify for exemptions.   Neither Title VII nor the ADA requires a healthcare network to imperil the public health or the health of its staff who are called upon to support high-quality patient care, delivered each and every day. MGB respectfully requests that the Court grant it summary judgment on all counts.

---

its Vaccination Policy to conform to that guidance after consultation with its experts in obstetrics. SOUF ¶174.   Though MGB did not grant medical exemptions based on the fact of pregnancy alone, pregnant employees could still seek exemptions based on other medical conditions that went beyond the fact of pregnancy, and where circumstances warranted, MGB permitted temporary exemptions until after childbirth.  SOUF ¶175.

MASS GENERAL BRIGHAM INCORPORATED
By Its Attorneys,
Respectfully Submitted,


*/s/ Dawn R. Solowey*
Lynn A. Kappelman (BBO# 642017)
Katherine E. Perrelli (BBO# 549820)
Kristin McGurn (BBO# 559687)
Dawn Reddy Solowey (BBO# 567757)
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
kperrelli@seyfarth.com
lkappelman@seyfarth.com
kmcgurn@seyfarth.com
dsolowey@seyfarth.com
TEL: (617) 946-4800
FAX: (617) 946-4801

Date: February 17, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). *Pro se* Plaintiff Laina Frazier was served a true and accurate copy of this document by e-mail on February 17, 2023.

*/s/ Dawn R. Solowey*
Dawn R. Solowey

41