## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TYLER ADAMS, et al.,

                Plaintiffs,

      v.

MASS GENERAL BRIGHAM
INCORPORATED,

                Defendant.

Civil Action No. 1:21-cv-11686-FDS

## MASS GENERAL BRIGHAM'S STATEMENT OF UNDISPUTED FACTS

Defendant Mass General Brigham Incorporated ("MGB") submits this Statement of

Undisputed Facts[1] in support of its Motion for Summary Judgment.[2]

## I.    MASS GENERAL BRIGHAM AND ITS FOCUS ON PATIENT HEALTH

### A.    Mass General Brigham

1.    MGB is comprised of at least 16 member institutions. These include The General

Hospital Corporation (Massachusetts General Hospital); The Brigham and Women's Hospital,

Inc.; The McLean Hospital Corporation; Massachusetts Eye and Ear Infirmary; and Newton-

Wellesley Hospital.  A. Vol. I, p. 78 (Declaration of Vanessa Gilbreth ("Gilbreth Dec."), ¶5).

MGB includes 6,500 physicians, 9,100 nurses, and another 78,000 individuals who collectively

provide safe, quality care in hospitals, labs, physicians' offices, outpatient centers, rehab

---

[1]All statements are made for purposes of MGB's Motion for Summary Judgment only, are not admissions, and may not be used for any purpose other than MGB's Motion for Summary Judgment, including without limitation any other proceeding in this lawsuit.

[2]All exhibits to this Statement of Undisputed Facts are in the Appendix, referred to as A. __ for the Court's ease of reference.  Following the A.__ citation is a parenthetical explaining the document, such as deposition transcripts or deposition exhibits.  Certain exhibits are charts that MGB has created based on all Plaintiffs' responses to Questionnaires that were served in discovery after Court approval.

facilities, urgent care clinics, and patients' homes.  A. Vol. I, p. 24 (Declaration of Dr. Michael Klompas ("Klompas Dec.") ¶5); *see also* A. Vol. II, p. 53 (Gandhi Tr. 47).  MGB is the largest healthcare provider, largest academic health system, and largest private employer in Massachusetts.  A. Vol. II, p. 45 (Gandhi Tr. 16-17); A. Vol. I, p. 24 (Klompas Dec. ¶7).

> **B.  MGB's Deep Commitment to Its Patients**

2.      MGB's workforce cares for 1.5 million patients a year, including some of the most medically complicated and vulnerable patients in the world.  A. Vol. I, p. 24 (Klompas Dec. ¶6).

3.      MGB strives to be at the cutting edge of protecting patients.  A. Vol. II, p. 297 (Walls Tr. 22).  MGB highly values that it is, and is known as, among the safest places for acutely ill patients in the state to receive treatment.  A. Vol. I, p. 24 (Klompas Dec. ¶7).

4.      MGB stayed open through the entire pandemic.  Unlike hotels, restaurants or movie theaters that could close, MGB's entities had to be open 24/7 for everyone who came to their doors, and had to be the safest place possible for patients.  A. Vol. II, p. 296 (Walls Tr. 19-20).

5.      As Plaintiffs concede, the primary mission of MGB and its health care facilities is to keep patients safe and healthy. *See*, *e.g.*, A. Vol. III, p. 185 (Garbitt Tr. 191); A. Vol. III, p. 74 (Brouillard Tr. 160); A. Vol. III, p. 317 (Pierre Tr. 157).

6.      Many Plaintiffs testified that keeping patients safe was their job too.  *See*, *e.g.*, A. Vol. III, p. 67 (Brouillard Tr. 48); A. Vol. III, p. 185 (Garbitt Tr. 191); A. Vol. III, p. 315 (Pierre Tr. 144); A. Vol. III, p. 350 (Zaiats Tr. 27).

7.      Part of MGB's mission is also to protect its employees from getting COVID in the workplace.  A. Vol. II, p. 127 (Klompas Tr. at 100).

**C.      Every Single MGB Employee Can Be Called into Work in an Emergency**

8.      Every MGB employee has a badge that says that in the event of an emergency, they are allowed to go to the hospital.  Employees may be called in for patient care, to hand out food, or to do whatever is needed.  A Vol. II, p. 286 (Sheehan Tr. 130-32).

9.      A sample of the badge for MGH is pictured here:



A. Vol. III, p. 79 (Brouillard Dep. Ex. 5).

10.      Plaintiffs admitted at deposition that they had badges with such emergency language and could be called in any time.  A. Vol. III, p. 22 (Alexandrova Tr. 38-39); A. Vol. III, p. 46 (Barone Tr. 106); A. Vol. III, p. 83 (Cadigan Tr. 29); A. Vol. III, p. 117 (Driscoll Tr. 63); A. Vol. III, p. 150 (Frenchwood Tr. 109); A. Vol. III, p. 178 (Garbitt Tr. 82); A. Vol. III, p. 192 (Giso Tr. 95-97); A. Vol. III, p. 234 (Hirtle Tr. 143); A. Vol. III, p. 269 (Ithier Tr. 55); A. Vol. III, p. 278 (Kerentsev Tr. 51-52); A. Vol. III, pp. 356-57 (Zaiats Tr. 57-58).[3]

---

[3] By agreement of the parties and Court Order, the Parties have completed Phase One of phased discovery, including 30 depositions of Plaintiffs (15 chosen by Plaintiffs and 15 by MGB) and 9 depositions of MGB witnesses (chosen by Plaintiffs).  Citations to Plaintiffs' transcripts are from those representative depositions.

11.     During the Boston Marathon bombing, for example, MGB employees were asked to come in on an emergency basis to assist.  A. Vol. III, p. 150 (Frenchwood Tr. 108); A. Vol. III, p. 192 (Giso Tr. 95).  MGB employees were also deployed following 9/11.  A. Vol. VII, pp. 1-6 (https://www.massgeneral.org/news/hotline/htl091021/20-years-later-reflecting-on-a-call-to-help); A. Vol. III, p. 192 (Giso Tr. 95); *see also* Section II, F, *infra*.

12.     As Plaintiff Zaiats testified, "If [an] emergency is happening, all of us who can help would go and help."  A. Vol. III, p. 356 (Zaiats Tr. 57).

## II.     MGB AND THE COVID PANDEMIC

### A.     MGB Has Been on the Front Lines of Treating COVID Patients

13.     Approximately 1,000,000 Americans have died from COVID-19 ("COVID").  Order, Doc. 140, citing Ctrs. for Disease Control & Prevention, COVID-19 Mortality Overview; Provisional Death Counts for Coronavirus Disease 2019 (2022) (last updated Nov. 26, 2022).  *See also e.g.,* A. Vol. III, p. 153 (Frenchwood Tr. 133); A. Vol. III, p. 183 (Garbitt Tr. 179-80); A. Vol. III, p. 217 (Hamel Tr. 111); A. Vol. III, p. 283 (Kerentsev Tr. 112).

14.     MGB has cared for many thousands of COVID patients.  A. Vol. I, p. 24 (Klompas Dec. ¶ 8).

15.     Some Plaintiffs saw how deadly COVID could be first-hand.  For example, Plaintiff F. Holmes and Plaintiff Pierre, both nurses, saw patients who developed severe COVID, some of whom went to the ICU, some who required mechanical assistance to breathe, and some who died.  A. Vol. III, p. 248 (F. Holmes Tr. 156); A. Vol. III, pp. 310, 314 (Pierre Tr. 54, 83).

16.     Plaintiff Zaiats, a registered nurse in the neuro ICU at The Brigham, testified, "I was actually standing alone in a room with patients who were dying from COVID, and I was the

last human being next to them, and they were holding my hand, squeezing my hand while they were dying." A. Vol. III, pp. 349, 365-66 (Zaiats Tr. 25, 169-70).

**B.      MGB's Patient Population Includes Many Especially Vulnerable to COVID**

17.      MGB treats medically vulnerable people at higher risk for serious disease and death from COVID than the general public, including—to name just a few examples—elderly patients; cancer patients and others with weakened immune systems; patients with severe heart and lung disease; infants in the neonatal intensive care unit; pregnant patients; and pediatric patients who are not yet eligible to be vaccinated. A. Vol. I, p. 27 (Klompas Dec. ¶21).

18.      Many of the Plaintiffs conceded that the patients they treated – including the elderly, the immunocompromised and the very young – were at particular risk for COVID. A. Vol. III, p. 25 (Alexandrova Tr. 54); A. Vol. III, p. 44 (Barone Tr. 42); A. Vol. III, pp. 11-12 (Alcantara Tr. 53-54); A. Vol. III, p. 60 (Bernardone Tr. 67); A. Vol. III, pp. 87-88 (Cadigan Tr. 53-54); A. Vol. III,  p. 109 (DiCicco Tr. 56); A. Vol. III, p. 214 (Hamel Tr. 48); A. Vol. III, p. 235 (Hirtle Tr. 147); A. Vol. III, p. 270 (Ithier Tr. 64-65); A. Vol. III, pp. 313, 317 (Pierre Tr. 81, 155-56); A. Vol. III, p. 329 (Rupnick Tr. 103). Plaintiff Conway admitted, "I believe it's dangerous for everybody." A. Vol. III, p. 97 (Conway Tr. 112).

**C.      MGB Took Unprecedented Measures to Control the Spread of COVID**

19.      MGB took unprecedented measures to try to stop the spread of COVID, including:  not allowing visitors to see patients; disrupting in-person conferences, including hospital teaching conferences; impeding patient discussions that had an in-person component; shutting down educational activities; prohibiting employee travel; not allowing in-person conferences; requiring masks all the time; and allowing staff to take up to 10 work days off for an infection. A. Vol. II, p. 128 (Klompas Tr. 104-05).

5

20.     All MGB workforce members are subject to the infection control policies of MGB and/or its entities.  A. Vol. VI, p. 2 (MGB Response to Request for Admission No. 2).  *See also e.g.*, A. Vol. III, p. 70 (Brouillard Tr. 60); A. Vol. III, p. 152 (Frenchwood Tr. 114-15); A. Vol. III, p. 179 (Garbitt Tr. 88); A. Vol. III, p. 359 (Zaiats Tr. 69).

21.     MGB's infection control policies prior to the availability of COVID vaccines included masking, testing, directives not to come into work while feeling sick, and restrictions on visitors to MGB facilities.  A. Vol. II, p. 133 (Klompas Tr. 124).

**D.     Despite Its Best Precautions, MGB Experienced In-Hospital Transmission**

22.     Despite these protocols, MGB experienced clusters of hospital-acquired infections by patients.  A. Vol. II, p. 116 (Klompas Tr. 54-55).  A cluster is a large number of related COVID infections in patients, staff or both around the same time that can be associated to internal transmission from one to the other.  A. Vol. II, p. 133 (Klompas Tr. 125).

23.     The Brigham experienced a "large COVID cluster" in the fall of 2020, despite a rigorous infection control infrastructure.  In that cluster, analyzed by genome sequencing in partnership with the state Department of Public Health, there were 38 staff infections and 14 patient infections.  A. Vol. II, pp. 119, 120, 133 (Klompas Tr. at 67-68, 72-73, 124); A. Vol. VI, pp. 644-653 (Klompas February 2021 *AIM* publication).

**E.     Concerned Patients Were Asking about Their Providers' Vaccination Status**

24.     More than three dozen Plaintiffs conceded that patients asked them if they were vaccinated.  A. Vol. IV, p. 26 (**CHART O** – Request for Admission ("RFA") No. 2 Admissions).

25.     Plaintiff Attarian, a home health nurse who treated patients in their homes, testified that a patient asked if she was vaccinated and she answered, "No."  A. Vol. III, p. 31 (Attarian Tr. 20).

26.     Plaintiff Bernardone, an RN, was also asked by a patient asked if she was vaccinated and she answered, "No."  A. Vol. III, p. 53 (Bernardone Tr. 24).

27.     Plaintiff Conway, a MRI Technologist and Radiology Supervisor, admitted that up to five patients asked her if she was vaccinated.  A. Vol. III, p. 96 (Conway Tr. 109).

28.     Plaintiff Cadigan, a nurse, testified that five to 10 times patients or family members expressed concern about whether staff were vaccinated.  They asked:  "How many staff are vaccinated? Are all the staff vaccinated?"  She "understood that they were looking for reassurance."  A. Vol. III, p. 82 (Cadigan Tr. 23-25).

29.     Plaintiff Hamel, a radiation therapist at a cancer center, admitted that five to 10 times, a patient or their family member asked if she was vaccinated.  She responded, "What is great about working in healthcare is that every one of us was given the opportunity."  A. Vol. III, pp. 214-15 (Hamel Tr. 49-50).

30.     Plaintiff F. Holmes was aware of patients who asked about the vaccination status of providers at Newton-Wellesley Hospital.  A. Vol. III, p. 249 (F. Holmes Tr. 158-59).

31.     Plaintiff Miller, who worked at the Mass General information desks, admits that more than five patients or their family members asked if she was vaccinated or whether staff was vaccinated.  A. Vol. III, p. 298 (Miller Tr. 24-25).

**F.     MGB Redeployed Thousands of Staff to Meet Urgent Pandemic Needs**

32.     Every MGB employee was subject to redeployment, including those who typically work offsite and those who do not interact with patients or the public in the regular

course.  Those employees could be re-deployed to patient- or public- facing roles.  A. Vol. II, p. 312 (Walls Tr. 82-83, 85).  Most Plaintiffs admitted this to be the case.  A. Vol. IV, p. 40 (**CHART T** – RFA No. 7 Admissions).

33.     Dr. Walls is MGB's Chief Operating Officer, a physician who practiced emergency medicine for over 35 years, and he is Incident Commander for the MGB system.  A. Vol. II, pp. 293, 310 (Walls Tr. 9, 76-77).

34.     Incident Command eliminates the normal bureaucratic obstructions to decision-making.  For example. Incident Command can order 60 people to come in and screen people for COVID symptoms or hand out masks at the hospital entrance; it can also order which segments produce the redeployments, such as redeploying 20 Information Technology (IT) people.  A. Vol. II, p. 311 (Walls Tr. 78-79).

35.     MGB redeployed thousands of personnel during the pandemic, taking them off of their regular jobs to  perform new functions.  For example, MGB redeployed employees who ordinarily performed accounting, IT, billing or collections.  A. Vol. II, p. 311 (Walls Tr. 79).

36.     Employees were redeployed to perform roles necessitated by the pandemic, including patient and public-facing roles e.g.: to direct patients and the public to designated entrances; to symptom-screen those entering the hospitals; to ask about COVID exposure history; to ensure that patients and visitors cleaned their hands; to give patients and visitors masks; and to give patients color-coded stickers to indicate they were properly screened. Hundreds of employees were required to manage those tasks, which required close proximity to the public and patients. A. Vol. II, pp. 311-12 (Walls Tr. 79-83).

37.     Boston Hope was a temporary hospital established by the City of Boston and Commonwealth of Massachusetts in the Convention Center.  MGB was asked to set it up,

8

organize it, and run all the operations.  It was a brand new, small field hospital that treated lower-acuity COVID patients to avoid other hospitals being overwhelmed.  A. Vol. II, p. 311 (Walls Tr. 80-81).

38.    MGB redeployed hundreds of people to help run vaccination clinics to help employees and patients get vaccinated.  A. Vol. II, p. 312 (Walls Tr. 82-83).  For example, a Finance Operations employee was redeployed as a supervisor at one of the vaccine clinics at the corporate office, where she worked in the same room as patients, during the period from December 2020 or January 2021 through 2022.  A. Vol. II, p. 57 (Gandhi Tr. 63-64).

39.    Forty (40) Plaintiffs admitted that they were redeployed at least once during the COVID pandemic.  A. Vol. IV, p. 43 (**CHART U** – RFA No. 9 Admissions).

40.    Plaintiffs were aware of staff, including those who worked remotely, being redeployed in the pandemic.  A. Vol. III, p. 178 (Garbitt Tr. 82); A. Vol. III, p. 229 (Hirtle Tr. 36-37); A. Vol. III, p. 269 (Ithier Tr. 56); A. Vol. III, pp. 357-58 (Zaiats Tr. 58, 61-62).

41.    About MGB employees redeployed throughout the pandemic, Sheehan testified, "They did anything that it took."  A. Vol. II, p. 286 (Sheehan Tr. 130-32).

## III.    MGB BEGAN CONSIDERING REQUIRING STAFF VACCINATION

### A.    "The Biggest Breakthrough":  The COVID Vaccine

42.    Dr. Walls testified, "The vaccine was the biggest breakthrough we had in a very bleak pandemic that was killing hundreds of thousands of Americans."  A. Vol. II, p. 296 (Walls Tr. 21).

43.    Dr. Walls testified that members of the Senior Management Committee ("SMC") at MGB were "almost holding their breath for a vaccine.  We needed a vaccine.  We knew that we couldn't really fully protect our patients without a vaccine."  A. Vol. II, p. 296 (Walls Tr. 18).

9

44.     Dr. Walls testified:  As soon as the vaccine became available, MGB's focus became "[H]ow do we take advantage of this to protect our patients?"  A. Vol. II, p. 296 (Walls Tr. 18).

**B.     Discussions about the Vaccination Policy Began in Spring 2021**

45.     Senior leadership began discussions as to whether MGB should require COVID vaccinations in March or April of 2021.  A. Vol. II, pp. 62, 63-64, 66 (Hashimoto Tr. 8, 10-17, 22-23).

46.     In spring of 2021, MGB leadership became aware that other health systems were beginning to mandate COVID vaccination.  A. Vol. II, p. 297 (Walls Tr. 22).

47.     By spring of 2021, MGB's leadership had determined that there was sufficient data, based on scientific evidence, that the COVID vaccine worked in preventing infection, had an impact on transmission, prevented severe disease, and that the benefits clearly outweighed any potential harm.  A. Vol. II, p. 111 (Klompas Tr. 36-37).

48.     MGB's senior leadership and Occupational Health group considered the issue from many angles, including operations issues such as vaccine supply, timing, the hospitals' mission, potential concerns in the workforce, communication systems and vaccine exemption systems.  A. Vol. II, p. 67 (Hashimoto Tr. 26-29).

49.     Some of MGB's most senior leaders, including world renowned experts in infectious disease and infection control, were involved in making the decision about whether to require the vaccination: Dr. Michael Klompas, Hospital Epidemiologist at The Brigham; Dr. Erica Shenoy, Associate Chief of Infection Control at Massachusetts General Hospital; Dr. Tom Sequist, MGB's Chief Medical Officer; Dr. Paul Biddinger, the Endowed Chair in Emergency Preparedness and Director of the Center for Disaster Medicine at Massachusetts General

Hospital; Dr. Dean Hashimoto, MGB's Chief Medical Officer for Workplace Health and

Wellness; and, Dr. Ronald Walls, MGB's Chief Operating Officer.  A. Vol. II, p. 107 (Klompas

Tr. 20); A. Vol. I, p. 26 (Klompas Dec. ¶18).  In addition, MGB leaders in Human Resources,

Occupational Health, Operations, Disaster Planning, Legal, Diversity, Equity and Inclusion, and

Finance were involved in the decision. A. Vol. I, p. 26 (Klompas Dec. ¶18); A. Vol. II, p. 107

(Klompas Tr. 20); A. Vol. II, pp. 255, 256, 258 (Sheehan Tr. 8, 10-12, 20); A. Vol. II, pp. 69-70

(Hashimoto Tr. 37-38); A. Vol. II, p. 45 (Gandhi Tr. 15-16).

50.     The SMC, which is chaired by MGB President and Chief Executive Officer Dr.

Anne Klibanski, and includes Chief Operating Officer Dr. Ron Walls, Chief Financial Officer

Niyum Gandhi, Chief Human Resources Officer Rosemary Sheehan, and doctor representatives

from stakeholder institutions within MGB, advised that MGB adopt a mandatory Vaccination

Policy.  There was not a single voice of dissent among the SMC.  A. Vol. II, pp. 294-95 (Walls

Tr. 12-14).

IV.     **THE ANNOUNCEMENT THAT MGB WOULD REQUIRE THE VACCINE**

A.     **MGB's June 2021 Announcement Previewing Its Vaccination Policy**

51.     On June 24, 2021, MGB's CEO announced to all staff that it would soon be

requiring staff to receive the COVID Vaccination as a condition of employment, absent an

approved medical or religious exemption (the "Vaccination Policy").  A. Vol. I, p. 24 (Klompas

Dec. ¶9).  The announcement did not specify the date of implementation.  A. Vol. I, pp. 24, 35-

37 (Klompas Dec. ¶9 Ex. 1).

## V.   THE REASONS THAT MGB ADOPTED THE VACCINATION POLICY

### A.   The Decision to Implement the Vaccination Policy:  Overview

52.     During the pandemic, MGB recognized that it had a heightened responsibility for the health and safety of its health care staff and patients and to continue to provide essential services to patients.  MGB determined that the Vaccination Policy was necessary given the unique emergency created by the COVID pandemic; the unique threat of severe illness and death associated with COVID especially in hospitalized patients; its responsibility to maintain the highest possible level of quality patient care; its need to protect patients, staff and visitors; its need to keep staffing levels adequate to provide patient care; its need as a major health care system to inspire trust with the public so that the public would feel safe accessing medical care; its prescient concern that the fall of 2021 and winter of 2022 would see another rise in COVID cases; and the additional stresses on its already overburdened system created by the highly contagious Delta variant.  A. Vol. I, pp. 26-27 (Klompas Dec. ¶¶19-20).

### B.   The Decision to Implement the Policy:  In-Hospital Spread of COVID

53.     Prior to issuing the Vaccination Policy, MGB's leaders recognized the immense burden that COVID had placed on MGB, its patients and employees.  Because of patients' uniquely vulnerable status, COVID is particularly deadly.  Even with all of the careful controls, there was still spread in hospitals, and more measures were needed to protect patients and staff, including a staff vaccination requirement.  Vol. I, p. 26 (Klompas Dec. ¶17).

54.     MGB leaders had studied the spread of COVID in hospitals, including well-documented instances of patient-acquired infections within MGB's entities, and reports in the medical literature of patient-acquired infections in hospitals worldwide.  Information about hospital-acquired clusters within MGB was shared with and considered by decision-makers who

decided to enact the Vaccination Policy.  A. Vol. II, pp. 116, 119, 120, 133 (Klompas Tr. at 54-57, 66-68, 72-73, 124).

55.     Dr. Klompas testified, "A patient who gets COVID inside of the hospital or an employee who gets COVID from another employee undermines the basic premise of the hospital, which is to try to make people better."  A. Vol. II, p. 122 (Klompas Tr. 81).

56.     Sheehan testified, "[T]here is an overall expectation when you're a healthcare system that when someone walks through the door, they're not going to get sick by someone who's there caring for them."  A. Vol. II, p. 272 (Sheehan Tr. 76).

57.     MGB's determination that health care workers and other essential workers have higher rates of infection than people in other fields was based on published data showing rates of infection by profession in the United States and around the world.  A. Vol. II, p. 128 (Klompas Tr. 105).

58.     In testimony and sworn admissions, Plaintiffs conceded that they were aware of transmission between staff, or between staff and patients, within MGB entities.  A. Vol. IV, p. 38 (**CHART S** – RFA No. 6 Admissions); A. Vol. III, p. 83 (Cadigan Tr. 27); A. Vol. III, p. 124 (Erickson Tr. 44); A. Vol. III, pp. 172-73 (Garbitt Tr. 57-60); A. Vol. III, p. 212 (Hamel Tr. 39); A. Vol. III, p. 247 (F. Holmes Tr. 147); A. Vol. III, p. 299 (Miller Tr. 27).

59.     Dr. Klibanski, MGB's President, expressed concern to Sheehan, MGB's CHRO, about how MGB could ensure a safe environment for patients.  Sheehan testified, "And [Dr. Klibanski] felt like none of us would be able to forgive ourselves if someone came into one of our hospitals and they got COVID because one of our unvaccinated employees gave them COVID and then they subsequently died."  A. Vol. II, p. 281 (Sheehan Tr. 111).

C.       **The Decision to Implement the Policy:  Clinical Data on COVID and the Vaccine**

60.      Dr. Hashimoto testified that MGB was "very lucky, very fortunate … to literally have international experts, the leading experts, not just in the country, but in the world in terms of vaccine side effects, in terms of the effectiveness of the vaccine."  A. Vol. II, p. 70 (Hashimoto Tr. 41).

61.      At the time the Vaccination Policy was implemented, clinical data and trends clearly demonstrated that: (i) COVID vaccines have high efficacy to prevent symptomatic COVID and even higher efficacy to prevent hospitalizations and deaths; (ii) COVID vaccines have similar or better safety profiles than other vaccines then fully approved by the Food & Drug Administration ("FDA"); (iii) full vaccination offers advantages regarding patient and healthcare personnel safety; (iv) morbidity and mortality of COVID far exceeds that of influenza; (v) COVID has been uniquely disruptive to hospital operations and workforce continuity, far more so than influenza; (vi) health care workers and other essential workers have higher rates of infection than people in other fields; (vii) masking diminishes risk of nosocomial (in-hospital) transmission but it is not perfect; vaccines provide additional and constant protection without requiring reminders, persuasion, mask-fitting aids, or other behavioral changes.  A. Vol. I, pp. 27-28 (Klompas Dec. ¶23).

62.      The Center for Disease Control (CDC) recommends that every person be vaccinated against COVID.  The CDC also specifies the need for a higher degree of protection and caution for healthcare workers compared to the general public.  A. Vol. II, pp. 153-54 (Klompas Tr. 205-06).

63.      In parallel with information about patients and staff being infected within the hospital, MGB leaders were studying data on vaccines showing they were powerfully effective in

decreasing infections.  A. Vol. II, p. 133 (Klompas Tr. 125) ("And then in parallel, we see the emerging data on vaccines showing …[v]accines … are powerfully effective in decreasing infections.").

64.     MGB's vaccine policymakers "could see that vaccination was [] effective at decreasing transmission," made individuals "less likely to be infected," caused the infected to "shed[] virus for shorter periods of time," and led to " lower rates of transmission" of COVID. A. Vol. II, p. 133 (Klompas Tr. 125).

65.     Dr. Klompas testified, "it was apparent to us that if this is a safe intervention, we should be doing this in order to try to further diminish the chances of additional hospital viral infections…"  A. Vol. II, p. 133 (Klompas Tr. 125).

66.     In the summer of 2021, MGB leaders determined based on scientific data that:

a.      people who were vaccinated were less likely to get infected with COVID;

b.      when a person who is vaccinated gets infected with COVID, they shed the virus for a shorter period of time compared with an unvaccinated person;

c.      the virus they do shed is less likely to be replication competent, to be able to actually reproduce itself and infect a cell, compared with an unvaccinated person;

d.      from transmission studies, a vaccinated person was about half as likely to transmit compared with an unvaccinated infected person;

e.      vaccinated people are less likely to have symptoms than unvaccinated people, and symptoms (coughing, sneezing, etc.) are a predictor of the amount of transmission; and,

f.      vaccinated people have a high viral load for a shorter time, making them less likely to transmit.

A. Vol. II, pp. 129, 133, 148, 153-54 (Klompas Tr. 108-09, 125, 184, 205-06).

67.     The overwhelming data from peer-reviewed scientific studies from peer-reviewed journals showed that the vaccination conferred an extremely high level of protection against getting infected with the virus.  A. Vol. II, p. 303 (Walls Tr. 47-48).

68.     Dr. Walls testified that the reasons that MGB implemented the Vaccination Policy included that "the overwhelming scientific evidence showed that vaccination was the single most effective step in preventing infection and contagion, which meant that we had a singular opportunity to protect our patients from being infected by one of our employees, or by another patient who was infected by one of our employees.  And we had a singular opportunity to maintain our workforce by ensuring that they would have the best possible protection against the virus and be able to come to work."  A. Vol. II, pp. 300, 313 (Walls Tr. 35, 86).

69.     Dr. Walls testified, "I would say that the overwhelming evidence we had from the scientific papers was more than enough proof that this was the right path to take.  So if 10,000 people drink gasoline and get really sick from it, I don't think you need to ask if any people in Westborough, Massachusetts, drink gasoline, will they get sick?  You know that because you've looked at such large populations.  So it's that understanding of the science that allows you to know how that vaccine affects how people get infected and spread that infection that make it overwhelmingly positive to do."  A. Vol. II, p. 300 (Walls Tr. 36).

**D.      The Decision to Implement the Policy:  Upholding the Public Trust**

70.     Dr. Walls testified that among the many reasons that MGB implemented the Vaccination Policy, "[T]he first is public trust.  We not only needed to stay open, we needed to stay welcoming, to stay trusted.  Establishing clearly for the public that our entire population of providers and employees and everyone they might encounter was vaccinated was a really important part of that."  A. Vol. II, p. 308 (Walls Tr. 68-69).

71.     In everything it does, MGB is committed to the public trust.  MGB has an obligation to be a trustworthy and safe source of healthcare for the public, and to do things in the safest possible way, just as it does when meticulously preparing a surgical site before an operation, to do everything possible to prevent introducing infection into that patient and causing harm when trying to do good.  A. Vol. II, p. 296 (Walls Tr. 19).

72.     MGB's decision to implement the Vaccination Policy also considered that a major stressor on the Massachusetts health system was the extremely high census (number of patients) and acuity (how sick patients are) in hospitals, attributable in part to the fact that many patients or members of the public deferred care because they feared contracting COVID.  A. Vol. I, p. 28 (Klompas Dec. ¶26); A. Vol. II, pp. 308-09 (Walls Tr. 69-70); A. Vol. II, pp. 138-39 (Klompas Tr. 144-146); A. Vol. II, p. 272 (Sheehan Tr. 76-77).

73.     MGB leaders were aware of papers published across the medical world showing that people with acute conditions were less likely to receive care during COVID, which was consistent with MGB's own data about deferred care within MGB, including a stark drop-off in people coming to the Emergency Department, notable decrease in in-patient admissions, and routine deferrals of essential surgeries, because of patients' fear of contracting COVID.  A. Vol. II, pp. 138-39 (Klompas Tr. 144-47); A. Vol. II, p. 272 (Sheehan Tr. 76-77).

74.     Health systems worldwide, including MGB, had seen "a startling drop off in people seeking care for what are really life-threatening conditions."  A. Vol. II, pp. 138-39 (Klompas Tr. 144- 147).  This pattern occurred "in every one of [MGB's] entities."  A. Vol. II, p. 309 (Walls Tr. 72).

75.     Dr. Walls testified that MGB "knew that people were not keeping appointments, whether for regular care, imaging, cancer follow-up, screening colonoscopy, heart specialists,

17

and for management of heart failure.  MGB had widespread evidence from numbers, from individual stories, from clinicians, that patients were staying away in droves."  A. Vol. II, p. 309 (Walls Tr. 70-71).

76.     Even for patients with heart attacks, strokes, asthma exacerbations, and people who required surgery to prevent cancer from spreading or killing them, there was a startling drop off in patients seeking care for life-threatening conditions.  Patients "were simply afraid to come to the hospital" and "therefore, did not."  A. Vol. II, p. 138 (Klompas Tr. 144-45).

77.     Dr. Klompas testified that requiring "as many people on campus [to be] vaccinated as possible" was "critical in order to provide [] catch-up care" for those who deferred services in the earlier part of the pandemic, since "the public, by and large, accepts the fact that vaccines are helpful."  A. Vol. II, p. 139 (Klompas Tr. 146).

78.     Many Plaintiffs conceded that many in the public were worried about contracting COVID.  *See, e.g.*, A. Vol. III, p. 11 (Alcantara Tr. 53); A. Vol. III, pp. 24-25 (Alexandrova Tr. 53-54); A. Vol. III, p. 44 (Barone Tr. 42); A. Vol. III, p. 87 (Cadigan Tr. 53); A. Vol. III, p. 109 (DiCicco Tr. 56); A. Vol. III, p. 182 (Garbitt Tr. 98); A. Vol. III, p. 249 (F. Holmes Tr. 158); A. Vol. III, p. 303 (Miller Tr. 46).  And many Plaintiffs testified they were aware that patients were deferring care due to fear of contracting COVID at the hospital.  *See, e.g.*, A. Vol. III, p. 39 (Attarian Tr. 61); A. Vol. III, p. 67 (Brouillard Tr. 48-49); A. Vol. III, p. 88 (Cadigan Tr. 56); A. Vol. III, p. 182 (Garbitt Tr. 98); A. Vol. III, p. 215 (Hamel Tr. 51); A. Vol. III, p. 249 (F. Holmes Tr. 160-61); A. Vol. III, p. 363 (Zaiats Tr. 87).

79.     Plaintiff Zaiats testified, "Everyone I knew back then, they didn't want to go to a hospital."  Asked "And why was that?" he testified:  "Because of Covid."  A. Vol. III, p. 362 (Zaiats Tr. 85).

80.     MGB determined it was essential "to make the hospital a safe place to people to come back to."  A. Vol. II, pp. 138-39 (Klompas Tr. 145-46).

81.     Patients' deferral of care resulted in higher census and acuity in 2021; patients came into MGB in very high numbers and with more advanced and severe disease.  A. Vol. II, p. 309 (Walls Tr. 71-72); A. Vol. II, pp. 138-39 (Klompas Tr. 144-47).  By the summer of 2021, there was a large backlog of patients still requiring critical care.  A. Vol. II, pp. 138-39 (Klompas Tr. 145-46).

82.     Many Plaintiffs were aware that deferral of care resulted in increased census and acuity.  *See, e.g.*, A. Vol. III, p. 39 (Attarian Tr. 61); A. Vol. III, p. 249 (F. Holmes Tr. 160-61); A. Vol. III, p. 363 (Zaiats Tr. 87).

**E.     MGB's Senior Leaders Were Aware of Patient Concerns about Staff Vaccination**

83.     COO Dr. Walls was aware of patient concerns about whether the staff who were treating them at MGB were vaccinated.  He became aware of those concerns from physicians who reported that patients had asked them if everyone was vaccinated, or "what specific steps have you taken to make sure I don't get COVID when I come in," or asked if they came in for a procedure would all of the people in the procedure room be vaccinated. The patient concerns informed the decision to have a rigorous exemption policy.  A. Vol. II, pp. 309-10 (Walls Tr. 73-74).

84.     For example, Dr. Walls was informed by a gynecologic oncologist at MGH about a cancer patient who was reluctant to see a GYN oncologist given her concern that coming to the hospital would expose her to COVID. A. Vol. II, p. 310 (Walls Tr. 75); A. Vol. II, p. 316 (Walls Dep. Ex. 4, filed under seal).

85.     Dr. Walls testified, "People were staying at home for days after they had an acute stroke that was obviously an acute stroke.  They have entire left-body weakness and they would stay home because they were afraid to go to the hospital.  We had people with heart attacks who stayed home with heart attacks.  We had people with cancer who skipped their cancer follow-up.  We had people who needed screening who skipped their screening and came in with cancer later.  So we had a responsibility to the public that they could trust us, that they could come in and they would be safe.  And we had to do everything we could to ensure that."  A. Vol. II, pp. 308-09 (Walls Tr. 69-70).

86.     Dr. Klompas testified, "The last thing we wanted to do at that point was to give out the impression that patients were still at high risk of getting COVID inside of the hospital and, therefore, you should push off your vital, lifesaving surgery even more, you should ignore your crushing chest pain and not come to the hospital and you should ignore your difficulty breathing because you're afraid of [getting] COVID."  A. Vol. II, pp. 138-39 (Klompas Tr. 145-146).

87.     Asked at deposition, "Did you believe that MGB's COVID-19 vaccine policy would be helpful in getting patients back into access[ing] care?" Dr. Walls' testified, "I believed it was the single most important thing we could do."  A. Vol. II, p. 309 (Walls Tr. 71).

**F.     The Decision to Implement the Policy:  Protecting Visitors**

88.     The Vaccination Policy also helps MGB to ensure that it is a safe place for visitors who come to the hospital in support of patients.  Many medically vulnerable people visit MGB offices every day to provide support to hospitalized family members: a patient may need a ride home after receiving anesthesia; pediatric patients require an adult parent or guardian to accompany them to appointments; elderly or disabled patients may require a companion to

20

access health care; many patients need emotional support from a family member or friend during their time at MGB.  A. Vol. I, pp. 28-29 (Klompas Dec. ¶27).

G.     **The Decision to Implement the Policy:  Responsibility as a Role Model**

89.     In the global pandemic, MGB recognized that it had a heightened responsibility to serve as a role model to other healthcare organizations nationwide.  A. Vol. I, p. 27 (Klompas Dec. ¶20).

90.     Dr. Hashimoto testified, "MGB and its hospitals are committed to community public health and that part of that core mission is basically serving as a model, as an example of what citizens generally in that community should be doing in this time of crisis, this pandemic." A. Vol. II, p. 80 (Hashimoto Tr. 80).

H.     **The Decision to Implement the Policy:  Support in Government Policy**

91.     MGB found additional support for the Vaccination Policy in the prioritization set by the federal and state government that included all hospital workers in the first wave of vaccinations in Dec. 2020-March 2021, regardless of whether they were front-line workers.  This prioritization recognized the need to preserve the integrity of the healthcare workforce during the pandemic.  A. Vol. I, p. 28 (Klompas Dec. ¶25).

I.     **The Decision to Implement the Policy:  Avoiding Staff Shortages**

92.     MGB's biggest risk in June of 2021 in terms of employee shortages was staff being out sick.  MGB determined this by looking at data regarding how units are opened or closed, staff turnover, sick time, and paid family leave time.  MGB is always monitoring to keep a dynamic balance between supply and demand including enough beds for patients and staff to care for them.  A. Vol. II, pp. 297, 298 (Walls Tr. 23-24, 27-28).

93.     MGB was aware that it would lose some staff who elected not to comply with the Vaccination Policy, at a time when there were staffing shortages generally.  However, MGB determined that the Vaccination Policy was the right balance between providing safe patient care and making sure there was sufficient staff present to provide the care.  A. Vol. II, p. 122 (Klompas Tr. at 81).

**J.     Many Other Leading Health Care Systems Required COVID Vaccines**

94.     MGB joined many other leading U.S. health care systems in requiring COVID vaccination for employees, ensuring that patients are being cared for in the safest clinical environment possible.  A. Vol. I, p. 30 (Klompas Dec. ¶30).

95.     In July 2021, the Massachusetts Health & Hospital Association ("MHA") unanimously endorsed COVID vaccination requirements for healthcare workers in the Commonwealth, noting that it had "reviewed the scientific and public health literature and has concluded that mandatory vaccination of healthcare workers is in the best interest of the public health and safety of patients and healthcare workers."  A. Vol. VII, pp. 7-9 (https://www.mhalink.org/MHA/MyMHA/Communications/PressReleases/Content/2021/MHA_Board_Endorses_Mandatory_Vaccines_for_Healthcare_Workers.aspx).

96.     Plaintiffs conceded at deposition that many other healthcare employers also had mandatory vaccination policies.  A. Vol. III, p. 90 (Cadigan Tr. 104); A. Vol. III, p. 111 (DiCicco Tr. 132); A. Vol. III, p. 158 (Frenchwood Tr. 193); A. Vol. III, p. 217 (Hamel Tr. 111); A. Vol. III, p. 239 (Hirtle Tr. 171); A. Vol. III, pp. 271-72 (Ithier Tr. 157-58); A. Vol. III, p. 328 (Rupnick Tr. 95); A. Vol. III, pp. 335-36 (Shulman Tr. 9-10); A. Vol. III, p. 364 (Zaiats Tr. 152).

### K.      Other Controls Were Not an Adequate Substitute for Vaccination

97.     MGB leadership determined that the Vaccination Policy was critical to its health and safety priorities.  Substitutes such as allowing an employee to decide instead to mask, engage in periodic testing, and socially distance were not adequate to meet MGB's urgent health and safety priorities and protect its vulnerable patient population because:  (i) in many MGB positions it was not practical to adequately socially distance from other staff, patients and visitors; (ii) testing by itself was not adequate to identify when an employee was infected and contagious because employees were at constant risk of infection; testing once per week will miss infections that might arise the other 6 days of the week; testing daily was unduly onerous on the system and impractical; testing could convey to healthcare workers a false sense of safety that may lead to lapses in other safety measures; (iii) if an employee does test positive they may have already been contagious for two or more days; and (iv) it was then well-established that even if a vaccinated individual gets infected they are at least 50% less likely to transmit infection compared to unvaccinated people.  A. Vol. I, pp. 29-30 (Klompas Dec. ¶29).

98.     Nearly 80% of Plaintiffs admitted that it was not possible for them to socially distance from all colleagues, patients, visitors, or members of the public when they worked on-site at an MGB entity. A. Vol. IV, p. 23 (**CHART N** – RFA No. 1 Admissions).

## VI.     THE DECISION TO INCLUDE ALL MGB EMPLOYEES IN THE POLICY

### A.      MGB Decided to Include *All* MGB Employees in the Vaccination Policy

99.     MGB decided to include all employees, including those who may work remotely, in the Vaccination Policy for reasons including that: (i) all MGB employees are expected to be deployable to the hospital as needed; (ii) employees who perform remote work may need to interface with personnel on the front lines in patient-facing positions; (iii) all employees

regardless of work location were providing critical support to the health care community during this pandemic and thus their absence due to illness can impact critical operations; and (iv) unvaccinated employees who perform remote work were more vulnerable to COVID infection, which can result in gaps in essential staffing.  A.  Vol. I, p. 29 (Klompas Dec. ¶28).

100.    Dr. Walls testified that MGB decided to include all employees in the Vaccination Policy, "Because the only way we could really protect our patients and our workforce was to vaccinate all of [our employees]."  A. Vol. II, p. 312 (Walls Tr. 83).

**B.      Roles Are Fluid:  Anyone Can Be Called on Campus**

101.    Many MGB employees' roles are fluid.  For example: an HVAC mechanic becomes patient-facing if a patient room has an HVAC problem; employees who usually perform work remotely will sometimes come to campus; and non-patient-facing employees routinely interact with visitors and patient-facing employees, such that an infection can flow over to patients.  A. Vol. II, p. 127 (Klompas Tr. at 99).

102.    Dr. Hashimoto testified, "If you're an employee of a hospital of MGB, you might be working remotely today, but it's very possible you might be called in."  A. Vol. II, p. 80 (Hashimoto Tr. 79-80).

103.    MGB determined that the only way to protect patients and the workforce was to vaccinate all employees.  For example, an employee who works remotely may have to come on campus to get a new laptop, or have an old one repaired.  MGB could not risk that employee also bringing the virus in with them.  That person might also meet other people – like an IT professional – who would interact with others.  MGB determined that vaccination was a "chain of protection" that protected patients.  A. Vol. II, p. 312 (Walls Tr. 84).

24

104.     Even an employee who never interacts with a patient may interact with another staff member who does interact with patients, meaning that there is still a risk of transmission to a patient.  A. Vol. II, p. 126 (Klompas Tr. at 97).  Dr. Klompas testified, "[T]here are not many degrees of separation between any one employee before you reach a patient."  A. Vol. II, p. 127 (Klompas Tr. at 99).

105.     Dr. Walls testified, "We couldn't risk that someone who was working remotely or even working in a site where they had very little exposure to people, that they would go to a training session or have to go into Occupational Health or have to go to a meeting or do something where they could expose one, two, three, four, ten people.  Each of those ten people then can go out and expose ten more people.  You just can't afford that kind of risk.  It's exponential."  A. Vol. II, p. 312 (Walls Tr. 83-84).

106.     MGB considers all employees to have a reasonable likelihood of contact with other employees.  A. Vol. II, p. 312 (Walls Tr. 85).

107.     While MGB allowed some employees to perform at least some work remotely beginning in March 2020 because of the pandemic, MGB was taking deliberate steps after November 2021 to get more and more of those workers back on campus, either on MGB campus full time or hybrid.  A. Vol. II, p. 302 (Walls Tr. 42-44); *See, e.g.*, A. Vol. III, pp. 143, 146 (Frenchwood Tr. 22, 71-72).

## C.     All MGB Employees Are Subject to Redeployment at Any Time

108.     Another reason to include all employees in the Vaccination Policy was that every employee is subject to redeployment, which occurred frequently in the pandemic, such as when employees who had previously performed remote work were redeployed to staff Boston Hope, vaccine centers and patient testing centers.   MGB needed a consistent policy for all employees

so that they could pull anyone in to a task as needed, without taking time to figure out who was vaccinated.  A. Vol. II, p. 286 (Sheehan Tr. 130-32).

109.    When MGB was deciding to redeploy a particular employee, there was no time to wait for them to become vaccinated.  It was not practical for example to wait for an employee to get a two-shot series, and then to wait for it to become effective weeks later.  Redeployments were time-sensitive, such as when MGB had to stand up a new initiative quickly or solve an acute problem.  A. Vol. II, p. 312 (Walls Tr. 83).

110.    MGB maintains Emergency Employee Transfer Guidelines that further outline the process by which employees may be temporarily redeployed in the event of an emergency.  A. Vol. III, pp. 357, 367-68 (Zaiats Dep. Ex. 6; Zaiats Tr. 59-60).

**D.    Non Patient Facing Roles Are Mission Critical**

111.    Many roles within MGB that are not patient-facing are absolutely mission critical. For example, if the electronic medical record system stopped working, the hospital could not function.  A. Vol. II, p. 126 (Klompas Tr. 97).

112.    Sheehan testified that, "every one of our employees has a critical job" and all support patient care.  For example, the person who answers the phone to confirm appointments might work remotely but is critical to the process of caring for patients.  Therefore, failing to protect those employees could hurt the ability to deliver patient care.  A. Vol. II, p. 286 (Sheehan Tr. 130-32).

113.    Asked why all employees were included in the Vaccination Policy, Dr. Hashimoto testified *inter alia*:

> There's the concern of workforce integrity, that is MGB was facing an urgent public health situation in which the very integrity of its workforce may be challenged.  And so it was very important, even if you're working remotely for MGB, your focus and your purpose, based on the MGB mission, is patient care.  So even if you're doing computer

26

work or doing something that is not patient facing, ultimately, what you're doing though is supporting an organization that must provide excellent and safe patient care.

A. Vol. II, pp. 80-81 (Hashimoto Tr. 79-82).

### E.     Equity Concerns Also Contributed to the Decision to Include All Employees

114.    Another reason to include all employees in the Vaccination Policy was equity. MGB treated all employees the same with respect to vaccination, just as it did when it initially offered vaccination to staff in early 2021.  A. Vol. II, p. 286 (Sheehan Tr. 130-32).

## VII.   THE TIMING OF THE VACCINATION POLICY

### A.     Publications in Support of Mandatory Vaccination in Healthcare Settings

115.    Dr. Klompas has published widely on surveillance, diagnosis, prevention, and treatment of infections in hospital settings, including COVID, in peer-reviewed journals such as ANNALS OF INTERNAL MEDICINE and CLINICAL INFECTIOUS DISEASES.  A. Vol. I, pp. 28, 49-53 (Klompas Dec. ¶24 Ex. 5); A.  Vol. II, pp. 167-169 (Klompas Dep. Ex. 4); A. Vol. VI, pp. 644-653 (Klompas February 2021 *AIM* publication).

a.      On or about February 9, 2021, Dr. Klompas published "A SARS-CoV-2 Cluster in an Acute Care Hospital" in the Annals of Internal Medicine, and in that cluster, analyzed by genome sequencing in partnership with the state Department of Public Health, there were 38 staff infections and 14 patient infections.  A. Vol. VI, pp. 644-653 (Klompas February 2021 *AIM* publication).

b.      On or about July 13, 2021, Dr. Klompas published "The Case for Mandating the COVID-19 Vaccine for Health Care Workers" in the Annals of Internal Medicine.  A. Vol. I, pp. 28, 49-53 (Klompas Dec. ¶24 Ex. 5).

c.      On or about November 2021, Dr. Klompas published "Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) From Asymptomatic to

Presymptomatic Individuals in Healthcare Settings Despite Medical Masks and Eye Protection" in Clinical Infectious Diseases.  A.  Vol. II, pp. 167-169 (Klompas Dep. Ex. 4).  In that article, Dr. Klompas describes multiple observed instances of COVID transmission from asymptomatic and pre-symptomatic individuals at The Brigham despite use of masks and eye protection, and he concludes by finding that COVID transmission may sometimes occur even where both parties to an interaction are masked.  *Id.*

116.    A range of healthcare entities issued a consensus statement recommending that the COVID vaccination should be a condition of employment for all healthcare personnel in facilities in the U.S. in July 2021.  A. Vol. I, p. 30 (Klompas Dec. ¶31).

117.    In July 2021, 58 signatories in the health care field, including the American Academy of Nursing and the American College of Physicians, signed on to a "Joint Statement in Support of COVID Vaccine Mandates for all workers in Health and Long Term Care."  A. Vol. I, p. 30, 54-58 (Klompas Dec. ¶32 Ex. 6).

**B.    The Decision to Have the Policy Go Into Effect in August 2021**

118.    After careful consideration, MGB's leadership decided to move forward with the Vaccination Policy prior to full approval of the COVID vaccines by FDA because having looked at the data from literally hundreds of thousands of inoculated people that had been published in the medical literature, they were able to extrapolate that the FDA would proceed to full approval and that MGB was making a safe and appropriate decision in requiring vaccination.  A. Vol. II, p. 112 (Klompas Tr. at 38-39); A. Vol. II, p. 267 (Sheehan Tr. 54-55).

119.    The arrival of the Delta variant in the summer of 2021, the large increase in infections and the anticipation of a very bad Autumn for COVID, in parallel with the large amount of practical experience with the vaccine and data reaffirming the safety and effectiveness

of the vaccine, prompted MGB to adopt the Vaccination Policy before full FDA approval.  A. Vol. II, p. 121 (Klompas Tr. at 74-75); A. Vol. II, p. 267 (Sheehan Tr. 54-55).

120.    In the summer of 2021, medical professionals anticipated a fall and winter surge of the Delta COVID variant.  A. Vol. II, pp. 71, 73 (Hashimoto Tr. 42, 51); A. Vol. II, p. 121 (Klompas Tr. 75); A. Vol. II, p. 267 (Sheehan Tr. 55).

### C.      MGB Rolled Out Its Vaccination Policy in August 2021

121.    On August 10, 2021, Dr. Klibanski sent a notice to staff members explaining the Vaccination Policy.  A. Vol. I, pp. 25, 38-40 (Klompas Dec. ¶10 Ex. 2).

122.    The Vaccination Policy stated:  "The COVID-19 vaccines are safe and effective and recommended for all of the healthcare workforce. Requiring vaccination as a condition of employment has been demonstrated to be necessary to achieve the highest levels of workforce vaccination and increase safety for all employees, patients and visitors to the health care settings. All [MGB] workforce are required to receive vaccination for COVID-19 unless exempted by this policy, in order to achieve a fully vaccinated workforce."  A. Vol. I, pp. 25-26 (Klompas Dec. ¶15); A. Vol. I, pp. 25-26, 44-48 (Klompas Dec. ¶15 Ex. 4).

### D.      The Announcement Explained the Exemption Request Process

123.    MGB's process allowed for religious and medical exemptions to its Vaccination Policy.  A. Vol. II, p. 141 (Klompas Tr. 154).

124.    MGB did not know how many employees would request exemptions, as there was little available data on that issue.  A. Vol. II, p. 69 (Hashimoto Tr. 34-35).

125.    The Policy initially indicated that employees should be fully vaccinated by October 15, 2021,  unless granted a religious or medical exemption.  A. Vol. I, pp. 25, 41-43 (Klompas Dec. ¶13 Ex. 3).

126.     The August 10, 2021 announcement included links to forms that employees could use to request a medical or religious exemption from the Vaccination Policy.  A. Vol. I, p. 25 (Klompas Dec. ¶12).  Managers were also empowered to help direct employees to the forms, and to help employees who might have varying levels of literacy or English fluency access the information.  A. Vol. II, p. 118 (Klompas Tr. 64-65).

127.     The deadline to request an exemption was September 3, 2021. A. Vol. I, p. 25 (Klompas Dec. ¶14).

128.     As of August 30, 2021, MGB's workforce was only 88.2% vaccinated.  A. Vol. II, p. 271 (Sheehan Tr. 73).

### E.     MGB Conducted Intensive Outreach to Its Employees

129.     MGB undertook extensive efforts to help employees get vaccinated, including: providing education in multiple languages; hosting live sessions where employees could ask questions; presenting an employee Town Hall with Chief Medical Officer Dr. Tom Sequist and CHRO Rosemary Sheehan; having senior leaders personally speak to employees who had questions; directing employees to free vaccination clinics; and changing the timetables for vaccination to allow people with even a single vaccination to be deemed complaint as long as their second vaccination was scheduled and then completed.  A. Vol. II, p. 312 (Walls Tr. 84-85); A. Vol. II, p. 123 (Klompas Tr. 82); A. Vol. III, p. 26 (Alexandrova Tr. 110-11).

130.     Dr. Klompas testified, "[MGB] gave people substantial advance notice, put on educational sessions regarding the effects of COVID itself, the safety of the vaccine, made the vaccine freely available on premises across a wide array of different hours and mechanisms, repeatedly reminded people of this need and of ways to be able to get the vaccine, [and] encouraged people to get their vaccine."  A. Vol. II, pp. 122-23 (Klompas Tr. 81-82).

## VIII.   Development of the Exemption Processes

### A.   MGB Decided to Create a Centralized Exemption Process

131.    MGB decided to create a new, clear, structured, centralized process for review of requests for medical and religious exemption, different from the decentralized process it had used previously for flu vaccination, due to:  the nature of the pandemic threat, the need to ensure it was fair and consistent across entities; and to comply with the deadlines that had been set in anticipation of COVID waves in fall and winter.  A. Vol. II, p. 124 (Klompas Tr. at 86-87); A. Vol. II, pp. 258-59 (Sheehan Tr. 21-23); A. Vol. II, p. 68 (Hashimoto Tr. 30-33); A. Vol. II, p. 213 (RERC 16 Tr. 20); A. Vol. II, p. 9 (RERC 5 Tr. 32-33).

132.    Sheehan testified, "So everything really changed with COVID.  It was a pandemic.  We were in a disaster response.  And for the first time really in our systems' history, we really pulled the entire system together and functioned as a system for everything."  A. Vol. II, p. 258 (Sheehan Tr. 21).  Centralizing the exemption process was also consistent with a general trend toward centralizing HR functions within MGB.  A. Vol. II, p. 259 (Sheehan Tr. 25).

133.    Vaccine exemptions did not carry over year to year at MGB.  A new request each year was required for approval.  A. Vol. III, p. 98 (Conway Tr. 129); A. Vol. III, p. 238 (Hirtle Tr. 163).

### B.   MGB's Goal Was to Get as Close as Possible to Universal Vaccination, While Respecting Exemption Requests that Met MGB's Criteria

134.    MGB leadership agreed that if an employee met the criteria for an exemption, that employee would be approved.  A. Vol. II, p. 125 (Klompas Tr. at 91).

135.    MGB had no quotas for numbers of vaccinated employees, or employees approved for exemptions.  A. Vol. II, p. 272 (Sheehan Tr. 74).

136.    MGB's goal was to get as close as possible to universal vaccination of employees, while respecting employees' requests for medical or religious exemption that met MGB's criteria for approval.  A. Vol. II, pp. 140, 141, 142-43 (Klompas Tr. 151-52, 155, 160-62); A. Vol. II, p. 272 (Sheehan Tr. 74); A. Vol. II, p. 68 (Hashimoto Tr. 30-31).

137.    The reasons that MGB aimed to get as close as possible to 100% vaccination of staff, while respecting exemptions that met MGB's criteria, included that MGB treats many sick, immunocompromised patients; that patients expect to be in a safe environment, cared for by vaccinated staff; and that MGB needed to keep the workplace safe for MGB employees.  A. Vol. II, p. 272 (Sheehan Tr. 75-77).

138.    MGB recognized that it could not achieve 100% vaccination because there had to be a process for exemptions.  A. Vol. II, p. 272 (Sheehan Tr. 74); A. Vol. II, p. 73 (Hashimoto Tr. 52).

**C.    Each Additional Unvaccinated Employee Increased Risk**

139.    MGB determined that each additional unvaccinated person presented an increased risk of in-hospital infections to MGB patients and employees and to public health.  A. Vol. II, pp. 140, 141, 143 (Klompas Tr. 151-52, 155, 162); A. Vol. II, pp. 68, 73, 80 (Hashimoto Tr. 30, 51-52, 78-80); A. Vol. II, p. 313 (Walls Tr. 87-88).

140.    Dr. Walls testified that outside of those employees approved for exemption to the Vaccination Policy, every additional unvaccinated person posed an unnecessary risk.  A. Vol. II, p. 313 (Walls Tr. 87-88).  Dr. Walls expressed to Sheehan that he was very concerned about patient care, and wanted as many employees to be vaccinated as possible.  A. Vol. II, pp. 281-82 (Sheehan Tr. 113-14).

141.    Achieving as close to universal vaccination as possible was "the only way [MGB] could really protect [its] patients and our workforce" because "the virus was ubiquitous in the community" and, thus, the objective was to create "a chain of protection" from vaccination among MGB's employees.  Every unvaccinated person who became infected could expose multiple people, creating a risk that was "exponential" in nature.  A. Vol. II, p. 312 (Walls Tr. 83-84).

142.    Dr. Walls testified:  "[I]t's a bit like drunk drivers.  You have one on the road, you have one.  If you have 100 on the road, you have 100."  He testified that those approved for exemptions were a necessary risk.  He testified, "But I think a single person in addition to that is an unnecessary risk."  A. Vol. II, p. 313 (Walls Tr. 87).

**D.    Proliferation of Materials Available Online for Sale or Download**

143.    Dr. Walls was aware that there were numerous websites online to help people claim religious exemptions, and was concerned that some might try to claim exemptions that were not legitimate.  A. Vol. II, pp. 306, 307 (Walls Tr. 61, 63).

144.    Media reports noted that many people were turning to online sources to help them avoid vaccines.  See, e.g., A. Vol. VII, pp. 10-16 (*Boston Globe*, 9/18/21, "Cottage industry helps people avoid shots by claiming it violates their faith"); A. Vol. VII, pp. 17-22 (*Daily Beast*, 9/11/21, "The New Side Hustle: Helping Anti-Vaxxers Get Religious Exemptions"); A. Vol. VII, pp. 23-25 (*New York Times*, 9/11/21, "Vaccine-resistant workers are sharing tips online for requesting exemptions to the requirements on religious grounds; others are submitting letters from far-flung religious authorities who have advertised their willingness to help").

E.      **The Decision to Have a Rigorous, Legally Compliant Process**

145.    Following privileged conversations with MGB's attorneys, Dr. Walls understood that under the law, there are legitimate religious exemptions to vaccination.  A. Vol. II, p. 308 (Walls Tr. 67-68).

146.    Although Dr. Walls understood that no major organized religion was against COVID-vaccination, he understood after privileged consultation with counsel that an individual person could, independent of any organized religion, have a sincerely held belief that was religious in nature and that conflicted with the COVID vaccine.  A. Vol. II, p. 307 (Walls Tr. 63).

147.    Dr. Walls decided to have a rigorous, legally compliant process for exemptions to the COVID vaccine.  He testified that he did so, first and foremost, because of "our commitment to our patients."  A. Vol. II, pp. 308, 313 (Walls Tr. 67-69, 86).

148.    Dr. Walls testified that by "rigorous," he meant a well-defined, fair and organized process, with people who are trained and knew what standards to apply, and who applied those standards consistently and fairly, such that MGB would approve exemption requests that met MGB's legally compliant criteria, but reject those that did not.  A. Vol. II, pp. 307-08 (Walls Tr. 63-68, with errata).

149.    In sum, MGB determined the exemption processes needed to be legally compliant yet rigorous so as to minimize the number of unvaccinated staff at MGB given the risks unvaccinated staff posed to MGB's patient population, employees, and visitors, and, ultimately, public health.  A. Vol. I, p. 31 (Klompas Dec. ¶34); A. Vol. I, pp. 4-5 (Hashimoto Dec. ¶18); A. Vol. II, p. 140 (Klompas Tr. 150); A. Vol. II, pp. 308-10 (Walls Tr. 68-74).

**F.      MGB Determined an Overly Permissive Process Would Cause Undue Hardship**

150.    MGB determined that an overly permissive exemption process, under which basically anyone could get an exemption, would undermine the overall Vaccination Policy, and lead to more employees requesting exemptions with less and less clear grounds for exemption, resulting in more unvaccinated employees and increased risk to patients and employees.  A. Vol. II, pp. 123, 128 (Klompas Tr. 84-85, 102).

151.    MGB determined that to liberalize the exemption process beyond what was legally required for medical and religious exemptions would open the floodgates, meaning many more people would choose not to be vaccinated, resulting in a larger number of unvaccinated MGB staff.  A. Vol. II, p. 140 (Klompas Tr. 151-52).

152.    MGB knew this from experience with its flu vaccine program; when the exemption process was very permissive, MGB was unable to get the vaccination rate above the high of 80%, which in the COVID context would pose a substantial risk.  A. Vol. II, p. 128 (Klompas Tr. 102-03).

**G.      Urgent Health and Safety Concerns Guided MGB's Exemption Processes**

153.    MGB implemented parallel but distinct processes for reviewing medical exemption and religious exemption requests, each with different teams.  A. Vol. I, pp. 30-31 (Klompas Dec. ¶33).  Those processing religious or medical exemption requests were advised of MGB's urgent health and safety priorities, and the need to develop a rigorous, rapid, and efficient review process. Senior leadership and health experts at MGB set these priorities.  A. Vol. I, p. 31 (Klompas Dec. ¶ 34); A. Vol. I, p. 4  (Hashimoto Dec. ¶17); A. Vol. I, p. 62 (Nichols Dec. ¶13).

35

154. Dr. Klompas testified that the importance of a formal, rigorous process was impressed upon those running the exemption processes because "the issues facing the system are so critical.  There is so much threat."  A. Vol. II, p. 143 (Klompas Tr. 164).

155. First, the review process needed to be prompt, given the ongoing and rapid spread of the Delta variant, the constant threat of nosocomial transmission of COVID, and the need to have employees vaccinated by the schedule set out in MGB's Vaccination Policy to meet these challenges.  Second, the review process was to be as rigorous as possible in accordance with the law, given the risks that unvaccinated staff presented to patients, employees, and visitors and to ensure MGB staff remained available to respond to the ongoing public health crisis.  Third, it would be an undue hardship for MGB to allow large numbers of employees to remain unvaccinated and thus a constant source of potential threat to MGB's medically vulnerable patient population, other employees and visitors.  A. Vol. I, p. 31 (Klompas Dec. ¶35); A. Vol. I, pp. 4-5, 9 (Hashimoto Dec. ¶¶18, 37); A. Vol. I, pp. 62, 66 (Nichols Dec. ¶13, 35); A. Vol. II, p. 73 (Hashimoto Tr. 51).

156. Those processing medical and religious exemption requests were advised that the pandemic, and the rapid spread of the Delta variant, was a public health emergency, and that MGB had an urgent responsibility to continue serving its large and complex patient population, as well as to protect its staff, medically vulnerable population and visitors from infection.  They were also aware that as a major hospital, the perception of safety was critical for patients, visitors and the public.  A. Vol. I, p. 31 (Klompas Dec. ¶ 36); A. Vol. I, p. 5 (Hashimoto Dec. ¶19); A. Vol. I, p. 62 (Nichols Dec. ¶15).  Those processing requests were aware that the coming fall and winter seasons were concerning for new waves of infection especially given the Delta variant.

A. Vol. I, p. 32 (Klompas Dec. ¶37); A. Vol. I, p. 5 (Hashimoto Dec. ¶20); A. Vol. I, pp. 62-63 (Nichols Dec. ¶16).

157.     Those processing requests were advised that exemption requests were to be reviewed and processed as soon as possible, to ensure that any employee whose exemption was denied would have time to consider vaccination, and if they decided to vaccinate, to do so consistent with the schedule laid out in the Vaccination Policy.  A. Vol. I, p. 8 (Hashimoto Dec. ¶34); A Vol. I, p. 63 (Nichols Dec. ¶17).

158.     Due to MGB's urgent health and safety priorities, MGB determined that they could not provide an appeal process for every employee whose request was denied.  Because the surge in cases from the Delta variant in the summer and fall of 2021 was stressing the health care system and this was a public health emergency, MGB's capacity to engage in an interactive process on these issues was not limitless.  A. Vol. I, p. 10 (Hashimoto Dec. ¶42); A. Vol. I, p. 67 (Nichols Dec. ¶42).

IX.     **The Medical Exemption Review Process**

A.     **Dr. Hashimoto Developed the Process**

159.     Dr. Hashimoto, MGB's Chief Medical Officer, Workplace Health and Wellness, developed and led MGB's interactive process for reviewing requests for medical exemption.  A. Vol. I, pp. 1-2 (Hashimoto Dec. ¶¶1, 3); A. Vol. II, p. 257 (Sheehan Tr. 16).

160.     Dr. Hashimoto is board certified in Occupational Medicine.  Dr. Hashimoto also has a JD from Yale University and clerked for Supreme Court Justice William Brennan.  He practiced law with Williams & Connolly and Ropes & Gray.  He is also a law professor at Boston College Law School.  Vol. I, pp. 1-2 (Hashimoto Dec. ¶2); A. Vol. VII, pp. 227-28 (Dean

Hashimoto Profile, J.D., M.D. on BC Law webpage, https://www.bc.edu/bc-web/schools/law/academics-faculty/faculty-directory/dean-hashimoto.html).

**B.     The Medical Exemption Request Form**

161.    To request a medical exemption, an employee had their health care provider (HCP) complete and sign the MGB form, and submit by email to Occupational Health.  A. Vol. I, pp. 2-3 (Hashimoto Dec. ¶6); A. Vol. II, p. 90 (Kim Tr. 14-15).

162.    The HCP could check various boxes to indicate certain conditions indicated by the CDC as potential contraindications for the COVID vaccine, including "history of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID vaccine," "temporary exemption due to administration of COVID-19 monoclonal antibodies," and "temporary exemption due to a history of multisystem inflammatory syndrome." The form allowed the HCP to identify and describe "Other medical reasons."  The form indicated "Requests will be reviewed on a case-by-case basis.  Clarification from the requesting employee and/or their physician may be requested in writing or by phone."  A. Vol. I, pp. 3-4, 15-16 (Hashimoto Dec. ¶¶8-11 Ex. 7).

**C.     The Two Clinical Panels Examining Requests for Medical Exemptions**

163.    MGB assembled two clinical panels to review medical exemption requests:  an Occupational Health Clinical Panel, comprised of three occupational health clinical directors who are nurse practitioners and registered nurses by training; and an Infection Control Panel, comprised of five physicians who are experts in infection control and disease.  These two panels worked in sync in examining and making consistent and thoughtful decisions about employees' medical exemption requests.  A. Vol. I, p. 4 (Hashimoto Dec. ¶¶13-16).

164.     In assembling the team for review of medical exemptions, Dr. Hashimoto wanted to:  take advantage of MGB's internationally renowned medical experts, including experts in vaccines, occupational health, and infection control; ensure a standardized and consistent approach; and given the public health crisis, ensure a nimble process in which requests were timely processed so that the vaccination program would be in place before another surge occurred.  A. Vol. II, p. 71 (Hashimoto Tr. 42).

165.     Dr. Hashimoto designed the system to include an infection control clinical panel consisting of five world class experts, and an occupational health panel consisting of three highly seasoned occupational health directors, so that no single clinician decided the outcome. Decisions were consensus driven after deliberation and thoughtful discussion within the two panels, providing consistency and standardization to the process.  A. Vol. II, p. 71 (Hashimoto Tr. 45).

**D.     MGB's Interactive Process with Respect to Medical Exemption Requests**

166.     Every medical exemption request was carefully considered by one or both panels, and was considered in light of the CDC guidance, which in turn is based on the largest set of data available.  A. Vol. II, p. 72 (Hashimoto Tr. 46-47).

167.     Each medical exemption request received an individualized, thoughtful, case-by-case review.  There were no "automatic" approvals.  The two panels used a layered, nuanced approach to reviewing the requests, meeting as often as needed to discuss and process the requests.  A. Vol. I, pp. 6-7 (Hashimoto Dec. ¶¶25-27); A. Vol. II, pp. 90-91 (Kim Tr. 16-18).

168.     The two medical panels developed an interactive process with respect to medical exemption requests.  A. Vol. I, p. 6 (Hashimoto Dec. ¶24); A. Vol. II, p. 70 (Hashimoto Tr. 40).

88206785v.8

169.    The panel(s) could generally make decisions based upon the original submission by HCPs. However, when the panels had questions for the employee or his or her HCP, such as when the information provided was too vague, or the nature or severity of the condition was unclear, they would reach out to the employee or the HCP for more information.  The employee or HCP could provide more information at a dedicated, confidential e-mail mailbox. A. Vol. I, pp. 7-8 (Hashimoto Dec. ¶¶29-30, 32).

        **E.    The Medical Panels Used CDC Criteria**

170.    The panels followed current CDC guidance regarding medical contraindications to vaccination, which evolved over time as new data and studies emerged.  The medical contraindications to the vaccine are few and well-defined by the CDC guidance. *See* A. Vol. I, pp. 3, 7, 17-22 (Hashimoto Dec. ¶¶7 (Ex. 8), 29).  Outside very narrow contraindications, the CDC recommends that the rest of the public get vaccinated.  A. Vol. II, pp. 153-54 (Klompas Tr. 205-06); A. Vol. VII, pp. 26-67 (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html, as the webpage appeared on June 24, 2021); pp. 68-95 (as the webpage appeared on August 10, 2021); pp. 96-124 (as the webpage appeared on August 11, 2021); pp. 125-159 (as the webpage appeared on October 15, 2021; pp. 160-193 (as the webpage appeared on November 5, 2021).

171.    Most people with underlying medical conditions not only are recommended to be vaccinated, but are especially in need of vaccination because they are higher risk for severe disease and death if they contract COVID.  A. Vol. VII, pp. 194-200 (https://web.archive.org/web/20210801230024/https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, as the webpage appeared on or around November 2021); pp. 201-209 (as the webpage appeared on or around January 2023).

172.     MGB's experts' consensus was that exemptions should be based on CDC guidance, like the rest of MGB's policy for COVID.  This provided consistency in following the science and public health recommendations, and allowed decisions to be based on the very large community of public health experts that result in CDC guidance, rather than just one particular clinician signing the exemption form.  A. Vol. II, p. 71 (Hashimoto Tr. 43-45); A. Vol. II, p. 91 (Kim Tr. 18-19).

173.     During the roll-out of the Vaccination Policy, the CDC updated its guidance to recommend that pregnant women should be vaccinated against COVID.  A. Vol. I, p. 8 (Hashimoto Dec. ¶34); A. Vol. VII, pp. 68 (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html, as the webpage appeared on August 10, 2021), 96 (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html, as the webpage appeared on August 11, 2021).

174.     Consequently, MGB updated its Vaccination Policy to conform to that guidance after consultation with its experts in obstetrics.  A. Vol. I, p. 8 (Hashimoto Dec. ¶35); A. Vol. II, p. 306 (Walls Tr. 58-59).

175.     Though MGB did not grant medical exemptions based on the fact of pregnancy alone, pregnant employees could still seek exemptions based on other medical conditions that went beyond the fact of pregnancy.  MGB also developed other temporary accommodations for pregnancy where feasible on a case by case basis, such as additional parental leave.  A. Vol. I, p. 8 (Hashimoto Dec. ¶35).

176.     There were rare exceptions where MGB approved an exemption that was not based on a CDC contraindication, including a couple of neurological cases in which there was

41

close proximity between neurological changes and the vaccine, after consultation with MGB neurology or immune-neurology specialists.  A. Vol. II, p. 72 (Hashimoto Tr. 47-48).

177.    Dr. Hashimoto ensured that the group of requests that fell into the category of behavioral health were handled consistently.  A. Vol. II, p. 72 (Hashimoto Tr. 48).

**F.    Dr. Hashimoto and the Panels Consulted with Subject Matter Experts**

178.    The panels consulted as needed with various world-renowned specialists at MGB, including specialists in Obstetrics, Allergy, and Neurology.  A. Vol. I, p. 7 (Hashimoto Dec. ¶28); A. Vol. II, p. 70 (Hashimoto Tr. 40).

179.    For example, Dr. Hashimoto consulted the Obstetrics Chiefs at MGH and The Brigham for advice and brought that back to the occupational health and infection control panels. He also consulted with allergists designated by the Allergy Chiefs at MGH and The Brigham because they had done important published studies on relevant issues and were very familiar with the data.  A. Vol. II, p. 75 (Hashimoto Tr. 58-60).

180.    Employees who requested an exemption based on certain allergy concerns were offered an opportunity to see an allergist at MGB on a prioritized basis.  This was optional and no employee was denied an exemption for the sole reason that they elected not to see an MGB allergist.  A Vol. II, pp. 75, 76 (Hashimoto Tr. 59, 62-63).

**G.    Communication of the Decisions on Medical Exemption Requests**

181.    Ultimately, one or both panels made thoughtful, considered decisions on each request, and as decisions were made, each employee received by e-mail a written decision either approving or denying the request.  A. Vol. I, pp. 8-9 (Hashimoto Dec. ¶¶36, 38).

182.    Decisions were made on a rolling basis to allow denied applicants as much time as possible to be vaccinated prior to the October 15 deadline.  Allowances were made to ensure

sufficient time including allowing temporary exemptions for those consulting their doctors for more information.  A. Vol. I, p. 9 (Hashimoto Dec. ¶39).

### H.      Some Employees Contacted the Panels About Denial of Their Requests

183.    Some employees whose requests were denied wrote to the Occupational Health mailbox to express disappointment or seek to provide additional information. The panels reviewed those additional communications to determine if they contained any new medical information sufficient to support the exemption.  A. Vol. I, p. 10 (Hashimoto Dec. ¶41).

### I.      Plaintiffs' Medical Exemption Requests

184.    Twenty-two current Plaintiffs claimed to have submitted medical exemption requests to MGB.  Dkt. 58 (Plaintiffs' First Amended Complaint), ¶¶6-29.

185.    The vast majority, eighteen of the 22, claim that they also submitted religious exemption requests.  Dkt. 58 (Plaintiffs' First Amended Complaint), ¶¶6-29.

186.    Most of the 22 worked on site all of the time (A. Vol. IV, p. 15 (**CHART F**)), one had a "hybrid" work arrangement (A. Vol. IV, p. 17 (**CHART H**)), and all of the Plaintiffs acknowledged reporting to campus for at least one work shift in the period beginning prior to the pandemic and continuing through the pandemic.  A. Vol. IV, pp. 15-17 (**CHARTS F-H**).

187.    All 22 have received other vaccinations in adulthood.  A. Vol. IV, p. 18 (**CHART I**).

188.    Sixteen of the 22 have never previously sought medical accommodation from any employer for any reason.  A. Vol. IV, p. 22 (**CHART M**).

189.    Plaintiffs Driscoll, Hooper, Pinnetti, and Vicente are among the 22 Plaintiffs who claim to have submitted medical exemption requests to MGB.  Dkt. 58, ¶¶6-29 (Plaintiffs' First Amended Complaint).

190.     In her sworn questionnaire responses, Plaintiff Driscoll identified herself as only having submitted a religious exemption request, and she produced no evidence in discovery that she sought a medical request.  A. Vol. V, p. 591 (Driscoll Questionnaire).

191.     Plaintiffs Hooper, Pinnetti, and Vicente conceded that their own HCPs refused to complete the MGB form to support their requests for exemption.  A. Vol. VI, p. 3 (Pinnetti affidavit ¶ 5,); A. Vol. VI, p. 15 (Hooper affidavit ¶ 4), A. Vol. VI, p. 550 (Vicente interactive process).

192.     In correspondence to others at MGB, Plaintiff Pinnetti admitted that her reported medical condition "does not qualify [her] for an exemption."  A. Vol. VI, p. 7 (Pinnetti email to Human Resources Manager dated August 27, 2021).

193.     Plaintiffs Blank, Driscoll, Fleury, Marconi, and Valstyn concede that their reported medical conditions do not substantially limit any of their major life activities.  A. Vol. IV, p. 20 (**CHART K**).  Plaintiffs Fleury and Marconi identified prior infection with COVID-19 their reported medical condition.  A. Vol. V, pp. 70 (Fleury identifies "Covid-19" as medical condition in sworn questionnaire), 1282 (Marconi identifies "Natural immunity" as medical condition in sworn questionnaire).

194.     Plaintiffs Blank and Haines sought medical exemption from the Vaccination Policy solely on the basis that they were each pregnant. A. Vol. IV, p. 21 (**CHART L**).

195.     Plaintiff Blank conceded that her pregnancy did not substantially limit any major life activity.  Plaintiff Haines did not identify any pregnancy-related complications that rendered her disabled as a matter of law.  A. Vol. IV, p. 20 (**CHART K**); A. Vol. VI, pp. 280-284 (Haines interactive process).

196.     Plaintiff Vicente completed and submitted a medical exemption form on his own – without the required provider signature – and despite the lack of supporting medical documentation, the Panel reviewed the request and denied it after determining that Plaintiff Vicente's reported condition was not a contraindication.  A. Vol. VI, pp. 550-638 (Vicente interactive process).

197.     Every Plaintiff in this case who sought a medical exemption was determined by MGB experts not to have a CDC contraindication to COVID vaccination.   A. Vol. VI, pp. 37-643 (interactive process docs).

198.     Plaintiffs Blank, Driscoll, Garbitt, Miller, Pinnetti, Saccoccio, and Williams conceded under oath that their medical conditions are not contraindications to the COVID vaccine.  A. Vol. IV, p. 19 (**CHART J**).  Plaintiffs Miller and Saccoccio identified "Mental Health" (Miller) and "Anxiety" and "PTSD" (Saccoccio) as their reported medical conditions. A. Vol. V, pp. 141 (Miller Questionnaire), 1737 (Saccoccio Questionnaire).

## X.     The Religious Exemption Review Process

### A.     Vanessa Gilbreth Designed the Religious Exemption Review Process

199.     Vanessa Gilbreth ("Gilbreth") is Senior Legal Counsel, Office of the General Counsel for MGB, specializing in Labor & Employment.  She has worked at MGB since 2015. Prior to that, Ms. Gilbreth was a Labor & Employment lawyer at Proskauer Rose and McDermott, Will & Emery for eight years.  Ms. Gilbreth earned her law degree at Boston University and her B.S. at University of Michigan.  A. Vol. I, p. 78 (Gilbreth Dec. ¶¶1-4).

200.     Gilbreth was directed to ensure there was a rigorous review process, meaning one that was consistent, fair, interactive, and met all legal requirements.  A. Vol. II, pp. 258, 262 (Sheehan Tr. 18-19, 34).

45

88206785v.8

**B.      The Religious Exemption Form**

201.      In order to request a religious exemption, an employee simply had to enter

information into an online form.  A. Vol. I, p. 60 (Nichols Dec. ¶7).

202.      The form asked the employee to "(1) identify your sincerely held religious belief,

practice or observance and (2) explain why it prevents you from receiving a COVID-19 vaccine."

The form advised each employee, "Please note that you may be required to provide additional

information or supporting documentation to support your request for an exemption."  Employees

could choose how long an explanation to write; it said right on the form that the text box would

expand as needed.  A. Vol. I, pp. 60-61, 74-77 (Nichols Dec. ¶¶8-9 Ex. 20); A. Vol. II, p. 191

(RERC 11 Tr. 84-85); A. Vol. II, p. 242 (RERC 16 Tr. 136).

**C.      The Religious Exemption Review Committee (RERC)**

203.      Gilbreth chaired the RERC, which reviewed the religious exemption requests, and

oversaw all of its functions.  A. Vol. II, pp. 258, 260 (Sheehan Tr. 20, 28); A. Vol. II, p. 4

(RERC 5 Tr. 12).

204.      For the RERC, Gilbreth assembled Human Resources (HR) professionals who

were trained in the applicable standards governing religious exemptions, including undue

hardship, and had the background and understanding needed to engage in the review process.  A.

Vol. I, p. 61 (Nichols Dec. ¶¶10-11); A. Vol. II, pp. 257-58 (Sheehan Tr. 17-18); A. Vol. II, p.

174 (RERC 11 Tr. 16).

205.      For example, RERC 11 was REDACTED PER PROTECTIVE ORDER.

Prior to MGB, she worked at REDACTED PER PROTECTIVE, where she led a team of 8-15 people that handled all

accommodations across the organization for 300,000 people.  A. Vol. II, pp. 172, 177 (RERC 11

Tr. 7, 26-27).   RERC 5 was the REDACTED PER PROTECTIVE ORDER

REDACTED PER PROTECTIVE ORDER.  A. Vol. II, p. 4 (RERC 5 Tr. 10-12).

206.    Other employees with particularly relevant expertise served as advisors to the Committee, such as Ramona Nichols, Director, Employee and Labor Relations at MGB.  A. Vol. I, pp. 61 (Nichols Dec. ¶¶1-3, 12).

### D.    Gilbreth Provided Extensive Training to the RERC

207.    MGB took care to create one consistent training process for the RERC to ensure that everyone was following the same guidelines.  Gilbreth was responsible for designing and delivering the training to the RERC.  A. Vol. II, p. 258 (Sheehan Tr. 18).

208.    Gilbreth provided significant training to the RERC.   In the trainings that she led, Gilbreth  discussed the process for reviewing religious exemption requests, the legal requirements around the process (including federal and state law regarding religious accommodations in the workplace), and the criteria for the process.  A. Vol. II, pp. 174-75 (RERC 11 Tr. 17-18); A. Vol. II, pp. 212, 244 (RERC 16 Tr. 14, 144); A. Vol. II, pp. 5-6 (RERC 5 Tr. 17-20).

209.    Training began in August 2021 before the Committee began reviewing requests. A. Vol. II, p. 244 (RERC 16 Tr. 144).   There were two introductory training sessions.  A. Vol. II, pp. 6, 15 (RERC 5 Tr. 18, 57).  Trainings continued once requests began coming in.  A. Vol. II, p. 244 (RERC 16 Tr. 145).  Ongoing training continued throughout the process, with Gilbreth leading discussions about requests, and RERC members asking questions and getting clarification on requests they were reviewing.  A. Vol. II, pp. 175, 176 (RERC 11 Tr. 18-19, 25); A. Vol. II, pp. 6, 15 (RERC 5 Tr. 18, 57); A. Vol. II, p. 218 (RERC 16 Tr. 41).  Discussing the

requests as a group allowed the RERC to be consistent in their approach.  A. Vol. II, p. 205
(RERC 11 Tr. 138).

210.    The Committee was trained that a religion could be a recognized world religion or
a set of someone's deeply held spiritual beliefs.  The Committee was trained that while a
particular organized religion or faith leader might promote vaccination, an individual follower of
that religion could disagree.  A. Vol. II, p. 11 (RERC 5 Tr. 38-40).

211.    The training covered issues including the role of fetal cell lines in the three
COVID vaccines.  Part of the training related to misinformation that the Committee saw within
the exemption requests, relating to the involvement of the fetal cell lines in the vaccine.  A. Vol.
II, pp. 234, 244 (RERC 16 Tr. 103, 145); A. Vol. II, p. 197 (RERC 11 Tr. 108).

212.    The RERC met frequently to develop a reasonably consistent approach to
religious exemption requests, and worked tirelessly to review and process each request.  The
Committee sought to apply a consistent and thoughtful approach to what would be considered a
sincere request; a religious request; and a conflict with the Vaccination Policy.  A. Vol. I, pp. 63,
66 (Nichols Dec. ¶¶20-22, 34).

E.    **Distribution of the Requests to the RERC Reviewers**

213.    Employees' requests for exemption went into a system called RedCap, which then
generated a spreadsheet of the requests.  The requests for each MGB entity were then filtered by
entity and sent to the RERC reviewers for that entity.  A. Vol. II, p. 176 (RERC 11 Tr. 23-24); A.
Vol. II, pp. 217-18 (RERC 16 Tr. 37-38).  For example, there was a small group of reviewers who
covered requests from The Brigham, and another that handled requests from MGH.  A. Vol. II,
pp. 179, 204 (RERC 11 Tr. 36-37, 137); A. Vol. II, pp. 8, 13 (RERC 5 Tr. 27-29, 48-49).

214.    RERC members recused themselves if they knew the requesting employee; that request would then be assigned to a different reviewer.  A. Vol. II, p. 13 (RERC 5 Tr. 47); A. Vol. II, p. 180 (RERC 11 Tr. 38-39); A. Vol. II, p. 219 (RERC 16 Tr. 42-43).

**F.      The RERC Conducted an Interactive Process with Employees**

215.    The RERC engaged in an interactive process with each employee requesting a religious exemption.  A. Vol. I, p. 64 (Nichols Dec. ¶¶ 23-25); A. Vol. II, pp. 190-91 (RERC 11 Tr. 80-85).  Individual RERC members interacted with employees about their requests on behalf of the RERC.  A. Vol. II, p. 183 (RERC 11 Tr. 52).  The goal of MGB's interactive process was to understand the employee's stated religious objection to the COVID vaccine.  A. Vol. II, pp. 184, 191 (RERC 11 Tr. 54, 85).

216.    Each request received careful, individualized attention from at least one reviewer from the RERC, and often from more member(s) of that Committee if not the full Committee. A. Vol. I, p. 64 (Nichols Dec. ¶¶ 23-25).

217.    The Committee's process involved having the requisite interaction with each employee to get an understanding of the nature of the sincere religious belief, the person's adherence to the religious belief, and how that person's religious belief prevented them from receiving the COVID vaccine.  A. Vol. I, p. 65 (Nichols Dec. ¶33).

218.    The interactive process was conducted in writing.  A. Vol. II, p. 243 (RERC 16 Tr. 141).  The Committee communicated with employees about requests via a MGB Religious Exemptions Committee e-mail account.  A. Vol. II, pp. 219, 243 (RERC 16 Tr. 44-45, 141).

219.    In that interactive process, employees who raised any substantive religious objection to the vaccine would by contacted by email for more information.  RERC members asked follow-up questions to assess the employee's religious belief, adherence to that belief, and

how the belief prevented them from receiving the COVID vaccine.  The Committee followed an approach aimed to achieve reasonable consistency between follow-up questions but also to provide each reviewer flexibility to customize the questions that were appropriate to that particular request.  The reviewer exercised his or her best judgment in choosing the follow-up questions most fitting for each individual request.  A. Vol. I, p. 64 (Nichols Dec. ¶¶26-28).

220.    Employees were instructed to send responses to the follow-up questions to a dedicated, confidential e-mail box at MGB.  Employees were free to submit whatever information or supporting documentation they wanted to that e-mail box along with their responses to the follow-up questions.  Many chose to send documents or attachments.  A. Vol. I, p. 65 (Nichols Dec. ¶29).

221.    Each employee's response was then typically reviewed by the RERC member who had been assigned to that request.  RERC members carefully reviewed any follow-up responses submitted by the employees to which they had been assigned.  A. Vol. I, p. 65 (Nichols Dec. ¶30).

222.    Where a RERC member determined that more information was needed, that member would send additional follow-up questions to the employee, and carefully review any additional information submitted by the employee in response.  A. Vol. I, p. 65 (Nichols Dec. ¶31).

### G.    Many Employees Submitted Material Found Online to the RERC

223.    Many employees submitted material downloaded or cut and pasted from the internet.  The RERC became well-acquainted with the many forms available online, as members saw the same internet forms submitted by multiple employees.  A. Vol. I, p. 65 (Nichols Dec. ¶29).

224. Many Plaintiffs admitted that they included in their requests material purchased or obtained online. Plaintiff Attarian paid money for someone to help her write a request. A. Vol. III, p. 36 (Attarian Tr. 43-44). Plaintiff Bernardone consulted an online source. A. Vol. III, p. 61 (Bernardone Tr. 86). Plaintiff Erickson used websites to write his request. A. Vol. III, pp. 126, 127-28, 130 (Erickson Tr. 62, 69-70, 90). Plaintiff Hirtle found a pastor online and asked him to help her write her exemption request, though they had never met; he emailed her a certificate saying she was a "disciple." A Vol. III, p. 231 (Hirtle Tr. 62-63, 65). Plaintiff J. Holmes bought a DIY exemption kit from a website called the Healthy American. A. Vol. III, pp. 259, 260 (J. Holmes Tr. 27, 72). Plaintiff Kerentsev submitted a document from a website without reviewing it in full. A. Vol. III, pp. 281-82 (Kerentsev Tr. 97-99) (Q: "Did you author any part of it?" A: "I believe not."). Plaintiff Miller submitted material she found online. A. Vol. III, p. 304 (Miller Tr. 76-77) (Q: "And so is any of what follows your own words?" A: "They're not.").

225. The RERC considered employees' use of a template or form written by a third party, or downloaded or purchased online, alongside all information provided by the requesting individual and all other available information about the request as part of its holistic assessment of whether the person requesting exemption had established a sincere, religious belief that precluded vaccination. A. Vol. VI, p. 1 (MGB Answer to Interrogatory No. 9).

### H.   Template Guidelines Guided the Review Process

226. Gilbreth provided the RERC with template guidelines (the "Template") that provided suggested language that the members could use or adapt when engaging in the interactive process with employees, and provided guidelines for the process and resources for RERC members. The Template provided guidance as to what should be requested if an RERC member needed more information about a particular employee's request. The RERC used the

template—an evolving document updated as the process proceeded—to guide its process, while working hard to maintain consistency. A. Vol. II, pp. 177-78 (RERC 11 Tr. 28-30, 33); A. Vol. II, p. 15 (RERC 5 Tr. 54-55); A. Vol. II, p. 245 (RERC 16 Tr. 146); A. Vol. II, p. 248 (RERC 16 Dep. Ex. 14 (one iteration of the Template from August 25, 2021).

227.    Gilbreth discussed the Template with RERC 11 and Nichols, REDACTED PER PROTECTIVE ORDER REDACTED PER PROTECTIVE ORDER, given their background and experience with accommodations.  A. Vol. II, p. 177 (RERC 11 Tr. 26).

228.    The RERC members could personalize the Template language to reflect the individual circumstances of a request.  A. Vol. II, p. 20 (RERC 5 Tr. 77).

229.    The Template included guidance relating to fetal cell lines.  A. Vol. II, p. 245 (RERC 16 Tr. 146-48).  At the time of the process, the internet was flooded with information and misinformation about fetal cell lines and COVID vaccines.  A. Vol. II, p. 197 (RERC 11 Tr. 108).

### I.    The RERC's Criteria Reviewing Exemptions

230.    The RERC reviewed each request  individually as it came, to evaluate whether the expressed view was a (i) sincerely held (ii) religious belief that (iii) conflicted with COVID vaccination.  A. Vol. II, pp. 212, 215, 219 (RERC 16 Tr. 17, 29, 42).  The RERC members reviewed each request, and determined whether the employee had identified a sincerely held religious belief and explained how that sincerely held religious belief conflicted with COVID vaccination.  A. Vol. II, p. 178 (RERC 11 Tr. 31-32).

231.    The RERC presumed the sincerity of religious beliefs.  A. Vol. II, pp. 186, 188 (RERC 11 Tr. 62, 71);  A. Vol. II, pp. 213, 215 (RERC 16 Tr. 18, 26).

232.    The RERC reviewed requests holistically.  No decision was made by the RERC based only on a single factor.  Instead, the RERC looked at all of the information the requesting employee provided.  The goal of the RERC was to understand.  A. Vol. II, p. 182 (RERC 11 Tr. 47, 49); A. Vol. II, pp. 234, 243-44 (RERC 16 Tr. 105, 141-42).

233.    There was no one formula for identifying a sincere religious belief that conflicted with the vaccine.  Each employee's explanation was distinct and the review was individualized. It was not the role of the RERC to tell employees what to say; nor could they, since only the employee knew his or her individual beliefs.  A. Vol. II, pp. 242-43 (RERC 16 Tr. 136-38); A. Vol. II, p. 182 (RERC 11 Tr. 47-49).

234.    The RERC did not issue any "automatic" approvals or denials.  A. Vol. II, p. 181 (RERC 11 Tr. 43-44); A. Vol. II, p. 220 (RERC 16 Tr. 48).

235.    At least one RERC member made the decision as to each request.  In some cases, a subset of the RERC or the whole RERC also participated in the decision.  A. Vol. I, p. 66 (Nichols Dec. ¶36).

### J.    The RERC Did Not Consider Job Role

236.    The RERC members did not consider the requesting employee's job position in deciding whether to approve or deny.  Occasionally, an employee volunteered their job title in the interactive process, but they were not a consideration for the RERC.  A. Vol. II, p. 37 (RERC 5 Tr. 143); A. Vol. II, p. 181 (RERC 11 Tr. 45).

### K.    Prior Vaccination History

237.    As HR professionals, the RERC members had access to an HR record that indicated whether the employee had received an exemption to a flu or COVID vaccine before, and

the date of exemption.  They did not have access to any medical information, or to any exemption

history for any vaccine other than flu and COVID.  A. Vol. II, p. 197 (RERC 11 Tr. 106-07).

238.    As part of their analysis as to whether the requestor had a sincerely held religious

belief that conflicted with the vaccine, the RERC members could consider whether the requesting

employee had shown that they adhered to the sincerely held belief in contexts outside the COVID

vaccine.  A. Vol. II, pp. 6, 10, 15-16 (RERC 5 Tr. 20-21, 36, 57-58); A. Vol. II, p. 236 (RERC 16

Tr. 112).  Vaccination history was considered as one of many factors in the RERC's holistic

review. A. Vol. II, pp. 182, 204 (RERC 11 Tr. 46-47, 136).

**L.    Many Believed Misinformation About the COVID Vaccine**

239.    When an employee's exemption request included misinformation, the RERC's

goal was to provide education to the requestor.  A. Vol. II, p. 245 (RERC 16 Tr. 146).  The

Template provided suggested language.  A. Vol. II, p. 248 (RERC 16 Dep. Ex. 14 (one iteration

of the Template from August 25, 2021).

240.    Public health authorities such as the CDC have issued alerts to correct myths and

misinformation about COVID vaccines that the public may hold.  See A. Vol. VII, p. 210-217

(https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html, as the webpage appeared on or

around November 2021); pp. 218-226 (as the webpage appeared on or around January 2023).

241.    Certain Plaintiffs testified they believed that the COVID vaccine: alters one's

DNA; contains pork, metals, DNA particles, fetal cells or "contaminants"; and kills people.  A.

Vol. III, p. 45 (Barone Tr. 74-75); A. Vol. III, p. 71 (Brouillard Tr. 94-95, 97); A. Vol. III, pp.

89, 90 (Cadigan Tr. 99, 102-03); A. Vol. III, p. 137 (Fotino Tr. 43); A. Vol. III, p. 280

(Kerentsev Tr. 82).

242.    Plaintiff Cadigan believes that the COVID vaccine has resulted in hundreds of thousands of deaths, and "blood clots, increased asthma, ADHD, cancer, rash, increased uterine bleeding, reproductive problems, stroke, infertility." A. Vol. III, pp. 89, 90 (Cadigan Tr. 99, 102-03).

243.    Plaintiff Hirtle believes that the COVID vaccine is a "toxic dart," that causes strokes, clotting, paralysis and death.  A. Vol. III, pp. 231, 232, 235, 236, 237 (Hirtle Tr. 65, 75, 77, 147-48, 156-57, 160-61).

244.    Plaintiff Barone is unsure if the COVID vaccine contains a microchip.  A. Vol. III, p. 45 (Barone Tr. 74-75).

245.    Plaintiff Shulman, a physician, believes that: COVID vaccines are "not vaccines," but rather genetic modifications; that vaccinated people are more dangerous than unvaccinated, and that it is possible that 2.8 million people died of the COVID vaccine but "it's been censored." A. Vol. III, pp. 338, 341, 343, 347 (Shulman Tr. 18-19, 31, 46, 94-95).

**M.      Communication of Decision on Religious Exemption Requests**

246.    After decisions were made, each employee who had requested an exemption received by e-mail a written decision either approving or denying the request.  A. Vol. I, p. 66 (Nichols Dec. ¶37).

247.    Most approvals were emailed to employees on or after September 6, 2021. Denials were then emailed as the decisions were made.  The RERC endeavored to ensure that all decisions for requests received before the September 3, 2021 deadline were emailed at least three weeks before the October 15 deadline for employee vaccination.  A. Vol. I, p. 66 (Nichols Dec. ¶38).

### N.     Some Employees Reached Out to the RERC About Denial of Their Requests

248.     Some employees wrote to the RERC to express their disappointment with the decision or seeking to provide additional information.  A significant number of employees did so by replying to the denial email.  Some of these interactions were very tense, and the RERC felt that it was important to continue to use the dedicated email address for these sensitive and deeply personal communications.  A. Vol. I, p. 67 (Nichols Dec. ¶40); A. Vol. II, pp. 189-90 (RERC 11 Tr. 77-78).

249.     If an employee submitted additional information after a request was denied, it was considered to the extent the employee offered new, material information to support their request. In particular, the RERC strove to ensure that each employee had the opportunity to provide for review the information they felt was necessary to consider their request.  A. Vol. I, p. 67 (Nichols Dec. ¶41); A. Vol. II, p. 189 (RERC 11 Tr. 74, 77).

## XI.     DECISIONS ON PLAINTIFFS' REQUESTS FOR EXEMPTIONS

250.     Each request for exemption was reviewed by the RERC, and those that met the criteria were approved, while those that did not meet the criteria were denied.  Every request went through that same process.  A. Vol. II, pp. 274, 275 (Sheehan Tr. 82-84, 87-88).

251.     After careful review, Plaintiffs' requests for religious or medical exemptions were denied.  A. Vol. I, pp. 10-12 (Hashimoto Dec. ¶¶43-54); A. Vol. I, pp. 67-71 (Nichols Dec. ¶¶43-74).

252.     By November 4, 2021, in total, MGB allowed 234 exemptions out of the 2,402 requests received.  A. Vol. I, pp. 78-79 (Gilbreth Dec. ¶6).

253.     By the conclusion of the exemption process, MGB's employees were over 99% vaccinated.  A. Vol. II, p. 274 (Sheehan Tr. 82).

**XII.  UNVACCINATED PLAINTIFFS WERE PLACED ON LEAVE AND TERMINATED**

**A.  MGB Provided Frequent Notices to Staff About Deadlines and Consequences**

254.    MGB provided frequent notices to staff about pending deadlines to submit

requests and to receive a first vaccine dose, and about the consequences of non-compliance with

the Vaccination Policy, including that if they remained unvaccinated without an exemption, they

would be placed on two weeks' unpaid leave and that if they remained unvaccinated, they would

be terminated.   A. Vol. I, p. 26 (Klompas Dec. ¶16); A. Vol. III, p. 13 (Alcantara Tr. 97); A.

Vol. III, pp. 17, 27 (Alexandrova Tr. 20, 114-15); A. Vol. III, pp. 37-38 (Attarian Tr. 53-54); A.

Vol. III, pp. 73, 75 (Brouillard Tr. 119-20, 174); A. Vol. III, p. 91 (Cadigan Tr. 108); A. Vol. III,

p. 110 (DiCicco Tr. 126); A. Vol. III, p. 118 (Driscoll Tr. 99-100); A. Vol. III, p. 129 (Erickson

Tr. 85); A. Vol. III, p. 154 (Frenchwood Tr. 134-36); A. Vol. III, p. 183 (Garbitt Tr. 179); A.

Vol. III, p. 205 (Haiti Tr. 63); A. Vol. III, pp. 218, 219 (Hamel Tr. 116, 122); A. Vol. III, p. 233

(Hirtle Tr. 101); A. Vol. III, p. 250 (F. Holmes Tr. 168); A. Vol. III, p. 271 (Ithier Tr. 157); A.

Vol. III, p. 284 (Kerentsev Tr. 115); A. Vol. III, pp. 319-20 (Pierre Tr. 173-74); A. Vol. III, p.

344 (Shulman Tr. 73); A. Vol. III, pp. 161-62 (Frenchwood Dep. Ex. 17) (example letter dated

October 1, 2021 regarding upcoming deadlines); A. Vol. III, p. 163 (Frenchwood Dep. Ex. 18)

(example letter dated October 20, 2021 regarding unpaid leave); A. Vol. III, p. 164 (Frenchwood

Dep. Ex. 19) (example letter dated November 12, 2021 regarding termination).

255.    When asked if they were vaccinated against COVID, 15 Plaintiffs admitted in

sworn questionnaires that they chose to get vaccinated against COVID and stay at MGB, while

61 Plaintiffs refused to respond to that question, and 84 responded that they were not vaccinated

against COVID at the time when they completed the questionnaire.  A. Vol. IV, p. 11 (**CHART**

**E**); *see also e.g.,* A. Vol. III, pp. 134, 139, 140 (Fotino Tr. 6, 52, 58); A. Vol. III, pp. 241, 251, 252 (F. Holmes Tr. 9, 170, 178-79); A. Vol. III, pp. 295, 305 (Miller Tr. 5, 105).

256.     The employees terminated in November of 2021 represented less than 1% of MGB's workforce.  No entity-wide changes were required as a result of losing these employees, though individual departments may have had to make some operational adjustments as a result of individual departures.  A. Vol. II, p. 299 (Walls Tr. 32-33).

257.     Dr. Klompas testified, "[T]he hospital very much wanted [Plaintiffs] to stay and did all they can in order to enable that, but at some point [we had] to make a decision that from a system level, we cannot knowingly facilitate hospital-acquired transmission of SARS COVID 2."  A. Vol. II, p. 122 (Klompas Tr. 81).

## XIII.   ALL PLAINTIFFS' ROLES WERE SUPPORTING PATIENT CARE

### A.     Many Plaintiffs Were Healthcare Workers Who Cared Directly for Vulnerable Patients, in Close Proximity to Other Staff

258.     More than two-thirds of the Plaintiffs worked on site at an MGB entity.[4] A. Vol. IV, p. 1 (**CHART A**).

259.     Plaintiffs include those who served in roles directly rendering medical care or assistance to patients, including medical assistants, nurses, technologists, physician assistants, nurse practitioners, surgical technicians, physicians, and mental health counselors.  A. Vol. IV, p. 7 (**CHART D**).

260.     Twenty-six (26) Plaintiffs worked a hybrid schedule with regular on-site presence.  A. Vol. IV, p. 4 (**CHART B**).

---

[4] Seven of these Plaintiffs did not include their job titles in their questionnaire responses.  MGB used the job descriptions in those Plaintiffs' personnel files to identify their job titles.  A. Vol. VI, pp. 17-36 (job descriptions for Bernardone, Jean-Mary, Mastro, O'Connor, Strong, Tobio, and Ventola).

261.     Seventeen (17) of the 21 Plaintiffs who claim they had a "remote" work arrangement acknowledged reporting to campus for at least one work shift in the period beginning prior to the pandemic and continuing through the pandemic, and two of the remaining four identified multiple instances when they were onsite at an MGB entity during that same period.  A. Vol. IV, p. 5 (**CHART C**).

262.     Plaintiff Attarian was a Registered Nurse (RN) Case Manager for MGB Home Care, making home visits to approximately six sick patients a day.  She testified that she had to do a "head to toe assessment" of patients, including touching them, taking vital signs, "a couple of pretty invasive things."  It was impossible for her to stay six feet apart from patients, with whom she worked from 30 to 45 minutes at a time in the same room.  She saw patients with chronic illness: "congestive heart failure, diabetes, COPD; those were the three big ones."  She also came into contact with patients' family members.  A. Vol. III, pp. 30-31, 33-34, 35 (Attarian Tr. 17-18, 20, 29-31, 38).

263.     Plaintiff Bernardone was a RN working per diem in Imaging in Chelsea and Waltham, helping patients with MRIs, CAT scans and PET scans.  She saw 20-30 patients a day and was physically close to them to perform her job such as placing IVs and drawing blood.  She saw patients with cancer, accident injuries, surgeries and abscesses.  Most of her patients were elderly.  She worked in proximity to other staff, such as radiology techs.  A. Vol. III, pp. 51, 52, 53, 54, 56, 57, 58-59 (Bernardone Tr. 6, 16, 22-24, 29, 48-49, 55, 61-62).

264.     Plaintiff Brouillard was a Radiologic Technologist I who worked with some of the most vulnerable patients at MGH.  She testified, "We did heart transplants, lung transplants, all kinds of very invasive -- and I mean that's what Mass General is."  She had to work in person, in very close contact with patients; she testified, "There's not a way to avoid that in imaging."  She

worked with high-risk patients including those in the neonatal intensive care unit (NICU), pediatric intensive care unit (PICU), surgical ICU, and patients who had cancer and heart disease, those who were elderly, and those who had liver disease, dementia, cerebral palsy, and those who were pregnant.  In her 12-hour shifts, she was within six feet of 30-60 patients a day, often inches from and touching patients, some of whom were not masked.  She interacted with visitors, such as parents of infants in the PICU, and was within six feet of more than ten other staff members per day.  A. Vol. III, pp. 63, 65-66, 68, 69, 70, 74 (Brouillard 20-21, 40-42, 44-45, 59, 51, 56, 159).

265.    Plaintiff Cadigan was a nurse in the CAT scan department in the emergency room (ER), where she saw 60-100 patients a day, from newborns to the elderly, five days a week. Starting IVs for patients to receive CAT scan dye, monitoring patients, and delivering injections in the event of a reaction to the dye, Cadigan could not stay six feet from patients.  She interacted with visitors, such as those accompanying the elderly.  On a typical day, she interacted with 12-13 other staff members.  A. Vol. III, pp. 81, 84, 85, 86-87 (Cadigan Tr. 14-16, 37, 44-45, 47, 49-50).

266.    Plaintiff Conway was a MRI Technologist and Radiology Supervisor at Wentworth Douglas Hospital.  Her duties required physical contact with patients closer than six feet, included performing imaging, situating patients in the MRI, helping them change, and moving them from a stretcher.  She worked with 12 coworkers in X-ray and two in MRI and testified, "It is not possible to stay six feet away from colleagues."  A. Vol. III, pp. 93, 94, 95 (Conway Tr. 96, 98-100, 103).

267.    Plaintiff DiCicco was a full-time X-ray Technologist Technical Supervisor at MGB.  She worked primarily in the ER but also with in-patients.  Her group saw 75 to 150

patients a day, ranging from neonatal to geriatric in age, in a 12 hour shift.  She personally interacted with up to 30 patients per day, administering X-rays, helping with transport, and bringing patients to and from the ER.  She could not stay six feet apart from patients and in some instances had "very, very close contact" with patients who included babies, children too young to be vaccinated, the elderly and the immunocompromised.  Sicker patients tended to require more contact.  Asked if she could do her job without interacting with patients, she testified: "If I was a bad supervisor."  She supervised 25 staff members on weekdays, and 12 on weekends, and interacted with them all day, answering questions and providing help.  A. Vol. III, pp. 100-07 (DiCicco Tr. 12, 21-24, 26, 28-31, 33-34, 43, 47-48).

268.    Plaintiff Fotino was a surgical tech at Mass General Danvers.  She worked in an operating room, on one to six operations a day, with patients who ranged from young to elderly, many of whom had comorbidities and were immunocompromised. Also in the operating room, in addition to Fotino and the patient, were a nurse, a surgeon, an anesthesiologist, and sometimes a fellow or resident.  A. Vol. III, pp. 134, 135-36 (Fotino Tr. 7, 21-23).

269.    Plaintiff Hamel was a Radiation Therapist at the Seacoast Cancer Center in New Hampshire.  She delivered ionizing radiation treatments to cancer patients and admits that her unvaccinated status heightened her cancer patients' risk.  She interacted with approximately 30-35 people a day, often at close range, including patients (including the elderly and children), families, and other staff.  Two or three therapists worked on the machine at once. She attended weekly meetings that had five to seven attendees, including two therapists, one physicist, the nurse and at least one doctor.  A. Vol. III, pp. 207, 208-10, 211, 216 (Hamel Tr. 20-21, 23-26, 28-30, 36-37, 98-99).

270.     Plaintiff Hirtle was a Medical Technician I at MGH.  She worked in person, processing samples; it was sometimes unavoidable to be less than six feet from colleagues.  At the shift changeover, there were up to eight people in a conference room; she does not know who among them might have been immunocompromised.  She used a break room with two to three other staff.  She entered MGH through the main entrance, encountering security guards and other staff in the lobby and other people in the elevator.  A. Vol. III, pp. 224, 225, 227, 228-29, 230 (Hirtle Tr. 7, 13, 21, 32-34, 42, 44-45).

271.     Plaintiff F. Holmes was a nurse at Newton Wellesley hospital, caring for patients pre- and post-surgery.  She saw patients receiving hip, knee, back, gall bladder surgeries, cancer surgeries, appendectomies; patients with broken bones; elderly patients and those too young to be vaccinated; and patients unable to mask.   She needed to be "up close and personal" with patients as she assessed their vital signs, placed IVs, and reviewed medical criteria and medications. She regularly interacted with visitors.  She worked with four to 12 colleagues at any given time and ate lunch in a conference room with one to five other staff, without masks.  A. Vol. III, pp. 242, 243-45, 246, 247, 248 (F. Holmes Tr. 12-13, 89-97, 100, 146, 154, 157).

a.       She was redeployed in the pandemic to the Intensive Care Unit for four to five months. A. Vol. III, p. 248 (F. Holmes Tr. 157).

272.     Plaintiff Pierre was a full-time RN at The Brigham.  She worked in person caring for patients before and after surgery, including in the Surgical, Cardiac (inpatient), Orthopedics, and Cancer Units. Her patients ran the gamut of all conditions that would cause someone to be in the hospital.  She cared for 3-4 patients at a time, in close proximity, preparing them for surgery, telling them what to expect, administering medicine or IVs, taking vital signs and blood pressure, performing physical assessments, and turning or repositioning them.  She worked with patients

with kidney disease, COPD, chronic liver disease, diabetes, heart failure, coronary artery disease, cardiomyopathy, obesity, and history of smoking, all of which make a patient more susceptible for COVID.  She understood that if she as a nurse got COVID, there was a possibility of transmitting that to her patients.  She worked with four to five other staff members (from whom she could not stay six feet apart from if they were, for example, lifting a patient), visitors and the public.  A. Vol. III, pp. 307, 308-09, 311-12, 315-16, 317, 318 (Pierre Tr. 12, 14-15, 17-18, 69-70, 72-73, 145-49, 155-56, 158-59).

273.    Plaintiff Rupnick is a physician who worked in person at Union and Salem Hospitals, as a hospitalist covering a medical service and as a cardiologist covering the cardiologist inpatient service.  As a cardiologist, she did cardiology consults, for both medical and surgical services, and then follow up rounds and recommendations for patients.  As a hospitalist, in 10-12 hour days, she did admissions, discharges, daily rounding and patient management.  She could not be six feet from patients when examining them.  She concedes that people who come to the hospital are sick and that the hospital does not want them to contract COVID in the hospital.  A. Vol. III, pp. 322, 323-24, 325, 326, 327 (Rupnick Tr. 9, 12-17, 19-20, 30, 48-49).

274.    Plaintiff Shulman is a pediatrician specializing in neonatal intensive care in the Division of Neonatology and Newborn Medicine at Holy Family Hospital, an MGB entity.  She worked as a hospitalist resuscitating babies in the neonatal intensive care unit.  She worked with very vulnerable infants on a day to day basis, touching them and breathing on them.   She treated one to eight babies at a time.  She wanted to continue to provide resuscitation to vulnerable infants in the neonatal intensive care unit, unvaccinated.  She went to all of the high-risk deliveries and took care of a special care nursery of babies who were high risk as well as

typical newborns.  She had to be in person and it was not always possible to be six feet apart from others including newborns, their families, or other staff.  She had contact with up to twenty other members of the neonatal team, including other doctors, nurses, respiratory therapists, and physician assistants.  A. Vol. III, pp. 335, 338, 339, 340, 342, 345-46 (Shulman Tr. 9, 21, 23-24, 26-27, 45, 82, 85-86).

275.    Plaintiff Zaiats was a nurse in the Neurology Intensive Care Unit at The Brigham. That job required frequent contact with patients, families and staff in a very tight space.  His patients in the ICU need a high level of clinical care based on the acuity of their condition, and he had to put his hands on patients in critical care, including immunocompromised patients.  His job required him to provide a safe environment for patients, staff, families and visitors, and awareness of potential and actual risks of infection and transmission. He was side by side and face to face with others, including patients and other staff when repositioning patients. His coworkers took mask breaks.  A. Vol. III, pp. 349, 350, 351, 352, 353, 354, 362 (Zaiats Tr. 25, 27-28, 34, 36-37, 39, 44-45, 48-49, 85).

a.    He was redeployed to the COVID ICU in March or April 2020 due to the pandemic.  A. Vol. III, p. 350 (Zaiats Tr. 29).

**B.    Many Plaintiffs Also Had Roles that Placed Them in Close Proximity to Patients, the Public, Other Staff**

276.    Plaintiff Alcantara was a Senior Network Admin Specialist who worked in IT. He was primarily located at the Dana Farber Cancer Institute in Methuen, where he worked with another staffer in an office with a window that did not open, but also worked at the Weymouth satellite office, in a cube with another staffer. He interacted with other employees as needed when they needed technology fixed and interacted with his manager in person as needed.  A. Vol. III, pp. 7-8, 9, 10 (Alcantara Tr. 34-39, 42-43, 48).

64

277.    Plaintiff Erickson was a Senior Clinical Business Analyst at The Brigham.  He worked in the hospital one day every week, and other days remotely, troubleshooting problems with EPIC, the electronic medical record.  He supported patients on the Oncology floor, to which he occasionally went, walking among cancer patients, some of the most immunocompromised patients at the Hospital.  He worked with 1-3 other application analysts on site, nurses and other senior level employees.  He was expected to perform on call coverage as business needs dictated, and travel for training.  A. Vol. III, pp. 121, 125, 131-32 (Erickson Tr. 11-12, 51, 101-02).

a.    From March to August 2020, Erickson was redeployed to bring iPads to COVID floors work on the "vix" program, a video intercom system, at The Brigham, less than six feet from others.  A. Vol. III, p. 124 (Erickson Tr. 44-45).

b.    Erickson was also redeployed from December 17, 2020 to January, 2021, to work 17 shifts in an MGB vaccination clinic, signing employees in, scheduling them and generally having in-person contact with over 100 employees per day.  A. Vol. III, pp. 122, 123 (Erickson Tr. 23, 27-28).

278.    Plaintiff J. Holmes was a full time Assistant Unit Administrator on the Bipolar Psychotic Disorders Unit at McLean Hospital, a locked in-patient unit into which patients were involuntarily committed.  She interacted daily with patients, families and visitors.  She could not always be six feet from others, particularly staff.  She also worked as a Psychiatric Triage Coordinator in the admissions office at McLean, where she interacted in person with staff and with patients by phone.  A. Vol. III, pp. 255-57, 258 (J. Holmes Tr. 13-14, 17-18, 24-25).

279.    Plaintiff Garbitt worked as Spanish and Russian translator, in person, in the ER and in-patient floors.  She had to be near patients to translate, including elderly patients, immunocompromised and pregnant patients, and people with cancer, heart disease, lung and

liver disease, hepatitis, tuberculosis, obesity, and people who were smokers.  In an ER shift, she would see up to 20 patients, and on an in-patient shift, up to 10.  She routinely was near patients' families and other providers. A. Vol. III, pp. 170, 171, 174, 175-76, 177, 184-85 (Garbitt Tr. 30-31, 50-52, 66-68, 70, 73-74, 79-80, 189-90).

280.   Plaintiff Ithier was a Secretary in the Registration department who regularly interacted with patients and the public. From May 2021 to her termination, she worked in the Registration department checking in 15-40 patients per day.  Patients would sit at her desk, less than six feet away, from those including the elderly and parents with children too young to vaccinate.  She worked in close proximity with four other staff, and took breaks in the hall with a colleague, removing her mask to drink.  A. Vol. III, pp. 262, 263, 264, 265, 266, 267-68 (Ithier Tr. 27, 29, 31, 35, 40, 42, 48-51).

a.   Ithier was redeployed to the main lobby of Mass General in Chelsea from March 2020 to May 2021, interacting with more than 100 patients a day, directing them to appointments, making sure they had masks and hand sanitizer. She also served as a door screener three times a week, asking patients to change masks, asking about COVID symptoms, and explaining the visitor policy.  She was aware of 30 additional employees who previously worked remotely before being redeployed to Chelsea.  A. Vol. III, pp. 262, 263, 269 (Ithier Tr. 29, 31-33, 56).

281.   Plaintiff Granara was a full-time front desk associate at a health club owned by MGB, about 200 yards from MGH.  His duties included checking guests in, customer service for guests, and working around the gym and pool.  He received warnings and corrective action for non-compliance with mask mandates while employed at MGB.  A. Vol. III, pp. 194-95, 196, 197, 198, 199 (Granara Tr. 9-10, 22-23, 32, 64-65, 98-100).

282.     Plaintiff Haiti worked at The Brigham as a security officer in multiple locations. He interacted daily with patients, visitors and staff (including doctors) at the hospital.  He had to be within six feet of others. He provided escorts for staff, visitors and patients as required; performed patient restraints; and detained individuals suspected of criminal conduct.  He also had to interact with between one to five other security officers.  A. Vol. III, pp. 201, 202-03 (Haiti Tr. 7, 23-29).

283.     Plaintiff Miller was the full-time Manager of Information Desks at MGB. Working in person, she managed 10 staff members, 19-20 temporary employees, plus volunteers. She interacted in person with the public, patients – of all kinds – and families.  She and her team checked in 3,000 people a day. Miller would accompany someone if they did not know where to go.  A. Vol. III, pp. 296, 297, 298, 300, 301-02 (Miller Tr. 6, 12, 22-24, 30-32, 41-42).

        a.     Plaintiff Miller was redeployed to the information desks because of COVID, from her prior role as Volunteer Coordinator.  A. Vol. III, p. 299 (Miller Tr. 29).

284.     Plaintiff Lundin was a Program Manager of Addiction and Recovery Services. While Lundin worked remotely during the lockdown, as of August 2021, she was back in the building at the Boys and Girls Club two to three days a week.   Her job was to work with addicts and the community.  She attended weekly staff meetings, some of which were in person; she does not know if any of her coworkers were immunocompromised. A. Vol. III, pp. 290, 291, 292, 293 (Lundin Tr. 23-24, 28-29, 45, 57).

**C.    Certain Plaintiffs Performed Remote Work But Came to Campus as Needed, Were Redeployed and/or Were Aware of Redeployments**

285.     Plaintiff Barone, who worked remotely following the pandemic on insurance issues for patients, was aware that all workers working remotely were subject to being called into

the work site. At one point, volunteers were solicited from her group to go on campus to do temperature screenings.  A. Vol. III, pp. 41, 42, 43 (Barone 14-15, 23-24, 27).

286.    Plaintiff Driscoll was a Lead Billing Managed Care Coordinator at The Brigham. She worked remotely, but came on campus to provide others with three full days of training in December 2020 and five full days of training in June 2021.  She understood she was subject to being redeployed if needed, due to the pandemic or otherwise.  A. Vol. III, pp. 113, 115-17 (Driscoll Tr. 9, 57-59, 61-63).

287.    Plaintiff Frenchwood worked for MGB as an Assistant Billing Manager. Beginning in March 2020, she worked primarily remotely but visited campus multiple times.  In September or October of 2020, she visited campus to bring in her passport and receive an ID; she went through the MGB Lobby, was near others including patients, and waited in a line of newly hired employees, less than six feet apart.  In September or October 2021, she went on campus to pick up equipment, and was within six feet of an officer who provided her a mask, and within six feet of an employee who gave her the equipment.  In November of 2021, she returned her equipment, also within six feet of an employee.  At the time of her termination, her role was coded "hybrid" meaning that she would be assigned a date to begin going into the office in the Navy Yard one or more days a week.  A. Vol. III, pp. 143-45, 146, 147 (Frenchwood Tr. 22, 24-32, 71-72, 97).

a.    In April and May of 2020, Frenchwood was redeployed two days a week to hand out masks to employees and patients, and check in employees, at the entrance of The Brigham, within six feet of others.  This position was entirely different from her regular job role.  As a Brigham employee, she was authorized to travel to the hospital despite the lockdown.  She was

aware of other employees who had been working remotely who were redeployed because of the pandemic emergency.  A. Vol. III, pp. 148-50, 151 (Frenchwood Tr. 101-06, 108, 110).

b.      The same day that MGB announced the Vaccination Policy, Plaintiff Frenchwood posted to a friend:  "Let's go and catch this cold."  By "cold," she meant COVID.  A. Vol. III, pp. 155, 156-57, 159-60 (Frenchwood Tr. 171, 180-82, 197-99); A. Vol. III, p. 165 (Frenchwood Dep. Ex. 32); A. Vol. III, pp. 166-67 (Frenchwood Dep. Ex. 36).

288.    Plaintiff Giso was an administrative assistant who worked primarily remotely. She admits that she could be called in when her manager wanted her to be in-person, and that she did have to go on campus once during the pandemic. She understood that all personnel, including those working remotely, could be called in. A. Vol. III, pp. 189, 190 (Giso Tr. 20-21, 29).

289.    Plaintiff Kerentsev was a Software Engineer II who worked remotely.  However, he understood that if management asked him to come onsite, he would have to, and he did go to a MGB campus three times in 2019.  His job description did not indicate it was a remote position.  A. Vol. III, pp. 275, 276, 277 (Kerentsev Tr. 24, 26-27, 43, 45).

**D.      Plaintiffs Who Routinely Performed Remote Work Were Performing Important Operational Duties that Support Patient Care**

290.    Plaintiff T. Adams was a New Patient Intake Clinical Navigator who worked remotely for North Shore Physicians Group.  Among her duties was to call new patients, and go over their past medical history, current medications, allergies, surgical history, family history and any patient concerns, as part of the patient intake process.  A. Vol. III, pp. 2, 3-4 (T. Adams Tr. 12-13, 16-19).

291.    Plaintiff Alexandrova was a Software Engineer I at MGB, working on the Patient Gateway team.  Patient Gateway is an online portal accessible at https://patientgateway.massgeneralbrigham.org/ at which patients can view test results,

communicate with a health care provider, request an appointment, participate in research, view

or pay medical bills, and more.  Alexandrova worked closely with an analytical team, and solved

maintenance issues.  Prior to March 2020 she worked once every two weeks in the office; she

worked remotely from March 2020 to her termination.  A. Vol. III, pp. 16, 18-21 (Alexandrova

Tr. 16-17, 25-31, 33-34, 36).

### E.    Most Plaintiffs Had Regular Contact with the Public and Other Personnel

292.    Most Plaintiffs had regular contact with the public and other MGB personnel such

as in the cafeteria, elevators, lobby and hallway.  A. Vol. III, pp. 64, 68 (Brouillard Tr. 33, 52)

(cafeteria, elevators with public, service elevator with staff); A. Vol. III, p. 83 (Cadigan Tr. 26)

(ate in nurses' station, break room, and cafeteria); A. Vol. III, p. 95 (Conway Tr. 102) (saw

general public in hall when transporting machine); A. Vol. III, p. 176 (Garbitt Tr. 74-77) (took

elevator with patients and visitors, service elevator with staff, ate and drank with other staff in

office); A. Vol. III, pp. 245-46 (F. Holmes Tr. 96-99) (lunch in conference room or cafeteria); A.

Vol. III, p. 355 (Zaiats Tr. 50-51) (interacted with staff within six feet in cafeteria, main

entrance, through the hospital, hallways, and elevators).

### F.    Plaintiffs Admit the Significant Limitations of Masks

293.    Plaintiffs admitted that masks are not perfect at preventing transmission, that the

quality of the mask matters and that masks cannot be effective when removed to eat or drink or

for mask breaks.  A. Vol. IV, p. 27 (**CHART P** – RFA No. 3 Admissions).  *See also e.g.* A. Vol.

III, p. 24 (Alexandrova Tr. 51); A. Vol. III, pp. 31-32 (Attarian Tr. 21-22); A. Vol. III, pp. 54, 59

(Bernardone Tr. 27, 62-63); A. Vol. III, p. 64 (Brouillard Tr. 32); A. Vol. III, pp. 84, 87 (Cadigan

Tr. 36, 53); A. Vol. III, p. 96 (Conway Tr. 107-08); A. Vol. III, p. 138 (Fotino Tr. 46); A. Vol.

III, pp. 172, 179 (Garbitt Tr. 54, 88-89); A. Vol. III, p. 189 (Giso Tr. 19); A. Vol. III, pp. 212,

213 (Hamel Tr. 39, 42); A. Vol. III, pp. 229, 234 (Hirtle Tr. 34, 145); A. Vol. III, p. 247 (F. Holmes Tr. 146); A. Vol. III, p. 269 (Ithier Tr. 54); A. Vol. III, p. 279 (Kerentsev Tr. 63); A. Vol. III, p. 299 (Miller Tr. 26); A. Vol. III, p. 327 (Rupnick Tr. 49); A. Vol. III, pp. 356, 360 (Zaiats Tr. 54, 72-73).

294.   Only one Plaintiff who sought a medical exemption refused to admit that masking does not prevent transmission of the COVID virus 100% of the time – that same Plaintiff admitted that, while working on-site at an MGB entity, he sometimes removed his mask indoors to eat or drink.  A. Vol. V, p. 588 (Doherty Questionnaire).

295.   In total, nearly 85% of Plaintiffs admitted that they had removed their masks indoors to eat or drink during the workday.  A. Vol. IV, p. 31 (**CHART Q** – RFA No. 4 Admissions).  *See also, e.g.,* A. Vol. III, pp. 9, 10 (Alcantara Tr. 44, 48); A. Vol. III, pp. 54, 55 (Bernardone Tr. 27, 30); A. Vol. III, p. 83 (Cadigan Tr. 26); A. Vol. III, pp. 106-07 (DiCicco Tr. 45-46); A. Vol. III, pp. 210, 213, 215 (Hamel Tr. 33, 42-43, 52); A. Vol. III, p. 235 (Hirtle Tr. 146); A. Vol. III, p. 299 (Miller Tr. 27).

296.   Some patients cannot mask because of their treatment; others do not put the mask properly over their nose or mouth; some did not wear a mask or refused; some needed to remove masks to take a temperature or a COVID test.  A. Vol. III, p. 179 (Garbitt Tr. 89); A. Vol. III, p. 247 ( F. Holmes Tr. 146); A. Vol. III, p. 312 (Pierre Tr. 71-72).

G.   **Instituting a New Surveillance Testing Program For All MGB Facilities Would Have Been Ineffective and an Undue Hardship**

297.   There was no MGB-wide mandatory COVID testing program for employees.  A. Vol. II, p. 53 (Gandhi Tr. 47).  *See also* A. Vol. II, pp. 46, 47 (Gandhi Tr. 18, 24).

298.   MGB scientists determined that a surveillance testing program would not be adequately protective for health and safety reasons.  A. Vol. II, p. 53 (Gandhi Tr. 47).

299.     Every Plaintiff but one admitted that testing is imperfect, including that one can test negative one day, but positive the next.  A. Vol. IV, p. 34 (**CHART R** – RFA No. 5 Admissions).  *See also e.g.* A.  Vol. III, p. 96 (Conway Tr. 109); A. Vol. III, p. 109 (DiCicco Tr. 54); A. Vol. III, pp. 214, 215 (Hamel Tr. 47, 52); A. Vol. III, p. 270 (Ithier Tr. 62); A. Vol. III, p. 299 (Miller Tr. 27); A. Vol. III, p. 361 (Zaiats Tr. 80).

300.     MGB is a very large organization; there is no single point of entry at which to test.  MGB's entities occupy approximately 25 million square feet, including 400 buildings across many campuses.  MGH alone has 65 buildings, and dozens of entrances.  Many MGB entities, such as MGH, are 24/7 operations.  MGB could not establish testing in offsite locations such as ambulatory surgery centers.  A. Vol. II, p. 53 (Gandhi Tr. 47-49); A. Vol. II, p. 285 (Sheehan Tr. 127-29).

301.     If MGB had to create a system-wide surveillance testing program for unvaccinated employees, there would have been issues with testing capacity given that MGB also had to test patients, such as for example testing required  in advance of admitting a patient. A. Vol. II, p. 285 (Sheehan Tr. 127-29). In fall 2021, MGB only had ready access to PCR testing. A. Vol. II, p. 54 (Gandhi Tr. 52).  Antigen tests were not readily available until late 2021 or 2022. A. Vol. II, p. 47 (Gandhi Tr. 23-24).  There were concerns about getting test results back in time for employee's shifts, particularly at a time when rapid tests were not available or reliable.  A. Vol. II, p. 285 (Sheehan Tr. 127-29).

302.     If MGB had to create a system-wide surveillance testing program for unvaccinated employees, three shifts of testing would have been needed, because the facilities are open 24/7.  To staff just *one* role at *one* single entrance, three shifts a day, and accounting for weekends, holidays and time off would typically require 5.5 Full Time Equivalent positions.  A.

72

Vol. II, pp. 53-54 (Gandhi Tr. 49-50).  At many entities, just one role might not be sufficient to handle all the people who needed testing.  A. Vol. II, pp. 53-54 (Gandhi Tr. 49-51).

303.    If MGB had to create a system-wide surveillance testing program for unvaccinated employees, MGB would have had to set up spaces for employees to wait at least an hour for PCR results after being swabbed.  It would be difficult to find, since every square foot of space is important for operational workflow, and tents would not be feasible because of space constraints and weather.  A. Vol. II, pp. 54, 55 (Gandhi Tr. 50-51, 54-55).

304.    Employees waiting in line for testing near an entrance would disrupt to MGB operations, impact patient care by delaying patients' entry, and present safety concerns with distancing employees from patients.  A. Vol. II, pp. 54, 55 (Gandhi Tr. 51-52, 55).  It also created operational issues with clocking in and compensation for testing time.  A. Vol. II, p. 285 (Sheehan Tr. 127-29).

305.    If MGB had been required to set up a surveillance testing program for unvaccinated employees, there would have been operational issues as to how to staff such wide scale testing.  A. Vol. II, p. 285 (Sheehan Tr. 127-29).  MGB would likely have had to staff such a site with employees from other operational areas, such as direct patient care areas, or using contract labor (at 2-3 times the cost), reducing the availability of that staff for other places where MGB needed them.  A. Vol. II, p. 55 (Gandhi Tr. 56).

306.    If MGB had been required to set up a surveillance testing program for unvaccinated employees, it would have had to offer such shifts to the broader workforce—such as medical assistants or patient care associates—and those who volunteered would be prioritized based on seniority under MGB's HR policies or collective bargaining agreements.  There would be a risk that the most experienced staff may want the lighter workload at a testing site, taking

them away from patient care and negatively impacting patients.  A. Vol. II, pp. 55-56 (Gandhi Tr. 57-59).

307.    Processing the tests from a surveillance testing program would require use of labs. For hospital locations that have labs, the tests would have to be run through those labs; for locations without an onsite lab, they would need to be transported to the nearest lab, which would be costly.  If MGB had to prioritize tests for unvaccinated employees, it might delay MGB patients from getting their own results, negatively impacting patient care.  A. Vol. II, p. 56 (Gandhi Tr. 59).

308.    If MGB had to create a system-wide surveillance testing program for unvaccinated employees, it would require significant resources and expense:  to get results back to employees, their supervisors and other relevant personnel; to create a mechanism to manage the testing staff, potentially diverting resources from patient care; to purchase supplies, including PCR tests, swabs, reagents, and additional PPE; and to arrange transport, facilities, security, planning, construction, finance, operations and accounting.  A. Vol. II, pp. 56-57 (Gandhi Tr. 59-64).  For most employees of MGB entities, if an employee took a COVID test, MGB would ultimately pay the cost of the test because MGB is self-funded for such insurance.  A. Vol. II, p. 53 (Gandhi Tr. 46-47).

309.    Ordinary staff turnover would have complicated a system-wide surveillance testing program for unvaccinated employees.  If a site had no unvaccinated employees on a Friday, but a new unvaccinated employee was starting at that site on Monday, MGB would suddenly need to stand up a surveillance program at that site.  A. Vol. II, p. 57 (Gandhi Tr. 62).

310.     Sheehan testified, about a surveillance testing program for unvaccinated
employees:  "So just operationally, it didn't make any sense."  A. Vol. II, p. 285 (Sheehan Tr.
129).

311.     MGB had over $1 billion in lost revenue in 2020 and 2021 and received $865
million in CARES Act funds (the maximum available).  MGB did not receive any funding from
any source to provide COVID testing, and the CARES Act funding was exhausted by other
COVID spending. MGB did not receive any funding from any outside sources as an incentive to
promote COVID vaccination.  A. Vol. II, pp. 48-49 (Gandhi Tr. 27-31).

**H.     Many Plaintiffs Contracted COVID While Unvaccinated**

312.     Most unvaccinated Plaintiffs contracted COVID and many missed work.  *See*
*e.g.*, A. Vol. III, p. 23 (Alexandrova Tr. 49) (contracted COVID January 2022); A. Vol. III, p. 52
(Bernardone Tr. 17) (tested positive May 1, 2022, out of work 10 days); A. Vol. III, p. 87
(Cadigan Tr. 51) (contracted COVID September 2021, out of work 10 days); A. Vol. III, p. 107
(DiCicco Tr. 49) (contracted COVID May 2022, a week after giving birth); A. Vol. III, p. 114
(Driscoll Tr. 35) (contracted May 2022); A. Vol. III, pp. 120-21 (Erickson Tr. 9-10) (contracted
January 2022, did not test, stayed home only when symptomatic, does not know if he was
contagious around immunocompromised people); A. Vol. III, pp. 142, 151 (Frenchwood Tr. 16,
112-13) (tested positive June 9, 2022 because symptomatic; had worked that day and previous
day with other people); A. Vol. III, pp. 169, 178-79, 180-81 (Garbitt Tr. 22, 85-86, 91-94) (tested
positive while asymptomatic on Nov. 5, 2021 after testing before a trip, missed 20 days of work);
A. Vol. III, p. 191 (Giso Tr. 37) (contracted COVID in January of 2022); A. Vol. III, p. 204
(Haiti Tr. 49) (contracted COVID three times since March 2020); A. Vol. III, p. 212 (Hamel Tr.
41) (contracted COVID in December 2021; quarantined for 14 days); A. Vol. III, pp. 226, 227

(Hirtle Tr. 15, 18-19) (tested positive January 2022, missed 5 days work; she worked the day she tested positive and the day before, and was within six feet of coworkers while potentially contagious and does not know if they contracted COVID); A. Vol. III, p. 254 (J. Holmes Tr. 8) (contracted COVID on December 23, 2021); A. Vol. III, pp. 274, 279 (Kerentsev Tr. 13, 63) (positive for Covid May 28, 2022, missed days of work); A. Vol. III, p. 325 (Rupnick Tr. 21) (contracted COVID October / November 2021); A. Vol. III, pp. 336, 337 (Shulman Tr. 13, 15) (contracted COVID in March 2020 and in January 2022, when she caught it from her college-age son); A. Vol. III, pp. 358-59 (Zaiats Tr. 62, 64-66, 67-68) (contracted COVID in fall 2021, and missed work; contracted it again, asymptomatic, after his child tested positive from an exposure at school).  *See also* A. Vol. III, pp. 288-89 (Lundin Tr. 13-14) (husband had COVID in February 2022, and she developed a cough, but did not test and still went to work with the cough).

## I.      The Vaccination Policy Worked

313.      After the Vaccination Policy was implemented, over 99 percent of MGB's workforce was vaccinated against COVID.  A. Vol. II, p. 274 (Sheehan Tr. 82).

314.      Since the Vaccination Policy was implemented, there has not been any cluster like the cluster at The Brigham in fall 2020.  A. Vol. II, p. 133 (Klompas Tr. 125) ("[S]ince we had the vaccine mandate in place we have not had a cluster anything like what we had back in fall 2020 before vaccines.").  Dr. Klompas attributes that fact to the Vaccination Policy.  A. Vol. II, p. 134 (Klompas Tr. 128).

315.      The data that health care and other essential workers have higher rates of infection than people in other fields has continued to be borne out in studies published after MGB implemented the Vaccination Policy.  A. Vol. II, p. 129 (Klompas Tr. 106-07).

MASS GENERAL BRIGHAM INCORPORATED

By Its Attorneys,

Respectfully Submitted,


*/s/ Dawn R. Solowey*
Lynn A. Kappelman (BBO# 642017)
Katherine E. Perrelli (BBO# 549820)
Kristin McGurn (BBO# 559687)
Dawn Reddy Solowey (BBO# 567757)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
kperrelli@seyfarth.com
lkappelman@seyfarth.com
kmcgurn@seyfarth.com
dsolowey@seyfarth.com
TEL: (617) 946-4800
Date: February 17, 2023         FAX: (617) 946-4801


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). *Pro se* Plaintiff Laina Frazier was served a true and accurate copy of this document by e-mail on February 17, 2023.

*/s/ Dawn R. Solowey*
Dawn R. Solowey

88206785v.8