UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TYLER ADAMS, et al., | ) )  ) |
| Plaintiffs, | ) ) Civil Action No. |
| v. | ) 21-11686-FDS ) |
| MASS GENERAL BRIGHAM INCORPORATED, | ) ) ) ) |
| Defendant. | ) ) |

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is a dispute arising from a mandatory COVID-19 vaccination policy at a major hospital network. Defendant Mass General Brigham Incorporated ("MGB") adopted a policy in June 2021 that required all of its employees to be vaccinated against COVID-19, with provisions for medical or religious exemptions under certain circumstances. More than 2,400 employees applied for exemptions; MGB granted only 234. Plaintiffs here are 160 of those employees who were denied exemptions. The complaint alleges violations of the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

After the first phase of discovery, MGB has moved for summary judgment on both the ADA and Title VII claims as to all plaintiffs. It contends that there is no genuine dispute of material fact that accommodating plaintiffs would be an undue hardship, and that plaintiffs cannot establish a *prima facie* case under the ADA as a matter of law.

This aspect of the dispute does not directly involve the legality of the vaccination policy

itself, but whether accommodating any additional employees would constitute an "undue hardship" to MGB. Nonetheless, the context in which the policy was adopted is significant.

As a major hospital and healthcare system, MGB is unquestionably entitled to rely on its own medical and scientific judgment in matters of patient health and safety, and to adopt strict infection-control policies to protect its patient and staff populations. And it has a strong interest in maintaining public confidence in the safety of its facilities.

It is also true that substantial deference must be given to the judgments of a hospital organization struggling to cope with a worldwide pandemic. And it is emphatically not the role of the federal courts simply to second-guess those judgments, or to substitute its own views for those of trained medical personnel.

In short, MGB was entitled to make a medical and scientific judgment as to the safety and efficacy of the COVID-19 vaccines, and to determine whether a mandatory vaccination policy was appropriate. It was not required to permit its staff to take unnecessary risks with patient health and safety. Nor was it required to accommodate irrational fears or conspiracy theories. Indeed, it is possible that MGB could have reasonably concluded that *all* of its employees should be vaccinated, without exception, and to have adopted a zero-tolerance policy toward those who refused to do so.

Instead, however, MGB set up a process under which a relative handful of employees were granted exemptions from the vaccination requirement on religious or medical grounds, and permitted to continue to work while wearing masks. It thus effectively made a determination that some level of risk—eventually, involving 234 unvaccinated individuals out of approximately 93,600 employees—was tolerable.

MGB now contends that permitting 160 additional employees to remain unvaccinated

would impose an "undue hardship" within the meaning of federal law due to the additional risk that those persons would present. It characterizes that additional risk as exponential, rather than merely incremental. However, even assuming the truth of that assertion—and even assuming that the adoption of the vaccination policy was entirely appropriate and lawful—it does not follow that summary judgment can be granted as to the claim of every plaintiff in this lawsuit.

This dispute does not involve an all-or-nothing proposition, in which the Court is required to conclude either that all 160 employees must be granted exemptions, or none of them. MGB made a series of separate exemption decisions as to each plaintiff. The complete factual context in which those decisions were made is not presently before the Court. It is possible, of course, that every one of those decisions was entirely defensible, indeed correct. But it is also possible that some subset of those decisions, even a single one, was improper. And the Court cannot conclude, at least on this record, that the additional risk—which could, conceivably, arise out of a differential between 234 and 235 unvaccinated employees—warrants the entry of summary judgment in MGB's favor in the aggregate as to every claim.

The claims of six specific plaintiffs, however, are on a different footing. As to each of those claims, MGB has established that the undisputed facts—for example, the failure of a plaintiff to offer proof of a medical condition—warrant the entry of summary judgment.

Accordingly, and for the following reasons, MGB's motion for summary judgment will be granted in part and denied in part.

I.  **Background**

    A.  **Factual Background**

The following facts are undisputed unless noted otherwise.

        1.  **The Parties**

MGB is a major health-care system comprising multiple institutions, including

Massachusetts General Hospital, Brigham and Women's Hospital, and Massachusetts Eye and Ear Infirmary.  (Gilbreth Decl. ¶ 5, Def.'s App'x, Vol. I at 78; Pls.' SMF ¶ 1).  MGB employs 6,500 physicians, 9,100 nurses, and 78,000 other workers.  (Klompas Decl. ¶ 5, Def.'s App'x, Vol. I at 24).  It provides care for 1.5 million patients annually, including "some of the most complicated and vulnerable patients in the world."  (*Id.* ¶ 6; Pls.' SMF ¶ 2).

Plaintiffs are 160 former employees of MGB.  (*See generally*, Def.'s App'x, Vol. V).[1]  They worked in various capacities at MGB, including roles that directly provided medical care or assistance to patients.  (*See* Chart D, Def.'s App'x, Vol. IV at 7-10; Pls.' SMF ¶ 259).[2]  Other plaintiffs worked in direct proximity to patients and staff.  (*E.g.*, Erickson Dep. at 101, Def.'s App'x, Vol. III at 131).[3]  Of the 21 plaintiffs who contend that their work was remote, 17 acknowledge that they had been on-site at an MGB entity at least once since January 1, 2019.  (*See* Chart C, Def.'s App'x, Vol. IV at 5-6; Pls.' SMF ¶ 261).

### 2.  COVID-19

COVID-19 is a contagious viral disease that can cause serious illness and death.  As of this writing, more than 1.1 million people in the United States have died from COVID-19.  CTRS. FOR DISEASE CONTROL AND PREVENTION, PROVISIONAL DEATH COUNTS FOR COVID-19 (2023) (last updated September 13, 2023).  COVID-19 is particularly dangerous for the elderly, and for people with lung conditions; heart disease; brain and nervous system conditions; diabetes;

---

[1] Plaintiffs' corrected amended complaint included 223 plaintiffs.  (ECF No. 61).  Of those, 47 plaintiffs voluntarily dismissed their claims (ECF Nos. 70, 73, 76, 89, 96, 97, 139); 15 plaintiffs were dismissed for failure to prosecute (ECF No. 99); and one plaintiff was dismissed as a sanction for failure to make discovery (ECF No. 140).  (*See also* Def.'s Mem. at 18 n.7).

[2] The Court cites MGB's summaries of the discovery questionnaire responses for convenience.  The questionnaire responses are in Volume V of MGB's appendix to its motion for summary judgment.

[3] For example, plaintiff Christopher Erickson "occasionally" visited the oncology inpatient floors in his capacity as a clinical business analyst, walking around patients with cancer and undergoing chemotherapy.  (Erickson Dep. at 101, Def.'s App'x, Vol. III at 131).

4

obesity; cancer; certain blood disorders; a weakened immune system; chronic kidney or liver diseases; and Down syndrome. MAYO CLINIC, COVID-19: WHO'S AT HIGHER RISK OF SERIOUS SYMPTOMS? (July 21, 2023).

The first known case of COVID-19 occurred in China in December 2019. *See* WORLD HEALTH ORG., ARCHIVED: WHO TIMELINE – COVID-19 (Apr. 27, 2020). By March 2020, it had spread into a worldwide pandemic. *Id.*

### 3. The Initial Response

In its initial response to the COVID-19 pandemic, MGB implemented several infection-control policies. MGB implemented a universal mask mandate for employees and patients; tested all patients on admission; restricted visitors; and required that symptomatic employees stay home. (Klompas Dep. at 124-25, Def.'s App'x, Vol. II at 133; *see also* Pls.' SMF ¶¶ 19, 21).[4]

Despite those measures, MGB saw COVID-19 spread inside its hospitals. "Clusters" of hospital-acquired infections emerged before June 2021. (Klompas Dep. at 54, Def.'s App'x, Vol. II at 116; Pls.' SMF ¶ 22). The hospital was able to "link together" 14 patient infections and 38 staff infections in a single cluster in fall 2020 "through whole genome sequencing." (Klompas Dep. at 124, Def.'s App'x, Vol. II at 133; Pls.' SMF ¶ 23).

### 4. The COVID-19 Vaccination Policy

In late 2020 and early 2021, the FDA authorized the emergency use of three different vaccines against COVID-19. The three vaccines were developed and produced by Pfizer, Moderna, and Johnson & Johnson. U.S. FOOD & DRUG ADMIN., COVID-19 VACCINES (2022)

---

[4] Plaintiffs request that some of Dr. Klompas's opinion be struck as premature expert testimony. (Pls.' SMF ¶ 23). However, Dr. Klompas testified to his direct observations of the spread of COVID-19 in MGB facilities, and was not testifying as an expert.

(last updated June 16, 2023).

On June 24, 2021, the CEO of MGB announced to staff that MGB would require all staff to receive a COVID-19 vaccination, with certain exceptions for those who qualified for a medical or religious exemption. (Klompas Decl. ¶ 9, Def.'s App'x, Vol. I at 24; Pls.' SMF ¶ 51). MGB policymakers relied on scientific studies showing that the vaccines were safe and effective; that vaccinated persons were less likely to carry COVID-19 than unvaccinated persons; that vaccinated persons shed COVID-19 for a shorter time than unvaccinated persons; and that vaccinated persons were less likely to shed replicable COVID-19. (*E.g.*, Klompas Dep. at 108-10, Def.'s App'x, Vol. II at 129). A deadline of September 3, 2021, was set for MGB employees to request an exemption. (Klompas Decl. ¶ 14; Pls.' SMF ¶ 127).

At the time that MGB announced the vaccination policy, its policymakers did not know how many employees would request exemptions. (Hashimoto Dep. at 35, Def.'s App'x, Vol. II at 69; Pls.' SMF ¶ 124). MGB's goal was "100 percent" vaccination, with as few exemptions as possible. (Sheehan Dep. at 74, Def.'s App'x, Vol. II at 272; Pls.' SMF ¶ 137). However, MGB did not set a quota for unvaccinated employees or exemptions. (Sheehan Dep. at 74, Def.'s App'x, Vol. II at 272; Pls.' SMF ¶ 135).

Dean Hashimoto, MGB's Chief Medical Officer, Workplace Health and Wellness, developed and led the medical-exemption process. (Hashimoto Decl. ¶¶ 1, 3, Def.'s App'x, Vol. I at 1-2; Pls.' SMF ¶ 159). MGB created a form where an employee could check boxes listing possible contraindications for the COVID-19 vaccine. (Hashimoto Decl. ¶¶ 6-7, Def.'s App'x, Vol. I at 2-3; Pls.' SMF ¶ 162). The form also allowed an employee's health-care provider to identify other medical reasons in favor of exemption. (Hashimoto Decl. ¶ 11, Def.'s App'x, Vol. I at 3-4; Pls.' SMF ¶ 162). Once an employee filled out the form, their provider was required to

complete and sign the form, and then send the form to a dedicated email address. (Hashimoto Decl. ¶¶ 6, 12, Def.'s App'x, Vol. I at 2-4; Pls.' SMF ¶ 161). Two panels assembled by MGB would then review requests. (Hashimoto Decl. ¶¶ 13-16, Def.'s App'x, Vol. I at 4; Pls.' SMF ¶ 163). The panels' objective was to be prompt and rigorous, in order to minimize the number of unvaccinated staff at MGB. (Hashimoto Decl. ¶ 18, Def.'s App'x, Vol. I at 4-5; *see* Pls.' SMF ¶ 155). The panels generally followed CDC guidance on medical contraindications. (Hashimoto Decl. ¶ 29, Def.'s App'x, Vol. I at 7; Pls.' SMF ¶¶ 162, 166).

Vanessa Gilbreth, MGB's Senior Legal Counsel, Office of the General Counsel, developed and led the religious-exemption process. (Gilbreth Decl. ¶¶ 1-2, Def.'s App'x, Vol. I at 78; Sheehan Dep. at 20, 29, Def.'s App'x, Vol. II at 258-60; Pls.' SMF ¶¶ 199-200). In order to request a religious exemption, an employee had to enter information into an online form. (Nichols Decl. ¶ 7, Def.'s App'x, Vol. I at 60).[5] The form asked the employee to identify their "sincerely held religious belief, practice or observance" and explain why "it prevent[ed] [him or her] from receiving a COVID-19 vaccine." (*Id.* ¶ 8). The form advised that additional information or supporting documentation might be necessary. (*Id.*). There was no limit on the number of characters that an employee could enter. (*Id.* ¶ 9).[6] Requests were reviewed by the Religious Exemption Review Committee ("RERC"), whose members were human-resources professionals drawn from various MGB entities. (*Id.* ¶ 10). Members of the RERC underwent training on how to review exemption requests. (*See, e.g.*, RERC Mem. Dep. at 17-18, Def.'s App'x, Vol. II at 174-75). The RERC would follow up with employees who raised a

---

[5] Plaintiffs dispute whether this was the only requirement of the policy, because the form also required employees to abide by MGB's masking policy. (Pls.' SMF at ¶ 201).

[6] The parties disagree as to whether the text box in the form expanded to accommodate longer answers. The form says, "free form and will expand." (Def.'s App'x, Vol. I at 76). However, plaintiffs contend that the text box did not, in fact, expand. (Pls.' SMF at ¶ 202).

"substantive religious objection" to vaccination and request more information from them. (Nichols Decl. ¶¶ 26-27, Def.'s App'x, Vol. I at 64).

### 5. Outcome of the Exemption Process

By November 4, 2021, MGB had received 2,402 requests for religious or medical exemptions from its mandatory vaccination policy. Ultimately, it granted 234 exemptions. (Gilbreth Decl. ¶ 6; Def.'s App'x, Vol. I at 78-79; Pls.' SMF ¶ 252).

All 160 plaintiffs have requested religious or medical exemptions. All their requests were denied, and they were terminated. (*See, e.g.*, Hashimoto Decl. ¶¶ 43-54, Def.'s App'x, Vol. I at 10-12; Nichols Decl. ¶¶ 43-74, Def.'s App'x, Vol. I at 67-71).

Ultimately, more than 99% of MGB's workforce was vaccinated. (Sheehan Dep. at 82, Def.'s App'x, Vol. II at 274; Pls.' SMF ¶ 253). Less than 1% were terminated for noncompliance with the mandatory vaccination policy. (Walls Dep. at 32-33, Def.'s App'x, Vol. II at 299; Pls.' SMF ¶ 256). Another COVID-19 cluster has not emerged at MGB. (Klompas Dep. at 125, Def.'s App'x, Vol. II at 133).

### 6. Later Developments

From November 1, 2021, to July 12, 2022, MGB hired 14,000 new employees, of whom 40 were granted religious, medical or temporary exemptions. (Sheehan Dep. at 35, Def.'s App'x, Vol. II at 262). According to MGB, the added risk was acceptable because "these people had legitimate exceptions." (Walls Dep. at 87-88, Def.'s App'x, Vol. II at 313).

### B. Procedural Background

On October 17, 2021, plaintiffs brought this suit against MGB. The initial complaint asserted claims for violation of the Americans with Disabilities Act, religious discrimination in violation of Title VII, and unlawful retaliation.

On November 4, 2021, the Court denied plaintiffs' motion for a preliminary injunction

against MGB. A written opinion followed on November 10, 2021.

On December 17, 2021, the Court entered a scheduling order. The order created two phases of fact discovery, with the second phase to follow the resolution of dispositive motions. The parties have since engaged in extensive fact discovery, and the first phase of fact discovery is now complete.

Also on December 17, 2021, plaintiffs filed an amended complaint. The amended complaint retained the ADA and Title VII claims, but omitted the retaliation claims. More than one hundred new plaintiffs joined the action.

MGB has moved for summary judgment as to all claims. It contends that granting plaintiffs' proposed exemptions would have imposed an undue burden. As a result, it argues, plaintiffs' claims under Title VII and the ADA must fail. It also contends that the claims of 22 plaintiffs who sought medical exemptions must fail as a matter of law. Plaintiffs oppose summary judgment.

## II.     Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st

Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### III. Analysis

#### A. "Undue Hardship" Under Title VII and the ADA

MGB has moved for summary judgment as to all plaintiffs on the grounds that providing the requested accommodations would impose an undue burden.

The accommodations requested by plaintiffs are not precisely clear. It appears, however, that they seek to be treated similarly to those employees who have been approved for an exemption; among other things, MGB requires such unvaccinated employees to adhere to a masking policy. (*See* Pls.' Mem. at 7-8; Sheehan Dep. at 68-69). The Court will therefore assume, for present purposes, that masking is the principal requested accommodation.

##### 1. Legal Standard

###### a. Title VII – Religious Discrimination

Title VII requires an employer to accommodate the religious practice of an employee unless it "demonstrates that [it] is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The Supreme Court has recently clarified that "undue hardship" is shown "when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023).

A court must take into account "all relevant factors in the case at hand, including the particular accommodations at issue, and their practical impact in light of the nature, size and

operating cost of an employer." *Id.* at 2295 (quotation marks and alterations omitted).[7]  Courts examine specific hardships imposed by specific accommodation proposals.  *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 135 (1st Cir. 2004).  Considerations include not only direct economic costs, but indirect ones related to health and safety.  *See* U.S. EQUAL EMP. OPPORTUNITY COMM'N, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS: § L (2021).  An employer's "los[s] [of] control over its public image" may be a relevant factor.  *Cloutier*, 390 F.3d at 137.

### b. ADA – Disability Discrimination

Under the ADA, employers may not discriminate against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

A "qualified individual" is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  To be a qualified individual, an employee must show "(1) 'that she possesses the requisite skill, experience, education and other job-related requirements for the position'; and (2) 'that she is able to perform the essential functions of the position with or without reasonable accommodation.'"  *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017) (quoting *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006)).

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the

---

[7] In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), the court used the language "more than a *de minimis* cost" to describe an employer's burden in a Title VII religious accommodation case.  *Id.* at 84.  In *Groff*, it clarified that *Hardison* "cannot be reduced to that one phrase," and that a test focusing on "substantial" burdens better adhered to the text of Title VII.  *Groff*, 143 S. Ct. at 2294.

employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). "Undue hardships are not limited to financial impacts; the term includes accommodations that are unduly extensive, substantially disruptive, or that would fundamentally alter the nature or operation of the business." *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 650 (1st Cir. 2000). Other factors considered as to undue hardship "include the cost of the accommodation, the effect on expenses and resources, the impact of the accommodation on the operation of the facility (including on other employees' ability to do their jobs) and the impact on the facility's ability to conduct business." *Id.* at 649.

A "significant degree of deference" must be given to an employer's own business judgment about the requirements of a position. *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012).

### 2. Analysis

This aspect of the dispute does not focus on the nature of the requested accommodation, but on the number of persons to whom such an accommodation can be given. MGB contends that providing any additional exemptions to its mandatory vaccination policy would create an undue hardship for its operations.[8] It argues that even a marginal reduction in its overall vaccination rate would be problematic for two reasons.

First, it contends that even a marginal reduction would "exponentially" increase the risk of COVID-19 transmission in MGB facilities. Dr. Ron Walls, the chief operating officer of MGB, testified that it could not risk that

---

[8] MGB contends that accommodating additional employees would lower the overall vaccination rate both directly (because of the specific affected employees) and indirectly (because a more permissive exemption process would "lead to more employees requesting exemptions with less and less clear grounds for exemption, resulting in more unvaccinated employees and increased risk to patients and employees"). (*See* Def.'s SMF ¶¶ 149-50).

> someone who was working remotely or even working in a site where they had very little exposure to people, that they would go to a training session or have to go into Occupational Health or have to go to a meeting or do something where they could expose one, two, three, four, ten people. Each of those ten people then can go out and expose ten more people. You just can't afford that kind of risk. It's exponential.

(Walls Dep. at 84, Def.'s App'x, Vol. II at 312). He analogized unvaccinated people to drunk drivers, testifying that

> [if] [y]ou have one on the road, you have one. If you have 100 on the road, you have 100 . . . I think a single person in addition to [unvaccinated employees who had been granted exemptions] is an unnecessary risk.

(*Id.* at 87, Def.'s App'x, Vol. II at 313).

Second, MGB contends that granting additional exemptions would undermine its public reputation for patient safety, deterring patients from seeking care. Dr. Walls testified that "public trust" was an important priority for MGB, and that it was important to commit to "the safest possible way." (Walls Dep. at 69, 19, Def.'s App'x, Vol. II at 308, 296). He further testified that, at the time, many patients were staying home, "terrified of COVID." (*Id.* at 69, Def.'s App'x, Vol. II at 308). It is undisputed that patients' fear of COVID-19 caused many patients to stay home.[9] And it is undisputed that patients were concerned about MGB's COVID-19 safety policies. (Walls Dep. 73-74, Def.'s App'x, Vol. II at 309-10; Pls.' SMF ¶ 83). Indeed, 41 plaintiffs here admitted that a patient or patient's family member asked them if they had been vaccinated against COVID-19 or expressed concern about whether staff were vaccinated against COVID-19. (Chart O, Def.'s App'x, Vol. IV at 26; Pls.' SMF ¶¶ 24-31).

As noted, it seems entirely possible that MGB could have reasonably concluded that all

---

[9] There is evidence that patients with stroke symptoms, heart attacks, cancer, and other severe medical problems were reluctant to come to the hospital. (*Id.* at 69-71). Dr. Klompas testified that patients were "sicker and [ ] need[ed] more acute care when they did reach their provider at MGB." (Klompas Decl. ¶ 26).

of its employees should be vaccinated, without exception.[10]  Alternatively, it could have reasonably concluded that some subset of its employees—for example, those employees with patient-facing job responsibilities—must be vaccinated.  It concluded, instead, that some relatively small degree of risk was acceptable—in other words, that if only a small number of employees was not vaccinated, the resulting level of risk was not unduly dangerous.

Furthermore, MGB did not set a quota—that is, a maximum number or percentage of employees who could be accommodated.  Instead, it adopted what it calls a "rigorous" review process, probably in the hope and expectation that the number of exemptions granted by such a process would be relatively few.  Again, and whatever its motivation or expectations, MGB elected to pick and choose among its employees rather than to impose a zero-tolerance vaccination policy.

Viewed from a high-level perspective, MGB's judgment appears to have been well within the requirements of the law.  Again, it could have been less generous in granting exemptions—either not granting them at all, or granting them only to back-office or remote workers.  Nonetheless, the difficulty here—at least for present purposes—is that this case involves both a set of high-level judgments by MGB (that is, whether to require vaccinations generally, whether to permit exemptions under certain circumstances, and if so, according to what procedures) and a series of separate low-level individual judgments (that is, whether a particular employee qualified for a particular exemption).  Even if the high-level decisions were fair and correct, all of the low-level ones may not have been.  Put another way, it is possible that

---

[10] If a hospital can require other infection-control measures (such as requiring scrubbing and sterilization and safe handling of medical waste), it is not clear why mandatory vaccinations should not be permissible as well.  It is true that vaccinations involve the ingestion of a product, which some persons might be unwilling or unable to do; nonetheless, there are many jobs across a wide variety of industries that involve *bona fide* occupational requirements, and it is not obvious why the ability (or willingness) to take a vaccine, in the setting of a hospital during a worldwide pandemic, could not be treated as a disabling characteristic.

one or more of those judgments was in fact discriminatory, even if the overall policy was not. And that distinction, at least on this record, precludes the entry of summary judgment.

Suppose, for example, that one employee—and only one employee—did, in fact, experience unlawful discrimination on the basis of religion. Had that employee been granted an exemption, the total number of exempt employees would have risen from 234 to 235. Presumably, it would be challenging for MGB to prove that a single marginal case would have materially increased the risk (particularly if the employee in question did not normally have patient-facing responsibilities), and that therefore the burden of making the requested accommodation was undue. It is not possible, on the current record, to evaluate the undue hardship created by any one specific accommodation—even if it is possible to do so on a wholesale basis.[11]

It is, of course, true that precision in measuring epidemiological risk is not possible, and that therefore it is impossible to state with complete confidence the exact additional risk enhancement posed by each additional exemption granted. And it is surely true that the additional risk posed by granting hundreds, or indeed thousands, of additional exemptions would have been substantial. But based on the record before it, the Court cannot grant summary judgment as to every individual claim on the basis of undue hardship considered as a whole. The fact that the overall decisions made by MGB may have been entirely reasonable does not necessarily mean that reversing a single individual decision would create such a hardship.

Accordingly, the Court will not grant summary judgment as to all claims on the basis that plaintiffs' requested accommodation is an undue hardship.

---

[11] As a result, and somewhat ironically, plaintiffs may be in a better position than if MGB had never given them an opportunity to demonstrate that they were entitled to a religious or medical exemption and simply terminated everyone who refused to be vaccinated.

B.     **"Qualified Individuals" under the ADA**

MGB further contends that no plaintiff is a "qualified individual," because their unvaccinated status made them direct threats to others.

Under the ADA, a plaintiff is not a "qualified individual" if he or she poses a "direct threat" to the health or safety of other individuals in the workplace.  42 U.S.C. § 12113(b).  "Where [plaintiff's] essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others." *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997); *see also School Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 n.16 (1987) (stating, in case concerning Rehabilitation Act, that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk").  Factors relevant to determining whether a plaintiff is a direct threat include "the nature of the risk (how the disease is transmitted)," "the duration of the risk (how long is the carrier infectious)," "the severity of the risk (what is the potential harm to third parties)," and "the probabilities the disease will be transmitted and will cause varying degrees of harm." *Arline*, 480 U.S. at 288.

MGB's argument that the plaintiffs in this action represent "direct threats" to others in the workplace, and therefore are not "qualified individuals," is based on the marginal additional risk posed by each additional unvaccinated employee.  As with the argument concerning "undue hardship," the Court cannot grant summary judgment as to every individual claim on that basis.  Again, and at a minimum, there are disputed issues of material fact as to the severity of the marginal risk and the probability of additional harm.  Accordingly, summary judgment as to that issue will be denied.

16

### C. "Reasonable Accommodation" under the ADA

Under the ADA, a plaintiff must "explain how the [proposed] accommodation is linked to [her] disability." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012). *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020) ("Accommodations must be necessary considering the employee's physical limitations. . . . An employee might not always need to show his accommodation is medically necessary to win a failure to accommodate claim. But he must do so when asked by his employer.").

MGB contends that where a plaintiff's medical conditions were not covered by a CDC contraindication for the vaccine, an exemption from the vaccine policy was not a reasonable accommodation. It is undisputed that every plaintiff in this case who sought a medical exemption "was determined by MGB experts not to have a CDC contraindication to COVID vaccination." (Pls.' SMF ¶ 197). Seven plaintiffs specifically concede that no contraindication applies to their own medical conditions. (Pls.' SMF ¶ 198).

The problem with MGB's argument is that it is also undisputed that in "rare exceptions" MGB approved "an exemption that was not based on a CDC contraindication." (Pls.' SMF ¶ 176; Hashimoto Tr. at 47, Def.'s Vol. II at 72). Those exceptions include "a couple of neurological cases in which there was close proximity between neurological changes and the vaccine, after consultation with MGB neurology or immune-neurology specialists." (Pls.' SMF ¶ 176; Hashimoto Tr. at 47-48, Def.'s Vol. II at 72). When asked if any requests were granted for mental conditions such as PTSD, Dean Hashimoto asserted that he could not "say for sure," but recalled reviewing behavioral-health requests to ensure consistent handling. (Hashimoto Tr. at 48, Def.'s Vol. II at 72).

Thus, MGB granted exemptions to at least a small number of other employees who did not have a condition for which the vaccine was expressly contraindicated by the CDC. The

17

current record does not disclose the precise standard used to determine those exemptions. And while plaintiffs do not dispute that their conditions are not listed by the CDC as contraindications, they do assert that they had other valid medical reasons for avoiding vaccination. The validity of those reasons is, to be sure, disputed. But under the circumstances, the Court cannot grant summary judgment as to the claims of every ADA plaintiff who did not seek a medical exemption based on a condition as to which there is a CDC contraindication.

### D. Plaintiff-Specific Challenges

MGB further contends that nine plaintiffs cannot show they are disabled as a matter of law.[12]

First, it is undisputed that plaintiff Jill Driscoll did not submit a medical-accommodation request. (Driscoll Questionnaire at 3, Def.'s App'x, Vol. V at 591; Pls.' SMF ¶ 190). Having failed to do so, her claim under the ADA necessarily fails.

Second, it is undisputed that plaintiffs Melissa Pinnetti, Scott Hooper, and Frivian Vicente did not provide a letter from a physician supporting their medical-exemption requests. (Pls.' SMF ¶ 191). As to plaintiff Vicente, the corrected amended complaint does not allege an ADA claim, and therefore there is no such claim as to which summary judgment can be granted. As to the claims of plaintiffs Pinnetti and Hooper, however, the omission is fatal. "An employer may require that the documentation about the disability and the functional limitations come from

---

[12] MGB has moved for summary judgment as to the claims of plaintiffs Blank, Vicente, and Valstyn, among others. (*See* Def.'s Mem. at 29, 30). However, as to those three plaintiffs, the corrected amended complaint alleges only that religious accommodations, not disability accommodations, were denied. (ECF No. 61 ¶¶ 52, 104, 213, 226). That complaint contends that 24 plaintiffs were denied a disability accommodation: Lancione, Miller, DiFronzo, Saccoccio, Dufrene, Fluery, Haines, Hooper, Marconi, Reynolds, Ritrovato, Wade, Driscoll, Williams, Tyler Adams, Candido, Cates, Doherty, Pierre, Pinnetti, Wines, Tone, Donegan, and Pasquantonio. (ECF No. 61 ¶¶ 6-29). While Blank, Vicente, and Valstyn may have submitted medical exemption requests, (*see* Blank Questionnaire, Def.'s App'x, Vol. V at 203, *but see id.* at 199; Vicente Rodriguez Questionnaire, Def.'s App'x. Vol. V at 2043; Valstyn Questionnaire, Def.'s App'x, Vol. V at 2001), on the face of the complaint, they did not assert ADA claims. In their briefing, counsel for plaintiffs did not defend the claim of any specific plaintiff. (*See* Pls.' Mem. at 28-29).

18

an appropriate health care or rehabilitation professional." U.S. EQUAL. EMP. OPP. COMM'N, EEOC-CVG-2003-1, ENFORCEMENT GUIDANCE ON REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE ADA: REQUESTING REASONABLE ACCOMMODATION (2002); *see Tchankpa*, 951 F.3d at 813 ("An employee might not always need to show his accommodation is medically necessary to win a failure to accommodate claim. But he must do so when asked by his employer."); *Schack v. Parallon Enterprises, LLC*, 2023 WL 4146238, at *2 (4th Cir. June 23, 2023) ("Because [plaintiff] did not provide the required medical documentation, the district court did not err by granting [defendant] summary judgment on this [failure to accommodate] claim."). Under the circumstances, MGB reasonably declined to accept their claims of disability, and summary judgment will be granted.

Third, five plaintiffs (Lora Blank, Jill Driscoll, Lori Fluery, Susan Marconi, and Corrine Valstyn) have conceded that their reported medical conditions did not substantially limit any major life activity. (*See* Chart K, Def.'s App'x, Vol. IV at 20; Valstyn Questionnaire at 7, Def.'s App'x, Vol. V at 2005; Pls.' SMF ¶ 193).[13] Such a limitation is a necessary component of an ADA claim. As to plaintiffs Blank and Valstyn, the complaint does not assert an ADA claim, and therefore there is no claim as to which summary judgment can be granted. Summary judgment is, however, appropriate as to the claims of plaintiffs Driscoll, Fluery, and Marconi.

Finally, it is undisputed that two plaintiffs (Lora Blank and Kerry Haines) sought medical exemptions on the basis of pregnancy without providing evidence of pregnancy-related complications. (Pls.' SMF ¶ 194). Again, as to plaintiff Blank, the complaint does not assert an

---

[13] "Evidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability"; the impairment must substantially limit one or more of an individual's "major life activities." *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011). Major life activities include basic tasks such as working, seeing, hearing, speaking, and breathing. 42 U.S.C. § 12102(2)(A). They also include "the operation of a major bodily function," including immune system functions, digestion, and normal cell growth. 42 U.S.C. § 12102(2)(B).

ADA claim. Plaintiff Haines did not identify any pregnancy-related complications sufficient to render her "disabled" as a matter of law. (*See* Chart L, Def.'s Vol. IV at 21; Haines Questionnaire, Def.'s Vol V at 926). Pregnancy alone is not a "disability" within the meaning of the ADA (although complications resulting from pregnancy may be). *See Navarro v. Pfizer Corp.*, 261 F.3d 90, 97 (1st Cir. 2001); U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-CVG-2015-1, ENF'T GUIDANCE ON PREGNANCY DISCRIMINATION & RELATED ISSUES (2015) (stating that "[a]lthough pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA"). Haines has therefore failed to make a showing of qualifying impairment, and her claim necessarily fails.

Under the circumstances, the Court will grant summary judgment as to the ADA claims of plaintiffs Jill Driscoll, Melissa Pinnetti, Scott Hooper, Lori Fluery, Susan Marconi, and Kerry Haines.

### IV.  Conclusion

For the foregoing reasons, the motion for summary judgment is GRANTED as to the ADA claims of plaintiffs Jill Driscoll, Melissa Pinnetti, Scott Hooper, Lori Fluery, Susan Marconi, and Kerry Haines, and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: September 28, 2022          Chief Judge, United States District Court