**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TYLER ADAMS, MICHELLE ORFANOS, AND JAMIE STEVERMAN, <br><br> Plaintiffs, <br><br> v. <br><br> MASS GENERAL BRIGHAM INCORPORATED, <br><br> Defendant. | Civil Action No. 1:21-cv-11686-FDS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF STEVERMAN'S CLAIM**

Defendant Mass General Brigham Incorporated ("MGB") submits this Memorandum of Law in support of its Motion for Summary Judgment on the claim of Plaintiff Jamie Steverman ("Plaintiff") pursuant to Fed. R. Civ. P. 56. The Court's Phase I summary judgment order—which is the law of this case—makes clear that undue hardship determinations will be made individually, on Plaintiff-specific records. Doc. 173 at 3. On this undisputed record, allowing Plaintiff to remain unvaccinated as a hospital nurse in Massachusetts General Hospital's ("MGH") Emergency Department would have imposed an undue hardship as a matter of law.

**INTRODUCTION**

MGB is one of the world's premier health care systems, serving 1.5 million patients a year, including those with some of the most medically complicated conditions in the world. In the height of the global COVID-19 (COVID) pandemic, to protect its vulnerable patient population, staff, visitors, and the public from COVID infection, MGB relied on public health guidance, scientific data, and the clinical judgment of its world-renowned experts to implement a policy in 2021 requiring all staff to be vaccinated against COVID absent an approved medical or religious exemption (the "Vaccination Policy"). It did so for compelling reasons including: despite its

extensive precautions, the virus was still spreading in hospitals; patients were deferring care for fear of contracting COVID; and public health guidance and clinical data showed that the COVID vaccines were safe and effective.  Failing to protect MGB's employees, patients, and visitors from illness amid a global pandemic would adversely impact MGB's workforce and hurt patient care.

This case arises out of MGB's enforcement of its Vaccination Policy with respect to Plaintiff Jamie Steverman, who worked as a Registered Nurse at MGH and applied for a religious exemption.  The undisputed evidence shows that Plaintiff worked in MGH's Emergency Department, providing care to elderly and medically vulnerable patients in a role requiring constant in-person interaction with patients, colleagues, and visitors during the height of the pandemic.  As a matter of law, allowing Plaintiff to remain in her position unvaccinated would have imposed an undue hardship on MGB's operations.

## FACTUAL BACKGROUND

### A.    MGB and Plaintiff's Job Duties as an In-Person Hospital Nurse

As of November 2021, MGB was comprised of at least 16 member institutions, including hospitals (such as MGH), providers' offices, outpatient centers, rehabilitation facilities, and urgent care clinics. Phase I Statement of Undisputed Facts (Doc. 150) ("SOUF I") ¶ 1; Plaintiff's Concise Statement of Material Facts from Phase I Summary Judgment ("PSMF I"), ¶ 1 (Undisputed) (Doc. 154).  With more than 80,000 personnel, MGB was and is the largest academic health system and private employer in Massachusetts, caring for 1.5 million patients annually.  SOUF I ¶¶ 1-2; PSMF ¶¶ 1-2.  MGB considers it critical that it is—and is perceived by the public to be—a safe place for acutely ill patients to seek care. SOUF I ¶ 3; PSMF ¶ 3.

From 2012 until her termination in November 2021, Plaintiff worked at MGH's Emergency Department Observation Unit as a Registered Nurse.  MGB's Phase II Statement of Undisputed Facts as to Plaintiff Jamie Steverman. ("SOUF II") ¶ 2.  The Observation Unit provides

short-term monitoring and treatment, often up to 24 hours, for patients with conditions such as possible heart attacks or infections, to determine whether they can be safely discharged or require hospital admission. SOUF II ¶ 3.

Plaintiff was responsible for seeing and treating patients in the Emergency Department, which required regular, physical contact with her patients, including "head-to-toe" assessments of patients at their bedside, "hands-on" examinations of patients, moving patients, administering medications, placing IVs, drawing blood, and checking vital signs.  Plaintiff saw patients including the elderly and those suffering from a variety of conditions, including heart conditions, TIAs (transient ischemic attacks, or "mini-strokes"), gastrointestinal issues, and skin conditions.  SOUF II ¶¶ 4, 7-9, 12-14.  Plaintiff worked 12-hour shifts and cared for approximately three to five patients per shift.  SOUF II ¶¶ 16-17.  There was no way to do her job other than in person, nor was it possible for Plaintiff socially distance from patients or others when she performed her duties. SOUF II ¶¶ 6, 19.  She admits that her patients asked if she was vaccinated.  SOUF II ¶ 18.  She interacted with colleagues (including doctors, other nurses, nurse practitioners, nursing assistants and staff such as environmental services employees who cleaned patient rooms), family members of patients, and hospital visitors during each of her shifts.  SOUF II ¶¶ 15, 23-25.  She worked in close proximity to other nurses at a windowless nurses' station, spent time in the breakroom with others several times every shift, and ate and drank with others without a mask.  SOUF II ¶ 26-31.

**B.      The Pandemic and MGB's Decision to Implement the Vaccination Policy**

COVID is a highly contagious viral disease that can cause serious illness and death. SOUF I ¶ 52; PSMF ¶ 52.  More than 1,000,000 Americans have died from COVID.  SOUF I ¶ 13; PSMF ¶ 13.  During the pandemic, MGB's patients included medically vulnerable people at higher risk for serious disease and death from COVID.  SOUF I ¶¶ 2, 17; PSMF ¶¶ 2, 17.  COVID placed an immense burden on MGB as a healthcare system, and on its patients and employees. SOUF I ¶ 53;

3

PSMF ¶ 53.  MGB's pandemic experience was that, even with other infection control measures in place, there continued to be COVID transmission in hospitals, and more measures were needed to protect patients and staff.  SOUF I ¶¶ 21-23; PSMF ¶¶ 21-23.  MGB's senior leadership, including world renowned experts in infectious disease and infection control, determined that a staff vaccination requirement was a necessary additional measure. SOUF I ¶¶ 47-49; PSMF ¶¶ 47-49.

The state of the pandemic in mid-2021 drove the decision to implement the Vaccination Policy; healthcare systems worldwide, including MGB, were confronting an unprecedented public health emergency.  SOUF I ¶ 52-54; PSMF ¶¶ 52-54.  MGB determined that the Vaccination Policy was necessary given the unique emergency created by the COVID pandemic; the unique threat of severe illness and death associated with COVID, especially in hospitalized patients; the additional stresses on its already overburdened system created by the highly contagious Delta variant; its responsibility to maintain the highest possible level of patient care; its need to protect patients, staff and visitors; its need to maintain staffing levels to provide patient care; its need as a major hospital system to inspire public trust so that the public would feel safe accessing care; the determination that alternatives, such as masking, periodic testing, or social distancing, were impracticable and inadequate in healthcare settings; and its concern that the fall/winter of 2021/2022 would see a rise in COVID cases.  SOUF I ¶ 52; PSMF ¶ 52.  MGB determined there was an extra onus on its healthcare workers treating medically vulnerable patients to protect themselves from COVID to the fullest extent possible.  SOUF I ¶ 53; PSMF ¶ 53.

At every juncture, MGB's decision to implement the Vaccination Policy, and its design of the policy, were informed by its own experience as a healthcare system and the latest public health guidance from federal and state public health authorities, including the Centers for Disease Control and Prevention ("CDC").  SOUF I ¶ 60; PSMF ¶ 60.  At the time that MGB considered whether

to require its staff to be vaccinated against COVID-19 as a condition of employment, it understood and relied upon CDC's recommendation that vaccination was the best way to protect against severe illness, hospitalization, and death, and reduce COVID transmission.  SOUF I ¶¶ 61-69; PSMF ¶¶ 61-69.[1]  One key consideration for MGB's decision to implement the Vaccination Policy was public and patient trust in the safety of MGB facilities.  SOUF I ¶¶ 52, 70-71, 85; PSMF ¶¶ 52, 70-71, 85.  Many patients were afraid to come to the hospital or doctor's office because they feared contracting COVID, causing them to be sicker and to need more acute care when they did reach their MGB provider.  SOUF I ¶¶ 74-77, 84-85; PSMF ¶¶ 74-77; 84-85. MGB felt it was imperative to assure both safety *and* the perception of safety.  SOUF I ¶¶ 71, 156; PSMF ¶¶ 71, 156.

### C.    The Religious Exemption Review Process

The Vaccination Policy allowed employees to request religious or medical exemptions. SOUF I ¶ 123; PSMF ¶ 123.  MGB decided to create a new, clear, structured, centralized process for review of requests for religious exemptions, different from the decentralized process it had used previously for flu vaccination, due to: the nature of the pandemic threat, the need to ensure it was fair and consistent across entities; and to comply with the deadlines that had been set in anticipation of fall and winter COVID waves.  SOUF I ¶ 131; PSMF ¶ 131.  To request a religious exemption, an employee filled out an online form that asked the employee to provide a narrative explaining the basis for the request and advised that the employee might be required to provide additional supporting information.  SOUF I ¶ 201-02; PSMF ¶¶ 201-02 (disputed for immaterial reasons).  Religious exemption requests were reviewed by a Religious Exemption Review Committee (the "RERC").  SOUF I ¶ 203; PSMF ¶ 203.  The RERC members were Human

---

[1] Not disputed, or purportedly disputed on erroneous, improper basis that the public health and scientific bases for the Vaccination Policy constituted "premature expert evidence," a claim which this Court rejected. *See* Doc. 173 at 5 n.4.

Resources professionals trained in responding to accommodation requests and religious exemption requests.  SOUF I ¶ 209, 211-12; PSMF ¶¶ 209, 211-12.  The RERC members had access to an HR record that indicated, e.g., whether the employee had received an exemption to a flu vaccine before, and the date of exemption.  They did not have access to any medical information, or to any exemption history for any vaccine other than flu and COVID.  SOUF I ¶ 237; PSMF ¶ 237.

Prior to reviewing exemption requests, RERC members were advised that the pandemic, and particularly the rapid spread of the Delta variant, was a public health emergency, and that MGB had an urgent responsibility to continue serving its medically vulnerable patients, and to protect staff and visitors from infection.  SOUF I ¶ 153-54, 156; PSMF ¶ 153-54, 156.  It was also emphasized to the RERC that, as a major hospital system, the perception of safety was critical for patients, visitors, and the public.  *Id.*  For these reasons, the RERC members were advised that a rigorous process was necessary to minimize the risk that unvaccinated staff remained as sources of potential infection while interacting with other staff, patients, and visitors.  *Id.*  The RERC was tasked with carrying out a review process consistent with those health and safety priorities.  *Id.*

The RERC conducted an interactive process in writing when evaluating each religious exemption request, including Plaintiff's.  SOUF I ¶¶ 218, 226, 233; PSMF ¶¶ 218, 226, 233; SOUF II ¶¶ 47-58.  The RERC also factored into its decision-making the public health considerations that flowed from allowing exemptions from the Vaccination Policy.  SOUF I ¶ 149; PSMF ¶ 149.

### D.    Plaintiff's Religious Exemption Request and Related Communications

On September 5, 2021, Plaintiff submitted a request for a religious exemption from the Vaccination Policy.  SOUF II ¶ 46.  When asked to identify her sincerely held religious belief or practice and to explain why it prevented her from receiving a COVID vaccine, she stated only:

> As a practicing Catholic, I believe that the human body is a gift from God and a temple of the Holy Spirit, (1 Corinthians 6:19, 20), and that it must not be polluted (2 Corinthians 7:1).  There is no flaw in God's design.  The ingredients in vaccines

are pollutants to the body.  As such, I find it to be contrary to my conscience to knowingly have these toxic chemicals injected into myself.

SOUF II ¶ 47.  The accommodation Plaintiff requested was an exemption from the requirement to be vaccinated.  *Id.* (attesting she was requesting an exemption from COVID-19 vaccine requirement).  Plaintiff did not request any other accommodation.  *Id.*

The RERC responded to Plaintiff on September 24, 2021, advising her that it required additional information.  SOUF II ¶¶ 51-52.  The RERC stated that she "did not explain how [her] religious beliefs prevent [her] from receiving a COVID-19 . . . vaccine.  Moreover, your religion has publicly supported vaccination."  SOUF II ¶ 52.  The RERC asked Plaintiff to provide any additional explanation and any supporting documentation relevant to her request.  SOUF II ¶ 53. The RERC asked Plaintiff to "explain how, in light of your religion's public support of vaccination, your faith prevents you from receiving a vaccine."  *Id.*  The RERC stated: "If you have received vaccines in the past, please explain why your religion did not prevent you from receiving vaccines in the past and will not allow for COVID-19 . . . vaccination."  *Id.*  Plaintiff responded to the RERC's request for more information on September 24, 2021, stating in part: "Receiving medical treatment against my will violates my body, and removes my free will as God has intended for me. I recognize God as my ultimate authority in all things and that He has delegated to each of us authority over our own lives and choices, matters of health, including that of vaccines…. 'My Body, My Choice.'"  SOUF II ¶ 54.  On September 27, 2021, the RERC informed Plaintiff that her religious exemption request was denied.  SOUF II ¶ 55.

On October 20, 2021, MGB notified Plaintiff she was not compliant with the Vaccination Policy, placed her on administrative leave starting October 21, 2021, and informed her that her employment would end if she failed to comply by November 5, 2021.  SOUF II ¶ 58.  Plaintiff did not comply by the deadline and was terminated November 10, 2021.  SOUF II ¶¶ 59-60.

**ARGUMENT**

On the undisputed record, MGB has established undue hardship as a matter of law.[2] "The undue hardship defense is built into the statutory definition of 'religion,' such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense applies." *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 17-18 (1st Cir. 2024) (quoting *Lowe v. Mills*, 68 F.4th 706, 724 (1st Cir. 2023)).  Summary judgment for an employer on undue hardship grounds is proper where, as here, there is "no genuine dispute of material fact that granting [the employee's] exemption request would have imposed an undue hardship on its business." *Rodrique v. Hearst Comms, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025); *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).

I.    **ALLOWING PLAINTIFF TO REMAIN UNVACCINATED IN HER PATIENT-FACING ROLE IN A PANDEMIC WOULD HAVE BEEN AN UNDUE HARDSHIP**

On this undisputed record, allowing Plaintiff to remain unvaccinated as a hospital nurse in MGH's Emergency Department would have imposed an undue hardship as a matter of law.

   A.    **Allowing Plaintiff to Remain Unvaccinated Posed Health, Safety, and Reputational Risks**

This Court has recognized that undue hardship encompasses not only "direct economic costs, but indirect ones related to health and safety." Doc. 173 at 11 (citing EEOC guidance).  In

---

[2] Courts assess Title VII religious accommodation claims using a two-part framework.  "First, the plaintiff must make [his] *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action." *Sanchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012) (quoting *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir.2004)) (emphasis in original).  "[T]he burden [then] shifts to the [employer] to show that it made a reasonable accommodation of the religious practice *or* show that any accommodation would result in undue hardship." *Id.* (quoting *E.E.O.C. v. Unión Independiente*, 279 F.3d 49, 55 (1st Cir. 2004)) (emphasis original). For purposes of this motion only, MGB does not challenge whether Steverman had a (i) sincere (ii) religious (iii) conflict with the vaccine, despite considerable record evidence supporting such a challenge.  MGB reserves all rights to press that challenge should her claim survive summary judgment.

the healthcare context, undue hardship also includes "the risk of reputational injury." *Cyr v. Bos. Med. Ctr.*, No. 1:22-CV-11930-JEK, 2025 WL 269239, at *6 (D. Mass. Jan. 22, 2025) (Kobick, J.); *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) (same); *Harmon v. Bos. Med. Ctr.*, No. CV 22-11856-MJJ, 2024 WL 4815292, at *5 (D. Mass. Nov. 18, 2024) (same). Particularly during the pandemic, MGB was responsible for safeguarding the health and safety of its staff and patients and ensuring that the public had confidence in seeking care at its facilities. SOUF I ¶ 52; PSMF I ¶ 52.

The undisputed record shows that MGB, "with the information available to it at the time,"[3] could not have "reasonably accommodated [Plaintiff's] request to be exempted from its [Vaccination] Policy without suffering 'substantial increased costs' in relation to its provision of healthcare services." *Cyr*, 2025 WL 269239, at *5.

Plaintiff admits that she provided in-person, hands-on care to medically vulnerable patients, and engaged in repeated, close physical contact while assessing their condition, administering medications, drawing blood, and placing IVs. SOUF II ¶¶ 5, 7-9, 11-14. She cared for approximately three to five patients per shift, moving between patients in a high-risk clinical environment. SOUF II ¶ 16. And her exposure was not limited to patients: during each 12-hour shift, she also interacted in close proximity with patients' family members, physicians, fellow nurses, nursing assistants, other staff and members of the public. SOUF II ¶¶ 17, 24-25. It was

---

[3] The overwhelming medical and scientific evidence available at the time showed COVID vaccines were safe and effective at reducing the risk of spread of the virus; multiple federal appellate courts have taken judicial notice of the public health guidance to this effect. *See, e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 32–33 (1st Cir. 2021) ("The COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected. Vaccination also reduces a person's risk of transmitting COVID-19 to others."); *Rodrique*, 126 F.4th at 92-93; *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397-98 (1st Cir. 2025). MGB indisputably relied on that data and public health guidance. SOUF I ¶ 52; PSMF I ¶ 52.

impossible for Plaintiff to physically distance herself from others while performing her work. SOUF II ¶¶ 5-6, 19. At the windowless nurses' station, she worked right next to other nurses. SOUF II ¶¶ 27-29. In the break room, she ate meals with MGB employees less than three feet away, without any mask. SOUF II ¶ 30. Given the frequency, duration, and volume of these close-contact interactions, Plaintiff posed a compounding and exponential risk of transmission to everyone around her. Each time she interacted up close with a vulnerable patient who had come to the Emergency Department to get well, she risked transmitting to them a potentially fatal disease. There is not a shred of evidence in the record to the contrary.

Applying controlling case law to the undisputed record evidence compels a finding of undue hardship as a matter of law. The record demonstrates that the only accommodation Plaintiff sought—to remain in her position as a hospital nurse while unvaccinated against COVID—would have required MGB to place Plaintiff's patients, other patients, fellow hospital staff, visitors, and members of the public at an unacceptable increased risk of danger from infection with a potentially fatal disease. As this Court has recognized, the law does not require that result. *Cf. Together Emps.*, 573 F. Supp. 3d at 441 ("permitting the named plaintiffs to continue to work at MGB without being vaccinated would materially increase the risk of spreading the disease and undermine public trust and confidence in the safety of its facilities").[4]

---

[4] When considered on an aggregate basis, the effect of these costs is even more substantial. *See* Order on Defendants' Motion for Summary Judgment (Doc. No. 35) and Motion to Strike (Doc. No. 54), *Morrill v. Beth Israel Lahey Health, Inc.*, No. 24-cv-11041-LTS, Doc. 63 at 30 (D. Mass. Apr. 10, 2026) (Sorokin, J.) (summary judgment for healthcare system and hospital, holding that "[g]ranting hundreds of accommodations would have imposed a significant, cumulative burden on Defendants' ability to safely and adequately staff its operations"); *Together Emps.*, 573 F. Supp. 3d at 437 ("in determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation").

Courts in this Circuit evaluating similar summary judgment records under Title VII have uniformly concluded that allowing a healthcare worker like Plaintiff to remain unvaccinated while caring for patients in a hospital during the pandemic would have imposed an undue hardship as a matter of law. Indeed, in 2025, Judge Murphy of this Court granted summary judgment to MGB in a case brought by a patient-facing nurse terminated for non-compliance with the same MGB Vaccination Policy at issue here on undue hardship grounds. *Lavine v. Mass Gen. Brigham Inc.*, No. CV 23-10987-BEM, 2025 WL 1372316, at *6 (D. Mass. May 12, 2025). Like Plaintiff Steverman, Lavine worked with vulnerable cardiac and elderly patients, "directly interact[ing] with patients during every shift . . . includ[ing] taking patients' vitals, administering medications, helping to position patients, examining patients, and drawing blood." *Id.* at *1. He "also worked in close contact with staff members at the Hospital." *Id.* As such, "Plaintiff's work as an RN placed him in a particularly risky position to spread infection." *Id.* at *6. The policy, health and safety reasons for the policy, reliance on public health guidance, and religious exemption process were the same as those at issue here. *Id.* at *2. The court held as a matter of law that MGB was reasonable in relying on "the objective, scientific information available to [it]" to determine that "vaccinated employees were less likely to transmit COVID than unvaccinated employees[,]" and concluded that the health and safety risks associated with allowing such a nurse to remain unvaccinated posed an undue hardship as a matter of law. *Id.* at *7 (citation omitted).

The First Circuit has consistently upheld summary judgment on undue hardship grounds for employers who relied on public health guidance in refusing to allow vaccine exemptions during the COVID-19 pandemic to protect people from infection. In *Melino,* the First Circuit affirmed summary judgment on undue hardship grounds in a case brought by a hospital nurse arising from a hospital's COVID vaccination policy. 127 F.4th at 398. Like Plaintiff Steverman, Melino was

a patient-facing nurse who provided direct care to patients, met with families, and interacted with other patient-facing staff.  *Id.* at 394.  As in this case, it was "uncontroverted that [the hospital] implemented its vaccine requirement based on the CDC's recommendations, which describe vaccines as mitigating the effects and spread of COVID-19."  *Id.* at 397-98.  The Court affirmed summary judgment on the grounds that allowing the nurse to continue working unvaccinated was an undue hardship because the public health guidance on which the hospital relied indicated that it would increase the risk of transmission among staff and patients.  *Id.* at 397-98.

In *Rodrique*, the First Circuit affirmed summary judgment for a *non*-healthcare employer— a news station—on undue hardship grounds after it denied a religious exemption to a photographer required to work in person.  126 F.4th at 87, 91 ("Because the record demonstrates that Hearst relied 'on the objective, scientific information available to [it],' with particular attention to 'the views of public health authorities,' we hold that it acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees.").

Numerous other district courts within this Circuit have held the same.  *See Munroe v. Bos. Med. Ctr.*, 790 F. Supp. 3d 52, 60 (D. Mass. 2025) (Saylor, J.) (summary judgment for hospital where "[i]t can hardly be disputed that a hospital is entitled to rely upon, and apply, medical and scientific evidence in the development and enforcement of its policies and procedures, and that prevention of infection is of paramount importance."); *Morrill*, No. 24-cv-11041-LTS, Doc. 63 at 29 (Sorokin, J.) (summary judgment for healthcare system which "reasonably determined that granting [plaintiff]'s exemption request would have caused them undue hardship"); *Cyr*, 2025 WL 269239, at *6-7 (Kobick, J.) (summary judgment for hospital on undue hardship grounds in case brought by nurse challenging denial of religious exemption from COVID vaccine requirement); *Harmon*, 2024 WL 4815292, at *5 (Joun, J.) (summary judgment for hospital on nurse's religious

claim where it "established that granting [plaintiff]'s accommodation would have resulted in an undue hardship").

### B.    Undue Hardship Is an Individualized Litigation Defense

It is undisputed that MGB implemented the Vaccination Policy to address the urgent health, safety, and operational harms from the spread of COVID in its healthcare system. SOUF I ¶¶ 52-81, 83-92; PSMF ¶¶ 52-81, 83-92.[5]  Despite this, MGB expects that Plaintiff will claim that its undue hardship defense is somehow undermined by the fact that it did not specifically indicate to Plaintiff in its written denial that granting her exemption would impose an undue hardship.  *See*, *e.g.*, ECF No. 407 at 7 (Pls.' Opp. to Mot. to Sever).  Any such suggestion lacks merit.  As an initial matter, the undisputed evidence shows that MGB sent voluminous communications to its workforce—which Plaintiff admits receiving, SOUF II ¶ 36—explaining that it was requiring vaccination to ensure the safety of its patients, employees, and visitors.  *E.g.*, SOUF I ¶¶ 51, 121-122; PSMF ¶¶ 51, 121-122; ECF No. 161-1 at 37-49.

Moreover, the law is clear that undue hardship is an affirmative defense that an employer asserts and proves in litigation—it is not a determination MGB was required to document or articulate at the time of the accommodation decision as part of an interactive process in order to preserve it. It is well settled that an employer may defeat a failure to accommodate claim by "show[ing] that it offered a reasonable accommodation *or ...* that doing so *would have* resulted in undue hardship." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004) (emphasis added); *Robinson v. Children's Hospital Boston*, No. 14-cv-10205, 2016 WL 1337255, *2, *10 (D. Mass. Apr. 5, 2016) (Casper, J.) (hospital entitled to summary judgment on its undue hardship defense where the hospital would not allow any religious exemptions to a vaccine requirement and

---

[5] Not disputed or purportedly disputed on erroneous, improper basis of "premature expert evidence." *See supra* n.1; Doc. 173 at 5 n.4.

13

made no contemporaneous individualized undue hardship determinations).  Multiple courts have made this observation in the context of Title VII cases pertaining to COVID vaccines.  *See*, *e.g.*, *McGinn v. Hawaii Symphony Orchestra*, 727 F. Supp. 3d 915, 937–38 (D. Haw. 2024) ("An undue hardship defense would also *preclude liability* premised on a failure to engage in an 'interactive process' in this Title VII context") (emphasis added).

Indeed, the only federal appellate courts to address the issue (of which MGB is aware) have rejected precisely this argument in the context of other healthcare systems' vaccination policies. *See Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135 (3d Cir. Apr. 10, 2025); *Kizer v. St. Jude Children's Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024). In *Bushra*, as in this case, the healthcare employer denied a patient-facing employee's religious exemption request from the employer's COVID vaccination policy on the basis that the employee had not "articulate[d] a sincerely held religious belief that is contrary to receiving the COVID-19 vaccination." 2025 WL 1078135, at *1.  The employer moved for summary judgment on undue hardship grounds, relying on the undisputed evidence concerning the impacts that allowing a patient-facing healthcare worker to remain unvaccinated would cause for the hospital's patients, employees, and staff.  *Id.* at *2.  In opposition, the employee argued that it was "disingenuous" for the employer to raise undue hardship "when it solely considered the sincerity of [the employee's] religious beliefs when denying his exemption request."  *Id.* at *2 n.14.  The Third Circuit rejected the argument, concluding that it "*cannot reasonably infer that [the defendant] could accommodate [the plaintiff] from the mere fact that it did not discuss the issue in its decision to deny his request on separate grounds*."  *Id.* at *2 n.14 (emphasis added).  *See also Kizer*, 2024 WL 4816856, at *3 ("[plaintiff] has pointed to no legal authority that would require employers considering Title VII accommodations … to engage in such a [good faith interactive] process"); *id.*, at *5 ("the EEOC

is clear that Title VII contains no such hard and fast requirement of an interactive process").

In fact, this Court has already rejected the argument in this very case, finding that MGB was likely to succeed on the merits of its undue hardship defense. *Together Emps.*, 573 F. Supp. 3d at 435-37, 441. When this Court reached that conclusion, the record was already clear that MGB did not separately articulate an undue hardship analysis in connection with its response to each individual exemption request. *Id.* at 425-26 (setting forth interactive process between then-named individual plaintiffs and reviewers). But that was of no moment in appraising MGB's likelihood of success as to undue hardship: instead, this Court correctly undertook an objective analysis of the record evidence regarding the nature of MGB's asserted burdens. *Id.* at 435-36. Since the seminal decision in *Together Employees*, this Court and others have followed its framework for assessing undue hardship in this context, and have accordingly entered summary judgment in favor of healthcare employers on undue hardship grounds even where the employers did not invoke undue hardship in their interactive correspondence—or merely referenced undue hardship without elaboration. *E.g.*, *Cyr*, 2025 WL 269239, at *2 (hospital entitled to summary judgment on undue hardship even where denial letter "did not explain its reasons"); *Munroe*, 790 F. Supp. 3d at 57 (employer's denial letter stated only that the requested exemption "would result in an undue hardship" without further elaboration); *Lavine*, 2025 WL 1372316, at *4 (granting summary judgment to MGB on undue hardship grounds despite lack of reference to undue hardship in interactive process). *Accord*, *e.g.*, *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *2, *5-*7 (S.D.N.Y. May 15, 2023) (rejecting plaintiffs' argument that employer "never informed them that granting their exemptions would cause an undue hardship").

So it is here. As this Court and others have already held in this case and numerous

analogous cases, MGB is entitled to demonstrate that Plaintiff's request would have imposed an undue hardship based on the facts and circumstances particular to Plaintiff, her work environment, and her job duties. Those undisputed facts establish that accommodating Plaintiff would have imposed an undue hardship as a matter of law.

### C.    The Fact That MGB Approved Other Exemptions Does Not Change That Allowing *Steverman* to Work Unvaccinated Was an Undue Hardship

MGB expects Plaintiff will argue that MGB cannot establish that granting *her* requested exemption would impose an undue hardship because it granted some *other* religious and medical exemptions. The suggestion is incompatible with both the law of this case and decisional law of federal courts in this circuit and elsewhere. And that is for good reason. On a fundamental level, such a rule would pose an impossible choice for healthcare employers seeking to implement infection control policies on their workforces, particularly in a public health crisis: either grant no exemptions at all, or else allow all exemptions and risk undermining the health and safety of the very patients those employers are committed to healing.[6] This Court was right to reject the argument at the preliminary injunction stage. Since that time, numerous courts have done the same, and this Court should do so again.

At the outset of this case, this Court rejected the notion that the existence of some

---

[6] In its Phase I summary judgment decision, this Court recognized this very problem, noting that, "somewhat ironically, plaintiffs may be in a better position" because MGB *allowed* employees to request exemptions from its Vaccination Policy than if MGB had "simply terminated everyone who refused to be vaccinated." Doc. 173 at 8 n.11. MGB notes that some Massachusetts healthcare employers took such a categorical approach—yet still faced significant litigation. *See, e.g., Cyr*, 2025 WL 269239, at *2 (noting, in cases arising from universal staff vaccination requirement, that hospital denied all of the religious exemption requests it received); *Melino*, 127 F.4th 391 (vaccine case against same hospital); *Munroe*, 790 F. Supp. 3d 52 (same); *Harmon*, 2024 WL 4815292 (same). Yet other employers who categorically *granted* vaccine exemption requests were sued, too. *See Leake v. Raytheon Tech. Corp.*, No. 23-15320, 2024 WL 1854287 (9th Cir. Apr. 29, 2024), *cert. denied*, 145 S. Ct. 428 (2024) (case brought by employees who were granted vaccine exemptions but objected to employer's testing requirement for unvaccinated workers); *Robert v. Raytheon Tech. Corp.*, 759 F. Supp. 3d 173 (D. Mass. 2024) (same).

unvaccinated employees with approved exemptions foreclosed MGB's undue hardship defense. To the contrary, the court concluded that MGB "does not have to show that it eliminated all risk from all possible sources of COVID-19 infection" in order to establish undue hardship. *Together Emps.*, 573 F. Supp. 3d. at 437.  And, in rejecting a similar argument regarding the presence of unvaccinated patients and visitors in MGB's facilities, this Court emphasized that the introduction of some degree of risk from those unvaccinated persons was "not material" in determining whether approval of the *Plaintiffs'* exemption requests imposed an undue hardship.  *Id.* at 436 ("the issue is whether granting *employees* an accommodation from the COVID-19 vaccine would impose an undue hardship; the vaccination status of defendant's patients or visitors is not material") (emphasis in original).  The same logic dictates that the vaccination status of other employees whose exemption requests are not at issue here does not negate the degree of risk that allowing *Plaintiff* to remain unvaccinated would have posed to MGB's operations as a hospital system in the middle of a public health emergency.[7]

Other federal courts, both in and outside of the First Circuit, have reached the same conclusion.  In *Robinson*, a case concerning a hospital's influenza vaccine requirement, the hospital required all of its healthcare workers to be vaccinated, but granted some medical

---

[7] This is particularly so given the undisputed evidence that MGB considered *any* approved exemption to pose grave health, safety, and operational harms during the pandemic, and only entertained exemptions because it felt it was legally constrained to do so.  *See* Doc No. 161-2, Appendix Vol. II, p. 253 (Deposition Tr. of Chief Human Resources Officer Rosemary Sheehan), 18:16-19:6; 20:22-23 ("By law, [we were] required to have a process."); 23:13-18 ("we were trying to adjudicate each and every request … to ensure that we followed the law"); 74:14-15 ("Our goal … was to have as few exemptions as possible."); Doc. No. 161-2, Appendix Vol. II, p. 291 (Deposition Tr. of Chief Operating Officer Ron Walls), 69:4-71:6 (explaining reasons for MGB's goal of universal provider and employee vaccination); 71:83:12-18 ("the only way we could really protect our patients and our workforce was to vaccinate all of [MGB's employees]"); 70:9-71:6 (MGB sought universal vaccination to ensure public trust in safety of its facilities; "We were very worried about that. We were constantly worried about it and we are worried about it to this day."); 87:10-11 ("there's always risk in having unvaccinated people" in healthcare system).

17

exemptions to patient-facing employees.  2016 WL 1337255, at *2.  Despite this, the court had little difficulty concluding that allowing the religious exemption request of a patient-facing administrative employee would impose an undue hardship as a matter of law, holding that the hospital was entitled to "achieve the *safest possible* environment for its patients" and seek "as close to total compliance as possible" with the vaccination requirement absent an approved exemption. *Id.*, at *2 (emphasis added).  And, in *Lavine*, the court granted summary judgment in favor of MGB on undue hardship grounds, and in doing so rejected the plaintiff's explicit contention— emphasized by counsel at oral argument—that MGB could not establish the absence of a genuine fact dispute because it granted some employees' religious exemptions.[8]

The Third Circuit in *Bushra*, too, explicitly rejected a patient-facing healthcare employee's argument that the employer "cannot claim undue hardship when it has granted religious exemptions to other employees."  *Bushra*, 2025 WL 1078135, at *2 (plaintiff's vague assertions about other employees granted religious exemptions "does not rebut [the employer's] substantial evidence that it could not accommodate him").  Otherwise stated, in the face of "substantial evidence of undue hardship" resulting from the grant of an exemption, a plaintiff cannot simply invoke the existence of some approvals to create a genuine dispute of material fact regarding the degree of hardship granting *the plaintiff*'s requested exemption would have occasioned.  *Id.*; *see also Lindahl v. Sheppard Pratt Health Sys., Inc.*, No. CV 1:24-1692-CDA, 2026 WL 591793, at *10 (D. Md. Mar. 3, 2026) (summary judgment for healthcare employer on undue hardship grounds on staff nurse's claim stemming from denial of COVID-19 vaccine exemption, and

---

[8] *See* Affidavit of Michael Steinberg, **Exhibit 10**, Oral Arg. Tr. in *Lavine*, at 25:16-20:
COURT: Your position is that … if they gave a religious exemption to anyone, then whether or not it's an undue hardship in this case is not capable of being resolved at summary judgment?
PLAINTIFF'S COUNSEL: That's correct[.]

rejecting argument that employer could not show undue hardship because it "granted certain medical exemptions and religious exemptions, and in turn allowed those employees to work unvaccinated"; observing the merits of other employees' requests was "not a question before the Court"); *Allbright v. S. California Permanente Med. Grp. Inc.*, 793 F. Supp. 3d 1214, 1229 (C.D. Cal. 2025) (summary judgment for employer in case involving religious exemption request by patient-facing provider; rejecting argument that "Defendant cannot claim undue hardship when it has granted religious exemptions to other employees"); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. CV 19-5734, 2022 WL 507479, at *7 (E.D. Pa. Feb. 18, 2022) ("Granting Plaintiff's religious exemption request, therefore, even though 24 such requests had already been granted, 'could have put the health of vulnerable patients at risk,' with the potential for increased hospitalization and death as result." (quoting *Robinson*, 2016 WL 1337255 at *10 )).

This Court was correct when it held in 2021 that the existence of some approved exemptions did not diminish MGB's likelihood of succeeding on undue hardship. *Together Emps.*, 573 F. Supp. 3d. at 437. Since then, many other courts nationwide have joined it. After discovery, the undisputed record shows that allowing Plaintiff's exemption would have created unacceptable risks to the safety of MGB's patients and staff. That is the end of the undue hardship inquiry.

### D.     Plaintiff Cannot Substitute Her Judgment for MGB's Judgment

This Court properly recognized in its Phase I Summary Judgment Order (Doc. 173 at 2):

> As a major hospital and healthcare system, MGB is unquestionably entitled to rely on its own medical and scientific judgment in matters of patient health and safety, and to adopt strict infection-control policies to protect its patient and staff populations. And it has a strong interest in maintaining public confidence in the safety of its facilities. It is also true that substantial deference must be given to the judgments of a hospital organization struggling to cope with a worldwide pandemic. And it is emphatically not the role of the federal courts to second-guess those judgments or to substitute its own views for those of trained medical personnel.

This is precisely correct. Title VII does not afford Plaintiff a jury trial simply because she disagrees

with the Vaccination Policy, or believes it would have somehow been safe for her to work up close to vulnerable patients and patient-facing medical staff twelve hours a day amid a global pandemic. *See Cloutier*, 390 F.3d at 136 (employer's determination that accommodation would adversely impact its public reputation was entitled to deference in analyzing undue hardship defense; "[s]uch a business determination is within [the employer's] discretion"); *Griel v. Franklin Med. Cen.*, 71 F. Supp. 2d 1, 9 (D. Mass. 1999), *aff'd sub nom*, 234 F.3d 731 (1st Cir. 2000) (courts "should not second-guess the hospital's judgment in matters of patient safety"); *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999) ("[c]ourts may not sit as super personnel departments") (citation omitted); Doc. 173 at 12 ("A 'significant degree of deference' must be given to an employer's own business judgment about the requirements of a position.") (quoting *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012)).  This basic legal principle is critical for preserving hospitals' ability to protect public health amid ongoing health and safety threats.[9]

## CONCLUSION

There are no genuine disputes of material fact for a jury to decide with respect to whether allowing Plaintiff to provide direct, in-person care for patients at the height of a global pandemic was an undue hardship.  The voluminous undisputed record conclusively establishes the urgency of the health and safety threat; MGB's need to achieve near-universal vaccination of staff; and the threat that Plaintiff posed as a patient-facing nurse to patients, families, staff, visitors, and the public.  It is for this Court to decide whether that life-or-death threat rises to the level of an undue hardship as a matter of law, and the record evidence readily establishes that the threat is an undue hardship.  MGB requests that this Court grant MGB summary judgment and dismiss Steverman's claim with prejudice.

---

[9] *See e.g.* Maggie Astor and Dani Blum*, Hospitals See Diseases Resurge as Vaccinations Decline*, THE NEW YORK TIMES,  June 2, 2026.

MASS GENERAL BRIGHAM INCORPORATED

By Its Attorneys,
Respectfully Submitted,

*/s/ Dawn R. Solowey*
Kristin McGurn (BBO# 559687)
Dawn Reddy Solowey (BBO# 567757)
Michael Steinberg (BBO# 690997)
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
kmcgurn@seyfarth.com
dsolowey@seyfarth.com
msteinberg@seyfarth.com
TEL: (617) 946-4800
FAX: (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that, on June 11, 2026, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Dawn R. Solowey*
Dawn R. Solowey

21