**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TYLER ADAMS, MICHELLE ORFANOS, AND JAMIE STEVERMAN,<br><br>Plaintiffs,<br><br>v.<br><br>MASS GENERAL BRIGHAM INCORPORATED,<br><br>Defendant. | Civil Action No.  1:21-cv-11686-FDS |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON THE CLAIM OF PLAINTIFF
STEVERMAN**

Defendant Mass General Brigham Incorporated ("MGB") submits this Statement of

Undisputed Facts in support of its Motion for Summary Judgment on the claim of Plaintiff Jamie

Steverman ("Plaintiff").

MGB incorporates its Phase I Statement of Undisputed Facts (Doc. 150) ("SOUF I") and

Plaintiffs' Response to the Phase I Statement of Undisputed Facts (Doc. 154)[1], and pursuant to the

Court's Order on Phase I summary judgment (Doc. No. 173) also offers these additional undisputed

facts that pertain in particular to Plaintiff Jamie Steverman.  *See* FRCP 56(c)(1) (moving party may

cite to summary judgment stipulations and admissions to establish absence of genuine factual

dispute).

---

[1] All exhibits to the Phase I Statement of Undisputed Facts are in the Appendix, referred to as "App. Ex. __" for the Court's ease of reference.  Following the App. Ex. citation is a parenthetical explaining the document, such as deposition transcripts pages, deposition exhibits, or discovery responses.

**I.     PLAINTIFF'S DUTIES AS A NURSE AT MASSACHUSETTS GENERAL HOSPITAL**

1.      In 2005, Plaintiff started working as a Registered Nurse in the Surgical Trauma Unit Massachusetts General Hospital ("MGH").  Affidavit of Michael Steinberg ("Steinberg Aff.") ¶ 2, **Exhibit 1**, Excerpts of the Transcript of the May 19, 2025 Deposition of Jamie Steverman ("Steverman Tr."), at 55:9-12. Plaintiff worked in the Surgical Trauma Unit from 2005 to 2012. *Id.*

2.      In 2012, Plaintiff moved to the Emergency Department Observation Unit as a Registered Nurse with the job title of "Clinical Nurse, Clinician."  Steverman Tr. 55:12-24.

3.      MGH's Emergency Department Observation Unit provides short-term monitoring and treatment, often up to 24 hours, for patients with conditions such as possible heart attacks or infections, to determine whether they can be safely discharged or require hospital admission. Steverman Tr. 25:9-20, 82:23-83:1.

**A.     Plaintiff Worked Closely In Person With Patients**

4.      Plaintiff was responsible for seeing and treating patients in the Observation Unit. Steverman Tr. 25:9-12.

5.      Plaintiff admitted that her role was in-person. Steverman Tr. 30:20-31:5 ("A. I worked in person.").

6.      Plaintiff admitted that there was no way to do her job in the Observation Unit without interacting directly with patients.  83:2-5 ("Q. Is there any way to do your job without interacting with patients?  A. Not in the Observation Unit."); Steinberg Aff. ¶ 4, **Exhibit 3**, (Plaintiff's Questionnaire and Responses to MGB's Requests for Admission at 5 ("Questionnaire and RFAs")).

2

7.    Plaintiff's patients included individuals suffering from a variety of conditions, including heart conditions, TIAs (transient ischemic attacks, or "mini-strokes"), gastrointestinal issues, and skin conditions.  Steverman Tr. 82:3-22.

8.    Plaintiff also cared for elderly patients.  Steverman Tr. 81:20-21.

9.    Plaintiff conducted "head-to-toe assessments" of patients at their bedside, which required her to stand in close physical proximity and, at times, engage in direct, "hands-on" examination of patients in hospital beds.  Steverman Tr. 68:21-69:10.

10.    Depending on the patient, the assessments could take eight to twenty minutes each. Steverman Tr. 81:5-10.

11.    In her role, Plaintiff spoke with patients face-to-face to assess their condition and determine the reason for their presentation to the emergency department, including individuals being evaluated for possible heart attacks, infections such as cellulitis, or placement from nursing or assisted living facilities.  Steverman Tr. 69:11-70:8.

12.    Plaintiff's role involved physically moving patients.  Steverman Tr. 71:3-6.

13.    Plaintiff cared for patients by administering medications, including cardiac medications, antibiotics, daily medications, and gastrointestinal medications.  Steverman Tr. 70:15-19.

14.    Plaintiff's role involved drawing blood, placing IVs, and checking vital signs. Steverman Tr. 57:15-24, 69:15-23.

15.    Plaintiff also helped with discharge planning, which involved working with both patients and their family members. Steverman Tr. 58:4-13.

16.    In 2021, Plaintiff was assigned to take care of approximately three to five patients per shift.  Steverman Tr. 71:14-17.

17. Plaintiff worked two 12-hour shifts per week. Steverman Tr. 77:3-4.

18. Plaintiff admits that a patient or patient's family member asked if she was vaccinated against COVID. Steverman Tr. 39:7-21 ("Q. But you recall that a patient or patient's family member asked about vaccination status? A. Correct."); Questionnaire and RFAs, p. 12 at RFA 2 ("While working at an MGB entity, I have had a patient or patient's family member ask me if I was vaccinated against COVID-19 or express concern about whether staff were vaccinated against COVID-19.").

19. Plaintiff admitted: "While working on-site at an MGB entity, it was not always possible for me to remain six feet or more away from every colleague, patient, visitor or member of the public." Steverman Tr. 39:1-6; Questionnaire and RFAs, p. 12 at RFA 1.

20. Plaintiff understood that COVID-19 could be dangerous for older people, immunocompromised people, and small children. Steverman Tr. 87:18-88:6.

21. Plaintiff understood that some people were afraid of contracting COVID. Steverman Tr. 87:14-17.

22. Plaintiff would receive a report, meet her patient, "assess them, give them medications, confer with either a nurse practitioner or provider, see what the plan was for the day. [Patients] might be going off to tests, coming back." Plaintiff would give her patients updates on their results. Steverman Tr. 71:8-13.

**B.     Plaintiff Worked in Close Physical Proximity to Colleagues, Staff, Family Members of Patients, and the Public**

23. In her job as a nurse at MGB, Plaintiff interacted with members of the public, including patients, family members of patients, and hospital visitors. Steverman Tr. 72:9-15.

24.     Plaintiff performed her duties in Bigelow 12, where the Emergency Department Observation Unit was located.  The Observation Unit took up the entire floor.  Steverman Tr. 55:14-15, 76:23-24.

25.     Plaintiff worked with "[e]veryone from environmental service people [who cleaned the rooms], nursing assistants, nurses, doctors, [and] nurse practitioners."  Steverman Tr. 61:4-13.

26.     On a typical day, when Plaintiff arrived at work, she would first go to the break room and put down her personal effects.  The break room was the size of a conference room and contained a table, chairs, and refrigerator.  Steverman Tr. 77:16-24.

27.     Plaintiff then went to the nurses' station, which was centrally located in the middle of the floor with patient rooms located around it.  There were no windows near the nurses' station.  Steverman Tr. 76:14-77:24, 79:10-12.

28.     Typically, around eight nurses, the secretary, and a couple of nursing assistants were working at the nurses' station.  Steverman Tr. 78:14-18.

29.     The nurses' station contained approximately ten computers, and Plaintiff sometimes worked at the computers next to colleagues who were simultaneously using the computers.  Steverman Tr. 78:20-79:6.

30.     Plaintiff spent time in the break room several times a shift.  She sometimes ate meals at a table with other MGB employees, who were less than three feet away from her.  If she was wearing a mask, she took it off to eat and drink.  Steverman Tr. 79:29-80:17.

31.     Plaintiff may also have taken her mask off at work for other reasons other than eating or drinking.  Steverman Tr. 80:20-23.

32.     Plaintiff admitted that she recalled that MGB colleagues were absent from work because they had COVID.  Steverman Tr. 41:2-4.

### C.    Plaintiff Understood the Limits of Non-Vaccination Alternatives

33.    Plaintiff admitted that masking does not fully prevent the transmission of COVID. For example, Plaintiff admitted that the effectiveness of masking depends on factors such as the type and quality of the mask and whether it is worn properly.  Steverman Tr. 85:16-18.

34.    Plaintiff admitted: "I understand that making does not prevent transmission of the COVID-19 virus 100% of the time."  Additionally, Plaintiff admitted in response to MGB's Requests for Admission: "During my workday when working on-site at an MGB entity, I have removed my mask indoors to eat or drink."  Steverman Tr. 39:22-40:6; Questionnaire and RFAs, p. 13 at RFA 4.

35.    Plaintiff admitted: "I understand that it is possible to test negative for the COVID-19 virus one day and be positive the next day, or even two days later."  Steverman Tr. 86:14-17; Questionnaire and RFAs, p. 13 at RFA 5.

## II.    PLAINTIFF RECEIVED NOTICE OF THE COVID-19 VACCINATION POLICY

36.    On or about June 24, 2021, Plaintiff received a communication from Dr. Anne Klibanski, President and Chief Executive Officer of MGB, announcing that MGB had decided to require a COVID-19 vaccination for all employees.  Steverman Tr. 146:18-147:10; Steinberg Aff. ¶ 5, **Exhibit 4**, (June 24, 2021 Message from Anne Klibanski, MD, COVID-19 Vaccine Requirement for Employees ("June 2021 COVID Message")).

37.    The communication stated that employees would be able to request an exemption from the requirement for medical and religious reasons.  Steverman Tr. 147:14-22; June 2021 COVID Message.

### III. PLAINTIFF'S RELIGIOUS EXEMPTION REQUEST AND HISTORY OF RECEIVING VACCINATIONS AND MEDICATIONS

#### A. Plaintiff's History of Vaccinations and Medications

38.     Plaintiff admits that she had received vaccines in the past.  Steverman Tr. 104:17-18.

39.     Plaintiff received Dose 1 of the MMR vaccine in 1989.  Steinberg Aff. ¶ 6, **Exhibit 5**, (Plaintiff Patient Summary Health Record Report ("Summary Health Report")).

40.     Plaintiff received Dose 2 of the MMR vaccine in 1993.  Summary Health Report.

41.     Plaintiff received Doses 1 and 2 of the Hepatitis B vaccine in 1997, and Dose 3 of the Hepatitis B vaccine in 1998.  Summary Health Report.

42.     After Plaintiff began working at MGH, Plaintiff received the Influenza vaccine in 2011, 2012, and 2016.  Steverman Tr. 27:8-11; Questionnaire and RFAs, p. 2-3 at Adult Vaccination History.

43.     Plaintiff admitted that she received these three flu vaccines despite the fact that they were not mandatory for her employment at the time.  Steverman Tr. 27:12-14; Questionnaire and RFAs, p. 3.

44.     Plaintiff admitted that the first time she applied for a religious exemption from MGB was in 2018, when she applied for an exemption from the flu vaccine, the first year MGB required employees to receive it.  Steverman Tr. 31:17-24.

45.     Plaintiff accepts that the Centers for Disease Control and Prevention (CDC) is a reliable source of public health information.  Steverman Tr. 134:12-15.

**B.     Plaintiff's Religious Exemption Request from the Vaccination Policy and Related Communications with the RERC in 2021**

46.     On September 5, 2021, Plaintiff submitted a request for a religious exemption from the Vaccination Policy.  Steverman Tr. 101:9-21; Steinberg Aff. ¶ 7, **Exhibit 6**, (Plaintiff's Sept. 5, 2021 COVID-19 Exemption Request Form ("Exemption Request")).

47.     This is a true and accurate excerpt of the form Plaintiff submitted to MGB on September 5, 2021.

Confidential

Record ID 77116_5_57138

Page 6001

| | |
|---|---|
| In the space provided, please (1) identify your sincerely held religious belief, practice or observance and (2) explain why it prevents you from receiving a COVID-19 vaccine. Please note that you may be required to provide additional information or supporting documentation to support your request for an exemption. | As a practicing Catholic, I believe that the human body is a gift from God and a temple of the Holy Spirit, (1 Corinthians 6:19, 20), and that it must not be polluted (2 Corinthians 7:1).  There is no flaw in God's design.  The ingredients in vaccines are pollutants to the body.  As such, I find it to be contrary to my conscience to knowingly have these toxic chemicals injected into myself. |
| Employee attestation regarding Covid-19 vaccination religious exemption | ☒ My religious beliefs, practices, and observances which form the basis for my exemption request are sincerely held. <br> ☒ My religious beliefs, practices and observances prevent me from receiving a COVID-19 vaccine. <br> ☒ I understand that I may be asked to provide additional information to support this request. <br> ☒ I understand that if my request for exemption is approved I will be required to follow all applicable infection control policies and procedures, including wear an approved mask. <br> ☒ I understand that, if approved, this exemption will last for the current COVID-19 vaccination process only. |
| Please sign as acknowledgment | |

Exemption Request.

48.     Plaintiff subsequently interacted directly with individual members of the RERC via email.  Steverman Tr. 29:18-20, 43:3-11, 108:4-109:7, 145:11-14.

49.     On September 22, 2021, the RERC sent Plaintiff an email stating that the deadline to submit a request for a religious exemption was September 3, 2021, and asked her to provide an explanation for why she had not met this deadline.  Steverman Tr. 110:5-21; Steinberg Aff. ¶ 8,

8

**Exhibit 7**, ( Sept. 22, 2021 E-mail Chain between the RERC and Plaintiff, at p. 4, RERC Sept. 22 Email ("Sept. 22 Email Chain")).

50.    Plaintiff responded to the RERC and stated that her smartphone, which she used for email, had broken, and that she submitted her request when she had an alternative device. Steverman Tr. 110:11-16; Sept. 22 Email Chain at p. 3 Steverman Sept. 22 Email.

51.    On September 24, 2021, the RERC sent Plaintiff an email advising her that it had received her request for a religious exemption from the COVID-19 vaccine but required additional information.  Steverman Tr. 109:23-110:1; Sept. 22 Email Chain at p. 3 RERC Sept. 24 Email.

52.    Specifically, the RERC stated:

> You named your religion as a practicing Catholic, but did not explain how your religious beliefs prevent you from receiving a COVID-19 . . . vaccine.  Moreover, your religion has publicly supported vaccination.

Sept. 22 Email Chain at p. 3 RERC Sept. 24 Email.

53.    The RERC also asked Plaintiff to provide any additional explanation and any supporting documentation relevant to further consideration of her request.  Sept. 22 Email Chain at p. 3 RERC Sept. 24 Email.  In particular, the RERC asked Plaintiff to "explain how, in light of your religion's public support of vaccination, your faith prevents you from receiving a vaccine." *Id.*  In addition, the RERC stated: "If you have received vaccines in the past, please explain why your religion did not prevent you from receiving vaccines in the past and will not allow for COVID-19 . . . vaccination."  *Id.*  The RERC also informed Plaintiff that her request would be denied if a response was not received by September 27, 2021.  *Id.*

54.    Plaintiff responded to the RERC's request for more information on September 24, 2021, stating, among other things:

> My beliefs are between me and God who teaches my beliefs are not to be scrutinized nor denied by any man…. The government can not

9

> [sic] be the arbiter of which Catholic is correct. This would violate the establishment clause of the First Amendment as well as Article II.
>
> The Bible informs all believers that our body is a Temple. Receiving medical treatment against my will violates my body, and removes my free will as God has intended for me. I recognize God as my ultimate authority in all things and that He has delegated to each of us authority over our own lives and choices, matters of health, including that of vaccines…. "My Body, My Choice".
>
> I have been granted religious exemptions in the past . . . . My beliefs have further evolved and have allowed me to possess even greater knowledge in this area, which is why I continue on this path of not harming my body. My faith requires that when I recognize an action to be wrongful, that I repent. Having committed a sin in the past is not an excuse to continue doing so . . . .

Sept. 22 Email Chain at p. 2-3 Plaintiff's Sept. 24 Email.

55.    The RERC responded to Plaintiff on September 27, 2021, and informed Plaintiff that her religious exemption request was not approved and provided her with a link to information regarding the ongoing vaccine clinics. Sept. 22 Email Chain at p. 2 RERC Sept. 27 Email.

56.    On September 30, 2021, Plaintiff responded stating: "Religious exemption is on file." Sept. 22 Email Chain at p. 2 Plaintiff's Sept. 30 Email.

57.    On October 1, 2021, the RERC replied, explaining that "[r]eligious exemptions do not carry over from one year to the next" and that MGB has "implemented a new process this year to evaluate requests for religious exemptions." Sept. 22 Email Chain at p. 1-2 RERC Oct. 1 Email. It also stated that her religious exemption request had been reviewed and was denied, and that it hoped she would "reconsider and receive the vaccine within the required time periods." *Id.*; Steverman Tr. 138:13-21.

58.    On October 20, 2021, MGB sent Plaintiff a letter stating that its records indicated that she had not complied with the Vaccination Policy. Steverman Tr. 148:1-19; Steinberg Aff. ¶9, **Exhibit 8**, (Oct. 20, 2021 Letter from K. Lehman to Plaintiff ("Oct. 20 Letter"). The letter further

stated that her access to MGB systems was being revoked, that she would be placed on unpaid administrative leave effective October 21, 2021, that she may not return to work unless she became compliant by November 5, 2021, and that her employment would be terminated if she failed to meet the Vaccination Policy requirements by that date. *Id.*

59. Plaintiff did not comply with the Vaccination Policy by the November 5, 2021 deadline. Steverman Tr. 148:12-19; Steinberg Aff. ¶ 10, **Exhibit 9**, (Nov. 12, 2021 Letter from K. Lehman to Plaintiff ("Nov. 12 Letter")).

60. As a result, effective November 10, 2021, MGB terminated Plaintiff's employment due to her non-compliance with the Vaccination Policy. Steverman Tr. 148:12-19; Nov. 12 Letter.

61. On December 27, 2021, Plaintiff tested positive for COVID. Steverman Tr. 27:17-19.

### C. Plaintiff's Litigation Testimony Regarding Her Alleged Religious Beliefs and Beliefs About the COVID Vaccine

62. When asked if her belief about vaccines was part of any religious doctrine, she conceded under oath: "I'm not aware of that." Steverman Tr. 107:15-17.

63. Plaintiff testified that she described the vaccine as "toxic chemicals" in her exemption request "[b]ecause that's what God says." Steverman Tr. 104:1-4. Plaintiff testified that God considers the vaccine to be a pollution in her body and that he told her: "'I created you, and trust what I want for you and your body.'" *Id*. at 103:3-5.

64. When asked what other restrictions her alleged religious beliefs require, Plaintiff testified: "Just asking God and letting Him decide and following my conscience." Steverman Tr. 107:19-22.

65. When asked if she understood that the Pope had issued guidance suggesting that vaccination was acceptable for Catholics, she testified: "I didn't know, and it didn't matter, because

. . . God was above the Pope.  So it had no relevance to me." Steverman Tr. 112:1-3.

66.     When asked if she believes that the COVID vaccine contains 5G, Plaintiff testified that she did not know.  Steverman Tr. 135:2-12.

67.     When asked if she believes that the COVID vaccine makes people magnetic, Plaintiff testified that she did not know.  Steverman Tr. 134:23-135:1.

68.     When asked if she believes that the COVID vaccine alters a person's DNA, Plaintiff testified that she did not know.  Steverman Tr. 135:13-15.

69.     When asked if she believes that the COVID vaccine contains a microchip, Plaintiff testified that she did not know.  Steverman Tr. 134:20-22.

70.     When asked if she believes that the COVID vaccine contains pork products or preservatives, Plaintiff testified that she did not know.  Steverman Tr. 135:19-24.

71.     When asked if she believes that the COVID vaccine contains blood products, Plaintiff testified that she did not know.  Steverman Tr. 136:4-6.

72.     Plaintiff stated in a sworn affidavit: "I am being forced to choose between complying to an unwanted medical procedure or losing my job."  Doc. 408-1 at 5 (Sept. 30, 2021 Signed Affidavit of Jamie Steverman).

73.     In the same affidavit, Plaintiff stated: "I am strongly opposed to the Covid Vaccine and do not feel I should be forced to have it injected into my body."  Doc. 408-1 at 5 (Sept. 30, 2021 Signed Affidavit of Jamie Steverman).

MASS GENERAL BRIGHAM INCORPORATED

By Its Attorneys,
Respectfully Submitted,

 /s/ Dawn R. Solowey
Kristin McGurn (BBO# 559687)
Dawn Reddy Solowey (BBO# 567757)
Michael Steinberg (BBO# 690997)
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
kmcgurn@seyfarth.com
dsolowey@seyfarth.com
msteinberg@seyfarth.com
TEL: (617) 946-4800
FAX: (617) 946-4801


## CERTIFICATE OF SERVICE

I hereby certify that, on June 11, 2026, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


/s/ Dawn R. Solowey
Dawn R. Solowey


13