**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TYLER ADAMS, MICHELLE ORFANOS, AND JAMIE STEVERMAN,<br><br>        Plaintiffs,<br><br>        v.<br><br>MASS GENERAL BRIGHAM INCORPORATED,<br><br>        Defendant. | Civil Action No.  1:21-cv-11686-FDS |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON THE CLAIM OF PLAINTIFF ADAMS**

Defendant Mass General Brigham Incorporated ("MGB") submits this Statement of
Undisputed Facts in support of its Motion for Summary Judgment on the claim of Plaintiff Tyler
Adams ("Plaintiff").

## I.   THE MEDICAL EXEMPTION REVIEW PROCESS

### A.   Dr. Hashimoto Developed the Process

1.   Dr. Hashimoto, MGB's Chief Medical Officer, Workplace Health and Wellness,
developed and led MGB's interactive process for reviewing requests for medical exemption.
Phase I Statement of Undisputed Facts ("SOUF I"), ¶ 159, Dkt. 150; Plaintiff's Concise
Statement of Material Facts from Phase I Summary Judgment ("PSMF I"), ¶ 159 (Undisputed)
Dkt. 154; Dkt 161-1, A. Vol. I, pp. 1-2 (Hashimoto Dec. ¶¶1, 3); Dkt. 161-2, A. Vol. II, p. 257
(Sheehan Tr. 16)[1].

---

[1] All exhibits to the Phase I Statement of Undisputed Facts were in the Appendix, referred to as A. __ for the Court's
ease of reference. Following the A.__ citation is a parenthetical explaining the document, such as deposition
transcripts or deposition exhibits. Certain exhibits are charts that MGB has created based on all Plaintiffs' responses
to Questionnaires that were served in discovery after Court approval.

2.      Dr. Hashimoto is board certified in Occupational Medicine.  Dr. Hashimoto also has a JD from Yale University and clerked for Supreme Court Justice William Brennan.  He practiced law with Williams & Connolly and Ropes & Gray.  He is also a law professor at Boston College Law School. SOUF I, ¶ 160; PSMF I, ¶160 (Undisputed); A. Vol. I, pp. 1-2 (Hashimoto Dec. ¶2); A. Vol. VII, pp. 227-28 (Dean Hashimoto Profile, J.D., M.D. on BC Law webpage,       https://www.bc.edu/bc-web/schools/law/academics-faculty/faculty-directory/dean-hashimoto.html).

### B.      The Medical Exemption Request Form

3.      To request a medical exemption, an employee needed to have their treating health care provider (HCP) complete and sign the MGB form, and submit by email to Occupational Health. SOUF I, ¶ 161; PSMF I, ¶161 (Undisputed); A. Vol. I, pp. 2-3 (Hashimoto Dec. ¶6); A. Vol. II, p. 90 (Kim Tr. 14-15); Steinberg Aff., ¶ 2, **Exhibit 1**, June 25, 2026 Deposition Transcript of Medical Panelist 2 ("Medical Panelist 2 Dep."), 38:8-21.

4.      This is a true and accurate copy of the COVID Vaccine Medical Exemption Request Form 2021.

325104192v.8

## 🏛 Mass General Brigham

**COVID VACCINE MEDICAL EXEMPTION REQUEST FORM 2021**

*Please Print:*

First Name:_____    Last Name:_____

PeopleSoft/Employee ID #:_____    Date of Birth: _____/_____/_____

*Please have your provider return this completed form to Occupational Health at the email listed at the bottom of the form.*

Dear Health Care Provider,

Mass General Brigham and its affiliates are committed to providing a safe work environment and to patient safety. Transmission of the SARS-CoV-2 virus can carry a significant risk for patients, co-workers and visitors. COVID-19 vaccination is an important tool to help control the pandemic and is strongly recommended by the CDC. *Therefore, all Mass General Brigham personnel are required to receive the COVID-19 vaccination or have an approved exemption.* Medical exemption is allowed only for recognized medically supported reasons.

The CDC encourages all pregnant people or people who are thinking about becoming pregnant and those breastfeeding to get vaccinated to protect themselves from COVID-19. The vaccines are safe and effective, and it has never been more urgent to increase vaccinations as we face the highly transmissible Delta variant and see severe outcomes from COVID-19 among unvaccinated pregnant people.

Your patient has indicated that they have a medical reason or contraindication not to be vaccinated. Please document if you believe that there is a medical reason or contraindication below.

☐ **History of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID-19 vaccine.** We encourage consultation with an allergy specialist.

   Vaccine name or vaccine component: _____    Date Received: _____

   Description of reaction:_____

☐ **Temporary exemption due to administration of COVID-19 monoclonal antibodies:**

   Date of last dose administered: _____

☐ **Temporary exemption due to history of multisystem inflammatory syndrome:**

   Date of diagnosis: _____

**Other medical reasons (Please describe below):** Requests will be reviewed on a case-by-case basis. Clarification from the requesting employee and/or their physician may be requested in writing or by phone.

_____

_____

I certify that my patient has the above contraindication and request the medical exemption.

Provider Name: _____    Date: _____
                (Please print clearly)

Provider Signature: _____    License #: _____

Telephone #: _____

Please email this completed form to PHSOHSCOVID19@partners.org

SOUF I, ¶ 162; PSMF I, ¶162 (Undisputed); A. Vol. 1, pp. 3-4, 15-16 (Hashimoto Dec. ¶¶8-11 Ex. 7).

5.     The HCP could check various boxes to indicate certain conditions identified by the CDC as potential contraindications for the COVID vaccine, including "history of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID vaccine," "temporary exemption due to administration of COVID-19 monoclonal antibodies,"

3

and "temporary exemption due to a history of multisystem inflammatory syndrome." The form allowed the HCP to identify and describe "Other medical reasons." The form states: "Requests will be reviewed on a case-by-case basis. Clarification from the requesting employee and/or their physician may be requested in writing or by phone." SOUF I, ¶ 162; PSMF I, ¶162 (Undisputed); A. Vol. I, pp. 3-4, 15-16 (Hashimoto Dec. ¶¶8-11 Ex. 7).

### C.    The Occupational Health Clinical Panel

6.    MGB assembled two clinical panels to review medical exemption requests. SOUF I, ¶ 163; PSMF I, ¶163 (Undisputed); A. Vol. I, p. 4 (Hashimoto Dec. ¶13-16).

7.    In assembling the team for review of medical exemptions, Dr. Hashimoto wanted to: take advantage of MGB's internationally renowned medical experts, including experts in vaccines, occupational health, and infection control; ensure a standardized and consistent approach; and given the public health crisis, ensure a nimble process in which requests were timely processed so that the vaccination program would be in place before another surge occurred. SOUF I, ¶ 164; PSMF I, ¶164 (Undisputed); A. Vol. II, p. 71 (Hashimoto Tr. 42).

8.    Dr. Hashimoto designed the system to include panels so that no single clinician decided the outcome. SOUF I, ¶ 165; PSMF I, ¶165 (Undisputed); A. Vol. II, p. 71 (Hashimoto Tr. 45).

9.    When medical exemption request came in, the Occupational Health Clinical Panel ("OHCP") reviewed the requests. A. Vol. I, p. 4 (Hashimoto Dec. ¶25); Medical Panelist 2 Dep., 125:11-19.

10.    The OHCP was comprised of three occupational health clinical directors who were nurse practitioners and registered nurses by training. Dr. Hashimoto selected these nurses to serve on the OHCP because they were some of the most experienced in the state, and even nationally, in terms of being responsible for the administration of vaccines. Affidavit of Michael

4

E. Steinberg ("Steinberg Aff." ¶ 3, **Exhibit 2**, 2026 Declaration of Dr. Hashimoto ("2026 Hashimoto Dec.") ¶2.

11.    There were three people on the Occupational Health Clinical Panel in August 2021. The roles were filled by the leaders of MGB's major Occupational Health clinics because they had substantial clinical and administrative knowledge concerning vaccine delivery. 2026 Hashimoto Dec. ¶3.

12.    When Plaintiff submitted her medical exemption request form to MGB in August 2021, the OHCP was comprised of three clinicians. Medical Panelist 5, an Occupational Health Director, who has a Bachelor of Science in Nursing, is a licensed Adult Nurse Practitioner and as part of her nurse practitioner program, pursued a concentration in occupational medicine at Harvard School of Public Health. Most recently she completed a Doctor of Nursing Practice. Medical Panelist 2, a Director of Occupational Health Services, is a Board-Certified Family Nurse Practitioner with a Master of Science in Nursing and a Master in Public Health. Medical Panelist 6, a Director of Community Occupational Health, is a Registered Nurse with a Master of Science in Nursing. 2026 Hashimoto Dec. ¶4; Medical Panelist 2 Dep., 21:18-22:5, 46:11-25; 49:12-50.

### D.    MGB's Interactive Process with Respect to Medical Exemption Requests

13.    Every medical exemption request was carefully considered by the Occupational Health panel (with input from an Infection Control panel if needed), and was considered in light of the CDC guidance, which in turn was based on the largest set of data available.    2026 Hashimoto Dec. ¶5; Medical Panelist 2 Dep., 32:23-34:6, 116:6-23, 120:14-18, 121:25-122:2, 122:19-123:8; Steinberg Aff., ¶ 4, **Exhibit 3**, June 22, 2022 Deposition of Tyler Adams ("Plaintiff 2022 Dep."), 37:26-38:1.

5

14.     Each medical exemption request received an individualized, thoughtful, case-by-case review.  There were no "automatic" approvals.  SOUF I, ¶ 167; PSMF I, ¶167 (Undisputed). A. Vol. I, pp. 6-7 (Hashimoto Dec. ¶25); A. Vol. II, pp. 90-91 (Kim Tr. 16-18).

**E.     The Medical Panels Used CDC Criteria**

15.     The panels followed the then-current CDC guidance regarding medical contraindications to vaccination, which evolved over time as new data and studies emerged.  The medical contraindications to the vaccine were few and well-defined under the CDC guidance. SOUF I, ¶ 170; PSMF I, ¶170 (Undisputed). *See* A. Vol. I, pp. 3, 7, 17-22 (Hashimoto Dec. ¶¶7 (Ex. 8), 29).

16.     Outside very narrow contraindications, the CDC recommended that the rest of the public get vaccinated. SOUF I, ¶ 170; PSMF I, ¶170 (Undisputed); A. Vol. II, pp. 153-54 (Klompas Tr. 205-06); A. Vol. VII, pp. 26-67 (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html, as the webpage appeared on June 24, 2021); pp. 68-95 (as the webpage appeared on August 10, 2021); pp. 96-124 (as the webpage appeared on August 11, 2021); pp. 125-159 (as the webpage appeared on October 15, 2021; pp. 160-193 (as the webpage appeared on November 5, 2021).

17.     Most people with underlying medical conditions not only were recommended to be vaccinated, but were especially in need of vaccination because they were higher risk for severe disease and death if they contract COVID., SOUF I, ¶ 171; PSMF I, ¶171 (Undisputed). A. Vol. VII, pp. 194-200 (https://web.archive.org/web/20210801230024/https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, as the webpage appeared on or around November 2021); pp. 201-209 (as the webpage appeared on or around January 2023).

6

325104192v.8

18.    MGB's experts' consensus was that exemptions should be based on CDC guidance, like the rest of MGB's policy for COVID.,  This provided consistency in following the science and public health recommendations, and allowed decisions to be based on the very large community of public health experts that result in CDC guidance, rather than just one particular clinician signing the exemption form. SOUF I, ¶ 172; PSMF I, ¶172 (Undisputed); A. Vol. II, p. 71 (Hashimoto Tr. 43-45); A. Vol. II, p. 91 (Kim Tr. 18-19).

**F.    Allergy-Based Contraindications**

19.    This is a true and accurate copy of an excerpt from the Vaccination Policy that pertains to medical contraindications based on allergies.

> o    Workforce members who seek a medical exemption due to medical contraindications (e.g., a previous severe or immediate allergic reaction to a vaccine or the components of a COVID-19) must complete an exemption form and provide documentation from a qualified health care provider that will be subject to review by OHS.

Klompas Declaration, ¶15, Dkt. 28; Vaccination Policy, Dkt. 31-4.

20.    This is a true and accurate copy of an excerpt from MGB's COVID-19 Policy clinical guidance that pertains to medical contraindications based on allergies.

2. Contraindications
   a. There are limited contraindications to vaccination. These are defined by the CDC (see Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized in the United States) and include a history of the following:
      i. Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine
      ii. Immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine
   b. Individuals with the following allergy histories should be provided counseling prior to vaccine administration in order to make an informed decision. Some of these allergies are specific to particular vaccine preparations. Discussion with an allergy expert may help identify safe alternatives.
      i. History of severe allergic reaction (anaphylaxis) to a vaccine; 30-minute post-vaccination observation required
      ii. History of a severe allergic reaction (anaphylaxis) to polyethylene glycol (PEG) or PEG-containing products such as Miralax or an injectable steroid: pre-vaccination virtual and/or in-person allergy evaluation required
      iii. History of a severe allergic reaction (anaphylaxis) to polysorbate or polyoxyl 35 castor oil (e.g., paclitaxel) containing injectable or vaccine: consider pre-vaccination e-consult or virtual allergy visit at HCP's discretion
      iv. History of a severe allergic reaction (anaphylaxis) to another antigen (e.g., food, medication, venom, latex): 30-minute post-vaccination observation required
      v. History of severe allergic reaction to specific formulation of COVID-19 vaccine after receipt of the vaccine; pre-vaccination virtual and/or in-person allergy evaluation required

*See* Hashimoto Dec. ¶7; MGB's COVID-19 Policy clinical guidance, Dkt. 31-8.

7

21.    MGB's policy was based on CDC guidance, as was true for its other COVID-related employee policies. *See* Hashimoto Dec. ¶7.

22.    This is a true and accurate copy of an excerpt—from the August 11, 2021 CDC Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized in the United States—that pertains to allergy-based contraindications to COVID-19 vaccines.

## Contraindications and precautions

Contraindications and precautions to COVID-19 vaccines are described below and summarized in Appendix B. For the purposes of this guidance, an immediate allergic reaction to a vaccine or medication is defined as any hypersensitivity-related signs or symptoms such as urticaria, angioedema, respiratory distress (e.g., wheezing, stridor), or anaphylaxis that occur within four hours following administration.

Healthcare professionals or health departments in the United States can request a consultation from the Clinical Immunization Safety Assessment COVIDvax project about an individual patient residing in the United States for a complex COVID-19 vaccine safety question not readily addressed by CDC guidance.

### Contraindications

CDC considers a history of the following to be a contraindication to vaccination with COVID-19 vaccines:

- Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine
- Immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the vaccine

[Dkt, 161-21] A. Vol. I, p. 8 (Hashimoto Dec. ¶34); A. Vol. VII, p. 96 (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html, as the webpage appeared on August 11, 2021) ("August 11, 2021 CDC Guidance").

23.    A "severe allergic reaction" poses a very high level of danger; it is generally at the level of an anaphylactic reaction, or otherwise very serious medically, such as difficulty breathing or other life-threatening condition. 2026 Hashimoto Dec. ¶6; Medical Panelist 2 Dep., 34:7-19.

24.    A "severe allergic reaction" does not include all kinds of allergic reactions; it is a special category of reaction that does not include more mild reactions such as a rash. 2026 Hashimoto Dec. ¶7.

8

25.     Under the CDC guidance, "an immediate allergic reaction to a vaccine or medication is defined as any hypersensitivity-related signs or symptoms … that occur within four hours following administration." August 11, 2021 CDC Guidance (emphasis added).

26.     Having a medical contraindication under the CDC guidance does not mean that a person can never get the vaccine to which there is a contraindication.  Rather, having a medical contraindication due to a severe or immediate allergy raises a red flag and means that there needs to be an individualized evaluation by an allergist to determine whether it is reasonably safe to administer the vaccine. 2026 Hashimoto Dec. ¶8.

27.     The different brands and types of COVID vaccines had different ingredients: the mRNA Moderna and Pfizer vaccines contained polyethylene glycol ("PEG"), while the non-mRNA Janssen ("J&J") vaccine did not contain PEG. The non-mRNA J&J vaccine contained polysorbate 80 ("PS80"), while the mRNA Moderna and Pfizer vaccines did not contain PS80. August 11, 2021 CDC Guidance; 2026 Hashimoto Dec. ¶9; Medical Panelist 2 Dep., 42:10-43:18, 92:4-8.

28.     The CDC guidance specifically provides that some people with a contraindication to one of the mRNA vaccines "may be able to receive [the J&J] Vaccine after a detailed risk assessment and possible allergy testing." August 11, 2021 CDC Guidance.

29.     Having a contraindication to one type of vaccine did not automatically preclude an individual from receiving the other type of vaccine. 2026 Hashimoto Dec. ¶10; Medical Panelist 2 Dep., 134:21-136:5.

30.     Under the Vaccination Policy, employees could receive any of the then available vaccines: the two-vaccine series of Pfizer or Moderna vaccines or the single dose of the J&J vaccine.  Vaccination Policy, Dkt. 31-4.

### G.    Thrombophilia Is Not a Contraindication Under CDC Guidance

31.    This is a true and accurate copy of an excerpt from the August 11, 2021 CDC Guidance that addresses specific considerations for the use of the J&J vaccine among people with venous thromboembolism (VTE) and risk factors for VTE, including thrombophilia:

Venous thromboembolism (VTE), defined as deep vein thrombosis, pulmonary embolism, or both, are common. The biologic mechanisms for VTE (as well as arterial thrombi) differ from the underlying immune-mediated mechanism for HIT. Based on current knowledge, experts believe that people with risk factors for VTE (e.g., inherited or acquired thrombophilia including Factor V Leiden; prothrombin gene 20210A mutation; antiphospholipid syndrome; protein C, protein S or antithrombin deficiency), or a prior history of other types of thromboses (including cerebral venous sinus thrombosis [CVST]) not associated with thrombocytopenia are unlikely to be at increased risk for TTS. Likewise, although the risk of thrombosis is increased during pregnancy and the postpartum period, and with certain hormonal contraceptives (e.g., combined oral contraceptives, patch, and ring), experts believe that these factors do not make people more susceptible to TTS after receipt of the Janssen COVID-19 vaccine. People with risk factors for VTE can receive any currently FDA-authorized vaccine, including the Janssen COVID-19 vaccine.

[Dkt, 161-21] A. Vol. I, p. 8 (Hashimoto Dec. ¶34); A. Vol. VII, p. 96 (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html, as the webpage appeared on August 11, 2021).

32.    Under this August 11, 2021 CDC Guidance, people with risk factors for VTE, including those with thrombophilia, were not contraindicated from receiving any of the then-authorized vaccines and could receive any of them, including the J&J vaccine. August 11, 2021 CDC Guidance; 2026 Hashimoto Dec. ¶11; Medical Panelist 2 Dep., 61:15-24, 151:14-152:1, 153:9-14.

### H.    MGB Asked for Additional Information When Needed

33.    The panel(s) could generally make decisions based upon the original submission by HCPs.  However, when the panel had questions for the employee or his or her HCP, such as when the information provided was too vague, or the nature or severity of the condition was unclear, they would reach out to the employee or the HCP for more information.  The employee or HCP could provide more information at a dedicated, confidential e-mail mailbox. SOUF I, ¶ 169; PSMF I, ¶169 (Undisputed). A. Vol. I, pp. 7-8 (Hashimoto Dec. ¶¶29-30, 32).

10

34.     Additionally, depending on the nature of the request, MGB would ask for more information from a specialist, such as—in the case of a claimed allergy to a vaccine or a vaccine component—an allergist. 2026 Hashimoto Dec. ¶12.

35.     Employees who requested an exemption based on certain allergy concerns were offered an opportunity to see an allergist at MGB on a prioritized basis.  This was optional and no employee was denied an exemption for the sole reason that they elected not to see an allergist from the MGB network. SOUF I, ¶ 180; A Vol. II, pp. 75, 76 (Hashimoto Tr. 59, 62-63).

36.     For employees who had concern about CDC contraindications involving an allergic reaction to the COVID vaccine, MGB made available the very best allergists, including those who had specialized knowledge about the COVID vaccine. Dr. Hashimoto, who designed the medical exemption process, believed it was important that the very best should be available as an option to employees who had such concerns, though they were also free to see their own allergists, if they wished.  2026 Hashimoto Dec. ¶13.

37.     Dr. Hashimoto, in designing the medical exemption process, determined that, in the case of request based on a claimed allergy, the very best medical advice available would be from an allergist who has specialized knowledge and understands the data specifically associated with the COVID vaccine.  He determined that a treating primary care physician may not have the necessary expertise to make the decision.  2026 Hashimoto Dec. ¶14.

38.     Where there was concern about a possible CDC contraindication, allergists who are highly familiar with vaccines like the COVID vaccine, may consider delivering a portion of the dose rather than the whole dose, initially. They may extend the observation period. They would be certain that the necessary medications would be available in case an urgent situation arose, such as an anaphylactic attack.  2026 Hashimoto Dec. ¶15.

325104192v.8

39.    Ensuring that the exemption was supported by a treating provider with the appropriate expertise was important, especially in a climate where certain providers would sign fraudulent notes without any relevant expertise.  2026 Hashimoto Dec. ¶16.

40.    There was a lot of misunderstanding about what is meant by an anaphylactic reaction or a severe allergic reaction, which was part of the reason why MGB had a process to ensure that there were experts involved in determining whether an individual fell into the severe category, and if the individual did fall into that category, whether there was the possibility of getting the vaccine, depending on the expert's recommendation. That is why it was very important to have experts involved, as opposed to general medical advice by providers who do not make allergic reactions their main study.  2026 Hashimoto Dec. ¶17.

41.    MGB's practice of requesting documentation from an allergist is consistent with the CDC guidance, which provided that referral to allergist-immunologist should be considered where there is a contraindication or precaution to vaccination based on an allergic reaction. August 11, 2021 CDC Guidance.  2026 Hashimoto Dec. ¶18.

I.    **The Process for Decisions on Exemption Requests**

42.    Each employee requesting exemption received an individualized decision on his or her medical exemption request.  2026 Hashimoto Dec. ¶19.

43.    Those employees who met MGB's criteria for a medical exemption were approved.  2026 Hashimoto Dec. ¶20.

44.    Those employees who did not demonstrate the need for a medical accommodation were not approved.  2026 Hashimoto Dec. ¶21.

45.    Each employee whose exemption request was denied was informed that the exemption request would be reassessed if additional medical documentation was submitted for consideration. Hashimoto Dec. ¶¶38.

325104192v.8

46.    The employee or his or her treating provider could provide more information at a dedicated Occupational Health e-mail mailbox. Hashimoto Dec. ¶32.

47.    Those employees who were not approved for a medical exemption and refused vaccination by the deadline were ultimately terminated.  2026 Hashimoto Dec. ¶22; Medical Panelist 2 Dep., 71:12-19.

## II.    PLAINTIFF'S INITIAL EMPLOYMENT WITH MGB

48.    In March 2018, Tyler Adams ("Plaintiff") began working for MGB as a Medical Assistant in the North Shore Physicians group at its Rowley, MA location. Plaintiff 2022 Dep., 12:21-13:2; 13:24-14:4; 14:9-15.

## III.    PLAINTIFF'S 2020 MASK ACCOMMODATION

49.    In June 2020, after MGB implemented a mask policy for COVID-19, Plaintiff submitted a letter to MGB from Samantha Flecchia, a nurse practitioner in the office of Plaintiff's primary care provider ("PCP"), Dr. Guido "Guy" Navarra, stating that Plaintiff had an allergic reaction to medical-grade surgical masks, which caused her to break "out into hives on her face and eyelids."  Steinberg Aff., ¶ 5, **Exhibit 4**, ("June 2020 Letter"); Steinberg Aff., ¶ 6, **Exhibit 5**, Signed Affidavit of Tyler-Marie Adams (2021 Affidavit).

50.    According to his publicly available profile, Dr. Navarra is Board-Certified in Internal Medicine, Geriatrics, and Obesity Medicine.[2]    Steinberg Aff., ¶ 7, **Exhibit 6**, Guy

---

[2] According to publicly available information on the justic.gov website, in June of 2021, Dr. Navarra entered into a Settlement Agreement with the Drug Enforcement Administration pertaining to his prescribing practices with respect to certain controlled substances.  Steinberg Aff., ¶ 8, **Exhibit 7**, U.S. v. Guido    Navarra,    M.D.    Settlement    Agreement    [https://www.justice.gov/usao-ma/press-release/file/1405421/dl]    Additionally, according to publicly available information on the Mass.gov website, the Massachusetts Board of Registration in Medicine took disciplinary action against Dr. Navarra for rendering substandard care to patients with regard to prescribing opioids, and stayed the suspension of his medical license, pursuant to a Consent Order, after he acknowledged rendering such substandard care.  Steinberg Aff., ¶ 9, **Exhibit 8**, February 29, 2024 Massachusetts Board of Medicine Disciplinary  Action.  [https://www.mass.gov/news/massachusetts-board-of-medicine-takes-disciplinary-action-february-29-2024].

325104192v.8

Navarra, MD's public profile ("Navarra Profile") [https://drguynavarra.com/]. The profile does not indicate that Dr. Navarra is an allergist or that he has any specialized expertise regarding allergies. *Id.*

51.    In 2020, Plaintiff's PCP advised her to undergo allergy testing.  2021 Affidavit.

52.    On August 11, 2020, Plaintiff had allergy patch testing done at a dermatology office.[3]  2021 Affidavit.

53.    On August 14, 2020, Plaintiff forwarded a letter from her dermatologist's office to her office manager, listing the positive allergens from Plaintiff's test results and her mask use restrictions. *Id.*

54.    Plaintiff's request for accommodation from masking was based on an alleged contact allergy to quaternium-15 and its formaldehyde-releasing counterparts.  The medical documentation Plaintiff submitted in support of her mask accommodation request did not mention thrombophilia or a PEG or PS80 allergy, or state that Plaintiff had a diagnosed allergy to either of those substances.  2026 Hashimoto Dec. ¶24.

55.    Nothing about Plaintiff's 2020 request for an accommodation for her contact allergy to masks suggested that she met the criteria in 2021 for a CDC contraindication for the COVID vaccine.  2026 Hashimoto Dec. ¶25.

56.    MGB worked with Plaintiff to find an accommodation for her mask allergy, including having her wear and test several different types of Powered Air-Purifying Respirators ("PAPRs"). 2021 Affidavit.

---

[3] The provider whom Plaintiff refers to in an affidavit as her "dermatologist," Kimberly Comeau, PA-C, is actually a physician's assistant practicing in a dermatology office.  According to the publicly available "About Us" section of Dermatology Associates—which includes Dermatology Associates of Danvers, 140 Commonwealth Avenue, Danvers, MA—Kimberly Comeau is a PA-C with their practice.  Steinberg Aff., ¶ 10, **Exhibit 9**, Dermatology Associate About Us ("Dermatology Associates About Us") [https://dermatology-assoc.com/aboutus/]. In keeping with Plaintiff's characterization, when referencing Plaintiff's dermatologist, MGB is referring to PA Comeau.

325104192v.8

57.     In November 2020—after MGB attempted to find an accommodation that would have allowed Plaintiff to remain in her clinical position, and at her request—Plaintiff was transferred to a role as a New Patient Clinical Navigator in the Department of Operations for the North Shore Physicians Group, working remotely, as a medical accommodation for her mask allergy. *Id.*; Plaintiff 2022 Dep., 13:10-23, 15:21-16:2.

58.     In that new role, Plaintiff would receive the folders for new patients, pull their available records, and call the patients to review their past medical history, current medications, allergies, surgeries, family history, and their current concerns. *Id.*, 16:3-13.

59.     In April 2021, Plaintiff moved to South Carolina and continued working remotely for MGB in the New Patient Clinical Navigator position. *Id.*, 18:1-19:2.

## IV.    PLAINTIFF'S PRE-2021 VACCINATION RECORD

60.     Before Plaintiff requested an exemption from the COVID-19 vaccine in 2021, she had never requested a medical exemption from any vaccine. *Id.*, at 21:4-6.

61.     Prior to 2021, from 2017 to 2020, Plaintiff received the following vaccines: Influenza on October 15, 2017; Tdap on March 16, 2018; Influenza on September 25, 2018; Influenza on September 30, 2019; and Influenza on November 5, 2020.  Steinberg Aff., ¶ 11, **Exhibit 10**, Plaintiff Phase I Questionnaire ("Plaintiff Phase I Questionnaire"); Steinberg Aff., ¶ 12, **Exhibit 11**, Plaintiff Vaccine Administration Record ("Vaccine Record"); Plaintiff 2022 Dep., 22:9-13.

62.     Prior to receiving these vaccines in 2017-2020, Plaintiff did not consult her doctor to determine whether she should receive any of these vaccines or whether any of them contained any components to which she was alleges she is allergic. *Id.*, 22:18-21; 24:4-8.

15

63.     Aside from localized swelling with the influenza vaccine, which she managed with allergy medication, Plaintiff did not experience any other adverse reactions to these vaccines. *Id.*, 23:13-24:1; 24:22-25:4.

64.     In 2021, when the COVID-19 vaccine was first required, Plaintiff also requested—for the first time—a medical exemption from the influenza vaccine even though she had successfully managed her localized reaction to that vaccine with allergy medication. This was the first time Plaintiff had ever requested a medical exemption from the influenza vaccine. *Id.*, 24:17-25:8.

## V.     PLAINTIFF RECEIVED NOTICE OF THE VACCINATION POLICY

65.     On or about August 10, 2021, Plaintiff received a communication from MGB's President announcing that MGB had decided to require a COVID-19 vaccination for all employees. Plaintiff 2022 Dep., 31:9-21; Steinberg Aff., ¶ 13, **Exhibit 12**, August 10, 2021 Message Regarding Vaccine Requirement ("August 10 Vaccination Message").

16

325104192v.8

66.    That communication stated in part:

Dear Colleagues:

Thank you for your outstanding service to our patients and their families, and your continued support of one another during these challenging times.

COVID-19 cases have increased in Massachusetts and across the nation as the highly transmissible delta variant surges. Currently, the vast majority of cases, hospitalizations and deaths are occurring in unvaccinated individuals. COVID-19 is a largely preventable disease and vaccination is a critical step we *all* need to take to help stop this current surge in cases. Over 348 million doses have been administered in the United States to date and more than 165 million Americans have been fully vaccinated. Although the new delta variant is more contagious than others, available COVID-19 vaccines are safe and effective at preventing serious illness and death from COVID-19.

As COVID-19 cases increase nationwide, Mass General Brigham joins other leading healthcare systems in ensuring we are doing everything we can to protect the health of our patients and each other.

After extensive input from our experts and careful deliberation, we have modified the timing of vaccination requirements as a condition of employment as follows:

- All current Mass General Brigham employees must have received a complete series of COVID-19 vaccine by October 15, 2021 (both doses Pfizer or Moderna, or single dose Johnson & Johnson). Requiring COVID-19 vaccine as a condition of employment is consistent with our approach to the influenza vaccine requirement implemented in 2018. To satisfy this requirement, you must do one of the following:

  o  Get vaccinated as soon as possible. There are many community sites offering free COVID-19 vaccines. Find a convenient location in Massachusetts or New Hampshire.

  o In order to meet the October 15 deadline for Pfizer and Moderna, employees must receive their first dose of Pfizer no later than September 23, and Moderna no later than September 16. Johnson & Johnson is single dose and must be received by October 15.

  o  If you have completed your vaccination series already, you still must take action:

  o If you were vaccinated at a Mass General Brigham site, you must provide consent to transfer this information to Occupational Health Services here.

  o If you have been vaccinated outside of Mass General Brigham, you must provide documentation here.

- All new hires must receive vaccination clearance to work from Occupational Health beginning September 13, which includes validation of a COVID-19 vaccine: first dose or both doses (Pfizer, Moderna) or single dose (Johnson & Johnson). New hires who have received Pfizer or Moderna first dose vaccinations must follow-up with Occupational Health after receiving their second dose for final clearance.

- Employees seeking an exemption for medical or religious reasons for the COVID-19 vaccine must submit a request by September 3. Access the medical exemption request form. Access the religious exemption request form.

We remain fully committed to supporting our colleagues who may have concerns about receiving the vaccine and have developed guidance to help answer questions, including those related to possible side effects and recommendations for pregnant women. As always, employees are strongly encouraged to discuss specific questions with their healthcare providers.

Thank you for getting vaccinated. Together, we are creating the safest environment possible.

Anne Klibanski, MD

August 10 Vaccination Message.

67.    The deadline for submitting an exemption request from the Vaccination Policy was September 3, 2021.  SOUF I, ¶127; PSMF I, ¶127 (Undisputed); August 10 Vaccination Message.

17

68.     Employees without an approved exemption were required to be fully vaccinated by October 15, 2021. August 10 Vaccination Message.

## VI.   PLAINTIFF'S DERMATOLOGIST REFUSED TO SIGN PLAINTIFF'S REQUEST FOR A MEDICAL EXEMPTION FROM THE COVID VACCINE

69.     After MGB announced its Vaccination Policy, Plaintiff spoke with her dermatologist regarding her alleged allergies and asked if she should be medially exempt from the COVID-19 vaccine due to those allergies.  2021 Affidavit.

70.     Plaintiff's dermatologist "stated she was unable to write a letter of exemption as she was not 'an expert in this area' and did not have [Plaintiff's] complete medical history" and referred Plaintiff back to her PCP.  *Id.*

## VII.   PLAINTIFF'S REQUEST FOR A MEDICAL EXEMPTION FROM THE COVID VACCINE

### A.     Plaintiff Submitted a Medical Exemption Request Form Signed by a Nurse Practitioner at her PCP's Office that Did Not Indicate that Plaintiff Had a Severe or Immediate Reaction to a Component of Any COVID Vaccine

71.     After Plaintiff's dermatologist declined to sign her exemption request, Plaintiff called her PCP's office and spoke with a nurse practitioner.  2021 Affidavit.

72.     On August 23, 2021, Plaintiff submitted a request for a medical exemption from the COVID Vaccine. Steinberg Aff., ¶ 14, **Exhibit 13**, Plaintiff's Covid Vaccine Medical Exemption Request Form 2021 ("Plaintiff's Exemption Request"); Plaintiff 2022 Dep., 32:14-33:2.

73.     This is a true and accurate copy of the form Plaintiff submitted to MGB.

**Mass General Brigham**

COVID VACCINE MEDICAL EXEMPTION REQUEST FORM 2021

*Please Print:*
First Name: Tyler          Last Name: Adams

PeopleSoft/Employee ID #: 100501033          Date of Birth: 01, 29, 1988

*Please have your provider return this completed form to Occupational Health at the email listed at the bottom of the form.*
Dear Health Care Provider,

Mass General Brigham and its affiliates are committed to providing a safe work environment and to patient safety. Transmission of the SARS-CoV-2 virus can carry a significant risk for patients, co-workers, and visitors. COVID-19 vaccination is an important tool to help control the pandemic and is strongly recommended by the CDC. *Therefore, all Mass General Brigham personnel are required to receive the COVID-19 vaccination or have an approved exemption.* Medical exemption is allowed only for recognized medically supported reasons.

Your patient has indicated that they have a medical reason or contraindication not to be vaccinated. Please document if you believe that there is a medical reason or contraindication below.

☐ History of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID-19 vaccine. We encourage consultation with an allergy specialist.

Vaccine name or vaccine component: _____     Date Received: _____

Description of reaction: _____

☐ Temporary exemption due to current pregnancy: Estimated delivery date: _____
According to the CDC and American College of Obstetrics and Gynecology, the COVID-19 vaccination is safe and effective for pregnant women and to protect the baby after it is born. However, pregnancy is a unique personal circumstance. We encourage those pregnant to discuss this issue with their medical provider.

☐ Temporary exemption due to administration of COVID-19 monoclonal antibodies:

Date of last dose administered: _____

☐ Temporary exemption due to history of multisystem inflammatory syndrome: _____

Date of diagnosis: _____

Other medical reasons (Please describe below): Requests will be reviewed on a case-by-case basis. Clarification from the requesting employee and/or their physician may be requested in writing or by phone.
Patient reports burning of hands and feet when taking miralax.

I certify that my patient has the above contraindication and requests the medical exemption.

Provider Name: Meghan Heald          Date: 8/16/21
(Please print clearly)

Provider Signature: Meghan Heald NP          License #: RN226987

Telephone #: 978-462-1555

Please email this completed form to PHSOHSCOVID19@partners.org

EXHIBIT 6
Adams
m.o. 6/22/22

MGB000008180

Plaintiff's Exemption Request.

74.    Plaintiff's medical exemption request was completed and signed by Meghan Heald, a nurse practitioner from Plaintiff's PCP's office. Plaintiff's Exemption Request; Plaintiff 2022 Dep., 32:14-33:6.

19

75.    According to her publicly available profile, Meghan Heald is a Primary Care Adult Nurse Practitioner. Steinberg Aff., ¶ 15, **Exhibit 14**, Megham Heald's public profile [https://primarycare.bilh.org/details/6674/meghan-heald-adult_nurse_practitioner-primary_care-amesbury].

76.    Neither NP Heald nor Dr Navarro diagnosed plaintiff with any alleged allergies to PEG or PS80 or any of the medication to which she claims to be allergic. Plaintiff Phase I Questionnaire.

77.    On the Exemption Request, Ms. Heald did not check the box for "History of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID-19 vaccine" or identify any component of any of the COVID vaccines to which Plaintiff was allergic.  Plaintiff's Exemption Request; Medical Panelist 2 Dep., 44:9-46:2.

78.    Instead, Ms. Heald checked the box to indicate that Plaintiff was seeking the exemption for "other medical reasons" and stated only: "patient reports burning of hands and feet when taking MiraLAX."  Plaintiff's Exemption Request; Plaintiff 2022 Dep., 33:13-18; Medical Panelist 2 Dep., 41:8-14, 43:19-44:8, 145:7-17.

79.    Plaintiff's medical exemption request said nothing about the timing of the onset of her reported reaction to taking MiraLAX and did not indicate that her alleged reaction occurred within four hours of taking MiraLAX.  Plaintiff's Exemption Request; Medical Panelist 2 Dep., 74:8-12.

80.    Plaintiff's reported reaction to burning of hands and feet with taking MiraLAX was the only reason cited in Plaintiff's medical exemption request.  Plaintiff's Exemption Request; Plaintiff 2022 Dep., 33:19-35:23.

20

81.     Aside from this alleged reported reaction to MiraLAX, Plaintiff's medical exemption request said nothing about anaphylaxis or about any allergies.  Plaintiff's Exemption Request; Plaintiff 2022 Dep., 33:19-34:11; Medical Panelist 2 Dep., 45:9-46-2.

82.     MiraLAX is not a component of any of the COVID vaccines.  It is the brand name of a laxative that contains PEG, but MiraLAX and PEG are not one and the same. Medical Panelist 2 Dep., 41:15-43:18, 132:15-133:4.

83.     Plaintiff's request did not mention PEG or PS80.  Plaintiff's Exemption Request; Plaintiff 2022 Dep., 33:19-21.

84.     Plaintiff's request failed to identify which COVID-19 vaccines Plaintiff was allegedly unable to receive—Pfizer or Moderna (the mRNA vaccines) or J&J (the non-mRNA vaccine)—or to explain how any alleged condition would prevent her from safely receiving any COVID vaccination. Plaintiff's Exemption Request.

85.     Plaintiff's medical exemption request said nothing about blood clotting or thrombophilia.  Plaintiff's Exemption Request; Plaintiff 2022 Dep., 34:13-35:6.

**B.     The Occupational Health Panel Reviewed and Denied Plaintiff's Request**

86.     On August 23, 2021, Plaintiff's request was submitted to the Occupational Health Clinical Panel ("OHCP"), and all three members of the panel indicated that Plaintiff's request should be denied. Steinberg Aff., ¶16, **Exhibit 15**, OHS COVID Medical Exemption Request ("OHS Exemption Request");[4] Medical Panelist 2 Dep., 49:12-50:3, 56:20-25.

87.     The OHCP determined that the description of Plaintiff reportedly experiencing burning of the hands and feet when taking MiraLAX was not a severe allergic reaction.  Plaintiff 2022 Dep., 38:5-10.

---

[4] This document, together with the emails with Plaintiff in the interactive process, are the only documents that MGB has located regarding the decision to deny Plaintiff's request.

88.     Medical Panelist 2 testified that the statement on the form that "patient reports burning of hands and feet when taking MiraLAX" did not establish that Plaintiff had an allergic reaction to MiraLAX; it was just a statement of what the patient reported. Medical Panelist 2 Dep., 43:19-44:8, 74:8-12; 133:10-15, 146:2-22.

89.     There was nothing in Plaintiff's exemption request form that indicated a contraindication to receiving a COVID vaccine as there was no documentation of a severe or immediate reaction to a vaccine component.   Medical Panelist 2 Dep., 44:9-46:2, 74:8-12, 154:11-17.

90.     The OHCP's denial was consistent with MGB's implementation of CDC guidance; the description of "reported burning of hands and feet when taking MiraLAX" contained in Plaintiff's initial exemption request does not indicate the type of the severe anaphylactic or life-threatening reaction that constituted a CDC contraindication to COVID vaccination; and there was nothing to indicate that this alleged reaction was immediate (occurring within 4 hours). 2026 Hashimoto Dec. ¶26.

91.     On August 30, 2021, the OHCP sent Plaintiff an email stating that her request for a medical exemption had been reviewed by a clinical panel and was denied because the provided medical information did not demonstrate a sufficient medical reason or contraindication to support an exemption. Steinberg Aff., ¶ 17, **Exhibit 16**, August 30, 2021 Exemption Denial Email ("Exemption Denial"); Plaintiff 2022 Dep., 36:4-37:6; 2021 Affidavit.

92.     The email also informed Plaintiff that she could submit additional information for further consideration and provided her with a link to information regarding the ongoing vaccine clinics.  Exemption Denial.

22

**C.** **Plaintiff Submits a Letter from Her PCP that Did Not Indicate that Plaintiff Had a Severe or Immediate Reaction to a Component of Any COVID Vaccine**

93. After receiving notification that her exemption request was denied, Plaintiff scheduled a telemedicine appointment with her PCP Dr. Navarra for August 31, 2021.  2021 Affidavit; Steinberg Aff., ¶ 18, **Exhibit 17**, August 31, 2021 Progress Notes from Appointment with Dr. Navarra  ("August 31, 2021 Progress Notes").

94. On September 2, 2021, Plaintiff sent an email to the OHCP stating that she was providing a letter from her primary care physician with further medical information to support her exemption request.  Steinberg Aff., ¶ 19, **Exhibit 18**, August 30 to September 5, 2021 Email Chain ("Response to Exemption Denial"); Plaintiff 2022 Dep., 38:19-39:21, 40:17-18.

95. This is a true and accurate copy of the letter Plaintiff submitted to MGB.

325104192v.8



Seacoast Medical Associates
21 HIGHLAND AVE
NEWBURYPORT MA 01950-3873
978-462-1555
09/01/2021

RE: TYLER ADAMS

To Whom It May Concern,

This letter is to certify that I am the primary care provider for this patient. I am writing to verify that this patient has been seen and treated in this office 08/31/2021. Patient is exempt from getting the COVID vaccine due to history of multiple allergies: MiraLAX, Cipro, Dupixin, Formaldehyde, Neomycin, Bromol and a history of Thrombophilia.

Please do not hesitate to contact our office should you have further questions.

Sincerely,

GUY NAVARRA, MD

Steinberg Aff., ¶ 20, **Exhibit 19**, September 1, 2021 Letter from Dr. Guido "Guy" Navarra ("Navarra Letter");Plaintiff 2022 Dep., 38:22-40:2.

96.     Dr. Navarra's letter said nothing about the timing of the onset of Plaintiff's alleged allergic reactions to taking MiraLAX, Cipro, Dupixent, Formaldehyde, Neomycin, or Bromol, nor did he indicate that her alleged allergic reactions to any of these

24

325104192v.8

medications/substances occurred within four hours of taking them.  Navarra Letter; Medical Panelist 2 Dep., 74:8-12, 133:16-20.

97.    Dr. Navarra's letter did not describe the nature of Plaintiff's alleged allergic reactions to taking MiraLAX, Cipro, Dupixent, Formaldehyde, Neomycin, or Bromol.  Navarra Letter.

98.    Dr. Navarra's letter said nothing about the severity of Plaintiff's alleged allergic reactions to taking MiraLAX, Cipro, Dupixent, Formaldehyde, Neomycin, or Bromol, and said nothing about Plaintiff having an anaphylactic reaction to any of these medication or substances. Navarra Letter; Medical Panelist 2 Dep., 74:8-12, 133:16-20.

99.    The letter from Dr. Navarra did not mention PEG or PS80.  Navarra Letter; Medical Panelist 2 Dep., 146:23-147:9.

100.    The letter from Dr. Navarra failed to identify which of the COVID-19 vaccines Plaintiff was allegedly unable to receive or explained how her alleged conditions would prevent her from safely receiving any COVID vaccination.  Navarra Letter.

101.    The letter from Dr. Navarra did not meet the criteria for demonstrating a contraindication to COVID vaccination because it did not demonstrate that Plaintiff had a severe or immediate allergic reaction to a vaccine component. Medical Panelist 2 Dep., 72:8-73:14; 115:9-116:9, 141:15-143:1.

**D.    After Reviewing the Letter from Dr. Navarra, the OHCP Informed Plaintiff that Her Request Was Still Denied**

102.    On September 5, 2021, the OHCP replied to Plaintiff's email regarding the new submission from Dr. Navarra, stating that the additional information had been submitted to the panel for review.  Response to Exemption Denial; Plaintiff 2022 Dep., 40:18-41:2.

25

103.   On September 13, 2021, Plaintiff replied to that email asking if there was an estimated date as to when she would be informed of the panel's determination.  Steinberg Aff., ¶ 21, **Exhibit 20**, August 30 to September 19, 2021 Email Chain ("Confirmation of Exemption Denial"); Plaintiff 2022 Dep., 41:7-42:9; 2021 Affidavit.

104.   On September 16, 2021, the OHCP responded, stating that the panel had reviewed the additional information and that Plaintiff's exemption request was still denied.  Confirmation of Exemption Denial; Plaintiff 2022 Dep., 43:13-17; 2021 Affidavit.

105.   This denial was consistent with MGB's implementation of CDC guidance: a statement that an individual has an allergy to a list of medications, without any additional information regarding the nature, severity, or timing of those allergic reactions is insufficient to demonstrate that the individual had the type of severe (anaphylactic or life-threatening) or immediate (within four hours) reaction that would constitute a CDC contraindication to COVID vaccination. 2026 Hashimoto Dec. ¶27.

106.   The denial was consistent with MGB's implementation of CDC guidance:  neither submission referenced anaphylactic or other life-threatening reactions, identified which vaccines Plaintiff was allegedly unable to receive, explained how her alleged conditions would prevent her from safely receiving a COVID vaccination, or contained information regarding possible options for Plaintiff to receive a vaccine with extra precautions, such as providing a partial dose or longer observation period. 2026 Hashimoto Dec. ¶28.

107.   Allowing a medical exemption when there was not a sufficient reason to get an exemption—such as when someone had an allergy to a component of a vaccine that was neither severe or immediate—represented a significant threat to the health or safety other others, including other members of the workforce, as well as patients. If MGB were to have granted

26

Plaintiff's request, it would have had to grant the request of potentially thousands who may have similar medical issues but did not qualify for a medical exemption. It would have opened up the flood gates and would have prevented MGB from achieving its goal to get as close as possible to universal vaccination of employees, which was necessary at that time. 2026 Hashimoto Dec. ¶29.

E.    **The OHCP Advised Plaintiff to Consult an Allergist Regarding Her Concerns and to Evaluate Whether a Non-mRNA Vaccine Was an Option, Offered to Arrange for Her to Have a Consult with an MGB or BWH Allergist, and Informed Her that She Could Resubmit Her Request After an Allergy Consult**

108.    The OHCP's September 16, 2021 email to Plaintiff also stated:

If you would like an allergy consult, we can arrange a referral for you….

The recommendation is that you consult an allergist for your specific concerns, as well as to evaluate whether a non-mRNA vaccine should be considered as a possible option.  If you wish, you may receive consultation from the MGH or BWH Allergy departments.  If interested, please reply back to this email and we can help enter a referral on your behalf.  Employees can resubmit the exemption form as needed, after consulting an allergy specialist.

Confirmation of Exemption Denial; Plaintiff 2022 Dep., 43:18-44:10.

F.    **Following the Denial of Her Request, Plaintiff Did Not Consult an Allergist as Recommended or Submit any Other Medical Documentation to MGB**

109.    Despite MGB's recommendation to see an allergist and offer to have a consultation with one of MGB's allergy departments, Plaintiff did not consult with an allergist after her request was denied and never asked for a referral to a MGH or BWH allergist. Plaintiff 2022 Dep., 44:7-16, 49:16-18.

110.    Instead, on October 1, 2021, Plaintiff responded to the September 16, 2021 denial email, requesting a contact number to speak with someone regarding her exemption status. Steinberg Aff., ¶ 22, **Exhibit 21**, August 30 to October 1, 2021 Email Chain ("Exemption Status Email"); Plaintiff 2022 Dep., 45:4-17. She also stated that she was currently working remotely as

a medical accommodation for an alleged allergy to a chemical in medical masks, and that she would not be in the office until the mask requirement was lifted.  Exemption Status Email.

111.    Between September 16, 2021, when MGB asked Plaintiff if she wanted an allergy consult and October 1, 2021, when Plaintiff sent this email asking to speak with someone about her exemption status, Plaintiff never asked MGB if she would have to pay for an allergy consult or whether she could do a consult virtually.  Plaintiff 2022 Dep., 45:18-23.

112.    Nor did Plaintiff go back to her primary care doctor, Dr. Navarra, to ask for updated information.  Plaintiff 2022 Dep., 45:24-46:4.

113.    Plaintiff knew that she could talk to an allergy specialist from BWH or MGB, that she could do so virtually, and that perhaps the allergy specialist would support her exception request.  Plaintiff 2022 Dep., 48:20-49:1.

114.    Despite this, Plaintiff never took MGB up on its offer to have a consult with an MGH or BWH allergist.  Plaintiff 2022 Dep., 49:2-5.

115.    Plaintiff testified that she did not take MGB up on its offer to see an allergist because she "had already seen an allergist outside of MGH" and did not see physicians within the MGB system. *Id.*, 44:7-21.

116.    Plaintiff submitted nothing to MGB from any allergist. Plaintiff's Exemption Request; Navarra Letter.

117.    There is no evidence in the record of Plaintiff seeing any allergist. Plaintiff Phase I Questionnaire; Dermatology Associates About Us; Navarra Profile.

118.    Plaintiff does not allege that she went to any allergist after her request was denied and testified that she "did not feel the need to seek out anybody else's opinion as [Dr. Navarra] was [her] primary care doctor." *Id.*, 49:16-18.

28

119.    Plaintiff did not submit any other medical documentation to MGB in connection with her request for an exemption from the Vaccination Policy aside from her August 11, 2021 request and the September 2, 2021 letter from Dr. Navarra.  Steinberg Aff., ¶ 23, **Exhibit 22**, April 16, 2026, Declaration of Tyler Adams ("2026 Adams Declaration") [DKT 407-1].

**G.    Plaintiff Declined MGB's Offer to Speak with the Associate Medical Director of Occupational Health at BWH Regarding Her Medical Questions and Concerns**

120.    On October 1, 2021, the OHCP responded to Plaintiff's email of that same date, copying Dr. Paul Medrek, the Associate Medical Director of Occupational Health at BWH, stating:

> The panel is making decisions based on what was submitted and the next step was to recommend an allergy referral to evaluate you for the COVID vaccine, which is unrelated to the mask allergy and the accommodation you have for the mask allergy.
>
> The remote status of employees is not a consideration in the vaccine policy.  In the meantime, please let us know if you'd like to be referred for the allergy consult for the COVID vaccine, which is a virtual consult.
>
> For other questions, I am copying Dr. Medrek, who is one of our occ med physicians and can be available to speak with you as a resource to address any questions.  I am copying in your forms for his information.  Please be aware that [he] does not sit on the panels.

Steinberg Aff., ¶ 24, **Exhibit 23**, August 30 to October 1, 2021 Email Chain with Dr. Medrek added ("Emails with Dr. Medrek Added"); Plaintiff 2022 Dep., 46:9-15; 47:21-48:18.

121.    Dr. Medrek responded promptly, informing Plaintiff that he was available for a call to discuss her concerns, if she wished.  Emails with Dr. Medrek Added; Plaintiff 2022 Dep., 46:16-17, 47:10-15.

122.    Instead of taking Dr. Medrek up on his offer to speak with her, Plaintiff sent him an email stating:

29

325104192v.8

I'm not sure what you would be able to discuss with me. I was informed that you were not on the exemption panel and despite the federal EEO laws [along] with my medical exemption, for the COVID vaccine per my PCP, and the fact that I am currently in a remote position that I accepted as a medical accommodation last year, I am still being threatened daily with termination of employment if I do not receive the COVID vaccine by October 15, 2021. Can you address any of the above issues?

Steinberg Aff., ¶ 25, **Exhibit 24**, October 1, 2021 Email Chain with Dr. Medrek ("October 1 Emails with Dr. Medrek").

123.    Dr. Medrek responded, stating in part: "Regarding any medical questions you may have, I am available to discuss if you would like. I am not empowered to grant you an exemption." October 1 Emails with Dr. Medrek.

124.    Plaintiff did not reach out to Dr. Medrek to talk about her medical concerns or any allergies. Plaintiff 2022 Dep., 47:17-20; October 1 Emails with Dr. Medrek.

## VIII.    PLAINTIFF IS SUSPENDED AND TERMINATED FOR FAILING TO COMPLY WITH THE VACCINATION POLICY

125.    Plaintiff refused to get vaccinated by the October 15th deadline. Plaintiff 2022 Dep., 65:11-23; Steinberg Aff., ¶ 26, **Exhibit 25**, October 20, 2021 Suspension Email ("Suspension Email").

126.    On October 20, 2021, MGB sent Plaintiff a letter stating that its records indicated that she had not complied with the Vaccination Policy. The letter also stated that her access to MGB systems was being revoked, that she would be placed on unpaid administrative leave effective October 21, 2021, that she may not return to work unless she became compliant by November 5, 2021, and that her employment would be terminated if she failed to meet the Vaccination Policy requirements by that date. Suspension Email; Plaintiff 2022 Dep., 66:21-67:6, 79:7-23.

127.    Plaintiff did not comply with the Vaccination Policy by the November 5th deadline, and remains unvaccinated.  Plaintiff Phase I Questionnaire; Steinberg Aff., ¶ 27, **Exhibit 2**, May 20, 2025 Deposition of Tyler Adams ("Plaintiff 2025 Dep."), 107:11-13.

128.    As a result, effective November 10, 2021, MGB terminated her employment for non-compliance with the Vaccination Policy.  Plaintiff Phase I Questionnaire; 2026 Adams Declaration.

## IX.    PLAINTIFF'S POST-TERMINATION STATEMENTS REGARDING HER ALLEGED THROMBOPHILIA AND ALLERGIES – WHICH WERE NOT BEFORE THE MGB OCHP IN 2021

129.    During her 2022 deposition, Plaintiff testified that her PCP told her that she could not get any of the available vaccines because of  allergies and history of thrombophilia.  Plaintiff 2022 Dep., 32:2-9.

130.    According to Plaintiff's verified response to MGB's Plaintiff Questionnaire, one of the medical conditions for which she claims to have sought an exemption from the COVID-19 vaccination was "Thrombophilia."  Plaintiff Phase I Questionnaire.

131.    According to Plaintiff's verified response to MGB's Plaintiff Questionnaire, Plaintiff alleges that Dr. Navarra diagnosed her with thrombophilia on August 21, 2019. Plaintiff Phase I Questionnaire.

132.    According to Plaintiff's verified response to MGB's Plaintiff Questionnaire, one of the medical conditions for which she claims to have sought an exemption from the COVID-19 vaccination was "Allergy."  Plaintiff Phase I Questionnaire.

133.    According to Plaintiff's verified response to MGB's Plaintiff Questionnaire, Kimberly Comeau PA-C, 140 Commonwealth Avenue, Danvers, MA, diagnosed the "Allergy" for which Plaintiff requested an exemption on August 14, 2020, which was around the time when

Plaintiff had the allergy patch testing done in connection with her alleged mask allergy. *Id.*; 2021 Affidavit.

134.    With respect to the alleged allergy for which Plaintiff sought an exemption and alleges was a CDC contraindication to the COVID-19 vaccine, Plaintiff stated in discovery in her Phase I Questionnaire:

> I have multiple known allergies to medications including cipro (Anaphylaxis), Dupixent (systemic reacting), and miralax (swelling and burning) which all include peg or polysorbate 80 in the ingredients.  I also had an allergic reaction after a laparoscopic procedure to the internal sutures and the dermabond, which also both contain polysorbate 80 or peg.

Plaintiff Phase I Questionnaire.

135.    Plaintiff was asked to attach any documents that supported her contention regarding her alleged allergy; she did not include any documents with her questionnaire response that indicate that Ms. Comeau PA-C (or anyone else) diagnosed Plaintiff with an allergy to any of these medications or the ingredients PEG or PS80. Plaintiff Phase I Questionnaire.

136.    During her 2022 deposition, Plaintiff testified that, prior to 2017, she had an anaphylactic reaction to Cipro, an antibiotic she alleges contains PEG, and that she began developing new allergies as of December 2017.  Plaintiff 2022 Dep., 22:21-24.

137.    During her 2022 deposition, Plaintiff testified that all of the medications or injections to which she has been allergic in the past contained either PEG or PS80.  Plaintiff 2022 Dep., 22:6-8.

138.    The only allergic reaction Plaintiff claims to have had since the end of her employment with MGB was a burning and itching rash from a massage cream that contained PEG, which she self-treated by taking two Zyrtec. Plaintiff 2025 Dep., 156:3-157:5.

139.    In Plaintiff's April 16, 2026 Declaration, she stated:

On August 11, 2021, I submitted a request for medical exemption from MGB's COVID vaccine mandate program due to my severe allergy to [PEG] found in MiraLAX and listed as a CDC contraindication for COVID vaccines.  My request stated, "Patient reports burning of hands and feet when taking Miralax.

2026 Adams Declaration [DKT 407-1].

140.    In Plaintiff's April 16, 2026 Declaration, she also stated: "On September 2, 2021, I submitted a letter to MGB from my primary care physician documenting my allergy to Miralax." 2026 Adams Declaration.

## X.    PLAINTIFF ADMITS THAT SHE DOES NOT HAVE A ANAPHYLACTIC REACTION TO MIRALAX

141.    During her 2022 deposition, Plaintiff admitted that she never had an anaphylactic reaction to MiraLAX.  Plaintiff 2022 Dep., 34:9-11.


**Dated:**  July 2, 2026

MASS GENERAL BRIGHAM INCORPORATED

By Its Attorneys,
Respectfully Submitted,

*/s/ Dawn R. Solowey*

Kristin McGurn (BBO# 559687)
Dawn Reddy Solowey (BBO# 567757)
Michael Steinberg (BBO# 690997))
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
kmcgurn@seyfarth.com
dsolowey@seyfarth.com
msteinberg@seyfarth.com
TEL: (617) 946-4800
FAX: (617) 946-4801

325104192v.8

## CERTIFICATE OF SERVICE

I, Dawn R. Solowey, certify that on July 2, 2026, a true and accurate copy of the foregoing document to be filed and uploaded to the CM/ECF system.

/s/ Dawn R. Solowey
Dawn R. Solowey

325104192v.8