## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **TYLER ADAMS, MICHELLE ORFANOS, And JAMIE STEVERMAN,** | ) ) ) | |
| Plaintiffs, | ) ) ) | **Civil Action No. 1:21-cv-11686-FDS** |
| v. | ) ) | |
| **MASS GENERAL BRIGHAM, INC.** | ) ) | |
| Defendant. | ) | |

## PLAINTIFF JAMIE STEVERMAN'S MEMORANDUM OF LAW IN OPPOSITION TO

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1

**INTRODUCTION**

Defendant Mass General Brigham, Inc. ("MGB") asks this Court to hold, as a matter of law, that granting Plaintiff Jamie Steverman, a part-time nurse, the same religious accommodation that MGB provided to hundreds of other employees, would have imposed an undue hardship. MGB cannot meet that standard. It must prove that Steverman, working unvaccinated, caused an undue hardship to MGB, yet it never performed an individualized assessment when it denied her request for a religious exemption from the COVID vaccine, and its own evidence defeats the defense rather than supporting it.[1]

This is MGB's second motion for summary judgment on undue hardship, and it fails for the same reason as the first. In its Phase I order (ECF 173), entered after full fact discovery on a far more developed record than the 2021 preliminary-injunction motion,[2] this Court denied MGB summary judgment on undue hardship. The Court held that because MGB chose to grant exemptions rather than adopt a zero-tolerance policy, it "effectively made a determination that some level of risk … was tolerable," *Id.* at 2, and that the dispute is therefore "not an all-or-nothing proposition," *Id.* at 3.

Hardship could not therefore be resolved when "considered as a whole"; the question was whether reversing a single denial, raising the count of exempt employees "from 234 to 235", would "materially increase[] the risk" enough to be undue. *Id.* at 15. The Court could not answer

---

[1]MGB does not challenge, for purposes of this motion, that Steverman has established a prima facie case of religious discrimination under Title VII. Def. Mem. 8 n.2. The sole question presented is undue hardship. MGB expressly reserves the right to contest sincerity at trial; that reservation underscores that the present motion turns entirely on the affirmative defense, on which MGB bears the burden.

[2]The 2021 preliminary-injunction decision, *Together Employees v. Mass General Brigham Inc.*, 573 F. Supp. 3d 412 (D. Mass. 2021), was decided on a likelihood-of-success standard, before fact discovery, and before *Groff v. DeJoy*, 600 U.S. 447 (2023). It was superseded on the question of undue hardship by this Court's Phase I summary-judgment order, ECF 173, which addressed the same defense on a fuller record under the correct post-*Groff* standard. The earlier caption was *Together Employees*; following the December 2021 amended complaint adding individual plaintiffs, the action proceeds as *Adams v. Mass General Brigham Inc.*.

2

that question then because "[t]he complete factual context in which those [individual] decisions were made" was "not presently before the Court." *Id.* at 3.

Phase II discovery has now filled that gap, overwhelmingly against MGB. The employees MGB accommodated were not back-office staff who could work from home. A large percent were hands-on clinicians: approximately 49 nurses and nurse practitioners, eleven physicians and anesthesiologists, and scores of surgical, radiologic, respiratory, and patient-care technicians, among them a registered nurse working the same shift structure as Steverman. Pl. Exhibit 2. A reasonable jury could infer that MGB's post-hoc "hardship" excuse is pretextual and unsupported on these facts.

Four further sets of undisputed facts, drawn largely from MGB's own files, along with medical evidence that the COVID vaccine failed to stop transmission of the virus, confirm that a reasonable jury could reject MGB's hardship defense.

First, MGB's own vaccination policy committee, with the express endorsement of its Infection Control Department, concluded that employees who were religious exemptions could safely "continue to work on site" while masked and warned that restricting those employees from patient-care areas would create "possible legal risk" precisely "since IC supports safety of working while masked." Pl. Exhibit 3 (MGB000005130). MGB cannot establish undue hardship "as a matter of law" when its own infection-control experts determined the requested accommodation was safe and "allow[ed] for stable staffing." *Id.*

Second, MGB never conducted any individual undue-hardship assessment for Steverman. Her RERC "communicator" testified that reviewers did not consider an applicant's job duties, did not distinguish patient-facing employees from others, and were not trained to evaluate or consider undue hardship. Instead, the emphasis was "the feeling that it was important to approve as few as

3

possible" through increasingly "rigorous" religious criteria. Exhibit 5, 22:19-23:9, 143:16-144:2. The individualized hardship MGB now advances is a *post hoc* litigation theory, unsupported by its contemporaneous records.

Third, after MGB denied Steverman's accommodation and terminated her, it permitted her to continue working unvaccinated, in person, with MGB patients, on MGB's own campus — as a teach nurse demonstrating clinical procedures — through a contract between MGB and her new employer. The accommodation MGB calls a categorical undue hardship is one it in fact tolerated, in its own buildings, with this very plaintiff.

MGB's motion also rests on legal foundations that *Groff v. DeJoy*, 600 U.S. 447 (2023), swept away. Its lead authorities — the 2021 *Together Employees* preliminary-injunction ruling superseded by the summary judgment decision and a 2016 case, *Robinson v. Children's Hospital Boston,* (2016 WL 1337255 (D. Mass. Apr. 5, 2016), applied the "*de minimis*" hardship standard that *Groff* abolished. Under the governing standard, MGB must show "substantial increased costs in relation to the conduct of its particular business," *Groff* at 470, through a "fact-specific" inquiry into "the particular accommodation[] at issue and [its] practical impact," *Groff* at 470–71, a showing MGB never attempted as to Steverman.

Finally, MGB's motion ignores Steverman's disparate-treatment claim entirely. Its written religious exemption rubric evaluated requests based on denomination and by the content of the applicant's religious beliefs, placing Catholics like Steverman at a disadvantage and consigning the very grounds she asserted ("conscience," "free will," and that her body is "a temple of the Holy Spirit") to an automatic-deny list. That claim alone independently presents a genuine issue for trial, and requires that the motion be denied.

4

## STATEMENT OF FACTS

### A. MGB Concedes Steverman's Prima Facie Case.

Jamie Steverman worked for MGB as a nurse in various positions and facilities from 2005 until her termination in late 2021. (SOF 74) A devout Catholic, Steverman believes she received guidance from the Holy Spirit — which Catholics believe speaks to the faithful through the religious conscience — to avoid vaccination. (SOF 76) Consistent with that belief, beginning in 2017, she declined vaccination and repeatedly sought and obtained religious accommodation from MGB's prior, decentralized flu-vaccine exemption process. [SOF 75.] For purposes of this motion, MGB does not challenge the sincerity of Steverman's religious beliefs or her prima facie Title VII case. Its sole contention is that accommodating her in person would have been an undue hardship as a matter of law.

### B. Approved Exemptions Included Patient-Facing Clinicians — Including Nurses in Steverman's Own Role

MGB approved exemptions for at least 242 employees. Pl .Exhibit 2 103. Discovery shows many of the approved roles were clinical and in person:[3] For example, MGB estimates that about 49 were staff nurses, clinician nurses, registered nurses, and nurse practitioners; eleven were physicians and anesthesiologists; twenty were surgical, radiologic, ultrasound, CT, respiratory, phlebotomy, and sterile-processing technicians, jobs that are inherently in person and 17 were patient care associates, LPNs and medical assistants.

---

[3]The breakdown is drawn from Pl. Ex. 2 (MGB000015806–11). [CONFIRM tabulation against the exhibit before filing and delete this highligh.]

MGB allowed every one of these employees to continue providing hands-on patient care while unvaccinated, under the same universal masking policy that applied to all staff. Pl. Ex. 2; Def. Ex. 1, 85:5-15.

### C. MGB's Own Infection Control Specialists Concluded That Exempt Employees Could Safely Work On Site While Masked

In August 2021, as MGB's Human Resources and Occupational Health leadership designed the treatment of approved exemptions, MGB's recommendation was unequivocal: "Permit employees with approved exemptions to continue to work on site under existing policies." Pl. Exhibit 3; SOF 133. That recommendation was expressly "Supported by Infection Control" and was preferred as it would "Allow[] for stable staffing." *Id.* MGB considered and *rejected* the alternative of "[p]rohibit[ing] employees with approved exemptions from working patient care areas," concluding that "[e]xisting policies support a safe environment" and that segregation carried "[p]ossible legal risk in treating employees differently based upon medical condition and religious beliefs (since IC supports safety of working while masked)." *Id*.

### D. MGB Did Not Individually Assess Undue Hardship for Steverman — or Anyone

MGB does not assert that anyone individually reviewed whether it would be a hardship to individually accommodate Steverman, either at the time of decision or even throughout this litigation. On the contrary, when asked what the individual hardship would be in interrogatories, MGB refused to answer on the ground that it would be "too burdensome" to individually assess hardship for so many plaintiffs. Pl. Exhibit 6. Despite Plaintiff's motion to compel (ECF No. 414), MGB has refused to supplement these answers or provide any individualized data or analysis or explanation for why Steverman could not be accommodated as hundreds of her colleagues were.

Steverman's "Communicator"[4] confirmed that the religious exemption review committee never considered undue hardship individually. For example, when asked whether the committee "consider[ed] the requestor's position within the hospital," she testified: "No." Pl. Exhibit 5, . 143:16-20. The communicator confirmed that patient-facing positions – even physicians -  "were not treated differently than anyone else." *Id.* 143:22-144:2. She did not recall undue hardship being raised in the committee's training, *Id.* 23:4-9, but left her training with "the feeling that it was important to approve as few as possible," *Id.* 22:19-23:3.

MGB's stated goal was "100 percent" vaccination with as few exemptions as possible, Pl. Exhibit 16, p. 74 — but as this Court recognized in the first denial of summary judgment, MGB set no quota for unvaccinated employees and undertook no assessment of how many could be safely accommodated, in the aggregate or by role. *Id. P.* 74; *see* Resp. SOF 131, 136. MGB's motion presents no individualized data — economic, operational, or epidemiological — explaining why Steverman in particular could not be accommodated the way other nurses and patient facing personnel were. Neither did MGB assess or provide any economic or other data to assess alternative placements or adjustments that could have removed Steverman from patient facing care at any stage – at the time, during litigation or in this motion practice.

**E. After Termination, Steverman Worked Unvaccinated as a Teach Nurse on the MGB/MGH Campus.**

After her termination, Steverman was employed through New England Life Care ("NELC"), an affiliate MGB cooperative whose member/owner hospitals include Massachusetts General Hospital and Brigham and Women's Hospital. In that role she worked as a "teach nurse" as an MGB contractor on the MGB and MGH campus — in person, with patients, demonstrating

---

[4] MGB asserts that it is "impossible to know" who reviewed any specific applications, so instead only disclosed to each plaintiff a "communicator." Because of this Court's protective order, Steverman's "communicator" is referred to as "RERC 5" or "communicator."

clinical procedures such as IV placement. SOF 79. She was allowed to do this while unvaccinated, pursuant to a religious exemption from NELC.[5] MGB did not treat Steverman's unvaccinated, in-person presence on its own campus, around patients, as any barrier. The accommodation MGB insists was an undue hardship "as a matter of law" is one it in fact permitted — in its own buildings, with patients, with this very plaintiff.

### F.  MGB's Written Rubric Pre-Classified Steverman's Stated Religious Grounds as Categorically Deniable

Instead of evaluating any actual safety or economic data, MGB's Religious Exemption Review Committee ("RERC") attempted to limit the number of accommodations by adopting a "more rigorous" written rubric that sorted requests for approval or denial based on the applicant's denomination and the content of her professed beliefs. Pl. Exhibit 9. The rubric placed three enumerated faiths — "Christian Scientist," "Dutch Reform[ed] Church," and "Rastafarian" — on an automatic or near automatic approval track (which is a dispute of material fact) requiring only "at least a basic explanation." Meanwhile, Catholics like Steverman were treated with suspicion under the policy, and forced to justify how they could have beliefs that differed from Pope Francis. Def. Exhibit 1, Page 112..

Steverman's communicator confirmed that the committee applied the denominational grid as written: members of the three favored faiths were approved on a "basic explanation," Pl. Exhibit 5, 50:11-51:8, while requests "based upon" Catholicism and other disfavored faiths required substantially more — though she could not say what. Exhibit 5, 67:1-68:2. She conceded that Catholics could have beliefs that differed from the Pope but she could not articulate any explanation that would have led her to grant a Catholic's request, and that applicants were not told

---

[5] Decl. of Jamie Steverman ¶¶ __; *see also* Pl. Ex. 5 (RERC 5 Dep. 43:13-24). [CONFIRM declaration paragraphs.]

why they were denied, to avoid giving them a "roadmap." *Id.* 96:8-97:2, 106:6-107:15, 132:7-9. Even in a case where RERC found an applicant sincere, and he presented a clear and well-known objection, such as an objection to the use of aborted fetal cells in the production and testing of the three available vaccines (a well-known matter of some debate within the Catholic Church), Steverman's communicator admitted she denied the request.

The RERC Policy did not only categorically sort denominations into preferred versus suspect. It also listed certain *beliefs* as categorically acceptable or deniable. For example, concerns about "mark of the beast" in the New Testament Book of Revelation were on the "Approved" column while abortion and all of Steverman's reasons were on the automatically "Denied" list. Steverman's request invoked precisely the grounds the rubric flagged for denial: that her body is "a temple of the Holy Spirit," that compelled vaccination "removes my free will as God has intended," and that she was "following my conscience." Def. SOUF II ¶¶ 47, 54. MGB's denial letter tracked a rigid reading of the RERC policy, telling Steverman that she was denied because her "religion has publicly supported vaccination." Def. SOUF II ¶ 52.

MGB's automated exclusion of "conscience" and its interplay with free will regarding the body fundamentally mischaracterizes Catholic doctrine, reducing a mandatory, core religious tenet to a mere personal preference. In formal Catholic theology, an individual's conscience is not an ad hoc personal whim; it is codified as "man's most secret core and his sanctuary" where he is "alone with God whose voice echoes in his depths." [6] Because the voice of conscience is understood to be the very voice of God prompting the believer, a Catholic is religiously "obliged to follow

---

[6] *Catechism of the Catholic Church* § 1776 (2d ed. 2019) ("Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. . . . For man has in his heart a law inscribed by God. . . . His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths.").

faithfully what he knows to be just and right."[7] By automatically placing "conscience" on its categorical denial list, MGB's rubric did not merely filter secular or political preferences; it actively penalized and excluded a binding, lifelong spiritual duty central to the Catholic faith.[8]

### G.  MGB Falsely Asserts That Patient Safety is Achieved by COVID Vaccination

MGB made the safety of patients and fellow employees the centerpiece of its memorandum of law and statement of facts, with the assumption that vaccination of employees such as Steverman would ensure such safety due to the effectiveness of the COVID vaccine in stopping or substantially reducing transmission of the virus. The implication is that MGB employees would have been imperiled if Steverman were to work in its facilities without receiving the COVID 19 vaccine. The statement of facts contains no medical or scientific data to showing that the COVID vaccination required by MGB policy was effective to stop transmission of the virus.

Since MGB has made this issue the core of its argument, the plaintiffs were obliged to provide facts to challenge that assumption and have done so. Exhibits 11, 20, 22. The overwhelming scientific consensus prior to the imposition of the MGB vaccine mandate, and to the termination of Plaintiff Steverman, was that there was no appreciable difference in infectiousness or transmission of the SARS-CoV-2 virus from Covid vaccinated and unvaccinated individuals, making the COVID-19 vaccination mandate entirely superfluous. Thus, no MGB employee who worked unvaccinated, such as Steverman, imposed any undue hardship on its patients or her colleagues for safety reasons.

---

[7] *Id.* § 1778 ("When he listens to his conscience, the prudent man can hear God speaking. . . . A human being must always obey the certain judgment of his conscience.").

[8] *Id.* § 1782 ("Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'") (quoting Second Vatican Council, Dignitatis Humanae § 3 (1965)); *id.* § 1784 (characterizing the lifelong discernment and formation of conscience as a mandatory spiritual practice).

MGB management had this medical data prior to the imposition of the vaccine mandate on its employees, as did the former head of the Center for Disease Control and Prevention (CDC) at the time, Rochelle Walensky, on August 8, 2021. Exhibit 10. The assertion that a COVID 19 vaccine prevented transmission of the virus is unsupported by facts and thoroughly dispelled by the defendant's own witnesses, scientists, former chief of infectious disease, and hospital epidemiologist.

### H.   MGB's Leadership Expressed Hostility Toward Religious Objectors

In August 2021, MGB leadership developed a badge "sticker program" requiring exempt, unvaccinated employees to display visible identifiers on their ID badges. Exhibit 4. Internal emails show leadership recognized the policy would stigmatize religious objectors. HR leaders warned of the "stigma associated with it" and that exempt employees would be "targeted," while Chief Human Resources Officer Sheehan responded that her "inclination is to say too bad." Exhibit 4, Chief Operating Officer Ron Walls further proposed separate badge labels for medical ("ME") and religious ("RE") exemptions, explaining that the purpose was to distinguish employees with "legitimate medical exemptions" from those who "simply don't want the vaccine and have manufactured a way around it." *Id.*

A reasonable jury could view these contemporaneous statements as evidence that MGB's leadership treated religious accommodation requests with suspicion and hostility rather than neutrality, supporting Plaintiffs' Title VII disparate-treatment claim.

## LEGAL STANDARD

Summary judgment is proper only where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The Court views the record in the light most favorable to Steverman and draws all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

11

255 (1986). Undue hardship is an affirmative defense on which MGB bears the burden of proof. *Groff v. DeJoy*, 600 U.S. 447, 468–71 (2023). Since *Groff,* an employer must show that the accommodation would impose "substantial increased costs in relation to the conduct of its particular business",  not the "de minimis" burden previously thought sufficient under *Hardison*. *Id.* at 468–70. Because the defense is MGB's to prove, summary judgment is available only if MGB's evidence is so one-sided that no reasonable jury could find for Steverman. It is not.

## ARGUMENT

I.    **THIS COURT ALREADY DENIED SUMMARY JUDGMENT ON UNDUE HARDSHIP, AND THE PHASE II RECORD ONLY STRENGTHENS THAT RULING**

MGB's renewed motion for summary judgment cannot be squared with this Court's prior denial of summary judgment; it is essentially the same motion made again, on a record that cuts even further against MGB. In denying the first motion, this Court held that MGB—having chosen to grant exemptions rather than impose a zero-tolerance policy—"effectively made a determination that some level of risk . . . was tolerable," and that the dispute is therefore "not an all-or-nothing proposition" (*Adams v. Mass General Brigham Inc.*, No. 1:21-cv-11686-FDS, ECF No. 173, at 2, 3 (D. Mass. Sept. 28, 2023)). It follows, the Court reasoned, that MGB cannot prevail "on the basis of undue hardship considered as a whole"; it must instead show that accommodating this individual plaintiff—raising the count "from 234 to 235"—would "materially increase the risk" enough to be undue. *Id.* at 15. That ruling is the law of the case, and it forecloses MGB's renewed reliance on aggregate, system-wide hardship. To the extent MGB again invokes the "exponential" or cumulative burden of granting exemptions, it presses precisely the wholesale theory this Court already declined to resolve on summary judgment. *Id.* at 12–15. A second motion built on the same premise fails for the same reason as the first.

12

MGB recasts its motion as "individualized," but it does not answer the individualized question this Court posed. It repeats generalized assertions about hospital safety, public trust, and "exponential" risk, then affixes the blanket label "patient-facing" to Steverman as though that label ends the inquiry. It does not. This Court identified the patient-facing versus remote line as one MGB could have drawn but chose not to: MGB "could have . . . grant(ed) (exemptions) only to back-office or remote workers," or confined them to non-"patient-facing" staff, but "instead . . . elected to pick and choose among its employees" (*Id.* at 13–14).

The Phase II record shows what that choice produced. MGB granted exemptions to a workforce comprised of patient-facing clinicians—roughly 40% of the accommodations were given to nurses and nurse practitioners, physicians and anesthesiologists, and hands-on technicians, all of whom continued to work in person (Pl. Exhibit 2). Having declined to limit exemptions to remote staff and instead tolerated masked, unvaccinated, patient-facing clinical care dozens of times over, MGB cannot now claim that one more patient-facing nurse crosses the line from tolerable to undue as a matter of law.

MGB's heavy reliance on the 2021 *Together Employees* preliminary-injunction decision cannot bridge that gap. That ruling was superseded, on this very issue, by this Court's Phase I summary-judgment decision in this same case—decided on a fuller post-discovery record and under the governing, post-*Groff* standard (*Adams*, ECF No. 173, at 10–11). A preliminary-injunction ruling on a likelihood-of-success standard, predating both discovery and *Groff*, is not the governing law of this case on undue hardship; ECF No. 173 is. To the extent MGB invokes *Together Employees*' aggregate reasoning, it asks this Court to revive precisely the wholesale theory ECF No. 173 rejected.

13

The existence of MGB's other accommodations does not, standing alone, establish Steverman's entitlement to one—but it does defeat MGB's motion. Having granted the identical accommodation—masked, unvaccinated, in-person clinical care—to scores of employees in materially identical roles, MGB bears the burden of articulating why Steverman alone could not be accommodated as her colleagues were, and of proving that the marginal burden of her accommodation was "substantial" (*Groff v. DeJoy*, 600 U.S. 447, 470 (2023)). MGB offers no such explanation.

Nor can MGB fall back on the theory that it had simply reached the limit of the risk it could absorb. As this Court expressly found, "MGB did not set a quota—that is, a maximum number or percentage of employees who could be accommodated" (*Adams*, ECF No. 173, at 14; *see id.* at 6). MGB never determined that 234 was the most it could safely accommodate, or that a 235th would tip the balance into undue hardship; it set no ceiling at all (*Id.* at 14). The 234-to-235 figure is therefore not a considered risk threshold for MGB identified and defended, but merely the point at which a discretionary review process happened to stop. MGB has not provided this Court with any individualized basis for deviation from the prior governing order and offers no basis for the Court to revisit its prior ruling on a vague aggregate defense.

## II.    MGB HAS NOT ESTABLISHED THAT IT WOULD BE AN UNDUE HARDSHIP TO ALLOW IN PERSON ACCOMMODATION

MGB's moving papers rest on the singular, sweeping assertion that allowing an unvaccinated nurse to perform on-site clinical duties created an unacceptable health and safety risk that constitutes an undue hardship as a matter of law (Def. Mem. 2, 8). Under *Groff*, however, an employer cannot establish an affirmative defense by relying on sweeping, abstract classifications; it must instead demonstrate a "substantial increased cost" via a "fact-specific" inquiry into the "particular accommodation at issue and (its) practical impact in light of the nature, size, and

operating cost" of the business. *Groff v. DeJoy*, 600 U.S. 447, 470–71 (2023). The Phase II record demonstrates that MGB has failed to meet this burden.

### A. MGB's Stated Safety Hardship is Contradicted by the Contemporaneous Medical Findings of Its Own Infection Control Experts

MGB devotes substantial portions of its moving papers to demanding that this Court accord absolute deference to its institutional medical judgment, arguing that an unvaccinated, masked nurse posed an unmanageable clinical safety risk (Def. Mem. 19–20). However, MGB's litigation theory is directly refuted by the contemporaneous written determinations of the very specialized medical personnel to whom MGB insists on deference.

For example, in August 2021, MGB's own Infection Control Department issued a formal, written recommendation explicitly endorsing the safety of on-site work by unvaccinated, accommodated employees (Pl. Exhibit 3). Far from identifying an immediate or catastrophic risk, the Infection Control experts affirmatively recommended that MGB "(p)ermit employees with approved exemptions to continue to work on site under existing policies, as they apply to unvaccinated employees," noting explicitly that this protocol "(a)llows for stable staffing" (*Id.*). In evaluating alternatives, the Infection Control team expressly rejected a policy that would prohibit exempted employees from working in patient-care areas, concluding that "(e)xisting policies support a safe environment" and warning that locking unvaccinated staff out of clinical spaces carried "(p)ossible legal risk in treating employees differently based upon medical condition and religious beliefs (since IC (Infection Control) supports safety of working while masked)" (*Id.*).

Because MGB's infection control authorities determined that in-person clinical work preserved a safe environment and protected operational staffing stability, MGB cannot maintain that extending that exact accommodation to Steverman constituted an intolerable or substantial increased cost as a matter of law. *Jeune v. UMass Memorial Health Care System*, 106 Mass. App.

15

Ct. 95 (2025), confirms the point on closely analogous facts. There, the court reversed summary judgment for a hospital system in a case brought by a Catholic surgical technician whose stated beliefs—that "her body is a temple of God" and that she "prayed to God and received a message not to receive the COVID-19 vaccination"—are nearly identical to Steverman's. *Jeune*, 100-103.

The court held that a hospital "which has a policy of providing a religious exemption to its vaccination requirement—failed to demonstrate" undue hardship as a matter of law, because such a policy "strongly suggests that it can do so without undue hardship." *Jeune* at 96. Where the hospital's own policy listed masking, distancing, and testing as accommodations—evidence, according to the court, the court emphasized that "its own . . . experts reached a conclusion contrary" to a claim of categorical hardship. *Jeune* at 103. Here, MGB's Infection Control records go even further: they affirmatively endorse masked on-site work as safe and reject excluding unvaccinated workers from patient-facing care (Pl. Exhibit 3).

In its Phase II memorandum of law, MGB offers little but bare unsupported conclusions asserted by its attorneys without record citations. It has shifted many of the facts it relies upon into its memorandum of law, which wrongly circumvents the Rule 56 motion architecture.

To the extent that MGB relies on its Phase I evidence which is copiously referenced in its current memorandum, that was already insufficient to win summary judgment as a matter of law. And the Phase I expert which MGB relied on (Michael Klompas, M.D.) admitted in his deposition that he had "zero involvement" in the development of the religious accommodation policies, structural calculations, or individualized review determinations, conceding that the entire apparatus was managed strictly by Human Resources and fell entirely "outside [his] expertise" (Pl. Exhibit 8, Dep. 64:18-20, 86:20-22).[9]

---

[9] Because this Court strictly mandated that summary judgment practice occur *prior* to expert disclosures, MGB could not use counsel's brief or references to the opinions of employees such as Klompas who played no role in

At minimum, MGB's internal contradictions leave a genuine dispute of material fact for trial. Having determined that in-person accommodation of exempt employees was feasible and having extended it to dozens of patient-facing clinicians, MGB bears the burden of explaining why Steverman—a part-time observation-unit nurse—was more dangerous or more costly to accommodate than almost a hundred other nurses, physicians, and technicians MGB did accommodate (*Groff*, 600 U.S. at 470–71). On that dispositive question, MGB's motion is entirely silent. It offers no evidence—epidemiological, operational, or financial—that Steverman's marginal risk or cost differed in any respect from that of the comparable in-person employees it accommodated.

MGB also refused to answer the interrogatory asking for an individualized description of any hardship for Steverman, asserting it was "too burdensome" to have to set forth the reasons for so many plaintiffs. *See,* Pl. Exhibit 6, Answer 4). Despite a Rule 37 motion to compel after the case was reduced to just three remaining plaintiffs, MGB refused to supplement that answer, which would have been a simple matter. Rule 37 precludes the use of evidence willfully withheld in discovery, and MGB's silence on Steverman's individualized hardship leaves a genuine dispute for trial.

### B. MGB Cannot Use Post-Hoc Litigation Theories to Substitute for the Total Failure to Assess Undue Hardship at the Time of Denial

In its opening brief, anticipating that Steverman would point out that undue hardship was admittedly not a factor in her denial, MGB asserts that undue hardship is a litigation defense it need not have "articulated" contemporaneously. That response attacks an argument Steverman

---

the accommodation decisions to launch a unilateral battle over epidemiological science on a truncated record in any event. To resolve this motion by crediting generalized litigation theories over MGB's conflicting, contemporaneous internal records would require this Court to impermissibly resolve a factual dispute against the non-moving party and would also violate Plaintiff's rights under Rule 56(d).

does not make. The point is not that MGB failed to recite the magic words "undue hardship" at the time of her denial; it is that MGB never assessed any hardship specific to her position at all—an omission that the Supreme Court's decision in *Groff v. DeJoy* does not excuse.

The unpublished, non-precedential cases MGB cites for its "no contemporaneous articulation required" proposition establish only that an employer need not label its internal reasoning in the denial to preserve the defense. *See Bushra v. Main Line Health, Inc.*, No. 24-1102, 2025 WL 1078135, at *4 (3d Cir. Apr. 10, 2025); *Kizer v. St. Jude Children's Research Hospital*, No. 23-6114, 2024 WL 4816856, at *3 (6th Cir. Nov. 18, 2024). These cases are outliers, and neither out-of-circuit disposition binds this Court.

More importantly, neither addresses a record like the one here, where the employer's own decision-maker admitted that the committee never considered the applicant's specific job or any operational hardship (Exhibit 5, 23:4-9, 143:16–144:2), and where the employer's own internal experts directly contradicted the hardship MGB now asserts in its brief. Unlike the records in *Bushra* and *Kizer*, where the employers' hardship evidence stood unrebutted, MGB's post-hoc calculations are flatly contradicted by its own internal expert record.

The reason this distinction matters is found in *Groff* itself. *Groff* commands that undue hardship must be a real, "fact-specific" burden, evaluated by looking at "all relevant factors in the case at hand, including the particular accommodation at issue and [its] practical impact in light of the nature, size, and operating cost of [the] employer." 600 U.S. 447, 470–71 (2023). An operational hardship that an employer never measured as to this specific plaintiff and this specific accommodation cannot be a "practical impact"—it is precisely the kind of generalized, hypothetical hardship *Groff* found deficient. *Groff* further dictates that an employer "must . . . reasonably accommodate . . . not merely . . . assess the reasonableness of a particular possible

18

accommodation," and that if one path is unfeasible, "[c]onsideration of other options . . . would . . . be necessary." *Id.* at 473. If the employer's burden is to accommodate absent proof of undue hardship, how could that burden have been met at the time of denial if no accommodation analysis was undertaken?

EEOC guidance likewise requires that an undue-hardship determination "must be based on an individualized assessment of current circumstances." U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Compliance Manual § XII-IV(B)(1) (2021). MGB never evaluated Steverman's specific job duties, considered reassignment, or assessed her individual risk. It cannot cure that failure by asking litigation counsel to construct a hypothetical undue-hardship analysis years later.

Moreover, undue hardship requires objective, fact-specific evidence, and a showing of actual costs. While a plaintiff's initial burden to show an accommodation is reasonable is "not a heavy one," an employer seeking to carry its burden of persuasion "must undertake a more refined analysis." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138–39 (2d Cir. 1995). The employer must present a detailed, fact-specific showing of actual impact including economic data, rather than abstract conclusions.

The Fifth Circuit's post-*Groff* decision in *Hebrew v. Texas Department of Criminal Justice,* 80 F.4th 717, 722–23 (5th Cir. 2023), illustrates this exact defect. The court reversed summary judgment because the employer asserted generalized safety and security concerns but "nowhere identifie[d] any actual costs" attributable to accommodating the employee, which does not establish undue hardship under *Groff*. The same defect exists here: MGB relies on generalized safety concerns without any individualized showing of substantial cost from accommodating Steverman.

19

At a minimum, a hardship theory that surfaced only after litigation began, that was never assessed at the time and was directly contradicted by the employer's contemporaneous expert records, is highly probative evidence from which a jury may find the asserted justification pretextual. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (holding that after-the-fact justifications "provided subsequent to the beginning of legal action" are evidence of pretext). Plaintiff does not request a categorical bar on litigation-stage proof; rather she asserts that the timing, novelty, and contradictory nature of MGB's rationale create a genuine dispute of material fact that preclude summary judgment against her.

### C.  MGB's Theory of Reputational Harm to "Public Trust" is Contradicted by the Record and Legally Deficient

MGB relies heavily on an abstract theory of reputational harm, asserting that granting accommodation to Steverman would compromise "public trust" if patients discovered a nurse was working while unvaccinated (Def. Mem. 15). Three distinct legal and factual defects defeat this argument on summary judgment.

First, this argument shares the same structural defect as MGB's broader categorical hardship defense. The record establishes that MGB accommodated hundreds of other employees— many of whom provided direct, in-person clinical care (Pl. Exhibit 2). MGB fails to provide any distinguishing job-specific or unit-specific factors or evidence explaining why accommodating Steverman specifically would disrupt public faith or alter patient access, while the nearly one hundred other accepted clinical exemptions did not.

Second, MGB's reputational defense impermissibly attempts to leverage potential community or customer aversion into an actionable undue hardship. MGB provides no actual data in its statement of facts to show that customer traffic in its facilities had been diminished or would have been diminished in absence of vaccinated employees.

In *Groff*, the Supreme Court explicitly affirmed that an operational hardship attributable to bias or hostility from co-workers or customers "to a particular religion, to religion in general, or to the very notion of accommodating a religious practice cannot be considered 'undue'" (*Groff*, 600 U.S. at 472). The Supreme Court warned that if coworker or community "bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself" (*id.* at 472–73). A reasonable jury could conclude that MGB's generalized reputational concern is precisely the type of impermissible community aversion that *Groff* excludes from the hardship calculus. *See, e.g., Jeune*, 106 Mass. App. Ct. at 110 (holding that under an analogous factual predicate involving a hospital Covid-19 policy, "a claim that an accommodation would hurt an employer's public image" was inadequate to show an undue hardship).

Third, MGB's own contemporaneous conduct directly refutes the factual premise of its defense. Internal records reveal that MGB designed a tracking program specifically to mark religiously accommodated employees—but notably not medically accommodated employees— with highly visible identification badge stickers to "call[] them out" (Pl. Exhibit 4). An employer that affirmatively planned to advertise the unvaccinated status of its religious staff cannot simultaneously maintain that the presence of a masked nurse—whose vaccination status would have otherwise remained entirely invisible to the public—so imperiled patient perception as to constitute an undue hardship as a matter of law. This irreconcilable contradiction creates a genuine dispute of material fact. Furthermore, the internal executive correspondence concerning the deployment of the sticker program focuses entirely on fears that employees would feel "targeted" by their peers; it is completely devoid of any concern that patients would be deterred or frightened

21

by the badges (*id.*). This striking omission underscores that MGB's "public perception" rationale is a post-hoc litigation theory rather than a contemporaneous operational concern.

### D. MGB Allowed Steverman to Continue Working Unvaccinated at MGB for Two Years after Denial of Accommodation – As a Contractor

MGB's undue hardship claim is contradicted by its own conduct. After terminating Steverman because her unvaccinated status posed an unacceptable safety risk, MGB permitted her to return to the same MGB campus as an intravenous clinician with New England Life Care ("NELC") (Pl. Exhibit 1, Par. 28; Def. Ex. 1, 43:14-19, 55:1-13). Working under a religious exemption with NELC, an affiliate of MGB, Steverman executed direct, hands-on patient care, including performing invasive clinical procedures and administering clinical demonstrations, inside MGB's own facilities as an MGB contractor. Id. at 57:15-24.

This operational reality completely destroys MGB's undisputed hardship defense. MGB cannot claim that accommodating Steverman imposed an intolerable operational burden while simultaneously allowing her to perform the same patient-facing duties inside its own buildings as an unvaccinated contractor. If Steverman's unvaccinated status and proximity to patients imposed a substantial increased cost under *Groff*, MGB would have barred her entry as a contractor. Its decision to permit Steverman to deliver clinical care on its campus under an identical mask-and-exempt framework, MGB has conceded that the accommodation was logistically feasible, safe, and entirely compatible with hospital operations, and creates a dispute of material fact.

### E. MGB Falsely Asserts That Patient Safety is Achieved by COVID Vaccination

The centerpiece of MGB's memorandum is that an unvaccinated employee would imperil the safety of its patients and its employees. As noted above, its memorandum cites no medical data establishing that COVID-19 vaccination meaningfully prevented transmission of the virus. Plaintiffs instead point to evidence that, at the relevant time, there was no appreciable difference

in transmission between vaccinated and unvaccinated individuals, including testimony from MGB witnesses and infectious disease experts. On that record, Plaintiffs contend the vaccination requirement was not necessary for patient safety and that Steverman's unvaccinated status did not create undue hardship.

Plaintiffs included medical and scientific refutation of MGB's implicit vaccine argument, as numerous plaintiff's cases foundered on failure to provide such data. See e.g. *Rodrigue v. Hearst Communications, Inc.,* 1126 F.4th 85 (2025); *Harmon v. Boston Medical Center,* U.S. District Mass., November 18, 2024; *Geronimo v. Melrose-Wakefield Healthcare Corp.*, U.S. District Mass, July 22, 2025; *Melino v. Boston Medical Center,* 127 F. 4th 391 (2025), et al.

## III. UNCONSIDERED ALTERNATIVES INDEPENDENTLY PRECLUDE SUMMARY JUDGMENT

Even if a patient-facing accommodation was a hardship, MGB has not carried — indeed has not attempted to carry — its burden of proving that *no* reasonable accommodation, including reassignment, was available without substantial cost. Under *Groff*, the undue-hardship defense requires more than showing that the single accommodation the employee initially proposed would be burdensome; Title VII "requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation," and the requested accommodation was not feasible "[c]onsideration of other options … would … be necessary." 600 U.S. at 473. The burden to identify and evaluate those options rests on the employer. *Id.*; *see* 29 C.F.R. § 1605.2(c)(1) (employer must show undue hardship "would in fact result from each available alternative method of accommodation"); *id.* § 1605.2(d)(1)(iii) (employer "should consider" lateral transfer).

MGB does not consider reassigning Steverman to a non-patient-facing role, much less prove that doing so would have imposed substantial cost. Reassignment was feasible and within

23

MGB's contemplation: MGB is the largest private employer in Massachusetts, spanning more than a dozen hospitals and hundreds of job families, (Pl. Exhibit 3); it convened "a SWAT team to assess staffing mitigation approaches, by role group by hospital," and resolved to "message to employees that replacement roles will be posted," *id.* (MGB000005127).

Steverman herself identified non-patient-facing options, testifying that "there w[ere] other positions within Mass General that [she] wouldn't have to [interact with patients] as a nurse." Def. Exhibit 1, 82:23-83:15; ECF 439-1, P. 27-28. MGB's contrary assertion that "Plaintiff did not request any other accommodation," Def. Mem. 7, is wrong on the facts and, under *Groff*, immaterial as a matter of law: the obligation to consider alternatives rests on the employer, and an employee's failure to enumerate every possibility does not waive accommodations the employer never offered. *Jeune* is again on point, faulting the hospital for offering "no evidence … that no other jobs were available." *Jeune*, 106 Mass. App. Ct. at 104.

*Groff* also required MGB to provide specific economic data to show that reassignment of duties or a lateral transfer was a substantial hardship in consideration of the size of the business. MGB provided no such data or analysis. Its accommodation of Steverman's co-plaintiff, Tyler Adams, provides insight into MGB's normal accommodation process. When it became apparent that the masks were causing Adams a serious allergic reaction, and MGB's masking policy (unlike vaccination) did not allow for an in-person accommodation, MGB simply gave Adams an entirely new job which could be done remotely. Pl. Exhibit 7. The same could have been considered for Steverman too if MGB had bothered to assess any alternatives to termination.

The decisions MGB cites affirming summary judgment for hospitals do not reach this record. They fall into two groups: cases where the employer denied *all* exemptions and so never confronted in-system alternatives, *see, e.g., Cyr v. Boston Medical Center*, 2025 WL 269239, at

24

*2 (D. Mass. Jan. 22, 2025); and cases where the plaintiff sought only to remain in an existing patient-facing role on a record of *unrebutted* expert evidence that masking and testing were inadequate. Here, MGB ran an exemption program approving 242 employees; the safety evidence is not unrebutted but squarely contradicted by MGB's own Infection Control records; and reassignment was never evaluated at all. Where a post-*Groff* record presents those disputes, summary judgment is unavailable. *See Passarella v. Aspirus, Inc.*, 108 F.4th 1005 (7th Cir. 2024).

### IV.    MGB IS NOT ENTITLED TO SUMMARY JUDGMENT ON STEVERMAN'S DISPARATE-TREATMENT CLAIM, WHICH ITS MOTION IGNORES

The complaint articulates two bases for Title VII relief – failure to accommodate, and religious discrimination (also referred to as disparate treatment). MGB's motion addresses only failure-to-accommodate and ignores Steverman's separate disparate-treatment claim. That omission alone defeats summary judgment as to that claim: MGB has not carried, or even attempted to carry, its burden as the movant. In any event, the record supplies direct evidence that MGB denied Steverman's request because of the content of her religious beliefs and her denomination — not through any neutral, individualized inquiry.

MGB's own written policy is the centerpiece. It directed near automatic approval of requests from three enumerated faiths (Christian Scientist, Dutch Reformed, Rastafarian) while directing denial of requests "based upon" five others by name — "Catholicism, Christianity, Judaism, Muslim, Buddhism" without substantial additional hoops. Pl. Exhibit 1, 9. Sorting employees for approval or denial by the religion they profess is religious discrimination in its most direct form. The rubric compounded the problem by placing Steverman's exact stated grounds — "conscience," "free will," and that her body is "a temple" — on the automatic-deny list. *Id.* A jury could find that MGB denied Steverman's request, not because it doubted her sincerity, but because her beliefs fell into pre-marked "deny" boxes. At the very least, the policy confirms that her beliefs

25

were treated differently than, say, belief in "mark of the beast" theology, which was on the automatic "approvals" list.

Where, as here, the employer's own policy expressly classifies exemptions by religion, the claim is one of direct evidence: the employer cannot escape liability merely by positing a nondiscriminatory reason that would have produced the same result. *Cf. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). MGB's denominational analysis grid cannot be squared with Title VII. An employer may inquire into the sincerity of a religious belief, but it may not sit in judgment of the belief's validity or theological correctness, may not deny an employee because her beliefs seem illogical or incoherent, and may not override an individual's sincere belief with the institution's view of what her denomination should require. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Binding First Circuit authority makes the point directly. In *Thornton v. Ipsen Biopharmaceuticals, Inc.*, the First Circuit held that a vaccine objector's beliefs, that she was "created in [God's] image," that defiling "her perfectly created body" would be a sin, and that she reached that conclusion through prayer, stated a protected religious belief, notwithstanding the employer's contrary characterization. 126 F.4th 76, 82–83 (1st Cir. 2025). Steverman's "temple of the Holy Spirit," "free will," and "conscience" grounds are materially indistinguishable. And as *Jeune* held on nearly identical "temple of God" facts, an employer may not deny accommodation on the ground that the applicant's denomination "has publicly supported vaccination" — the precise reason stated in MGB's denial letter to Steverman. Slip op. at 9–12; SOUF II ¶ 52; *see also Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 16–17 (1st Cir. 2024).

Steverman's communicator confirms the discriminatory mechanism. She testified that she applied the rubric's denominational and content-based criteria, was steered to "approve as few as

26

possible," and could not articulate any explanation that would have led her to grant a Catholic's request. Pl. Exhibit 5, 22:19-23:3, 50:11-51:8, 67:1-68:2, 96:8-97:2. She did not consider the applicant's job at all. *Id.* 143:16-144:2. The animus evidence reinforces the inference:

MGB's Chief Operations Officer characterized objectors as people who "simply don't want the vaccine and have manufactured a way around it"; an HR leader admitted the goal was to "call[] out" the unvaccinated; and the CHRO's reaction to objectors' stigma concerns was that she wanted to say "too bad" while admitting she had personal biases against them. Pl. Exhibit 4. Taken together, the rubric, the leadership emails, and the directive to approve as few requests as possible would permit a reasonable jury to find that MGB intentionally discriminated against Steverman because of her religion. That the hardship rationale MGB now advances appeared only in litigation — and was never the stated basis for the denial — further supports an inference of pretext. *See Santiago-Ramos*, 217 F.3d at 56.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny MGB's motion for summary judgment in its entirety.

Respectfully submitted,
JAMIE STEVERMAN,
By her attorneys,

/s/ Sujata S. Gibson

Sujata S. Gibson

Gibson Law Firm, PLLC

120 E Buffalo St., Ste. 2

Ithaca, NY 14850

Tel: (607) 327-4125

sujata@gibsonfirm.law

27

/s/ Gregory A. Hession, J.D.
Gregory A. Hession, J.D.
93 Summer Street,
P.O. Box 543
Thorndike, MA 01079
Tel: (413) 289-9164

Gregoryhession@protonmail.com

B.B.O. No. 564457

Dated: July 2, 2026

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the CM/ECF system on July 2, 2026, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Gregory Hession

Gregory A. Hession J.D.