**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **TYLER ADAMS, MICHELLE ORFANOS,** **And JAMIE STEVERMAN,** ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | **Civil Action No. 1:21-cv-11686-FDS** |
| **MASS GENERAL BRIGHAM, INC.** ) ) | |
| Defendant. ) | |

**PLAINTIFFS CONCISE STATEMENT OF MATERIAL FACTS**

The plaintiffs respond to the defendant's concise statement of material facts as follows:

I.  **PLAINTIFF'S DUTIES AS A NURSE AT MASSACHUSETTS GENERAL HOSPITAL**

1. In 2005, Plaintiff started working as a Registered Nurse in the Surgical Trauma Unit Massachusetts General Hospital ("MGH"). Affidavit of Michael Steinberg ("Steinberg Aff.") ¶ 2, **Exhibit 1**, Excerpts of the Transcript of the May 19, 2025 Deposition of Jamie Steverman ("Steverman Tr."), at 55:9-12. Plaintiff worked in the Surgical Trauma Unit from 2005 to 2012. *Id.*

**Plaintiff's Response:** Admitted in part and disputed in part. Disputed as to the date that Plaintiff began at MGB in 2004 as a nursing assistant, meaning that she had 17 years of committed service before her termination. Steverman Tr. 55:9-12;.

2. In 2012, Plaintiff moved to the Emergency Department Observation Unit as a Registered Nurse with the job title of "Clinical Nurse, Clinician." Steverman Tr. 55:12-24.

1

**Plaintiff's Response:** Undisputed for purposes of this motion.

3. MGH's Emergency Department Observation Unit provides short-term monitoring and treatment, often up to 24 hours, for patients with conditions such as possible heart attacks or infections, to determine whether they can be safely discharged or require hospital admission. Steverman Tr. 25:9-20, 82:23-83:1.

**Plaintiff's Response:** Undisputed for purposes of this motion.

### A.    Plaintiff Worked Closely In Person With Patients

4. Plaintiff was responsible for seeing and treating patients in the Observation Unit. Steverman Tr. 25:9-12.

**Plaintiff's Response:** Undisputed for purposes of this motion.

5. Plaintiff admitted that her role was in-person. Steverman Tr. 30:20-31:5 ("A. I worked in person.").

**Plaintiff's Response:** Undisputed for purposes of this motion.

6. Plaintiff admitted that there was no way to do her job in the Observation Unit without interacting directly with patients. 83:2-5 ("Q. Is there any way to do your job without interacting with patients? A. Not in the Observation Unit."); Steinberg Aff. ¶ 4, **Exhibit 3**, (Plaintiff's Questionnaire and Responses to MGB's Requests for Admission at 5 ("Questionnaire and RFAs")).

**Plaintiff's Response:** Undisputed for purposes of this motion.

7. Plaintiff's patients included individuals suffering from a variety of conditions, including heart conditions, TIAs (transient ischemic attacks, or "mini-strokes"), gastrointestinal issues, and skin conditions. Steverman Tr. 82:3-22.

**Plaintiff's Response:** Undisputed for purposes of this motion.

8. Plaintiff also cared for elderly patients. Steverman Tr. 81:20-21.

**Plaintiff's Response:** Undisputed for purposes of this motion.

9. Plaintiff conducted "head-to-toe assessments" of patients at their bedside, which required her to stand in close physical proximity and, at times, engage in direct, "hands-on" examination of patients in hospital beds. Steverman Tr. 68:21-69:10.

**Plaintiff's Response:** Undisputed for purposes of this motion.

10. Depending on the patient, the assessments could take eight to twenty minutes each. Steverman Tr. 81:5-10.

**Plaintiff's Response:** Undisputed for purposes of this motion.

11. In her role, Plaintiff spoke with patients face-to-face to assess their condition and determine the reason for their presentation to the emergency department, including individuals being evaluated for possible heart attacks, infections such as cellulitis, or placement from nursing or assisted living facilities. Steverman Tr. 69:11-70:8.

**Plaintiff's Response:** Undisputed for purposes of this motion.

12. Plaintiff's role involved physically moving patients. Steverman Tr. 71:3-6.

**Plaintiff's Response:** Undisputed for purposes of this motion.

13. Plaintiff cared for patients by administering medications, including cardiac medications, antibiotics, daily medications, and gastrointestinal medications. Steverman Tr. 70:15-19.

**Plaintiff's Response:** Undisputed for purposes of this motion.

14. Plaintiff's role involved drawing blood, placing IVs, and checking vital signs. Steverman Tr. 57:15-24, 69:15-23.

**Plaintiff's Response:** Undisputed for purposes of this motion.

15. Plaintiff also helped with discharge planning, which involved working with both patients and their family members. Steverman Tr. 58:4-13.

**Plaintiff's Response:** Undisputed for purposes of this motion.

16. In 2021, Plaintiff was assigned to take care of approximately three to five patients per shift. Steverman Tr. 71:14-17.

**Plaintiff's Response:** Undisputed for purposes of this motion.

17. Plaintiff worked two 12-hour shifts per week. Steverman Tr. 77:3-4.

**Plaintiff's Response:** Undisputed for purposes of this motion.

18. Plaintiff admits that a patient or patient's family member asked if she was vaccinated against COVID. Steverman Tr. 39:7-21 ("Q. But you recall that a patient or patient's family member asked about vaccination status? A. Correct."); Questionnaire and RFAs, p. 12 at RFA 2 ("While working at an MGB entity, I have had a patient or patient's family member ask me if I was vaccinated against COVID-19 or express concern about whether staff were vaccinated against COVID-19.").

**Plaintiff's Response:** Undisputed for purposes of this motion. This averment of fact does not request and the response does not state the motive or purpose of the patient question to Ms. Steverman, and none should be inferred.

19. Plaintiff admitted: "While working on-site at an MGB entity, it was not always possible for me to remain six feet or more away from every colleague, patient, visitor or member of the public." Steverman Tr. 39:1-6; Questionnaire and RFAs, p. 12 at RFA 1.

**Plaintiff's Response:** Undisputed for purposes of this motion.

20. Plaintiff understood that COVID-19 could be dangerous for older people,

4

immunocompromised people, and small children. Steverman Tr. 87:18-88:6.

**Plaintiff's Response:** Undisputed for purposes of this motion.

21. Plaintiff understood that some people were afraid of contracting COVID. Steverman Tr. 87:14-17.

**Plaintiff's Response:** Undisputed for purposes of this motion.

22. Plaintiff would receive a report, meet her patient, "assess them, give them medications, confer with either a nurse practitioner or provider, see what the plan was for the day. [Patients] might be going off to tests, coming back." Plaintiff would give her patients updates on their results. Steverman Tr. 71:8-13.

**Plaintiff's Response:** Undisputed for purposes of this motion.

**B.     Plaintiff Worked in Close Physical Proximity to Colleagues, Staff, Family Members of Patients, and the Public**

23. In her job as a nurse at MGB, Plaintiff interacted with members of the public, including patients, family members of patients, and hospital visitors. Steverman Tr. 72:9-15.

**Plaintiff's Response:** Undisputed for purposes of this motion.

24. Plaintiff performed her duties in Bigelow 12, where the Emergency Department Observation Unit was located. The Observation Unit took up the entire floor. Steverman Tr. 55:14-15, 76:23-24.

**Plaintiff's Response:** Undisputed for purposes of this motion.

25. Plaintiff worked with "[e]veryone from environmental service people [who cleaned the rooms], nursing assistants, nurses, doctors, [and] nurse practitioners." Steverman Tr. 61:4-13.

**Plaintiff's Response:** Undisputed for purposes of this motion.

26. On a typical day, when Plaintiff arrived at work, she would first go to the break

room and put down her personal effects. The break room was the size of a conference room and contained a table, chairs, and refrigerator. Steverman Tr. 77:16-24.

**Plaintiff's Response:** Undisputed for purposes of this motion.

27. Plaintiff then went to the nurses' station, which was centrally located in the middle of the floor with patient rooms located around it. There were no windows near the nurses' station. Steverman Tr. 76:14-77:24, 79:10-12.

**Plaintiff's Response:** Undisputed for purposes of this motion.

28. Typically, around eight nurses, the secretary, and a couple of nursing assistants were working at the nurses' station. Steverman Tr. 78:14-18.

**Plaintiff's Response:** Undisputed for purposes of this motion.

29. The nurses' station contained approximately ten computers, and Plaintiff sometimes worked at the computers next to colleagues who were simultaneously using the computers. Steverman Tr. 78:20-79:6.

**Plaintiff's Response:** Undisputed for purposes of this motion.

30. Plaintiff spent time in the break room several times a shift. She sometimes ate meals at a table with other MGB employees, who were less than three feet away from her. If she was wearing a mask, she took it off to eat and drink. Steverman Tr. 79:29-80:17.

**Plaintiff's Response:** Undisputed for purposes of this motion.

31. Plaintiff may also have taken her mask off at work for other reasons other than eating or drinking. Steverman Tr. 80:20-23.

**Plaintiff's Response:** Undisputed for purposes of this motion.

32. Plaintiff admitted that she recalled that MGB colleagues were absent from work because they had COVID. Steverman Tr. 41:2-4.

**Plaintiff's Response:** Undisputed for purposes of this motion.

### C.    Plaintiff Understood the Limits of Non-Vaccination Alternatives

33. Plaintiff admitted that masking does not fully prevent the transmission of COVID. For example, Plaintiff admitted that the effectiveness of masking depends on factors such as the type and quality of the mask and whether it is worn properly. Steverman Tr. 85:16-18.

**Plaintiff's Response:** Undisputed for purposes of this motion.

34. Plaintiff admitted: "I understand that masking does not prevent transmission of the COVID-19 virus 100% of the time." Additionally, Plaintiff admitted in response to MGB's Requests for Admission: "During my workday when working on-site at an MGB entity, I have removed my mask indoors to eat or drink." Steverman Tr. 39:22-40:6; Questionnaire and RFAs, p. 13 at RFA 4.

**Plaintiff's Response:** Undisputed for purposes of this motion.

35. Plaintiff admitted: "I understand that it is possible to test negative for the COVID-19 virus one day and be positive the next day, or even two days later." Steverman Tr. 86:14-17; Questionnaire and RFAs, p. 13 at RFA 5.

**Plaintiff's Response:** Undisputed for purposes of this motion.

## II.    PLAINTIFF RECEIVED NOTICE OF THE COVID-19 VACCINATION POLICY

36. On or about June 24, 2021, Plaintiff received a communication from Dr. Anne Klibanski, President and Chief Executive Officer of MGB, announcing that MGB had decided to require a COVID-19 vaccination for all employees. Steverman Tr. 146:18-147:10; Steinberg Aff.

¶ 5, **Exhibit 4**, (June 24, 2021 Message from Anne Klibanski, MD, COVID-19 Vaccine Requirement for Employees ("June 2021 COVID Message").

**Plaintiff's Response:** Undisputed for purposes of this motion.

37. The communication stated that employees would be able to request an exemption from the requirement for medical and religious reasons. Steverman Tr. 147:14-22; June 2021 COVID Message.

**Plaintiff's Response:** Undisputed for purposes of this motion.

## III.    PLAINTIFF'S RELIGIOUS EXEMPTION REQUEST AND HISTORY OF RECEIVING VACCINATIONS AND MEDICATIONS

### A. Plaintiff's History of Vaccinations and Medications

38. Plaintiff admits that she had received vaccines in the past. Steverman Tr. 104:17-18.

**Plaintiff's Response:** Undisputed for purposes of this motion.

39. Plaintiff received Dose 1 of the MMR vaccine in 1989. Steinberg Aff. ¶ 6, **Exhibit 5**, (Plaintiff Patient Summary Health Record Report ("Summary Health Report").

**Plaintiff's Response:** Admitted that she received a vaccine 37 years ago.

40. Plaintiff received Dose 2 of the MMR vaccine in 1993. Summary Health Report.

**Plaintiff's Response:** Admitted that she received a vaccine 33 years ago.

41. Plaintiff received Doses 1 and 2 of the Hepatitis B vaccine in 1997, and Dose 3 of the Hepatitis B vaccine in 1998. Summary Health Report.

**Plaintiff's Response:** Admitted that she received vaccines 29 and 28 years ago.

42. After Plaintiff began working at MGH, Plaintiff received the Influenza vaccine in 2011, 2012, and 2016. Steverman Tr. 27:8-11; Questionnaire and RFAs, p. 2-3 at Adult Vaccination History.

8

**Plaintiff's Response:** Undisputed for purposes of this motion.

43. Plaintiff admitted that she received these three flu vaccines despite the fact that they were not mandatory for her employment at the time. Steverman Tr. 27:12-14; Questionnaire and RFAs, p. 3.

**Plaintiff's Response:** Undisputed for purposes of this motion.

44. Plaintiff admitted that the first time she applied for a religious exemption from MGB was in 2018, when she applied for an exemption from the flu vaccine, the first year MGB required employees to receive it. Steverman Tr. 31:17-24.

**Plaintiff's Response:** Undisputed for purposes of this motion.

45. Plaintiff accepts that the Centers for Disease Control and Prevention (CDC) is a reliable source of public health information. Steverman Tr. 134:12-15.

**Plaintiff's Response: Disputed.** Plaintiff accepted this averment at the time she made the statement. She no longer believes it is a reliable source of information about COVID vaccines, based on her study, clinical data, and experience. Steverman Declaration, Par. 29..

**B. Plaintiff's Religious Exemption Request from the Vaccination Policy and Related Communications with the RERC in 2021**

46. On September 5, 2021, Plaintiff submitted a request for a religious exemption from the Vaccination Policy. Steverman Tr. 101:9-21; Steinberg Aff. ¶ 7, **Exhibit 6**, (Plaintiff's Sept. 5, 2021 COVID-19 Exemption Request Form ("Exemption Request").

**Plaintiff's Response:** Undisputed for purposes of this motion.

47. This is a true and accurate excerpt of the form Plaintiff submitted to MGB on September 5, 2021.

*Exemption Request.*

**Plaintiff's Response:** Undisputed for purposes of this motion.

48. Plaintiff subsequently interacted directly with individual members of the RERC via email. Steverman Tr. 29:18-20, 43:3-11, 108:4-109:7, 145:11-14.

**Plaintiff's Response:** Undisputed for purposes of this motion.

49. On September 22, 2021, the RERC sent Plaintiff an email stating that the deadline to submit a request for a religious exemption was September 3, 2021, and asked her to provide an explanation for why she had not met this deadline. Steverman Tr. 110:5-21; Steinberg Aff. ¶ 8, **Exhibit 7**, ( Sept. 22, 2021 E-mail Chain between the RERC and Plaintiff, at p. 4, RERC Sept. 22 Email ("Sept. 22 Email Chain").

**Plaintiff's Response:** Undisputed for purposes of this motion.

50. Plaintiff responded to the RERC and stated that her smartphone, which she used for email, had broken, and that she submitted her request when she had an alternative device. Steverman Tr. 110:11-16; Sept. 22 Email Chain at p. 3 Steverman Sept. 22 Email.

**Plaintiff's Response:** Undisputed for purposes of this motion.

51. On September 24, 2021, the RERC sent Plaintiff an email advising her that it had received her request for a religious exemption from the COVID-19 vaccine but required additional information. Steverman Tr. 109:23-110:1; Sept. 22 Email Chain at p. 3 RERC Sept. 24 Email.

**Plaintiff's Response:** Undisputed for purposes of this motion.

52. Specifically, the RERC stated:

You named your religion as a practicing Catholic, but did not explain

how your religious beliefs prevent you from receiving a COVID-19

10

. . . vaccine. Moreover, your religion has publicly supported

vaccination.

Sept. 22 Email Chain at p. 3 RERC Sept. 24 Email.

**Plaintiff's Response:** Undisputed for purposes of this motion.

53. The RERC also asked Plaintiff to provide any additional explanation and any supporting documentation relevant to further consideration of her request. Sept. 22 Email Chain at p. 3 RERC Sept. 24 Email. In particular, the RERC asked Plaintiff to "explain how, in light of your religion's public support of vaccination, your faith prevents you from receiving a vaccine." *Id.* In addition, the RERC stated: "If you have received vaccines in the past, please explain why your religion did not prevent you from receiving vaccines in the past and will not allow for COVID-19 . . . vaccination." *Id.* The RERC also informed Plaintiff that her request would be denied if a response was not received by September 27, 2021. *Id.*

**Plaintiff's Response:** Undisputed for purposes of this motion.

54. Plaintiff responded to the RERC's request for more information on September 24, 2021, stating, among other things:

My beliefs are between me and God who teaches my beliefs are not

to be scrutinized nor denied by any man…. The government can not

[sic] be the arbiter of which Catholic is correct. This would violate

the establishment clause of the First Amendment as well as Article

II.

The Bible informs all believers that our body is a Temple. Receiving

medical treatment against my will violates my body, and removes

my free will as God has intended for me. I recognize God as my

ultimate authority in all things and that He has delegated to each of us authority over our own lives and choices, matters of health, including that of vaccines…. "My Body, My Choice".

I have been granted religious exemptions in the past . . . . My beliefs have further evolved and have allowed me to possess even greater knowledge in this area, which is why I continue on this path of not harming my body. My faith requires that when I recognize an action to be wrongful, that I repent. Having committed a sin in the past is not an excuse to continue doing so . . . .

Sept. 22 Email Chain at p. 2-3 Plaintiff's Sept. 24 Email.

**Plaintiff's Response:** Undisputed for purposes of this motion.

55. The RERC responded to Plaintiff on September 27, 2021, and informed Plaintiff that her religious exemption request was not approved and provided her with a link to information regarding the ongoing vaccine clinics. Sept. 22 Email Chain at p. 2 RERC Sept. 27 Email.

**Plaintiff's Response:** Undisputed for purposes of this motion.

56. On September 30, 2021, Plaintiff responded stating: "Religious exemption is on file." Sept. 22 Email Chain at p. 2 Plaintiff's Sept. 30 Email.

**Plaintiff's Response:** Undisputed for purposes of this motion.

57. On October 1, 2021, the RERC replied, explaining that "[r]eligious exemptions do not carry over from one year to the next" and that MGB has "implemented a new process this year to evaluate requests for religious exemptions." Sept. 22 Email Chain at p. 1-2 RERC Oct. 1 Email. It also stated that her religious exemption request had been reviewed and was denied, and

that it hoped she would "reconsider and receive the vaccine within the required time periods." *Id.*; Steverman Tr. 138:13-21.

**Plaintiff's Response:**

58. On October 20, 2021, MGB sent Plaintiff a letter stating that its records indicated that she had not complied with the Vaccination Policy. Steverman Tr. 148:1-19; Steinberg Aff. ¶9, **Exhibit 8**, (Oct. 20, 2021 Letter from K. Lehman to Plaintiff ("Oct. 20 Letter"). The letter further stated that her access to MGB systems was being revoked, that she would be placed on unpaid administrative leave effective October 21, 2021, that she may not return to work unless she became compliant by November 5, 2021, and that her employment would be terminated if she failed to meet the Vaccination Policy requirements by that date. *Id.*

**Plaintiff's Response:** Undisputed for purposes of this motion.

59. Plaintiff did not comply with the Vaccination Policy by the November 5, 2021 deadline. Steverman Tr. 148:12-19; Steinberg Aff. ¶ 10, **Exhibit 9**, (Nov. 12, 2021 Letter from K. Lehman to Plaintiff ("Nov. 12 Letter")).

**Plaintiff's Response:** Undisputed for purposes of this motion.

60. As a result, effective November 10, 2021, MGB terminated Plaintiff's employment due to her non-compliance with the Vaccination Policy. Steverman Tr. 148:12-19; Nov. 12 Letter.

**Plaintiff's Response:** Undisputed for purposes of this motion.

61. On December 27, 2021, Plaintiff tested positive for COVID. Steverman Tr. 27:17-19.

**Plaintiff's Response:** Undisputed for purposes of this motion.

13

**C. Plaintiff's Litigation Testimony Regarding Her Alleged Religious Beliefs and Beliefs About the COVID Vaccine**

62. When asked if her belief about vaccines was part of any religious doctrine, she conceded under oath: "I'm not aware of that." Steverman Tr. 107:15-17.

**Plaintiff's Response:** Undisputed for purposes of this motion.

63. Plaintiff testified that she described the vaccine as "toxic chemicals" in her exemption request "[b]ecause that's what God says." Steverman Tr. 104:1-4. Plaintiff testified that God considers the vaccine to be a pollution in her body and that he told her: "'I created you, and trust what I want for you and your body.'" *Id*. at 103:3-5.

**Plaintiff's Response:** Undisputed for purposes of this motion.

64. When asked what other restrictions her alleged religious beliefs require, Plaintiff testified: "Just asking God and letting Him decide and following my conscience." Steverman Tr. 107:19-22.

**Plaintiff's Response:** Undisputed for purposes of this motion.

65. When asked if she understood that the Pope had issued guidance suggesting that vaccination was acceptable for Catholics, she testified: "I didn't know, and it didn't matter, because. . . God was above the Pope. So it had no relevance to me." Steverman Tr. 112:1-3.

**Plaintiff's Response:** Undisputed for purposes of this motion.

66. When asked if she believes that the COVID vaccine contains 5G, Plaintiff testified that she did not know. Steverman Tr. 135:2-12.

**Plaintiff's Response:** Undisputed for purposes of this motion.

67. When asked if she believes that the COVID vaccine makes people magnetic, Plaintiff testified that she did not know. Steverman Tr. 134:23-135:1.

**Plaintiff's Response:** Undisputed for purposes of this motion.

68. When asked if she believes that the COVID vaccine alters a person's DNA, Plaintiff testified that she did not know. Steverman Tr. 135:13-15.

**Plaintiff's Response:** Undisputed for purposes of this motion.

69. When asked if she believes that the COVID vaccine contains a microchip, Plaintiff testified that she did not know. Steverman Tr. 134:20-22.

**Plaintiff's Response:** Undisputed for purposes of this motion.

70. When asked if she believes that the COVID vaccine contains pork products or preservatives, Plaintiff testified that she did not know. Steverman Tr. 135:19-24.

**Plaintiff's Response:** Undisputed for purposes of this motion.

71. When asked if she believes that the COVID vaccine contains blood products, Plaintiff testified that she did not know. Steverman Tr. 136:4-6.

**Plaintiff's Response:** Undisputed for purposes of this motion.

72. Plaintiff stated in a sworn affidavit: "I am being forced to choose between complying to an unwanted medical procedure or losing my job." Doc. 408-1 at 5 (Sept. 30, 2021 Signed Affidavit of Jamie Steverman).

**Plaintiff's Response:** Undisputed for purposes of this motion.

73. In the same affidavit, Plaintiff stated: "I am strongly opposed to the Covid Vaccine and do not feel I should be forced to have it injected into my body." Doc. 408-1 at 5 (Sept. 30, 2021 Signed Affidavit of Jamie Steverman).

**Plaintiff's Response:** Undisputed for purposes of this motion.

15

## PART II —

## PLAINTIFF'S ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

The plaintiff asserts the following additional statements of material fact, supported by references in the record. They establish a genuine dispute of material fact.

### Plaintiff's Employment History at MGB

74. Plaintiff Jamie Steverman ("Steverman") worked for MGB as a nurse in various positions and facilities from 2005 until her termination in late 2021. Exhibit 1, Par.1

75. Beginning in 2017, Steverman declined vaccination consistent with her religious beliefs and repeatedly sought and obtained religious accommodation under MGB's prior, decentralized flu-vaccine exemption process.  Exhibit 1, Par. 5

76. Steverman is of the Catholic religion, and believes she received guidance from the Holy Spirit — which Catholics believe speaks to the faithful through the religious conscience — to avoid vaccination.Def. (SOUF) ¶ 54.

77. MGB accepted Plaintiff's identical religious beliefs as sincere in 2018, 2019, and 2020 and on that basis granted her exemption from the flu vaccine. Def. Exhibit 1, 31:17–24; Def. (SOUF)¶ 44; Exhibit 1, Par. 5..

78. MGB created new religious exemption criteria in 2021 that presumptively excluded Catholic conscience-based objectors. Exhibit 9.

**Plaintiff's Employment at New England Life Care**

79. After MGB terminated plaintiff Steverman's employment, she began to work for New England Life Care in August of 2022 as a clinical liaison/teach nurse. Exhibit 1, Par.13.

80. New England Life Care is a Maine non-profit corporation owned by about fifty New England hospitals, including the hospitals owned by MGB, which provides infusion services to the member hospitals. Exhibit 1, Par.15.

81. New England Life Care granted Plaintiff Steverman's religious exemption to the COVID vaccine, and she worked unvaccinated during her tenure there. Exhibit 1, Par. 14, 28.

82. As a Clinical Liaison/Teach Nurse, Steverman's responsibilities included providing direct, in-person education and instruction to patients and caregivers regarding infusion therapies and related medical treatments. Exhibit 1, Par. 16.

83. Steverman's duties included, but were not limited to, teaching patients and caregivers how to administer intravenous medications, operate infusion pumps, care for central venous catheters and PICC lines, perform flushing procedures, recognize signs of infection and complications, and safely manage prescribed therapies. Exhibit 1, Par. 17.

84. Steverman's duties required direct face-to-face interaction with patients and caregivers and often involved prolonged periods of close physical proximity. Exhibit 1, Par. 18.

85. As part of Steverman's employment with New England Life Care, she entered and worked in MGB, Brigham and Women's Hospital, Newton-Wellesley Hospital, and Faulkner Hospital providing services involving bedside patient care and patient education to vulnerable patients. Exhibit 1, Par. 19.

86. While working in these MGB facilities, Steverman interacted with patients, family members, and healthcare personnel in a close, patient-facing nursing role where she was unable to be 6 feet from patients. Exhibit 1, Par. 20.

87. The patients Steverman served at MGB facilities frequently had significant medical conditions requiring ongoing infusion therapy and specialized nursing instruction.Exhibit 1,Par. 16.

88. Steverman's work at MGB facilities required her to assess patients' understanding of treatment plans, observe and evaluate their performance of infusion-related procedures, answer questions, reinforce safety precautions, and provide individualized nursing education. Exhibit 1 Par. 20-25

89. In order to perform her duties effectively, Steverman was required to be physically present with patients and caregivers and could not perform the educational components of her job remotely. Exhibit 1 Par. 23.

90. Steverman's work as a Clinical Liaison/Teach Nurse at MGB facilities involved direct contact with patients and required her to provide hands-on instruction and education regarding medical treatments and devices. Exhibit 1 Par. 19-25.

91. While employed by New England Life Care, Steverman complied with all infection-control requirements imposed by the facilities in which she worked, including masking and other protective measures when required. Exhibit 1, Par. 26.

92. Steverman was never denied entry to any Mass General Brigham facility because of her unvaccinated status. Exhibit 1, Par. 27.

93. No one in management or any patient or colleague at Mass General Brigham or New England Life Care expressed any concern that Steverman's unvaccinated status created a risk to patients, coworkers, or the public. Exhibit 1, Par. 29.

94. During her employment with New England Life Care, Steverman did not cause or contribute to any patient safety incident related to COVID-19. Exhibit 1, Par. 30.

95. Steverman worked unvaccinated at MGB facilities for two years. Exhibit 1, p.28 Def. Exhibit 1, pp. 45–48.


**MGB's Religious Exemption Review Committee**

96. MGB collected a group of employees to evaluate all requests by employees for an exemption from taking the COVID vaccine, called the "Religious Exemption Review Committee." ("RERC") Exhibit 5, p. 28-30.

97. MGB attorney, Vanessa Gilbreath, prepared a document, dated October 5, 2021, (the "RERC Criteria Document") (ECF 161-2, p. 134) — which MGB required the members of the RERC to use to evaluate all religious exemption requests, including Plaintiff's. Exhibit 9.

98. Each employee who requested an exemption for the COVID vaccine on religious grounds was assigned a reviewer or team of reviewers to consider and respond to the employee's claim. Exhibit 5, P. 28-30.

99. The reviewers of each claim were to assign each employee/applicant into one of three categories set out in the RERC Criteria Document: approved, denied, or need more information. Exhibit 9.

100. Per the RERC Criteria Document, the "approved" listed adherents of the Rastafarian, Christian Science and Dutch Reformed religions, and those who believed in the eschatological

19

construct referred to as the "mark of the beast", these employees were presumptively approved for an exemption from the vaccine on religious grounds, if they demonstrated a sincere religious belief. Exhibit 9.

101. Per the RERC Criteria Document, the "denied" category listed employees who were Catholic, Christian, Jews, Muslims, and Buddhists were presumptively denied an exemption from the vaccine, regardless of the sincerity of their beliefs. Exhibit 9.

102. By November 19, 2021, Steverman's RERC communicator had stated: "I have no feelings left for religious exemption requests." Exhibit 5, pp. 67–68.

100. RERC members were never told what "undue hardship" meant before reviewing exemption requests. Exhibit 5, p. 23.

103. RERC personnel were told to "approve as few [exemptions] as possible." Exhibit 5, pg. 23

104. The institutional goal was to minimize unvaccinated staff to the "barest, barest minimum possible." Exhibit 8, P. 152

105. MGB approved religious or medical exemptions for at least 242 employees. Exhibit 2.

106. Of the approved exemptions, approximately 49 were staff nurses, clinical nurses, registered nurses, and nurse practitioners; 11 were physicians and anesthesiologists; 20 were surgical, radiologic, ultrasound, CT, respiratory, phlebotomy, and sterile-processing technicians; and 17 were patient care associates, LPNs, and medical assistants. Exhibit 2.

107. MGB allowed each of these approved employees to continue providing hands-on, in-person patient care while unvaccinated, subject to the same universal masking policy applicable to all staff.  Exhibit 2

20

**The RERC's Denial of Plaintiff Steverman's Religious Exemption**

108. Plaintiff Jamie Steverman is and was Catholic at the time of her covid vaccine religious exemption request. Exhibit 1.

109. Plaintiff's stated grounds for her religious exemption request included that her body is "a temple of the Holy Spirit," that compelled vaccination "removes my free will as God has intended," and that she was "following my conscience." Def. SOUF II ¶¶ 47, 54.

110. Per the RERC Criteria Document, applicants belonging to the three favored faiths were approved upon "at least a basic explanation," while applicants belonging to disfavored faiths, including Catholicism, were required to provide substantially more support — though Plaintiff's RERC reviewer could not identify what additional showing was required. Exhibit 5, 50:11–51:8, 67:1–68:2.

111. The RERC Criteria Document listed concerns about the "mark of the beast" as a basis for approval, while listing abortion-related objections — and the substance of Plaintiff's own stated grounds — as bases for automatic denial. Exhibit 9, Page 10.

112. MGB's denial of Steverman's request for a religious exemption from the COVID vaccine was based on the categories set out in the RERC criteria document, not by an individualized sincerity analysis. Exhibit 9.

113. MGB's written denial of Plaintiff's exemption request stated that she was denied because her "religion has publicly supported vaccination." Def. SOUF II ¶ 52.

114. Plaintiff's RERC reviewer testified that applicants were never told the reasons for their denial, in order to avoid giving them a "roadmap." Exhibit 5, 96:8–97:2, 106:6–107:15, 132:7–9.

115. No individualized assessment of what hardship Plaintiff's specific accommodation would impose was ever performed. Exhibit 5, pp. 52–55; Exhibit 8,  pp. 141–142.

116. When asked in interrogatories to identify the individualized hardship that would result from accommodating Plaintiff, MGB refused to answer, asserting it would be "too burdensome" to individually assess hardship given the number of plaintiffs. Exhibit 6

117. Plaintiff moved to compel a substantive response. ECF No. 414.

118. Plaintiff's RERC reviewer testified that the committee did not consider an applicant's position within the hospital when evaluating exemption requests, and that patient-facing employees — including physicians — "were not treated differently than anyone else." Exhibit 5. 143:16–144:2.

119. Plaintiff Steverman agreed to infection control requirements stated on the exemption request in order to continue working, which was rejected by MGB. Exhibit 1, Par. 7.

120. No one from the RERC or Human Resources ever discussed possible accommodations with Plaintiff Steverman, engage in any interactive dialog with her, or asked what accommodations she was seeking. Exhibit 1, Par. 8.

121. The process of requesting a religious exemption from the COVID vaccine consisted of a form submission by the employee, a possible request for more information by the anonymous RERC reviewer, and a template approval or denial. Steverman Deposition, pp. 62–65; RERC#5 Deposition, pp. 78–82.

122. Plaintiff proposed as an accommodation: masking, regular testing, and other infection control measures. MGB never evaluated or responded to these proposals. Def. Exhibit 1, pp. 58–60.

123. MGB has produced no evidence of any actual transmission incident involving Plaintiff, no individualized analysis of her specific role, and no evidence that masking and other measures would have been insufficient. Def. Ex. 1, Steverman Tr. 85:5–15.

124. Among the employees MGB accommodated was a registered nurse who worked the same twelve-hour shift structure as Plaintiff Steverman.  Exhibit 2

125. MGB convened an internal "SWAT team" to assess staffing-mitigation approaches by role group and by hospital, and resolved to communicate to employees that replacement roles would be posted. Exhibit 3.

126. Plaintiff Steverman testified that other, non-patient-facing positions existed within MGB that she could have filled without interacting with patients as a nurse. Def. Ex. 1, Steverman Tr. 82:23–83:15.

127. When co-plaintiff Tyler Adams developed a serious allergic reaction to MGB's masking requirement, MGB did not terminate her but instead created an entirely new, remote position for her. Adams Declaration. Exhibit 7 Par. 13.

## MGB's Alteration to Religious Exemption Criteria

128. Marvel Kim, MGB Executive Director of Workplace Health and Wellness, who directly reported to Dean Hashimoto, M.D., submitted a religious exemption request to the RERC and was initially denied. Exhibit 14, Page 36

129. Kim's denial was reversed after Hashimoto personally advocated to Chief Human Resources Officer Sheehan that Kim had "valid and deeply held religious reasons." Exhibit. 15.

130. After receiving a religious exemption from the vaccine, Marvel Kim also received a pay raise and a retention bonus within weeks of the reversal. Exhibit 14, Page 50.

131. No comparable opportunity to appeal or advocacy was ever extended to Plaintiff Steverman. Plaintiffs were told decisions were "final" with "no appeal process." Exhibit 9, Page 7.

**Further Policies and Statements from MGB Staff Regarding Unvaccinated Workers and Religious Exemptions**

132. Before the COVID vaccine mandate was implemented, MGB's Infection Control Committee determined that "unvaccinated employees could safely work in person with no special restrictions." Exhibit 3, Page 9

133. In August 2021, MGB's Human Resources and Occupational Health leadership, in designing the treatment of approved exemptions, recommended: "Permit employees with approved exemptions to continue to work on site under existing policies." Exhibit 3

134. MGB internal memoranda rejected additional restrictions for exempt employees, noting "existing policies support a safe environment" and that further restrictions posed "possible legal risk in treating employees differently based upon medical condition and religious beliefs (since IC supports safety of working while masked)." Ex. 3, Page 9.

135. On August 10, 2021 — while Plaintiff's exemption was being processed — MGB's Hospital Epidemiologist Dr. Michael Klompas published on MGB's own Brigham Bulletin website: "we've learned that the viral burden in those vaccinated people is the same as it is in unvaccinated people. And it's high — meaning that these individuals can transmit the virus to other people." Exhibit 18 (Brigham Bulletin)

136. Dr. Klompas testified in deposition about the hardship from accommodating unvaccinated employees: "It adds marginal threat to the system. To that extent, it is a hardship that has to be balanced against people's medical and religious rights."  Exhibit 8, Page 154.

137. Dr. Klompas testified that he had "zero involvement" in the development of the religious accommodation policies, the criteria used to evaluate requests, or any individualized review determinations, and that this process was managed strictly by Human Resources and fell entirely "outside [his] expertise." Exhibit 8, P. 64:18–20, 86:20–22.

138. MGB's Chief Human Resources Officer, Rosemary Sheehan, testified: "No. That data, I never saw... that data did not exist for us", when asked whether MGB had any internal data showing unvaccinated employees were more dangerous.  Exhibit 15,  P. 137.

139. MGB Chief Operating Officer, Ron Walls, testified: "did MGB have to make any operational changes as a result of losing those employees?" Answer: "No. Well, let me — I said that too quickly... we didn't have to do a plan to figure out how to deal with that number of employees." Exhibit 17, P. 33

140. MGB's Chief Human Resources Officer Rosemary Sheehan, testified: "Our goal was to have as few exemptions as possible. Yes, 100 percent. That was our goal." Exhibit 16, Page 74.

## MGB's Sticker Program

141. In August 2021, MGB senior leadership designed and implemented an internal program requiring unvaccinated, exempt employees to display visible tracking stickers on their identification badges. Exhibit 4.

142. On August 11, 2021, MGB Human Resources leader Katina McKinney wrote to Dean Hashimoto and others that the tracking policy "creates an interesting environment" and that "[p]erhaps we are dancing around the fact that unvaccinated people should be called out, but I'm not sure it's ok." Exhibit 4.

143. On August 12, 2021, MGB Senior Vice President of Human Resources Paula Squires notified leadership that her HR team gave "SIGNIFICANT pushback on the stickers" due to the "stigma associated with it" and concern that exempt employees would be "targeted."  Exhibit 4.

144. That same day, MGB Chief Human Resources Officer Rosemary Sheehan emailed Chief Operating Officer Ron Walls regarding the sticker program: "Thoughts. My inclination is to say too bad but want to make sure my biases are getting in the way." Exhibit 4.

145. Dr. Walls responded by defending the sticker program and proposing a tiered badge-labeling system using "'ME' [medical exemption] stickers for legitimate medical exemptions" and "'RE' for the religious exemptions we feel we can't prevent," explaining the labels would "separate those with medical issues from those who simply don't want the vaccine and have manufactured a way around it."  Exhibit  4.

146. Throughout the internal correspondence concerning the sticker program, no MGB official expressed any concern that the badge labels would deter or frighten patients. Exhibit  4.

### **Facts Regarding Failure of COVID Vaccine To Prevent Transmission**

147. MGB has made the effectiveness of the COVID vaccine to prevent transmission of the disease one of the central issues in its memorandum, while supplying no facts or evidence in its concise statement of facts.

26

148. In order to oppose these statements in its memorandum, plaintiff Steverman was obliged to provide expert medical and scientific testimony to refute the assertion that an unvaccinated employee would pose a safety concern to patients and fellow employees.

149. The Court emphasized that MGB must prove that **accommodating this specific plaintiff** would impose a substantial burden — not rely on generalized fears about vaccination policy or hypothetical transmission risks. (ECF 173 at 3, 8 n.11, 12–15).

150. The scientific consensus at the time that MGB imposed its vaccine mandate is that the COVID vaccine did not prevent transmission. See Declarations of Richard Amerling, M.D., Jessica Rose Ph.D. and Kevin McKernan, Exhibits 13, 20, 22.

151. Rochelle Walensky, former head of the United States Centers for Disease Control, stated on August 8, 2021 on CNN in an interview with Wolf Blitzer, "Our vaccines are working exceptionally well. They continue to work well for Delta with regard to severe illness and death, they prevent it. But what they can't do anymore is prevent transmission."  Exhibit  10.p.3

Respectfully submitted,
JAMIE STEVERMAN,
By her attorneys,


/s/ Sujata S. Gibson

Sujata S. Gibson

Gibson Law Firm, PLLC

120 E Buffalo St., Ste. 2

Ithaca, NY 14850

Tel: (607) 327-4125

sujata@gibsonfirm.law

/s/ Gregory A. Hession, J.D.
Gregory A. Hession, J.D.
93 Summer Street,
P.O. Box 543
Thorndike, MA 01079
Tel: (413) 289-9164

Gregoryhession@protonmail.com

B.B.O. No. 564457

Dated: July 2, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document has been filed through the CM/ECF system on July 2, 2026, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Gregory Hession

Gregory A. Hession J.D.