Exhibit B

# Exhibit B

# The Last Nurse Standing

**MAUREEN STEELE** | 7:14 PM ON JULY 01, 2026




*AP Photo/Ted S. Warren*

There are court cases that arrive dressed as employment disputes but carry the weight of an era. *Adams et al. v. Mass General Brigham* is one of them.

On paper, it is a federal discrimination case in Boston involving three remaining plaintiffs, Tyler Adams, Michelle Orfanos, and Jamie Steverman, against Mass General Brigham, the most powerful hospital system in Massachusetts. In reality, it is a post-pandemic reckoning over institutional power, religious liberty, scientific certainty, workplace coercion, and who gets to write the official history of the mandate years.

Advertisement

Mass General Brigham is not some minor regional employer. It is the largest private employer in Massachusetts, a Harvard-affiliated medical empire with tens of thousands of employees and annual revenue measured in the tens of billions. Its own public materials

describe the system as having 82,000 employees and $23 billion in annual revenue, while its CEO profile states that Anne Klibanski leads an 85,000-employee system with $22 billion in revenue and $2.7 billion in annual research funding.

In June 2021, MGB announced that all 80,000 employees would be required to receive a COVID-19 vaccine once the FDA granted approval to one of the vaccines. "The evidence of COVID-19 vaccine safety and effectiveness is overwhelming," Klibanski said in the announcement. Employees, MGB stated, would be able to request medical and religious exemptions.

That promise, that exemptions existed, is where the story begins.

More than 2,400 employees sought exemptions. MGB granted only 234. In a 2023 federal order, Judge F. Dennis Saylor wrote that MGB had "effectively made a determination that some level of risk, eventually involving 234 unvaccinated individuals out of approximately 93,600 employees… was tolerable."

For the plaintiffs, that fact is not incidental. It is central. Their argument is not that MGB granted no exemptions. Their argument is that MGB granted some exemptions while allegedly denying others through a secretive, discriminatory, and uneven process that favored certain religions and disfavored others.

The most vivid remaining face of that fight is Michelle Orfanos, a registered nurse who had worked for MGB since 2012. According to her state-court complaint, Orfanos worked throughout the pandemic unvaccinated, including as a homecare nurse and as a volunteer in the Boston COVID field hospital. She says she had received religious exemptions to flu vaccines for years, only to have her COVID religious exemption denied in 2021, resulting in her termination.

Then came the second firing.

Orfanos alleges that MGB rehired her in 2023 as a per diem emergency room nurse at Brigham and Women's Hospital, approved her religious exemption for the flu vaccine, cleared her to work, and allowed her to begin employment. Months later, according to her complaint, MGB placed her on leave, demanded a COVID vaccine exemption form, denied the request, and terminated her again in February 2024 for "non-compliance with Mass General Brigham's COVID-19 Vaccination Policy."

Advertisement

That second termination is now the subject of a separate Massachusetts state-court action, *Michelle M. Orfanos v. Mass General Brigham, Inc.*, filed in Suffolk Superior Court. There, Orfanos alleges religious discrimination, failure to accommodate, retaliation, coercion, fraudulent misrepresentation, and negligent misrepresentation.

The state complaint reads like a blueprint for a much larger institutional indictment.

It alleges that MGB did not evaluate religious exemption requests individually, as the law requires, but instead created internal criteria that divided religious beliefs into approved and disapproved categories. According to the complaint, Christian Scientists, Dutch Reformed Christians, Rastafarians, and employees citing the “Mark of the Beast” were treated more favorably, while Catholics, mainstream Christians, and employees citing conscience or fetal-cell-line objections were allegedly placed into a disfavored category.

One alleged policy excerpt is startling. The complaint says MGB’s updated exemption guidance stated that requests based on Christian Scientists, Dutch Reformed Christians, Rastafarians, or “Mark of the Beast” concerns should be approved with a basic explanation, while requests based on religions that “support vaccination,” including Catholicism, Christianity, Judaism, Islam, and Buddhism, should be denied unless the employee could satisfy additional narrow criteria.

If true, that is not merely bureaucratic sloppiness. It is theological sorting by a corporate employer.

The most cinematic allegation involves a pseudonymous “Jane Doe,” an assistant to Dr. Dean Hashimoto, MGB’s Chief Medical Officer of Workplace Health. According to Orfanos’s complaint, Doe was initially denied an exemption based on a “Mark of the Beast” belief, became emotional after allegedly hearing committee members ridicule that belief, appealed through Hashimoto, and had her denial quickly reversed. Her husband’s denial was allegedly reversed as well, despite MGB telling employees there was no appeal process.

Soon after, the complaint alleges, “Mark of the Beast” objections were added to the approved criteria. That allegation, if proven, would cut to the heart of the case: exemptions were not necessarily about sincerity or safety. They may have been about access, categories, and who inside the institution took up your cause.

Advertisement

MGB denies the plaintiffs’ framing. Its lawyers at Seyfarth Shaw portray the remaining plaintiffs and their counsel as attempting to restart a five-year-old case, pursue conspiracy theories, and turn a discrimination lawsuit into a broad anti-vaccine proceeding. In its May 18, 2026 opposition, MGB argues that plaintiffs have had years to obtain discovery, that the case should move toward summary judgment and trial, and that Orfanos’s new state-court filing is filled with “baseless conspiracy theories, anti-vaccine misinformation, and bogus claims of ‘fraud.’”

This is now a case about the case itself.

The plaintiffs say critical evidence was withheld or obscured. MGB says discovery was extensive, burdensome, and complete. Plaintiffs say they were denied meaningful access to the people who judged them. MGB says the review process was collective, anonymized where possible, and that it cannot identify every reviewer who participated in every religious exemption decision.

That “Communicator” structure has become one of the most important legal and narrative battlegrounds. MGB says that because many requests were reviewed by multiple committee members, often without employee names attached, it designated a “Communicator,” a reviewer or group most knowledgeable about each request. Plaintiffs argue that one “Communicator” is not the same thing as identifying the actual decision-makers.

At a March 26, 2026 status conference, plaintiffs' counsel Sujata Gibson told Judge Saylor that critical documents were only just surfacing. She said reviewer notes for Tyler Adams's first denial had been produced for the first time on Feb. 12, 2026, despite earlier representations that such notes did not exist. "We're just getting initial documents now," Gibson told the court. "I still have no reviewer notes or even knowledge of who reviewed Ms. Orfanos' or Ms. Steverman's claims."

The plaintiffs' Rule 37 motion, filed May 5, 2026, sharpened that claim. They asked the court to allow fifteen Phase II depositions, compel MGB to identify the individuals who reviewed and decided each plaintiff's exemption request, require MGB to reproduce discovery in usable form, extend fact discovery, and defer summary judgment until plaintiffs could complete depositions.

Advertisement

The motion claims MGB had represented for years that identifying reviewers was "impossible" and that no contemporaneous records existed, but that a February 2026 production proved otherwise.

MGB's answer was withering. It argued that plaintiffs waited too long, ignored court directives, failed to identify proposed deponents, and were trying to reopen litigation after nearly five years. It also noted that plaintiffs' predecessor counsel had already taken depositions of senior MGB figures, including Chief Medical Officer Dr. Dean Hashimoto, Chief Operating Officer Dr. Ron Walls, Chief Human Resources Officer Rosemary Sheehan, hospital epidemiologist Dr. Michael Klompas, and members of the Religious Exemption Review Committee.

The procedural dispute may sound dry. It is not. In cases like this, discovery determines history. Whoever controls the record controls what the public may someday know.

The judge, F. Dennis Saylor IV, has repeatedly tried to keep the case from becoming a referendum on COVID vaccines. At the March 26 conference, he told plaintiffs' counsel that he would not permit expert testimony "that the vaccines are ineffective or unsafe." "It's not a trial about whether or not these vaccines are safe," he said. "There's overwhelming evidence, of course, that they are safe."

Gibson pushed back, not by arguing that the entire CDC should be put on trial, but by arguing that evidence about transmission and accommodation mattered to the discrimination claims themselves. If MGB knew in 2021 that vaccinated and unvaccinated workers could both transmit the virus, plaintiffs argue, then MGB's claim that unvaccinated religious objectors posed an

unmanageable safety risk becomes far more vulnerable.

That is the legal hinge.

This case does not require a court to decide every disputed question about COVID vaccines. It does, however, require the court to decide whether MGB fairly applied religious accommodation law, whether it engaged in individualized review, whether it had a legitimate undue-hardship basis for denying exemptions, and whether its internal criteria were neutral or discriminatory.

Advertisement

The plaintiffs' state complaint goes further. It alleges that MGB told religious exemption reviewers to deny requests challenging the experimental or EUA status of the vaccines by stating: "The Pfizer vaccine has been fully approved by the FDA and is readily available for employees." The complaint contends that this was materially false as applied at the time because, although Pfizer's Comirnaty received full FDA approval on August 23, 2021, the fully licensed product allegedly did not ship into the United States until May 2022.

The complaint also alleges that Rosemary Sheehan, MGB's chief human resources officer, wrote to peer institutions on August 2, 2021: "We are now moving forward without the FDA approval, please do not share this broadly."

That line may become one of the most important in the entire story.

Because it captures the plaintiffs' broader thesis: that employees were told one thing while leadership allegedly knew another; that religious objectors were treated not as workers with rights, but as obstacles to be managed; and that an institution celebrated as the pinnacle of medical authority may have used that authority to crush dissent inside its own ranks.

There are human beings inside every one of these abstractions.

Michelle Orfanos was not an internet pundit. She was not a protester outside a hospital. She was a nurse. She had cared for patients. She had worked through the emergency. She had been granted religious vaccine exemptions before. She was rehired after the first termination, approved for a flu exemption, placed back into patient care, and then fired again after the

institution revisited her COVID status.

That is why this case carries historical force.

The COVID mandate years created a new American template: emergency power flowed through employers, hospitals, universities, licensing boards, and courts. Rights were not always suspended outright. Often, they were buried under process. Forms. Deadlines. Committees. Checkboxes. Templates. "More information needed." "Denied." "No appeal."

The question now is whether the machinery of compliance became, in some places, machinery of discrimination.

Advertisement

MGB will argue that it was protecting patients during a pandemic, relying on medical judgment, and navigating unprecedented risk. That argument has force, and Judge Saylor has recognized it.

In his 2023 order, he wrote that courts should give substantial deference to hospitals struggling through a worldwide pandemic and should not simply substitute judicial views for those of trained medical personnel.

But deference is not immunity.

A hospital may make infection-control decisions. It may rely on science. It may protect patients. But it may not create religious categories that favor some faiths over others. It may not use secret criteria to deny protected beliefs. It may not tell employees that no appeal exists while insiders obtain reversals. It may not claim that accommodation is impossible while accommodating hundreds of others. And it may not use the fog of emergency to erase the rights of those who ask inconvenient questions.

That is what this case is really about.

It is about the nurses, technicians, therapists, doctors, and staff who were told they were heroes in 2020 and liabilities in 2021.

It is about whether religious liberty means anything when the belief is unpopular, unfashionable, or inconvenient to a $20-billion institution. It is about whether courts will allow discovery into what powerful institutions knew, said, concealed, and decided when the country was afraid.

And it is about Michelle Orfanos, standing at the center of a case that began with hundreds and now narrows toward a few remaining plaintiffs willing to keep fighting after the headlines moved on.

The mandate era is already being rewritten in softer language. Mistakes become “policy evolution.” Coercion becomes “workplace safety.” Censorship becomes “misinformation management.” Firings become “noncompliance.” Religious discrimination becomes “process.”

But court records have a way of resisting euphemism.

They preserve emails. They preserve testimony. They preserve the moment a judge says a case is not a “MAHA trial.” They preserve the moment an attorney says, “We’re just getting initial documents now.” They preserve the templates, the denials, the categories, the shifting explanations, and the people who refused to disappear quietly.

Advertisement

History often turns not on the loudest battles, but on the records left behind.

And in Boston, inside the federal courthouse and now the Massachusetts Superior Court, the record is still being written.