**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **TYLER ADAMS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**MASS GENERAL BRIGHAM, INC.,**<br><br>**Defendant.** | ) | **Civil Action No. 21-11686-FDS** |

**MEMORANDUM AND ORDER ON**
**MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action arising out of a mandatory COVID-19 vaccination policy. Defendant Mass General Brigham, Inc. ("MGB"), is a Massachusetts corporation and major hospital and healthcare network that operates, among other facilities, Massachusetts General Hospital and Brigham and Women's Hospital in Boston. In June 2021, MGB announced a mandatory COVID-19 vaccination policy for all its employees, with exemptions for medical or religious reasons under certain circumstances. MGB received exemption requests from more than 2,400 employees and granted 234 of them.

Plaintiffs Michelle Orfanos, Jamie Steverman, and Tyler Adams are three of the employees who were denied a religious or disability exemption from the COVID-19 vaccination policy. They have filed suit, alleging unlawful discrimination on the basis of religion (Orfanos and Steverman) or disability (Adams). MGB has moved for summary judgment in its favor as to all three claims.

This is, or rather ought to be, a relatively straightforward case involving claims of unlawful discrimination on the basis of religion or disability. Plaintiffs' counsel has nonetheless repeatedly endeavored to raise claims concerning the safety and efficacy of the COVID-19 vaccines that have no legal relevance to the resolution of this dispute. The Court has declined to permit counsel to waste its time and resources on such issues, or to provide a platform from which to propagate misleading, and potentially dangerous, medical information.

For MGB, and for the larger health-care community, the stakes are much greater than avoiding wastes of time. A core obligation of a hospital is to take reasonable steps to reduce the risks of infection for patients, visitors, and staff. In the case of infectious diseases for which FDA-approved vaccines are available, it can hardly be doubted that hospitals have the right to impose reasonable vaccination requirements on their employees. That is particularly true as to the COVID-19 vaccines, which were developed on an emergency basis in the wake of a worldwide pandemic that killed at least 1.2 million Americans, and which have been proved, according to the overwhelming consensus of the medical community, to be safe and effective at preventing or reducing the risk of serious illness, hospitalization, or death.

It is of course true that MGB is obligated to follow the law, including the laws concerning discrimination on the basis of religion and disability. In accordance with those requirements, it may be required under some circumstances to provide a reasonable accommodation to an employee, if it can do so without an undue hardship. But it is under no obligation to run unnecessary risks, or abandon fundamental principles of medicine or science, to provide such an accommodation.

It also bears mentioning that the legal precedents set in litigation arising out of the COVID-19 pandemic will likely guide responses to future public health emergencies. As this is

being written, an outbreak of measles in the United States has claimed the lives of at least thirteen people—including several children—despite the fact that a safe and effective vaccine has been in existence since 1963, and that the United States had effectively eradicated the disease decades ago.[1] The apparent reason for the outbreak is a substantial drop in the vaccination rate arising out of widespread misinformation and unfounded fears. Under the circumstances, and at a minimum, courts should be careful not to impose undue burdens on the decisions of health-care professionals seeking, and sometimes struggling, to reduce the spread of infectious diseases based on scientific and medical evidence.

In any event, the claims of the three plaintiffs in this action may be readily resolved within the established framework of Title VII and the ADA. Plaintiffs Orfanos and Steverman contend that the administration of the vaccine violated their religious principles. In substance, the accommodation that they requested was to continue working in their positions without receiving the vaccine, while wearing masks and undergoing periodic testing. Because their positions both involved direct patient care, it would have presented an undue hardship to MGB to comply with those requests. They declined to receive the vaccine, and were terminated. Plaintiff Adams, who worked remotely, contends that she was allergic to an ingredient in the two mRNA vaccines and a different ingredient in the third, viral-vector vaccine, and that she could not take either due to a blood-clotting disorder. She failed, however, to provide the necessary degree of

[1] *See* CTR. FOR DISEASE CONTROL & PREVENTION, *History of Measles* (Nov. 20, 2026), https://www.cdc.gov/measles/about/history.html; Lilia Luciano, *9th Measles Death Recorded in Pennsylvania as Outbreak Surpasses 1,600 Cases in the State*, CBS (Nov. 23, 2026), https://www.cbsnews.com/news/pennsylvania-measles-outbreak-death; Chad Thompson, *Wisconsin Measles Outbreak Death Toll Rises to 3 as Cases Near 1000*, WBAY (Nov. 24, 2026), https://www.wbay.com/2026/11/24/wisconsin-measles-outbreak-claims-third-life-reaches-920-cases; Press Release, VA. DEP'T OF HEALTH, *Virginia Department of Health Announces First Measles-Associated Death in 2026* (Nov. 20, 2026), https://www.vdh.virginia.gov/news/public-relations-contacts/2026-news-releases/vdh-1st-measles-death-2026.

notice to MGB concerning her claimed allergies, and refused to consult with an allergist during the interactive process. After she declined to receive the vaccine, she too was terminated.

For the reasons set forth below, the employment actions by MGB did not violate Title VII or the ADA. Summary judgment will therefore be granted in favor of MGB as to the claims of all three plaintiffs.

# I. <u>Background</u>

## A. <u>Factual Background</u>

The following facts are undisputed unless otherwise noted.

### 1. <u>COVID-19 Pandemic</u>

COVID-19 is a contagious viral disease that can cause severe illness and death. As of this writing, more than 1.2 million Americans, including more than 23,000 Massachusetts residents, have died from the disease. CTR. FOR DISEASE CONTROL & PREVENTION, *Provisional COVID-19 Mortality Surveillance* (Nov. 19, 2026), https://www.cdc.gov/nchs/nvss/vsrr/covid19.[2]

MGB is the largest healthcare provider in Massachusetts. (MGB Phase I Statement of Undisputed Facts, Dkt. No. 150, ¶¶ 1-2) ("Def. SMF"). It has cared for thousands of COVID-19 patients. (*Id.* ¶ 14). Many of MGB's patients are medically vulnerable people at higher risk of disease and death from COVID-19, such as patients who are elderly; are pregnant; are infants in the neonatal intensive care unit; or have serious medical conditions, such as cancer or severe heart or lung disease. (*Id.* ¶ 17).

After the beginning of the pandemic in March 2020, MGB took a variety of steps to stop the spread of COVID-19. Those measures included periodic testing, requiring masks to be worn

[2] The First Circuit has taken judicial notice of information on the CDC website. *See Melino v. Boston Med. Ctr.*, 127 F.4th 391, 394 n.1 (1st Cir. 2025).

at all times, limiting in-person patient interactions when possible, prohibiting visitors from seeing patients, and suspending educational activities, among other things. (*Id.* ¶¶ 19-21). Despite those measures, COVID-19 continued to spread in MGB facilities. (*Id.* ¶¶ 22-23).

### 2. The MGB COVID-19 Vaccination Policy

By December 2020, the FDA had approved emergency use authorization for mRNA vaccines developed by Pfizer-BioNTech and Moderna. A third vaccine, developed by Johnson & Johnson (Janssen), was authorized in February 2021. The Janssen vaccine was a viral-vector vaccine that used a modified and harmless version of the virus to trigger an immune response.

On June 24, 2021, MGB announced that it would require staff to be vaccinated against COVID-19 unless they received an approved medical or religious exemption. (*Id.* ¶ 51). On August 10, 2021, MGB notified its employees that they were required to be fully vaccinated by October 15, 2021, unless they had been granted a medical or religious exemption. (*Id.* ¶¶ 121, 125). Employees who did not receive the vaccine would be placed on two weeks' unpaid leave and then terminated if they remained unvaccinated. (*Id.* ¶ 254).

MGB's stated reasons for adopting the mandatory vaccination policy were the following:

> the unique emergency created by the COVID pandemic; the unique threat of severe illness and death associated with COVID especially in hospitalized patients; its responsibility to maintain the highest possible level of quality patient care; its need to protect patients, staff and visitors; its need to keep staffing levels adequate to provide patient care; its need as a major health care system to inspire trust with the public so that the public would feel safe accessing medical care; its prescient concern that the fall of 2021 and winter of 2022 would see another rise in COVID cases; and the additional stresses on its already overburdened system created by the highly contagious Delta variant.

(*Id.* ¶ 52).

At the time the vaccination policy was implemented, the scientific data showed that

> (i) COVID vaccines have high efficacy to prevent symptomatic COVID and even higher efficacy to prevent hospitalizations and deaths; (ii) COVID vaccines have similar or better safety profiles than other vaccines then fully approved by the

> Food & Drug Administration ("FDA"); (iii) full vaccination offers advantages regarding patient and healthcare personnel safety; (iv) morbidity and mortality of COVID far exceeds that of influenza; (v) COVID has been uniquely disruptive to hospital operations and workforce continuity, far more so than influenza; (vi) health care workers and other essential workers have higher rates of infection than people in other fields; (vii) masking diminishes risk of nosocomial (in-hospital) transmission but it is not perfect; vaccines provide additional and constant protection without requiring reminders, persuasion, mask-fitting aids, or other behavioral changes.

(*Id.* ¶ 61).

MGB determined that a mandatory vaccination policy was necessary because "the overwhelming scientific evidence showed that vaccination was the single most effective step in preventing infection and contagion." (*Id.* ¶ 68). Its decision to adopt the mandatory vaccination policy involved some of the world's foremost experts in infectious disease and infection control. (*Id.* ¶ 49). Its leadership made the following determinations based on scientific data:

> a. people who were vaccinated were less likely to get infected with COVID;
>
> b. when a person who is vaccinated gets infected with COVID, they shed the virus for a shorter period of time compared with an unvaccinated person;
>
> c. the virus they do shed is less likely to be replication competent, to be able to actually reproduce itself and infect a cell, compared with an unvaccinated person;
>
> d. from transmission studies, a vaccinated person was about half as likely to transmit compared with an unvaccinated infected person;
>
> e. vaccinated people are less likely to have symptoms than unvaccinated people, and symptoms (coughing, sneezing, etc.) are a predictor of the amount of transmission; and
>
> f. vaccinated people have a high viral load for a shorter time, making them less likely to transmit.

(*Id.* ¶ 66).[3]

[3] Plaintiffs dispute the "scientific conclusions" in paragraph 66. (Plaintiffs' Concise Statement of Material Facts, Dkt. No. 154, ¶ 66) ("Pl. SDMF"). But questioning the underlying merit of the science does not create a factual dispute as to whether MGB reasonably relied on the available scientific information.

In addition to scientific expertise, MGB's decision was informed by public-health guidance from federal and state authorities. At the time, the CDC recommended vaccinations for everyone, especially healthcare workers, and state and federal governments prioritized healthcare workers in the first wave of vaccinations. (*Id.* ¶¶ 62, 91). MGB was also guided by the mandatory-vaccination practices adopted by other leading healthcare systems in the United States. (*Id.* ¶¶ 94-96).

Since the implementation of the mandatory vaccination policy, more than 99% of MGB staff have been vaccinated against COVID-19, and MGB has not seen the infection clusters that it experienced before the vaccine rollout. (*Id.* ¶¶ 313-14).

### 3. <u>The MGB Medical Exemption Process</u>

The August 10, 2021 notice linked to forms that staff could use to request a medical or religious exemption, and set a deadline of September 3, 2021, to file an exemption request. (*Id.* ¶¶ 126-27). MGB created a centralized process to review exemption requests. (*Id.* ¶ 131). It recognized that it could not achieve its goal of 100% vaccination due to the exemption process, and did not establish exemption quotas. (*Id.* ¶¶ 135-38). As of November 4, 2021, MGB had allowed 234 exemptions out of 2,402 requests. (*Id.* ¶ 252).

Dr. Dean Hashimoto, the MGB Chief Medical Officer for Workplace Health and Wellness, developed the process for reviewing requests for medical exemptions. (*Id.* ¶ 159). The first step was for an employee's healthcare provider to complete and submit the medical exemption request form. (*Id.* ¶ 161). The form provided boxes that the healthcare provider could check to indicate conditions that the CDC determined were potential contraindications to the COVID-19 vaccines, as well as a space for the provider to describe "Other medical reasons." (*Id.* ¶ 162). Those contraindications included a "history of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID vaccine," "temporary

exemption due to administration of COVID-19 monoclonal antibodies," and "temporary exemption due to a history of multisystem inflammatory syndrome." (*Id.*).

MGB assembled two panels to review those requests: one focused on occupational health and the other focused on infection control. (*Id.* ¶ 163). The two panels worked together with Dr. Hashimoto to develop an interactive process. (*Id.* ¶ 168). The Occupational Health Clinical Panel comprised three nurse practitioners serving as occupational health clinical directors. (*Id.* ¶ 163). The Infection Control Panel comprised five physicians with expertise in infection control and disease. (*Id.*). Each medical exemption request was considered by one or both panels. (*Id.* ¶ 166). When the medical exemption panels had additional questions for employees or their healthcare providers, they would solicit additional information by e-mail. (*Id.* ¶ 169). Employees who requested exemptions based on allergies were offered the opportunity to consult with an MGB allergist. (*Id.* ¶ 180). MGB informed employees of the decisions as to their requests on a rolling basis by email. (*Id.* ¶ 182).

As with the rest of the mandatory vaccination policy, the panels followed CDC guidance. That guidance set forth a relatively narrow number of contraindications and urged vaccination for medically vulnerable people, due to their higher risk of severe disease and death from COVID-19. (*Id.* ¶ 170-72). In the "Contraindications" section, the policy as of October 2021 stated that individuals with a "[h]istory of severe allergic reaction (anaphylaxis) to polyethylene glycol (PEG) or PEG-containing products such as MiraLAX" and/or a "[h]istory of severe allergic reaction (anaphylaxis) to polysorbate . . . containing injectable or vaccine . . . should be provided counseling prior to vaccine administration in order to make an informed decision." (Joint Appendix Vol. I, Dkt. No. 161-1, at 18).

At the time, CDC guidance stated the following:

> CDC considers a history of the following to be a contraindication to vaccination with COVID-19 vaccines:
>
> - Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine
> - Immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine
>
> . . . Polyethylene glycol (PEG) is an ingredient in both mRNA COVID-19 vaccines, and polysorbate 80 is an ingredient in Janssen COVID-19 vaccine. PEG and polysorbate are structurally related, and cross-reactive hypersensitivity between these compounds may occur. People with a contraindication to one of the mRNA COVID-19 vaccines should not receive doses of either of the mRNA vaccines (Pfizer-BioNTech or Moderna). However, people with a contraindication to mRNA COVID-19 vaccines may be able to receive Janssen COVID-19 vaccine, and vice versa, provided certain measures are taken (see "precautions" below). Known polysorbate allergy is no longer a contraindication to mRNA vaccination; however, known polysorbate allergy is a contraindication to Janssen COVID-19 vaccine and thus, a precaution to mRNA COVID-19 vaccination.
> . . . .
> Most people deemed to have a precaution to a COVID-19 vaccine at the time of their vaccination appointment can and should be administered vaccine.
> . . .
> People with a contraindication to one type of the currently FDA-approved or FDA-authorized COVID-19 vaccines (e.g., mRNA) have a precaution to the other (e.g., Janssen viral vector). However, because of potential cross-reactive hypersensitivity between ingredients in mRNA and Janssen COVID-19 vaccines, consultation with an allergist-immunologist should be considered to help determine if the patient can safely receive vaccination.

(Joint Appendix Vol. VII, Dkt. No. 161-21, at 144-45).

CDC guidance also discussed considerations concerning the Janssen vaccine and its connection with thrombosis with thrombocytopenia syndrome ("TTS"). It noted that "[t]he highest rates of TTS per vaccine doses administered were identified in women <50 years of age," but that the risk was still "rare" and women less than 50 years old "can receive any currently FDA-approved or FDA-authorized COVID-19 vaccine." (*Id.* at 139). It stated that people with "inherited or acquired thrombophilia . . . are unlikely to be at increased risk for TTS" and that

such individuals "can receive any currently FDA-approved or FDA-authorized vaccine, including the Janssen COVID-19 vaccine." (*Id.* at 140).

#### 4. <u>The MGB Religious-Exemption Process</u>

Vanessa Gilbreth, Senior Legal Counsel at MGB's Office of the General Counsel, developed MGB's process for reviewing requests for religious exemptions. (Def. SMF ¶ 199). The first step was for the employee to fill out an online form, which asked the employee to "(1) identify your sincerely held religious belief, practice, or observance and (2) explain why it prevents you from receiving a COVID-19 vaccine." (*Id.* ¶¶ 201-02). The requests were evaluated by the Religious Exemption Review Committee ("RERC"), which was chaired by Gilbreth. (*Id.* ¶ 203). The RERC was composed of human-resources personnel who had backgrounds relevant to the review process and received training in the legal standards governing religious exemptions. (*Id.* ¶¶ 204, 208). The deadline to request an exemption was September 3, 2021. (*Id.* ¶ 127).

Internal MGB documents listed the criteria for approving and denying requests for religious exemptions. (Ex. 9, Dkt. No. 453-9, at 10-11). The document stated that requests from members of the Christian Scientist, Dutch Reformed Church, and Rastafarian faiths "[w]ith at least a basic explanation of faith and its opposition to vaccination . . . should be approved." (*Id.* at 10). The document recommended approval of requests professing that the COVID-19 vaccine is (1) "the 'Mark of the Beast' or 'Mark of the Devil,' will prevent reincarnation, will prevent them from entering heaven," supported by (2) "a thoughtful and clear description of the religious foundation for the belief and why it prevents vaccination." (*Id.*). And finally, it stated that requests should be approved if they satisfied the following requirements:

> (1) A statement that their body is a temple, they must remain clean/cannot be unclean, their blood must be pure/cannot be tainted, must follow[] all natural, homeopathic medicine, no chemicals, etc.

> (2) An explanation that and how the aforementioned is due to their religious beliefs (e.g., citation of scripture verses, letter from religious leader, articulation of religious beliefs); and
>
> (3) Provide evidence of adherence to these practices and beliefs (e.g., evidence of a history of declining vaccines, an attestation from the individual confirming that they follow the described religious practices).

(*Id.*). The guidance specified that the requests should be in the form of "a personal statement" and that statements that were copy and pasted or purchased from the Internet required further follow up. (*Id.*).

The document recommended denial of requests "based upon organized religions that support vaccination (e.g., Catholicism, Christianity, Judaism, Muslim, Buddhism, etc.) without any further explanation of personal religious beliefs that prohibit vaccination." (*Id.*). Denial was also warranted for requests based on opposition to abortion or the use of fetal cell lines, "free will," "conscience," and "my body is my temple as a tenant [sic] of the religion (without further explanation of specific religious practices followed supporting this principle as outlined above)." (*Id.* at 10-11). The document further stated that requests "based on religious objections to use of blood or animal products" (as opposed to objections to animal testing of vaccines and objections to contaminating one's blood) should be denied. (*Id.* at 11). Finally, denial was recommended for requests espousing "conspiracy theories or patiently erroneous beliefs such as: the vaccine will modify one's DNA; the vaccine will prevent future reproduction." (*Id.*).

**5. <u>The Accommodation Request of Michelle Orfanos</u>**

Michelle Orfanos began working as a registered nurse for MGB in 2012. (Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment on the Claim of Plaintiff Orfanos, Dkt. No. 467, ¶ 1). Her primary duty was to provide home care to patients who were homebound, recovering from surgery, or required skilled nursing care, such as people

with congestive heart failure, diabetes, and coronary artery disease. (*Id.* ¶¶ 3-5). She worked with a variety of patient populations, including elderly patients, cancer patients, and patients recovering from organ transplants. (*Id.* ¶¶ 7-9). She performed hands-on tasks, such as placing IVs, drawing blood, administering medications, and dressing wounds. (*Id.* ¶¶ 11-12). Her role involved coordinating patient care with physicians and family members. (*Id.* ¶¶ 16-19).

In addition to her home-care duties, Orfanos worked at Boston Hope Medical Center, a temporary facility that MGB operated from April to June 2020 to care for COVID-19 patients during the early stages of the pandemic. (*Id.* ¶ 23). She also worked at COVID-19 vaccine clinics operated by MGB. (*Id.* ¶ 22).

On August 17, 2021, Orfanos submitted a request for a religious exemption. (*Id.* ¶ 41). The request stated: "My religious beliefs, practices, and observances which form the basis for my exemption request are sincerely held." (*Id.* ¶ 42). The RERC requested additional information, advising her: "You did not adequately explain your sincerely held religious practices nor did you explain how your religious beliefs prevent you from receiving a COVID-19 vaccine." (*Id.* ¶ 44). It also asked her: "If you have received vaccines in the past, please explain why your religion did not prevent you from receiving vaccines in the past and will not allow for COVID-19 vaccination." (*Id.* ¶ 45) (citation modified).

Orfanos has received vaccines in the past, including the Hepatitis B and MMR vaccines in July 2020. Those vaccines were not required not as a condition of her employment, but of her graduation from a master's program in nursing. (*Id.* ¶¶ 32-38).

In response, Orfanos said she had "looked into it" and concluded that the COVID-19 vaccines were developed using aborted fetal cells. (*Id.* ¶ 46). She stated: "I am an observant Christian, and my beliefs are sincerely held, lifelong, and meaningful. My sincerely held beliefs

include, but are not limited to the current COVID vaccine development involved the use of cloned aborted fetal cells, which is in opposition to my belief." (*Id.* ¶ 49). She provided links to documents published by Catholic sources. (*Id.*).[4] Orfanos acknowledged that she had previously received rubella, Hepatitis A, and varicella vaccines, but stated that she "was unaware that these were grown on WI 38 and MRC 5 lines at the time of my inoculation. I have requested exemptions in years past, which have been approved by MGB." (*Id.* ¶ 50). She further stated that "religious beliefs can include unique views held by a few or even one individual" and "attest[ed] to having a fundamental belief system of deep and imponderable matters that includes formal and external signs to which I am declining the COVID vaccine." (*Id.* ¶ 51).[5]

Orfanos was notified by the RERC on September 13, 2021, that her exemption request was denied. (*Id.* ¶ 52). She failed to take the vaccine, and was terminated on December 11, 2021. (*Id.* ¶ 54).

Approximately two or three weeks later, Orfanos tested positive for COVID-19. (*Id.* ¶ 55).

In November 2023, Orfanos was hired by Brigham and Women's Hospital, an MGB facility, as a floating nurse in the emergency department. (*Id.* ¶ 66). She was placed on leave on January 4, 2024, after MGB advised her that there had been an oversight as to her COVID-19 vaccination status. (*Id.* ¶¶ 67-68). That same day, she again requested a religious exemption, which was denied two weeks later. (*Id.* ¶¶ 70-71).

After she declined again to receive the vaccine, she was terminated on February 2, 2024.

---

[4] Orfanos identifies as a Christian, not as a Catholic. (*Id.* ¶ 61).

[5] The phrases "deep and imponderable matters" and "formal and external signs" are apparently taken from Third Circuit case law. *See, e.g.*, *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 491 (3d Cir. 2017).

(*Id.* 72).

### 6. The Accommodation Request of Jamie Steverman

Jamie Steverman worked as a clinical nurse in the Emergency Department Observation Unit. (Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment on the Claim of Plaintiff Steverman, Dkt. No. 438, ¶ 1) ("Def. SMF as to Steverman"). That was an in-person role that required direct, face-to-face interactions with patients as she conducted "head-to-toe" assessments. (*Id.* ¶¶ 5-6, 9-10). Her role also involved physically moving patients. (*Id.* ¶ 12). Her patients included elderly people and people with heart conditions. (*Id.* ¶¶ 7-8). In addition to patient interactions, she also interacted closely with family members, hospital visitors, and other hospital staff. (*Id.* ¶¶ 23-32).

Steverman has received vaccines in the past, including flu vaccines in 2011, 2012, and 2016, before those vaccines had become a condition of employment at MGB. (*Id.* ¶¶ 38-43).

In 2018, the first year the flu vaccine became mandatory for MGB employees, Steverman applied for a religious exemption for the first time. (*Id.* ¶ 44). MGB granted her requests for a religious exemption from the flu vaccine in 2018, 2019, and 2020. (Plaintiffs' Concise Statement of Material Facts, Dkt. No. 452, ¶ 77).

On September 5, 2021, Steverman submitted a request for a religious exemption from the COVID-19 vaccination policy. (Def. SMF as to Steverman ¶ 46). The request stated:

> As a practicing Catholic, I believe that the human body is a gift from God and a temple of the Holy Spirit, (1 Corinthians 6:19, 20) and that it must not be polluted (2 Corinthians 7:1). There is no flaw in God's design. The ingredients in vaccines are pollutants to the body. As such, I find it to be contrary to my conscience to knowingly have these toxic chemicals injected into myself.

(*Id.* ¶ 47). When the RERC asked her why she had missed the September 3 deadline to request a religious exemption, she stated that her phone, which she used for email, was broken. (*Id.* ¶ 50).

The RERC asked Steverman to provide additional information. Specifically, it asked her to "explain how, in light of your religion's public support of vaccination, your faith prevents you from receiving a vaccine," and "why your religion did not prevent you from receiving vaccines in the past and will not allow for COVID-19 vaccination." (*Id.* ¶ 53) (citation modified). She responded:

> My beliefs are between me and God who teaches my beliefs are not to be scrutinized nor denied by any man. . . . The government cannot be the arbiter of which Catholic is correct. This would violate the establishment clause of the First Amendment as well as Article II.
>
> The Bible informs all believers that our body is a Temple. Receiving medical treatment against my will violates my body, and removes my free will as God has intended for me. I recognize God as my ultimate authority in all things and that He has delegated to each of us authority over our own lives and choices, matters of health, including that of vaccines. . . . "My Body, My Choice."
>
> I have been granted religious exemptions in the past. . . . My beliefs have further evolved and have allowed me to possess even greater knowledge in this area, which is why I continue on this path of not harming my body. My faith requires that when I recognize an action to be wrongful, that I repent. Having committed a sin in the past is not an excuse to continue doing so . . . .

(*Id.* ¶ 54) (citation modified).

On September 27, 2021, the RERC informed Steverman that her request for a religious exemption to the COVID-19 vaccine was denied. (*Id.* ¶ 55). She was placed on unpaid administrative leave on October 21, 2021, and told she could not return to work unless she was vaccinated by November 5, 2021. (*Id.* ¶ 58). She declined to take the vaccine, and was terminated on November 10, 2021. (*Id.* ¶ 60).

Approximately six weeks later, on December 27, 2021, Steverman tested positive for COVID-19. (*Id.* ¶ 61).

In August 2022, Steverman began to work for New England Life Care as a clinical liaison/teaching nurse. (Plaintiffs' Concise Statement of Material Facts, Dkt. No. 452, ¶ 79). As

part of her work at New England Life Care, she occasionally provided in-person education to patients and caregivers about infusion treatments at MGB facilities. (*Id.* ¶ 85).[6]

**7. <u>The Accommodation Request of Tyler Adams</u>**

Tyler Adams began working for MGB as a medical assistant in 2018. (Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment on the Claim of Plaintiff Adams, Dkt. No. 448, ¶ 48) ("Def. SMF as to Adams"). Her primary care provider, Dr. Guy Navarra, is board-certified in internal medicine, geriatrics, and obesity medicine, but not as an allergist. (*Id.* ¶ 50).

After MGB instituted a masking policy in June 2020, Adams submitted a letter from Samantha Flecchia, a nurse practitioner in Dr. Navarra's office, stating that she had an allergic reaction to surgical masks. (*Id.* ¶ 49; Dkt. No. 449-4). She underwent allergy testing at a dermatologist's office, which submitted a letter in support of her mask accommodation request, stating that she was allergic to quaternium-15 and formaldehyde-releasing compounds. (*Id.* ¶ 54). MGB attempted to find an accommodation, and ultimately transferred Adams to a remote role in the Department of Operations for the North Shore Physicians Group, which is part of MGB. (*Id.* ¶ 57). In April 2021, Adams moved to South Carolina, where she continued to work remotely for the North Shore Physicians Group. (*Id.* ¶ 59).

Adams received the flu vaccine in 2017, 2018, 2019, and 2020, as well as the Tdap vaccine in 2018. (*Id.* ¶ 61). Other than some localized swelling following the flu shots, which she managed with allergy medication, she experienced no other adverse reactions to those

[6] MGB disputes the frequency and extent of Steverman's placements at MGB facilities, contending that her testimony referred to only two such instances and lacked documentary support. (Def. Reply in Support of Mot. for Summary Judgment on Steverman's Claim, Dkt. No. 461, at 15).

vaccines. (*Id.* ¶ 63). She requested a medical exemption from the flu vaccine for the first time in 2021. (*Id.* ¶ 64).

When MGB announced its mandatory COVID-19 vaccination policy in August 2021, Adams asked her dermatologist for an exemption letter. (*Id.* ¶ 69). Her dermatologist "stated she was unable to write a letter of exemption as she was not an expert in this area and did not have Plaintiff's complete medical history." (*Id.* ¶ 70) (citation modified).

On August 23, 2021, Adams submitted a request for a medical exemption from the COVID-19 vaccine that had been completed and signed by Meghan Heald, a nurse practitioner in Dr. Navarra's office. (*Id.* ¶¶ 72, 74). Heald did not check the boxes for "[h]istory of severe or immediate allergic (anaphylactic) reaction to a previous dose or component of a COVID-19 vaccine," "[t]emporary exemption due to current pregnancy," "[t]emporary exemption due to administration of COVID-19 monoclonal antibodies," or "[t]emporary exemption due to history of multisystem inflammatory syndrome." (*Id.* ¶ 73).[7] Under "[o]ther medical reasons," Heald stated: "Patient reports burning of hands and feet when taking MiraLAX." (*Id.*).[8]

All three members of the Occupational Health Clinical Panel agreed that the exemption request should be denied. (*Id.* ¶ 86). The panel determined that Adams's report of a burning sensation in her hands and feet when taking MiraLAX was not a severe allergic reaction. (*Id.* ¶ 87).[9]

On August 30, 2021, Adams was informed that her request for a medical exception was

---

[7] As to the temporary exception due to current pregnancy, the form stated: "According to the CDC and American College of Obstetrics and Gynecology, the COVID-19 [vaccine] is safe and effective for pregnant women and to protect the baby after it is born. However, pregnancy is a unique personal circumstance. We encourage those pregnant to discuss this issue with their medical provider." (*Id.*).

[8] MiraLAX is an over-the-counter laxative. (*Id.* ¶ 82).

[9] A severe allergic reaction "is generally at the level of an anaphylactic reaction." (*Id.* ¶ 23).

denied. (*Id.* ¶ 91). She was advised, however, that she could submit additional information. (*Id.* ¶ 92). She then scheduled an appointment with Dr. Navarra on August 31, 2021. (*Id.* ¶ 93).

On September 2, 2021, Adams sent an email to the panel with a letter from Dr. Navarra in support of her exemption request. (*Id.* ¶ 94). The letter stated:

> This letter is to certify that I am the primary care provider for this patient. I am writing to verify that this patient has been seen and treated in this office 08/31/2021. Patient is exempt from getting the COVID vaccine due to history of multiple allergies: MiraLAX, Cipro, Dupixin, Formaldehyde, Neomycin, Bromol, and a history of Thrombophilia. Please do not hesitate to contact our office should you have further questions.

(*Id.* ¶ 95). It did not provide any information on the nature or severity of her allergic reactions. (*Id.* ¶¶ 97-98).[10]

The main ingredient in MiraLAX is polyethylene glycol ("PEG"), which is also an ingredient of Cipro. (Ex. 7, Dkt. No. 473-7, at 4; Ex. 18, Dkt. No. 473-18, at 1). Dupixent is a drug administered by injection that contains polysorbate 80 ("PS80"), along with five other ingredients. (Ex. 8, Dkt. No. 473-8, at 9). The Moderna and Pfizer vaccines contain PEG, but not PS80. (Def. SMF as to Adams ¶ 27). The Janssen vaccine contained PS80, but not PEG. (*Id.*).

A contraindication to one type of vaccine does not automatically preclude receiving another type of vaccine. (*Id.* ¶ 29). As of August 2021, CDC guidance stated that risk factors for venous thromboembolism, such as thrombophilia, were not contraindications to any of the vaccines. (*Id.* ¶ 32).

On September 5, 2021, Adams was informed that the letter had been submitted to the

---

[10] During her 2022 deposition, Adams testified that all of the medications to which she was allergic contained PEG or PS 80, and that she had an anaphylactic reaction to Cipro (an antibiotic that contains PEG) before 2017. (*Id.* ¶¶ 136-37). In 2025, she testified that, after her termination from MGB, she experienced an allergic reaction to a massage cream containing PEG that she treated by taking two Zyrtec tablets. (*Id.* ¶ 138). MGB was not, however, informed of those facts when it was evaluating her exemption request.

panel for review. (*Id.* ¶ 102). On September 16, she was notified that the panel had reviewed the additional information and that her exemption request was again denied. (*Id.* ¶ 104). That same email informed her:

> The recommendation is that you consult an allergist for your specific concerns, as well as to evaluate whether a non-mRNA vaccine should be considered as a possible option. If you wish, you may receive consultation from the MGH or BWH Allergy departments. If interested, please reply back to this email and we can help enter a referral on your behalf.

(*Id.* ¶ 108).

Adams did not accept the offer to consult with an MGB allergist, nor did she ask for updated information from Dr. Navarra. (*Id.* ¶¶ 112, 114). She stated that she "had already seen an allergist outside of MGH" and did not consult with MGB physicians. (*Id.* ¶ 115). The record contains no other evidence that Adams saw an allergist, or what the advice of that allergist was. (*Id.* ¶ 117).

On October 1, 2021, Adams responded to the September 16 email. She requested to speak to someone about her exemption request, noting that Dr. Navarra had exempted her from the vaccine and that she was already working remotely due to a previous medical accommodation for her allergy to surgical masks. (*Id.* ¶ 110; Ex. 21, Dkt. No. 449-21). That same day, the panel responded as follows:

> The panel is making decisions based on what was submitted and the next step was to recommend an allergy referral to evaluate you for the COVID vaccine, which is unrelated to the mask allergy and the accommodation you have for the mask allergy.
>
> The remote status of employees is not a consideration in the vaccine policy. In the meantime, please let us know if you'd like to be referred for the allergy consult for the COVID vaccine, which is a virtual consult.
>
> For other questions, I am copying Dr. Medrek, who is one of our occ med physicians and can be available to speak with you as a resource to address any

> questions. I am copying in your forms for his information. Please be aware that he does not sit on the panels.

(Def. SMF as to Adams ¶ 120) (citation modified).

As noted, Dr. Paul Medrek, who is the Associate Medical Director of Occupational Health at Brigham and Women's Hospital, was copied on the email. (*Id.*). He promptly responded and offered to discuss her concerns by telephone. (*Id.* ¶ 121). Adams did not speak with Dr. Medrek, but instead sent him an email stating the following:

> I'm not sure what you would be able to discuss with me. I was informed that you were not on the exemption panel and despite the federal EEO laws along with my medical exemption, for the COVID vaccine per my PCP, and the fact that I am currently in a remote position that I accepted as a medical accommodation last year, I am still being threatened daily with termination of employment if I do not receive the COVID vaccine by October 15, 2021. Can you address any of the above issues?

(*Id.* ¶ 122) (citation modified). Dr. Medrek responded that he was available to discuss medical questions, but was "not empowered to grant you an exemption." (*Id.* ¶ 123). Adams did not take up Dr. Medrek on the offer to discuss her medical concerns. (*Id.* ¶ 124).

Adams remained unvaccinated, and was placed on unpaid administrative leave on October 21, 2021. (*Id.* ¶ 126). She was told that she must receive the vaccine by November 5, 2021. (*Id.*). She declined to do so. (*Id.* ¶ 127). She was terminated on November 10, 2021. (*Id.* ¶ 128).

### B. <u>Procedural Background</u>

On October 17, 2021, 237 plaintiffs brought this suit against MGB, all of whom contended that they were wrongfully terminated. The initial complaint asserted claims for violation of the Americans with Disabilities Act ("ADA") religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and unlawful retaliation. On November 4, 2021, the Court denied plaintiffs' motion for a preliminary injunction against MGB, and

issued a written opinion on November 10, 2021. On December 17, 2021, the Court entered a scheduling order with two phases of fact discovery. That same day, plaintiffs filed an amended complaint that omitted the retaliation claims, and added more than 200 new plaintiffs. On September 28, 2023, after phase one of discovery had been completed, the Court granted MGB's motion for summary judgment as to the ADA claims of certain plaintiffs, but denied the motion as to the ADA claims of other plaintiffs.

On October 20, 2023, the Court entered a scheduling order for the second phase of fact discovery. The Court has entered settlement orders of dismissal for all but three plaintiffs—Tyler Adams, Jamie Steverman, and Michelle Orfanos. MGB has now moved for summary judgment as to the ADA claim of Adams and the Title VII claims of Steverman and Orfanos.

## II. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Burt v. Board of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 510 (1st Cir. 2023) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)) (citation modified). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986) (citation modified). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

### A. Motion for Summary Judgment as to the Claim of Michelle Orfanos

Title VII prohibits employers from discriminating against employees on the basis of religion, among other things. 42 U.S.C. § 2000e-2(a). Claims of religious discrimination under Title VII are analyzed under a two-part framework. A plaintiff must first make a *prima facie* case "that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004). Second, if the plaintiff establishes a *prima facie* case, "the burden then shifts to the employer to show that it offered a reasonable accommodation," or if it did not, "that doing so would have resulted in undue hardship." *Id.*

In its motion for summary judgment, MGB focuses on the issue of undue hardship and does not dispute that Orfanos has established a *prima facie* case as to a bona fide religious practice. (Def. Memorandum of Law in Support of Mot. for Summary Judgment on the Claim of Plaintiff Orfanos, Dkt. No. 466, at 7 & n.5) ("Def. Memo as to Orfanos"). The Court will therefore assume that Orfanos can make a *prima facie* case that a bona fide religious practice prevents her from taking the COVID-19 vaccine, and analyze whether MGB has met its burden of showing that accommodating Orfanos would have resulted in undue hardship.

In *Groff v. DeJoy*, the Supreme Court clarified that "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business," which is a "fact-specific inquiry." 600 U.S. 447, 468 (2023). Courts must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the

nature, size and operating cost of an employer.'" *Id.* at 470-71 (citation modified). Those considerations "include not only direct economic costs, but indirect ones related to health and safety." *Adams v. Mass Gen. Brigham Inc.*, 2023 WL 6318821, at *5 (D. Mass. Sept. 28, 2023). An accommodation can present an undue hardship if granting it "would adversely affect the employer's public image," *Cloutier*, 390 F.3d at 136, or would "require an employer to relieve an employee of her essential job functions and assign them to another employee," *Antredu v. Massachusetts Dep't of Youth Servs.*, 729 F. Supp. 3d 76, 84 (D. Mass. 2024). In making the undue-hardship determination, "it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation." *Andrade v. Massachusetts Dep't of Correction*, 2025 WL 319563, at *4 (D. Mass. Jan. 13, 2025) (quoting *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022)).

Finally, to show that granting an exemption from the vaccination policy would result in undue hardship, MGB is "require[d] . . . to demonstrate that it looked to the objective medical evidence available to it in the fall of 2021 in reasonably concluding that the vaccine reduces the likelihood of transmitting COVID-19." *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 92 (1st Cir. 2025). It does not need to actually "prove to a factfinder that vaccinated workers are less likely to transmit the virus in the workplace." *Id.*

As an initial matter, MGB relied on its own experience and guidance from the CDC and other public-health authorities in requiring all staff, including Orfanos, to receive the vaccine. That experience and guidance indicated that the COVID-19 vaccines significantly reduced the risk of infection and serious illness. Therefore, because "the record demonstrates that [MGB] relied 'on the objective, scientific information available to it,' with particular attention to 'the views of public health authorities,'" MGB "acted reasonably when it determined that vaccinated

employees are less likely to transmit COVID-19 than unvaccinated employees." *Id.* at 91 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 649-50 (1998)) (citation modified).

Here, the only accommodation requested by Orfanos was to continue in her existing role without receiving the vaccine, while wearing a mask and undergoing periodic testing. Her primary duty was to provide home care, often to elderly patients. She worked in close physical proximity to her patients, performing hands-on tasks such as placing IVs, drawing blood, administering medications, and dressing wounds. Homebound patients, by the nature of the care they require, are very often medically vulnerable. They may be temporarily vulnerable, as in the case of a patient recovering from surgery, or could have a more permanent condition such as congestive heart failure, diabetes, or cancer. Furthermore, when visiting patients' homes to provide care, Orfanos interacted with their family members.

Courts in this circuit have uniformly held, on similar facts, that providing the requested accommodation of remaining unvaccinated amounts to an undue hardship. In *Lavine v. Mass General Brigham, Inc.*, the court addressed the very same vaccination policy at issue here. It held that there was "undue hardship as a matter of law" because the "sole accommodation Plaintiff sought—to remain in his position as an inpatient hospital nurse while unvaccinated against COVID—would have required Defendants to place Plaintiff's patients, not to mention other patients, fellow hospital staff, visitors, and members of the public, at an unacceptable increased risk of danger from infection." 2025 WL 1372316, at *6 (D. Mass. May 12, 2025). The court in *Cyr v. Boston Medical Center* came to the same conclusion, finding undue hardship as a matter of law where "the undisputed facts show that allowing Cyr to continue working as a NICU nurse while unvaccinated would have jeopardized the health of BMC's staff and patients, and risked damaging BMC's reputation of providing safe medical care." 2025 WL 269239, at *7

(D. Mass. Jan. 22, 2025). And in *Antredu*, the court held that granting an exemption to the COVID-19 vaccine "would have substantially burdened" defendant where plaintiff engaged in "in-person, one-on-one interactions with both youth, their families, and other employees" and thus would "put his colleagues, clients, and their families at a higher risk for contracting COVID-19" and potentially cause defendant to "los[e] the confidence of some clients." 729 F. Supp. 3d at 84.

Similar cases abound. *See, e.g.*, *Andrade*, 2025 WL 319563, at *5; *Gabana v. Tufts Med., Inc.*, 2026 WL 2719879, at *5 (D. Mass. Sept. 15, 2026); *Curtin v. Cambridge Health All.*, 2026 WL 1459788, at *7 (D. Mass. Apr. 10, 2026); *Geronimo v. Melrose-Wakefield Healthcare Corp.*, 2025 WL 2050286, at *4 (D. Mass. July 22, 2025); *LaFreniere v. Spectrum Health Sys., Inc.*, 2025 WL 2793761, at *7 (D. Mass. Sept. 30, 2025); *Banks v. Dep't of Correction*, 2026 WL 3150992, at *3-*4 (D. Mass. Oct. 21, 2026); *Munroe v. Boston Med. Ctr.*, 790 F. Supp. 3d 52, 60 (D. Mass. 2025); *Anastos v. Boston Med. Ctr.*, 2025 WL 275597, at *4 (D. Mass. Jan. 7, 2025); *Harmon v. Boston Med. Ctr.*, 2024 WL 4815292, at *5 (D. Mass. Nov. 18, 2024).

In short, every session of this Court to address the issue has held that granting a vaccine exemption results in undue hardship where the nature of plaintiff's work creates a high risk of transmitting COVID-19 to vulnerable individuals and where contemporaneous public-health guidance indicated that vaccination would reduce that risk.

Plaintiff does not attempt to distinguish those cases, and instead makes largely factual counterarguments. First, she contends that, as a general matter, MGB's religious-exemption process violates Title VII. (Orfanos' Opposition to Summary Judgment, Dkt. No. 480, at 16-18) ("Pl. Opp. as to Orfanos"). As to herself specifically, she contends that MGB did not "ascertain [her] sincerely held religious beliefs" or "appl[y] any undue hardship analysis to [her] at the time

of her termination," and that there was no "interactive process about possible accommodations." (*Id.* at 17, 19-20).

Again, the governing framework for Title VII religious-discrimination claims is as follows:

> First, the plaintiff must make her *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action. If the plaintiff establishes her *prima facie* case, the burden then shifts to the employer to show that it offered a reasonable accommodation *or, if it did not offer an accommodation*, that doing so would have resulted in undue hardship.

*Cloutier*, 390 F.3d at 133 (emphasis added) (citation modified). The law requires that employers consider whether an employee has a bona fide religious belief; whether a practice or tenet of that religion conflicts with an employment requirement; and whether it can offer a reasonable accommodation to the employee without undue hardship. But it does not dictate how employers must structure their review processes to assess claims of religious exemption.

Furthermore, and in any event, undue hardship is an affirmative defense to a Title VII claim. *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023). And it is a complete defense—an employer that establishes undue hardship will prevail even if it "has made no efforts to accommodate the religious beliefs of an employee." *Cloutier*, 390 F.3d at 134 (quoting *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989)); *see also Rodrique*, 126 F.4th at 90-91 (explaining that where defendant "admits that it never offered to accommodate [plaintiff's] religious beliefs," it can "avoid Title VII liability" by "show[ing] that there was no genuine dispute of material fact that granting [plaintiff's] exemption request would have imposed an undue hardship on its business"). That is why "[a]n undue hardship defense would also preclude liability premised on a failure to engage in an 'interactive process' in this Title VII context."

*McGinn v. Hawaii Symphony Orchestra*, 727 F. Supp. 3d 915, 937–38 (D. Haw. 2024).[11]

Orfanos further contends that the lack of contemporaneous accommodation analysis violates *Groff's* instruction that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." 600 U.S. at 473. After the fact, she proposes the alternative of "reassigning [her] to a non-patient-facing role." (Pl. Opp. as to Orfanos at 20); *but see Kizer v. St. Jude Children's Rsch. Hosp.*, 2024 WL 4816856, at *4 (6th Cir. Nov. 18, 2024) (rejecting the argument that "St. Jude should be required to present evidence that it considered various alternative accommodations proposed by Kizer after the fact").[12]

Regardless, Orfanos acknowledges that "[h]er primary duties were in home-based care." (Pl. Opp. as to Orfanos at 3). She does not dispute that the job required close physical contact with medically vulnerable patients. And reassigning her to a role that did not involve a patient-facing role is not a reasonable accommodation; it is "an undue burden to require an employer to relieve an employee of her essential job functions and assign them to another employee." *Antredu*, 729 F. Supp. 3d at 84. Thus, where an emergency doctor contemporaneously requested

[11] Orfanos further contends that MGB's hardship claim is "pretextual." (Pl. Opp. as to Orfanos at 22). There is apparently no reported Supreme Court or appellate case "that imports a 'pretext' or 'discriminatory motives' analysis into the 'undue hardship' failure to accommodate analysis." *MacDonald v. Oregon Health & Sci. Univ.*, 2026 WL 2966688, at *15 (9th Cir. Oct. 2, 2026). Furthermore, and in any event, if the defendant is able to prove undue hardship, by definition that hardship is not pretextual.

[12] Orfanos relies on *Jeune v. UMass Memorial Health Care System*, where the Massachusetts Appeals Court reversed a grant of summary judgment on grounds of undue hardship. 106 Mass. App. Ct. 95, 103 (2025). The court did fault defendant for "provid[ing] no evidence . . . that no other jobs were available." *Id.* at 104. But there, defendant had explicitly listed job transfers as a potential accommodation. *Id.* Regardless, *Jeune* distinguished this Court's earlier decision in this case, *Together Emps.*, 573 F. Supp. 3d at 435, because "the involved hospital provided a declaration from an epidemiologist that the hospital had consulted with experts and determined that 'the requested accommodations would create a greater risk of COVID-19 infection in its facilities' and that social distancing and frequent testing would be ineffective." *Id.* at 103. By contrast, the defendant in *Jeune* "provided no such evidence" and "its own COVID-19 vaccination policy . . . suggests that UMass Memorial's experts reached a contrary conclusion to that of Mass General Brigham." *Id.*

"to perform tasks that would not require direct contact with patients or staff," another session of this court affirmed defendant's "conclu[sion] that relieving Plaintiff of her core responsibilities as an emergency physician while retaining her as an employee posed an undue hardship." *Gabana*, 2026 WL 2719879, at *5; *see also Andrade*, 2025 WL 319563, at *4 ("He did not request an accommodation to work remotely, and for good reason: he could not have possibly performed his job duties from afar.").

Orfanos also emphasizes that MGB approved exemptions for other employees, which, in her view, counsels against finding undue hardship. (Pl. Opp. as to Orfanos at 10-11). She contends that "many of the approved roles were patient facing," based on the job titles of the individuals who were granted exemptions. (*Id.*). But merely stating the job titles of the individuals granted exemptions "fail[s] to demonstrate that the positions in which the [] exempted employees worked posed the same burdens on the operations" of MGB as her home-care position. *Antredu*, 729 F. Supp. 3d at 84 n.4. In any event, the issue here is the "fact-specific inquiry" into whether granting her an exemption would result in an undue hardship, given her primary duties as a home-care nurse, not the overall fairness of MGB's policy. *Groff*, 600 U.S. at 468. As this Court previously stated, "defendant does not have to show that it eliminated all risk from all possible sources of COVID-19 infection" to prevail on an undue-hardship claim. *Together Emps.*, 573. F. Supp. 3d at 437. It has likewise emphasized that "[t]his dispute does not involve an all-or-nothing proposition, in which the Court is required to conclude either that all 160 employees must be granted exemptions, or none of them." *Adams v. Mass Gen. Brigham Inc.*, 2023 WL 6318821, at *2.

Orfanos points to the fact that she was rehired in 2023 in a patient-facing role while she was still unvaccinated. (Pl. Opp. as to Orfanos at 24). That does not, however, require a

different result. First, she "may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment," because "[a]llowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (quoting *Calvi v. Knox Cnty.*, 470 F.3d 422, 431 (1st Cir. 2006)); *see also Courchesne v. Citizens Bank, N.A.*, 2018 WL 11482812, at *3, n.2 (D. Mass. Nov. 21, 2018) ("[A]s this argument, and the factual allegations on which it is based, were not raised in her Amended Complaint the court does not consider it now [at the summary-judgment stage]."). Here, Orfanos never filed an amended complaint that included the allegations concerning her rehiring, despite the Court granting her leave to amend to do precisely that. (Transcript of April 27, 2026 Status Conference, Dkt. No. 411, at 15-16, 19-20). On May 1, 2026, plaintiffs "g[ave] notice that they will not amend the current complaint to include facts or a new claim about a second incident affecting plaintiff Orfanos, which was optionally permitted by the judge on April 23, 2026." (Pls'. Notice of Non-Amendment, Dkt. No. 410). That is reason enough to reject her arguments based on her rehiring.

Furthermore, and perhaps most importantly, Orfanos was again terminated after MGB realized that she had not received the COVID-19 vaccine, which supports the fact that MGB believed granting her a vaccine exemption would be an undue hardship.[13]

Finally, Orfanos claims that MGB's own experts "were fully aware in July of 2021, prior to implementation of its vaccine policy, that the vaccines did not reduce transmission." (Pl. Opp.

[13] Orfanos's contention that she was granted a religious exemption from the flu vaccine does not require a different result. Among other things, MGB relied on scientific data at the time showing that "morbidity and mortality of COVID far exceeds that of influenza" and that "COVID has been uniquely disruptive to hospital operations and workforce continuity, far more so than influenza." Thus, an exemption from the flu vaccine and an exemption from the COVID-19 vaccine are not similarly situated in the undue-hardship analysis.

as to Orfanos at 23). She cites an interview transcript where Dr. Klompas, an MGB epidemiologist, stated, "we've learned that the viral burden in those vaccinated people is the same as it is in unvaccinated people, and it's high—meaning that these individuals can transmit the virus to other people." (Ex. 11, Dkt. No. 482-11, at 2).

Again, plaintiffs' claim that the vaccines were not effective—and that therefore every medical officer and scientist at MGB (and everywhere else in the world) who believes to the contrary is grossly mistaken—is legally irrelevant. For what it is worth, MGB does not contend that the vaccine is perfect, or that it completely prevents transmission, but that it significantly reduces the incidence of transmission and severity of the disease. And that is precisely what Dr. Klompas stated throughout the interview, plaintiff's cherry-picked statement notwithstanding.[14]

In sum, MGB has established that granting Orfanos an exemption from the vaccination policy would result in an undue hardship. Accordingly, its motion for summary judgment as to the claim of plaintiff Orfanos will be granted.

### B. Motion for Summary Judgment as to the Claim of Jamie Steverman

As with the claim of plaintiff Orfanos, in its motion for summary judgment as to the claim of plaintiff Steverman, MGB focuses on the issue of undue hardship and does not dispute that she has established a *prima facie* case. (Def. Memorandum of Law in Support of Mot. for Summary Judgment on the Claim of Plaintiff Steverman, Dkt. No. 437, at 8 & n.2) ("Def. Memo as to Steverman"). MGB's undue-hardship claim as to Steverman succeeds for largely the same

[14] Among other things, Dr. Klompas said that the vaccines "remain very effective overall, particularly against severe disease," and that "it's very unusual for a vaccinated person to require hospitalization or die from infection. This [Delta] variant basically seeks out the unvaccinated population, which is where it is so successful at spreading." (*Id.*). In fact, when asked about "differences in how Delta affects vaccinated and unvaccinated people," he stated, "a vaccinated person is not going to be contagious for as long as an unvaccinated person" and that "the serious symptoms—shortness of breath, hospitalization, and death—are *highly* unusual in a vaccinated person." (*Id.*).

reasons that it did as to Orfanos. As an emergency department nurse, Steverman was in close physical contact with medically vulnerable patients and their families, as well as hospital visitors and fellow employees. Granting her an exemption from the vaccination policy would therefore result in an undue hardship for MGB.

Steverman makes many of the same counterarguments that Orfanos does. She contends that the MGB's granting of religious accommodations to other patient-facing employees defeats its undue-hardship claim at the summary-judgment stage. (Steverman's Opposition to Motion for Summary Judgment, Dkt. No. 451, at 14-17) ("Pl. Opp. as to Steverman"). She likewise contends that "MGB cannot use post-hoc litigation theories to substitute for the total failure to assess undue hardship at the time of denial." (*Id.* at 17) (citation modified). She further contends that "MGB d[id] not consider reassigning Steverman to a non-patient-facing role, much less prove that doing so would have imposed substantial cost." (*Id.* at 23-24; *Jeune*, 106 Mass. App. Ct. at 103-04). And she contends that "the vaccination requirement was not necessary for patient safety and that Steverman's unvaccinated status did not create undue hardship." (*Id.* at 23). Those arguments fail for the reasons set forth above.

Steverman raises some additional arguments. First, she contends that "MGB's theory of reputational harm to 'public trust' is contradicted by the record and legally deficient." (*Id.* at 20) (citation modified). That argument is squarely foreclosed by the caselaw. *See, e.g.*, *Cyr*, 2025 WL 269239, at *7 (granting vaccine exemptions to patient-facing healthcare personnel "risk[s] damaging BMC's reputation of providing safe medical care"); *Curtin*, 2026 WL 1459788, at *7 ("[A]llowing an unvaccinated nurse practitioner to work in close contact with patients would have damaged CHA's reputation as a healthcare provider."); *Geronimo*, 2025 WL 2050286, at *4 (finding that allowing a radiologic technologist to work unvaccinated "would have

jeopardized [the hospital's] reputation for furnishing safe care to patients, including those in the emergency and operating rooms"); *Harmon*, 2024 WL 4815292, at *5 ("[I]f BMC allowed the accommodation, such accommodation would impede the BMC's ability to provide a safe environment for their already vulnerable patients, and negatively impact its reputation.").[15]

Steverman also relies on the fact that after her termination, her subsequent work for New England Life Care brought her to MGB facilities on occasion. She contends that "MGB cannot claim that accommodating [her] imposed an intolerable operational burden while simultaneously allowing her to perform the same patient-facing duties inside its own buildings as an unvaccinated contractor." (Pl. Opp. as to Steverman at 22). Crucially, she does not allege that MGB even knew that she worked as a contractor at its facilities, or how it might have learned that fact. On summary judgment, the Court is required to draw reasonable inferences in her favor, but it cannot speculate as to existence of facts. "Speculation and conclusory allegations, unaccompanied by evidentiary support, do not suffice to avoid summary judgment." *MacLeod v. Kern*, 379 F. Supp. 2d 103, 109 (D. Mass. 2005).[16]

Finally, Steverman contends that she "raised a separate disparate-treatment claim" in the complaint that MGB has not addressed. (Pl. Opp. as to Steverman at 25). The operative complaint has two counts. Count 1 is "disability discrimination—failure to make reasonable accommodations," and Count 2 is "religious discrimination." (Dkt. No. 61 at 44, 46) (citation

---

[15] As a matter of common sense, if patients learned that the facility at which they were seeking care did not require its patient-facing employees to be vaccinated against a highly contagious and deadly disease—during a worldwide pandemic—a substantial portion of those patients would be fearful or uncomfortable with that fact, to the reputational damage of the facility.

[16] Steverman began working for New England Life Care in August 2022, and therefore the alleged instances of work at MGB facilities occurred, at a minimum, many months after her termination. Subsequent events are largely irrelevant, because "[t]he undue hardship analysis is . . . dependent upon the circumstances that existed at the time" and MGB's "contemporaneous judgment" in light of them. *Gabana*, 2026 WL 2719879, at *5. Moreover, Steverman does not specify when the incidents occurred during her work for New England Life Care.

modified). The Supreme Court has instructed that claims for religious discrimination (also known as disparate treatment) and claims for failure to accommodate religious beliefs under Title VII are identical. *See EEOC. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 n.2 (2015) ("Failing to hire for that reason is *synonymous* with refusing to accommodate the religious practice. To accuse the employer of the one is to accuse him of the other. If he is willing to "accommodate"—which means nothing more than allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary—adverse action 'because of' the religious practice is not shown."); *see also United States v. Board of Educ. for Sch. Dist. of Philadelphia*, 911 F.2d 882, 886 (3d Cir. 1990) ("Since the reasonable accommodation/undue hardship exception is contained within the definition of religion, it must be applied at the threshold of the court's analysis. The import of the statute is clear: if public schools cannot accommodate the wearing of religious garb without undue burden, then the wearing of such garb is not "religion" within the meaning of Title VII."). The complaint itself reflects that doctrinal reality—Count 2 states the two-step framework from *Cloutier* and alleges that "[d]efendant neither offered to accommodate the plaintiffs nor showed that an accommodation would have resulted in 'undue hardship.'" (*Id.* ¶ 277). Therefore, the Court's undue-hardship analysis applies to Count 2.[17]

The undisputed facts show that granting Steverman an exemption from the vaccination policy would result in an undue hardship for MGB. Accordingly, MGB's motion for summary judgment as to the claim of plaintiff Steverman will be granted.

[17] Steverman relies on two First Circuit cases for the proposition that MGB "may not override an individual's sincere belief with the institution's view of what her denomination should require." (Pl. Opp. as to Steverman at 26). The language she cites concerns the *prima facie* case of religious discrimination, which is not the issue here. *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 16–17 (1st Cir. 2024); *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 82-83 (1st Cir. 2025).

### C. <u>Motion for Summary Judgment as to the Claim of Tyler Adams</u>

Plaintiff Tyler Adams has asserted a claim for disability discrimination in violation of the ADA. The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).

To establish a claim for failure to provide a reasonable accommodation, plaintiff must show (1) that she has a disability within the meaning of the ADA; (2) that she is a qualified individual within the meaning of the ADA; and (3) that the employer knew about her disability and did not reasonably accommodate it. *Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 742 (1st Cir. 2025). Defendant's arguments center entirely on the third prong, and it assumes that plaintiff can establish a disability for the purposes of the present motion. (Def. Memorandum of Law in Support of Mot. for Summary Judgment on the Claim of Plaintiff Adams, Dkt. No. 447, at 9-10 & n.6) ("Def. Memo as to Adams").

As to the third prong, "[i]t is the plaintiff's burden to show availability of 'reasonable accommodations' and the defendant then has the opportunity to 'demonstrate that the accommodation would impose an undue hardship on the operation of [its] business.'" *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 136 (1st Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). The accommodation must be "reasonable on its face." *Together Emps.*, 573 F. Supp. 3d at 433 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). Plaintiff "must 'provide

sufficient information to put the employer on notice of the need for accommodation' and 'explain how the accommodation is linked to plaintiff's disability.'" *Id.* (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012)). To satisfy that notice and nexus requirement, her disability must be a contraindication to the vaccine. *Id.* at 434. And she must show that the requested accommodation "'would enable [her] to perform the essential functions of [her] job' and would be 'feasible for the employer under the circumstances.'" *Together Emps.*, 573 F. Supp. 3d at 433 (quoting *Tobin*, 553 F.3d at 136) (citation modified).

Analysis of the third prong can also require inquiry into the parties' participation in an "interactive process" wherein "the employer and employee . . . engage in a meaningful dialogue, in good faith, for the purpose of discussing alternative reasonable accommodations." *Ortiz-Martínez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017). "[B]oth the employer and the employee have a duty to engage in good faith." *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014). Thus, if "the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations." *Id.*

If the plaintiff makes a *prima facie* showing as to the availability of a reasonable accommodation, the defendant bears the burden of demonstrating undue hardship by "show[ing] that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered." *Tobin*, 553 F.3d at 136.

Here, as to the claim of plaintiff Adams, MGB has not moved for summary judgment on undue-hardship grounds. (Def. Reply in Support of Summary Judgment on Tyler Adams' Claim,

Dkt. No. 477, at 10 n.14) ("Def. Reply as to Adams").[18] Instead, it contends that Adams failed to put it on notice of her alleged disabilities and failed to engage in the required interactive process.

The accommodation requested by Adams was to continue to work in her remote role without receiving the vaccine. The Court will first analyze whether she has met her burden of showing that her requested accommodation was feasible for her employer and would enable her to perform her essential job duties. It will then analyze whether she has satisfied her obligation of providing notice to MGB as to the specific accommodation that she requested and how it was linked to her claimed disability. Finally, the Court will evaluate whether the parties participated in the interactive process in good faith.

**1. Feasibility**

Unlike the other two plaintiffs, Adams was not providing patient care in person. By April 2021, before the vaccine mandate was announced, she had been working remotely as part of an accommodation granted by MGB due to her reported allergy to compounds in surgical masks. Therefore, her requested accommodation—again, to continue in her remote role without being vaccinated—would enable her to perform the essential functions of her job and was feasible for MGB. *Cf. Together Emps.*, 573 F. Supp. 3d at 434 ("To the extent plaintiffs are requesting remote work as reasonable accommodations, they have not provided evidence that their positions could be performed remotely . . . ."); *Oquendo v. Costco Wholesale Corp.*, 857 Fed. App'x 9, 12 (1st Cir. 2021) ("[A]n employer need not create a new position tailored to the employee's abilities.").

---

[18] In any event, because the feasibility of the requested accommodations is relevant to both inquiries, "in many cases the dividing line between 'reasonable accommodation' and 'undue hardship' will be inexact—but benignly so." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 260 (1st Cir. 2001).

MGB's response is that it "was not required to provide her with the accommodation of her choice, but only with a *reasonable* accommodation." (Def. Reply as to Adams at 10). That is certainly true as to the ultimate determination. *See, e.g.*, *Oquendo*, 857 Fed. App'x at 11 ("[A]n employer need not give an employee her preferred accommodation."). However, at this stage, the inquiry is whether Adams demonstrated "not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed*, 244 F.3d at 259. At this point, she has met that burden.

**2. <u>Notice and Nexus</u>**

The next question is whether Adams provided sufficient information to give MGB notice of her disability and its connection to the requested accommodation. Her claimed disabilities are allergic reactions to PEG (a substance in the mRNA vaccines) and PS 80 (a substance in the Janssen vaccine), and thrombophilia, a blood-clotting disorder.

MGB first contends that Adams "failed to adequately inform MGB that she had a diagnosed allergy to PEG . . . or PS80," as "neither the initial exemption request nor the letter that {she] submitted from her PCP made any mention of PEG or PS80." (Def. Memo as to Adams at 13) (emphasis omitted).

As to Adams's claimed allergy to PEG, the initial form filled out by her nurse practitioner simply stated that she "reports burning of hands and feet when taking MiraLAX." The nurse practitioner did not check the box for a severe allergic reaction to a component of the COVID-19 vaccine. When asked to provide more information, Adams provided a letter from her primary care physician, Dr. Navarra, stating that she should be exempted from receiving the vaccine because of her history of allergies to MiraLAX and Cipro, among other drugs. Both medications contain PEG.

It is certainly true that the two documents submitted by Adams from her providers did not specifically refer to PEG. However, MGB's policy indicated that "PEG-containing products such as MiraLAX" were potential contraindications, in line with CDC guidance at the time. Moreover, after she provided the letter from Dr. Navarra, MGB's response to her indicated that a non-mRNA vaccine was a potential alternative, which could suggest its awareness of a possible PEG contraindication. Therefore, drawing all reasonable inferences in favor of Adams, there is a genuine dispute of material fact as to whether MGB was on notice of her possible contraindication to the Pfizer and Moderna mRNA vaccines, based on the presence of PEG in the vaccines.[19]

The Janssen vaccine, however, did not contain PEG. The letter from Dr. Navarra stated that Adams was "exempt from getting the COVID vaccine" due to a history of allergies to "Dupixin," among other drugs. Presumably, Dr. Navarra was referring to Dupixent, which is a biologic drug delivered by injection that contains PS 80. PS 80 is an ingredient in the Janssen vaccine. MGB's vaccine policy indicates that a "[h]istory of severe allergic reaction (anaphylaxis) to polysorbate . . . containing injectable or vaccine" is a potential contraindication to vaccination, which aligns with CDC guidance. However, it does not specify that Dupixent contains PS 80, unlike in the case of MiraLAX and PEG. And PS 80 is not the main ingredient

---

[19] MGB further contends that even assuming Adams put MGB on notice of her allergies to PEG and PS 80, "she cannot show that any allergy was severe or immediate (occurring within four hours) as required for a contraindication under the Vaccination Policy and CDC guidance." (Def. Memo as to Adams at 14) (emphasis omitted). It is undisputed that there was no evidence of the severity or immediacy of her allergic reactions at the time, and that in the initial form, the nurse practitioner did not check the box for a severe allergic reaction to a component of the COVID-19 vaccine.

MGB's reading of the CDC guidance is not quite accurate. It states, "CDC considers a history of the following to be a contraindication to vaccination," and then lists "severe allergic reaction (e.g., anaphylaxis) . . . to a component of the COVID-19 vaccine" and "immediate allergic reaction of any severity to a previous dose *or* known (diagnosed) allergy to a component of the COVID 19 vaccine." (Joint Appendix Vol VII, Dkt. No. 161-21, at 144-45) (emphasis added). The guidance therefore does not require a history of severe or immediate allergic reaction in the case of a known, diagnosed allergy, which is presumably based on such a history.

in Dupixent (there are five others), whereas PEG is the primary, and often sole, ingredient in MiraLAX. Furthermore, the fact that MGB responded to Dr. Navarra's letter by noting that a non-mRNA vaccine could be an alternative suggests that it was not aware of Adams' claimed allergy to PS 80.

Adams contends that MGB cannot claim lack of notice when it "asked neither [her] nor Dr. Navarra about her Dupixent reaction, the shared excipient, or Janssen's suitability." (Pl. Opp. as to Adams, Dkt. No. 471, at 13) ("Pl. Opp. as to Adams"). But Adams—not MGB—bore the burden of providing adequate notice. That is, "[t]he obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation." *Jones*, 696 F.3d at 89; *see also Together Emps.*, 575 F. Supp. 3d at 434 ("It is plaintiffs' burden to demonstrate what specific accommodations they needed and how those accommodations were connected to their ability to work."). Here, MGB did follow up with Adams multiple times in response to her requests. And its obligation was to engage in good-faith dialogue with Adams, not to affirmatively uncover facts supporting her requested accommodation. In sum, she did not satisfy the notice and nexus requirement as to her claimed PS 80 allergy.

CDC guidance states that "PEG and polysorbate are structurally related" such that "cross-reactive hypersensitivity between these compounds may occur." Adams cites that as a reason for why "the Janssen vaccine was not medically suitable." (Pl. Opp. as to Adams at 12). But the CDC guidance states that individuals with a contraindication to the mRNA vaccines, such as a known PEG allergy, have a "precaution," not a contraindication, to the Janssen vaccine, and emphasizes that "[m]ost people deemed to have a precaution to a COVID-19 vaccine at the time of their vaccination appointment can and should be administered vaccine." Her argument therefore falls short, because "where the claimed disability is not a contraindication for the

vaccine, the requested accommodation does not sufficiently relate to the claimed disability." *Together Emps.*, 573 F. Supp. 3d at 434.

Moreover, CDC guidance also noted that in cases of "potential cross-reactive hypersensitivity between ingredients in mRNA and Janssen COVID-19 vaccines, consultation with an allergist-immunologist should be considered to help determine if the patient can safely receive vaccination." And Adams refused to consult with an allergist, despite the fact that MGB offered to arrange a referral.

The final issue of notice and nexus as to the Janssen vaccine is Adams's claim of thrombophilia, which again is a blood-clotting disorder. The letter from Dr. Navarra states that she has "a history of Thrombophilia." It is undisputed that the CDC did not include thrombophilia as a contraindication to any of the three available vaccines. CDC guidance stated that individuals with thrombophilia, whether acquired or inherited, could still safely receive the Janssen vaccine. Adams contends that her requested accommodation should not be deemed unreasonable "merely because thrombophilia was not itself listed as a CDC contraindication." (Pl. Opp. as to Adams at 13).[20] But the burden was on Adams to provide sufficient information

[20] Adams cites this Court's prior memorandum and order that granted in part and denied in part MGB's motion for summary judgment as to all plaintiffs in the lawsuit. *Adams v. Mass General Brigham, Inc.*, 2023 WL 6318821 (D. Mass. Sept. 28, 2023). It relies on that opinion for the proposition that "the CDC categories were not dispositive, particularly where MGB granted exceptions outside of them." (Pl. Opp. as to Adams at 13).

That misstates the Court's holding, which recognized plaintiffs' "assert[ions] that they had other valid medical reasons for avoiding vaccination" such that "under the circumstances, the Court cannot grant summary judgment as to the claims of every ADA plaintiff who did not seek a medical exemption based on a condition as to which there is a CDC contraindication." *Adams v. Mass General Brigham, Inc.*, 2023 WL 6318821 at *9. The Court emphasized that "[t]he complete factual context in which those decisions were made is not presently before the Court," and noted that "[i]t is possible, of course that every one of those decisions was entirely defensible." *Id.* at *2. Here, the Court has the full factual record as to Adams before it. And, as discussed above, thrombophilia was specifically addressed in the CDC guidance, on which MGB was entitled to rely.

Adams's family history of clotting disorders is not relevant, because MGB was not made aware of that fact at the time it was evaluating her exemption request.

to MGB as to why the CDC guidance should not apply. Having failed to do so at the time, she cannot now claim that MGB should have conducted its own inquiries.

In sum, Adams did not provide information sufficient to provide MGB with reasonable notice as to her claimed contraindication to the Janssen vaccine and its connection to her requested accommodation. The inquiry could end here. *See Reed*, 244 F.3d at 260 ("We need not concern ourselves with the reasonableness of Reed's accommodation, however, because Reed has failed to prove another essential element of her burden: that she ever sufficiently requested the accommodation in question."). The Court will nonetheless take up the issue of whether the parties engaged in good-faith dialogue during the interactive process.

### 3. <u>Interactive Process</u>

Both Adams and MGB maintain that there was a breakdown in the interactive process. Each blames the other party. (Def. Memo as to Adams at 19; Pl. Opp. as to Adams at 16). In determining who is at fault, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Ortiz-Martínez*, 853 F.3d at 605 (quoting *Enica v. Principi*, 544 F.3d 328, 339 (1st Cir. 2008)).

MGB contends that the interactive process broke down because Adams refused to see an allergist after MGB recommended an allergy referral and did not provide additional information about her claimed disability. (Def. Memo as to Adams at 19-20). Adams maintains that the breakdown is MGB's fault because it "identified no deficiency [in Dr. Navarra's letter], posed no questions to Adams or Dr. Navarra, and ultimately stated only that vaccination was a condition of employment and that her employment would end if she did not comply." (Pl. Opp. as to Adams at 17).

Those contentions are not mutually exclusive. However, in assigning blame for the breakdown, courts must consider that "[t]he burden is on [the plaintiff] to demonstrate in the first instance what specific accommodations she needed and how those accommodations were connected to her ability to work." *Ortiz-Martínez*, 853 F.3d at 605. Therefore, the fact that Adams refused to consult an allergist and failed to provide more detailed information when given the opportunity carries substantial weight in the analysis. *See Kohl's*, 774 F.3d at 133 ("[B]ecause Manning chose not to follow up with Carr's offer to discuss alternative accommodations, Manning was primarily responsible for the breakdown in the interactive process."); *see also Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 575 (4th Cir. 2025) (explaining that "if the employee prevents the employer from understanding her disability, then . . . the employee's claim fails," because "a central purpose of the interactive process" is for the employer to gain an understanding of how "an employee's disability limits her in a way that needs accommodating").

Adams was thus primarily responsible for the breakdown in the interactive process. As discussed above, she did not meet her initial burden of putting MGB on notice as to her specific need for the requested accommodation and its connection to her claimed disability. And when MGB offered to have her consult with an allergist, at no cost, to discuss the issues, she refused to do so.

Accordingly, MGB's motion for summary judgment as to the claim of plaintiff Adams will be granted.

## IV. Conclusion

For the foregoing reasons, the motion of defendant Mass General Brigham, Inc., for summary judgment as to the claims of Michelle Orfanos, Jamie Steverman, and Tyler Adams is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: November 25, 2026